JUDGE WOOD

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

**14 CV  8175**

RECEIVED
OCT 10 2014
U.S.D.C. S.D.N.Y.
CASHIERS

——————————————— x
ROYAL PARK INVESTMENTS SA/NV,
Individually and on Behalf of All Others
Similarly Situated,

                Plaintiff,

   vs.

HSBC BANK USA, NATIONAL
ASSOCIATION, as Trustee,

             Defendant.
——————————————— x

:  Civil Action No
:
:  CLASS ACTION
:
:  CLASS ACTION COMPLAINT AND
:  ALTERNATIVE VERIFIED DERIVATIVE
:  ACTION FOR BREACH OF THE TRUST
:  INDENTURE ACT, BREACH OF
:  CONTRACT AND BREACH OF TRUST
:
:
:
:
:
:  DEMAND FOR JURY TRIAL

# TABLE OF CONTENTS

**Page**

I.    SUMMARY OF THE ACTION ...................................................................... 1

II.   JURISDICTION AND VENUE .................................................................... 13

III.  PARTIES ...................................................................................................... 13

IV.  FACTUAL ALLEGATIONS ........................................................................ 14

    A.    The Securitization Process for the Mortgage Loans ............................ 14

    B.    HSBC's Duties as Trustee for the Covered Trusts ............................... 17

          1.    HSBC's Duty to Enforce the Warrantors' Obligations to Cure, Substitute or Repurchase Mortgage Loans that Breached Their R&Ws ......................................................................... 18

          2.    HSBC's Duties upon the Occurrence of an Event of Default ................... 20

          3.    HSBC's Heightened Duty to Prudently Protect Plaintiff's and the Class's Interests as Though They Were HSBC's Own Interests During an Event of Default ........................................................................ 22

          4.    HSBC's "Duty of Trust" to Avoid Conflicts of Interest with Plaintiff and the Class .................................................................. 23

          5.    HSBC's Duties and Obligations Under the TIA ......................... 24

    C.    The Covered Trusts Suffer from Serious Defects Because HSBC Failed to Perform the Duties Required of It Under the Governing Agreements, the TIA and Common Law .................................................................. 25

          1.    HSBC Discovered No Later than April 13, 2011 that the Covered Trusts' Warrantors Breached Their R&Ws, Thus Triggering HSBC's Duty to Enforce the R&W Claims ............................. 25

               a.    Prior to April 2011, HSBC Learned that Some of the Warrantors' R&Ws Were False ..................................... 26

               b.    By April 13, 2011, HSBC Absolutely Knew that the Warrantors Had Breached Their R&Ws Concerning the Mortgage Loans in the Covered Trusts ......................... 29

               c.    Specific Claims Made About the Mortgage Loans in the Specific Covered Trusts Caused HSBC to Discover Breaches of the Warrantors' R&Ws ............................. 41

**Page**

          d.      HSBC Also Learned of the Warrantors' R&W Breaches
from Borrowers' Bankruptcies ......................................................43

   2.      HSBC Had Actual Knowledge of Events of Default No Later than
April 13, 2011, Thus Triggering Its Duties to Act Under the
Governing Agreements and the TIA.........................................................46

          a.      Shortly After the Covered Trusts Were Formed, HSBC
Became Aware of Widespread Loan Servicing Abuses that
May Have Affected the Covered Trusts, and by the End
of October 2010, HSBC Learned that the Master Servicers
and Servicers Were Committing Events of Default as to the
Mortgage Loans in the Covered Trusts.........................................49

          b.      By April 13, 2011, HSBC Had Actual Knowledge that the
Covered Trusts' Master Servicers and Servicers Had
Committed Events of Default with Respect to the Mortgage
Loans in the Covered Trusts .........................................................60

          c.      After April 2011, HSBC Had Actual Knowledge that the
Master Servicers and Servicers Were Continuing to
Commit the Same Events of Default with Respect to the
Mortgage Loans in the Covered Trusts and Were Also
Committing New and Additional Events of Default.....................67

          d.      HSBC Also Knew that Successor Servicer Ocwen Was
Committing Events of Default ......................................................68

   3.      HSBC Has Conflicts of Interest with Plaintiff and the Class and
Improperly Put Its Interests Ahead of the Interests of Plaintiff and
the Class to Benefit Itself........................................................................72

D.     HSBC Failed to Discharge Its Critical Duties and Obligations Under the
Governing Agreements, the TIA and Common Law and Thereby Breached
and Violated the Governing Agreements, the TIA and Common Law .................74

   1.      HSBC Failed to Enforce the Warrantors' Obligations to Cure,
Substitute or Repurchase Mortgage Loans Breaching the
Warrantors' R&Ws, as Required by the Governing Agreements
and the TIA .............................................................................................75

   2.      HSBC Failed to Perform Its Duties with Respect to Events of
Default as Required by the Governing Agreements and the TIA..............76

**Page**

    3.    HSBC Failed to Exercise All of Its Rights and Duties Under the Governing Agreements as a Prudent Person Would, as Required by the Governing Agreements and the TIA ...................................................79

    4.    HSBC Failed to Discharge Its Common Law Duty of Trust Owed to Plaintiff and the Class ...........................................................79

E.    Plaintiff and the Class Have Suffered Significant Damages Due to HSBC's Breaches of the Governing Agreements and Common Law and Its Violations of the TIA ...................................................80

F.    Plaintiff May Sue HSBC as Trustee .................................................81

V.    CLASS ACTION ALLEGATIONS .................................................82

VI.    DERIVATIVE ACTION ALLEGATIONS .................................................84

COUNT I .................................................86

    Violation of the Trust Indenture Act of 1939, 15 U.S.C. §77aaa, *et seq.* .................................................86

COUNT II .................................................88

    Breach of Contract .................................................88

COUNT III .................................................90

    Breach of Trust .................................................90

PRAYER FOR RELIEF .................................................91

JURY DEMAND .................................................92

1.     Plaintiff Royal Park Investments SA/NV ("plaintiff" or "RPI") alleges the following based on information and belief and the investigation of plaintiff's counsel (except as to the allegations pertaining to plaintiff, which are based on personal knowledge), which included an investigation and review of information concerning defendant HSBC Bank USA, National Association ("HSBC" or "defendant"), a review and analysis of information and data concerning the "Covered Trusts" at issue herein, the "Mortgage Loans" within the Covered Trusts, the "Warrantors" and originators of the Mortgage Loans, and the "Master Servicers" and "Servicers" of the Mortgage Loans, as well as interviews and consultations with experts, consultants and others knowledgeable in the field of residential mortgage-backed securities ("RMBS").  Plaintiff and plaintiff's counsel believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.    SUMMARY OF THE ACTION

2.     Plaintiff brings this action on its own behalf and on behalf of a class of all RMBS investors in the following three substantially similar RMBS trusts for which defendant HSBC serves as Trustee (collectively, the "Covered Trusts"):

| Covered Trust Name | Hereinafter Referred to as: |
|---|---|
| 1.  Deutsche Alt-A Securities Mortgage Loan Trust, Series 2006-AR5 | DBALT 2006-AR5 |
| 2.  Fremont Home Loan Trust 2006-C | FHLT 2006-C |
| 3.  Wells Fargo Home Equity Asset-Backed Securities 2006-2 Trust | WFHET 2006-2 |

3.     Alternatively, plaintiff brings this action derivatively in the right and for the benefit of the Covered Trusts against defendant HSBC.

4.     Plaintiff sues HSBC for breach of contract, and for breach of HSBC's common law duty of trust, in connection with the Covered Trusts.  Plaintiff also sues HSBC for violating the Trust Indenture Act of 1939 ("TIA"), 15 U.S.C. §77aaa, *et seq*.  Plaintiff and the class are beneficiaries of

the Covered Trusts, which hold residential "Mortgage Loans."[1]  Plaintiff and the class own RMBS "certificates" in the Covered Trusts, which are essentially bonds granting plaintiff and the class the right to receive monthly principal and interest payments generated by the Mortgage Loans.

5.     As the Trustee for the Covered Trusts, HSBC owes plaintiff and the class certain contractual duties and obligations.  In addition, HSBC owes plaintiff and the class similar statutory duties imposed on it by the TIA.  HSBC also owes plaintiff and the class a "duty of trust" under the common law, which requires HSBC to avoid conflicts of interest with plaintiff and the class.

6.     HSBC's contractual duties and obligations arise from and are contained within the Covered Trusts' "Governing Agreements," called "Pooling and Servicing Agreements" ("PSAs"), and other agreements related thereto, such as "Mortgage Loan Purchase Agreements" ("MLPAs") and "Servicing Agreements" ("SAs").  A copy of one of the Governing Agreements, the PSA for the DBALT 2006-AR5 Covered Trust (the "DBALT 2006-AR5 PSA"), is attached hereto as Exhibit A. All of the Governing Agreements for the other Covered Trusts are substantially similar to the PSA for the DBALT 2006-AR5 Covered Trust, and are incorporated herein by reference as if set forth fully herein.

7.     The purpose of having Trustees, such as HSBC, for the Covered Trusts is to ensure that there is at least one independent party to the Governing Agreements that – unlike plaintiff and the class – does not face collective action, informational, or other limitations, thereby allowing the Trustee to protect the interests of plaintiff and the class and administer the Covered Trusts for their benefit.

---

[1]     Each of the Covered Trusts held thousands of residential mortgage loans that were transferred to them.  These mortgage loans transferred to the Covered Trusts are referred to herein as the "Mortgage Loans."

8.      The Governing Agreements, as modified by the TIA and common law, effectuate this purpose by granting HSBC certain powers and obligating it to exercise those powers for the benefit of plaintiff, the class and the Covered Trusts.  For example, the Governing Agreements contain and/or reference representations and warranties ("R&Ws") from certain entities that aggregated the Mortgage Loans that were ultimately transferred to the Covered Trusts.  These entities were the "Depositors," the "Sellers," the "Sponsors" and/or the originators of the Mortgage Loans and the Covered Trust securitizations (collectively referred to herein as the "Warrantors").  The Warrantors' R&Ws attested to the credit quality and characteristics of the Mortgage Loans.[2]  If it turned out that any Mortgage Loan was in breach of the Warrantors' R&Ws, the offending Warrantor was required to cure the breach, or substitute or repurchase the defective Mortgage Loan.

9.      Both the Governing Agreements and the TIA require HSBC – upon discovery of a breach of any R&W – to promptly provide notice of the breach to the offending Warrantor.  If the Warrantor does not timely cure the breach, the Governing Agreements further require HSBC to enforce the breaching Warrantor's obligation to either substitute or repurchase any defective Mortgage Loans.

10.     The veracity and accuracy of the R&Ws by the Warrantors were extremely important to both investors and the credit rating agencies that rated the RMBS certificates, because they conveyed information concerning the quality of the Mortgage Loans, and thus the level of risk of investing in the Covered Trusts' RMBS.  The credit rating agencies relied on and assessed the quality

---

[2]      As discussed more fully *infra*, the Warrantors' R&Ws attested to the credit characteristics of the Mortgage Loans and vouched for the accuracy of the data they provided about the Mortgage Loans. Generally, these R&Ws promised that the information the Warrantors provided about the Mortgage Loans was true and correct; that the Mortgage Loans were originated in accordance with, and complied with, all applicable laws; that the Mortgage Loans were not illegal predatory or "high costs" loans; that the Mortgage Loans were originated in accordance with specific underwriting guidelines; and that the Mortgage Loans were otherwise as represented in the offering documents used to sell the Covered Trusts' RMBS to investors.

of the Covered Trusts' Mortgage Loans and RMBS and issued the RMBS credit ratings – nearly all of which were high "investment grade" credit ratings – based on the Warrantors' R&Ws about the Mortgage Loans.  In fact, the credit rating agencies *required* that such R&Ws be made by the Warrantors as a pre-condition to providing credit ratings for the RMBS.  Given the critical importance of the Warrantors' R&Ws, the Governing Agreements obligated the Warrantors to timely cure, substitute or repurchase any Mortgage Loan that materially breached any of their R&Ws.  In other words, the R&Ws served as insurance to plaintiff, the class and the Covered Trusts that the Mortgage Loans were as the Warrantors represented.  Importantly, if they were not, HSBC was required by the Governing Agreements to make them so, by enforcing the Warrantors' obligations to cure any breaches, or substitute new, non-breaching loans in place of defective Mortgage Loans, or repurchase the defective Mortgage Loans.

11.     As alleged more fully below, by no later than April 13, 2011, HSBC "discovered," as that term is used in the Governing Agreements, that the Warrantors had breached their R&Ws as to thousands of Mortgage Loans within the Covered Trusts.  Despite HSBC's discovery and knowledge of the breaches, however, HSBC failed to notify the Warrantors of their breaches.  Nor did HSBC enforce the Warrantors' obligations to cure, substitute or repurchase the breaching Mortgage Loans, including many Mortgage Loans that were so obviously defective that they had already been foreclosed on, liquidated and/or written off as losses long before April 2011.  Instead, HSBC did nothing.  HSBC's failure to comply with its duties under the Governing Agreements was a breach of the Governing Agreements and has resulted in hundreds of millions of dollars of damages to plaintiff, the class and the Covered Trusts.  Moreover, HSBC engaged in multiple additional breaches of its continuing duties to enforce the Warrantors' obligations under the Governing Agreements by continuing to refuse to act after learning of the breaches, as well as failing to act after learning of new

breaches, causing the claims against the Warrantors to be lost to the statutes of limitations.  HSBC's

failure to act also violated the TIA, as the TIA required HSBC to perform any duties mandated by the

Governing Agreements.  Moreover, under the TIA, HSBC was further required to give plaintiff and

the class notice of the Warrantors' defaults/breaches, which HSBC also failed to do, in violation of

the TIA.

12.    In addition to HSBC's obligations to enforce R&W claims against the Warrantors,

HSBC also owed other critical duties to plaintiff, the class and the Covered Trusts under the

Governing Agreements and the TIA.  The Governing Agreements require HSBC to take steps to

protect plaintiff, the class and the Covered Trusts whenever it becomes aware of loan servicing

failures by the Covered Trusts' "Master Servicers" or "Servicers" that amount to "Events of Default"

under the Governing Agreements.  To explain, the Governing Agreements designated certain entities

to be the Master Servicers and/or Servicers of the Mortgage Loans within the Covered Trusts (these

Master Servicers and Servicers are sometimes collectively referred to herein as "Master

Servicers/Servicers").   The Master Servicers/Servicers are responsible under the Governing

Agreements to ensure that the Mortgage Loans within the Covered Trusts are properly and legally

serviced and administered for the benefit of plaintiff and the class.  An "Event of Default" occurs

under the Governing Agreements whenever a Master Servicer or Servicer fails to ensure that the

Mortgage Loans are being legally, "prudent[ly]" and properly serviced.[3]    The Master

---

[3]    This included, *inter alia*, ensuring the prompt and legal collection of payments from borrowers
and the remittance of the same to the Covered Trusts; ensuring the proper and legal sending of
notices to borrowers who were late or defaulted on their Mortgage Loan payments; ensuring the
proper maintenance and reporting of accurate information regarding the Mortgage Loans; ensuring
the proper and legal modification of Mortgage Loans when permitted and as necessary; ensuring the
proper and legal institution and prosecution of foreclosure proceedings, when and as necessary, on
behalf of HSBC as Trustee; and properly maintaining the Covered Trusts' "REO" properties
(properties the Covered Trusts owned).  In short, the Governing Agreements require the Master
Servicers/Servicers to do whatever a "prudent" Master Servicer/Servicer would customarily do to

Servicers/Servicers also commit an Event of Default whenever they discover breaches of the Warrantors' R&Ws and fail to promptly give notice of those breaches to HSBC.

13.     Under the Governing Agreements and the TIA, HSBC is required to act whenever it becomes aware of an Event of Default by the Master Servicers/Servicers.  First, HSBC is required to notify the offending Master Servicer or Servicer of its Event of Default and demand that it be cured.  Moreover, HSBC is also required to promptly give notice of uncured Events of Default to plaintiff and the class, so that they can mobilize and direct HSBC on how to deal with the offending Master Servicer or Servicer and the Event of Default.  Finally, HSBC is allowed to take additional steps to protect plaintiff and the class if an Event of Default is not cured, including terminating and replacing the offending Master Servicer or Servicer or taking over its duties, in certain circumstances.

14.     Importantly, under both the Governing Agreements and the TIA, the occurrence of an Event of Default that is known to HSBC dramatically increases HSBC's duties to plaintiff and the class.  The occurrence of any such Event of Default ***requires HSBC to protect plaintiff and the class by exercising all of the rights and powers vested in HSBC by the Governing Agreements, as a reasonably prudent person would*** *under the circumstances, and to act as if HSBC is protecting its own interests*.  Essentially, when an Event of Default occurs, HSBC is required to act as a fiduciary for plaintiff and the class and take all prudent actions to protect them, as if HSBC is protecting its own interests.

15.     It was critically important that HSBC act when it became aware of Events of Default because the proper servicing of the Mortgage Loans and the reporting of Warrantor R&W breaches to HSBC was vital to: (1) the ongoing financial viability of the Covered Trusts; (2) ensuring the Covered Trusts had sufficient cash flows to pay expenses and to fund payments to plaintiff and the

ensure the proper servicing and administration of the Mortgage Loans in accordance with law, for the benefit of plaintiff and the class.

- 6 -

class; (3) avoiding and minimizing any losses to plaintiff, the class and the Covered Trusts from defaults, delinquencies or foreclosures of the Mortgage Loans or Warrantor R&W breaches; and (4) maintaining the credit ratings and market values of plaintiff's and the class's RMBS. Because of this, the Governing Agreements require HSBC to act as a quasi-fiduciary for plaintiff and the class whenever it becomes aware of an Event of Default by a Master Servicer or Servicer.

16.     As alleged more fully below, HSBC obtained actual knowledge of widespread, rampant Events of Default by the Covered Trusts' Master Servicers and Servicers no later than April 13, 2011. By April 13, 2011, HSBC had actual knowledge that the Master Servicers and Servicers were engaging in numerous, widespread, improper and/or illegal foreclosure proceedings and other loan servicing misconduct with respect to the Mortgage Loans in the Covered Trusts that were Events of Default. In fact, HSBC even actively participated in the misconduct, including the making of false statements, the filing of false and illegal affidavits in foreclosure actions, and the participation in other improper or illegal loan servicing misconduct with the Master Servicers/Servicers, all of which were Events of Default. In addition, by April 13, 2011, HSBC also had actual knowledge that the Master Servicers/Servicers knew of widespread breaches of the Warrantors' R&Ws but had not reported those breaches to HSBC, which were also Events of Default. These Events of Default triggered HSBC's fiduciary-like duties under the Governing Agreements and the TIA to take action and protect plaintiff and the class as a prudent person would. However, HSBC did not do so, as it failed to do any of the things required of it by the Governing Agreements and the TIA. Instead, HSBC allowed the Events of Default to go on unchecked, thereby engaging in multiple breaches of its duties under the Governing Agreements and TIA. In fact, despite its knowledge of these Events of Default, and numerous new, additional Events of Default that have occurred repeatedly and continuously *after* April 13, 2011, HSBC has continued to fail to act, let alone act

prudently, and thus has engaged in multiple additional breaches of its duties under the Governing Agreements and the TIA, as the Covered Trusts continue to suffer from pervasive Events of Default.

17.     HSBC's multiple failures to act have resulted in thousands of defective Mortgage Loans that breached their R&Ws not being cured, replaced or repurchased by the Warrantors, and also in Mortgage Loans being improperly, imprudently and illegally serviced, causing substantial damages to plaintiff, the class and the Covered Trusts.  HSBC's failures to properly act with respect to the Warrantors' breaches of their R&Ws and the Master Servicers' and Servicers' Events of Default have resulted in, *inter alia*: (1) failures to have Mortgage Loans in breach of the Warrantors' R&Ws cured, replaced or repurchased; (2) numerous foreclosures of the Mortgage Loans being denied, invalidated and/or delayed, substantially driving up the Covered Trusts' expenses and losses; (3) numerous Mortgage Loan delinquencies being allowed to stretch on interminably without payments being remitted to the Covered Trusts, while the Master Servicers and Servicers continuously added improper and excessive fees and charges to such Mortgage Loans, which are paid to the Master Servicers and Servicers from the Covered Trusts; (4) numerous Mortgage Loans being modified or foreclosed, or not being modified or foreclosed, in a manner that financially benefitted the Master Servicers'/Servicers' financial interests but not plaintiff's and the class's financial interests; (5) the Master Servicers and Servicers entering into numerous settlements with governmental regulatory authorities because of their Events of Default wherein the Master Servicers and Servicers were required as part of the settlements to modify and reduce mortgage loan balances on loans they serviced – including the Mortgage Loans – which caused additional losses to plaintiff, the class and the Covered Trusts; and (6) various and numerous other illegal and improper servicing misconduct alleged herein amounting to Events of Default that caused millions of dollars in damages

to plaintiff, the class and the Covered Trusts. All of these foregoing events were caused by HSBC's breaches of the Governing Agreements and violations of the TIA.

18.     As previously alleged, these uncured Events of Default require HSBC to use a heightened "prudent person" duty of care, like that of a fiduciary, and to exercise all of HSBC's rights and powers under the Governing Agreements for the benefit of the plaintiff and the class. *This heightened duty of care does not apply only to the Master Servicers'/Servicers' Events of Default, however, it also applies to all of the Warrantors that have breached their R&Ws*. Thus, HSBC was also required to enforce the R&W claims against the Warrantors as a prudent person would, and seek to fully recover for those claims as though HSBC was seeking to recover for itself.

19.     HSBC, however, ignored these duties and obligations owed to plaintiff, the class and the Covered Trusts under the Governing Agreements and the TIA, and did not exercise its rights and powers under the Governing Agreements, or exercise the degree of care and skill required of a prudent person in the conduct of his/her own affairs. As a result, HSBC breached the Governing Agreements and violated the TIA, and caused plaintiff, the class and the Covered Trusts to suffer over $1.25 billion in damages from the loss and non-prosecution of the R&W claims against the Warrantors (which are now time barred), and has further caused millions of dollars in additional damages resulting from the Master Servicers'/Servicers' uncured loan servicing Events of Default, which continue unabated. Plaintiff, the class and the Covered Trusts are entitled to recover damages caused by these breaches of the Governing Agreements by HSBC, and for its violations of the TIA.

20.     HSBC's failure to act also breached its common law "duty of trust" owed to plaintiff and the class. Under this duty, HSBC was required to avoid conflicts of interest with plaintiff and the class. HSBC's failure to act as required under the Governing Agreements was a result of the fact that HSBC had fundamental conflicts of interest with plaintiff and the class.

21.     To explain, HSBC had ongoing and prospective business relationships with the loan originators, Warrantors, Master Servicers and Servicers to the Covered Trusts (and the entities related to them).  These were the decision-makers that selected RMBS trustees for RMBS trusts, and they had selected HSBC to be the Trustee of the Covered Trusts, as well as the trustee for hundreds, if not thousands, of other RMBS trusts.  HSBC derived significant RMBS trustee business from such relationships, and it desired to continue profiting therefrom.  Thus, HSBC did not want to disrupt its business relationships with these entities, or anger them, by seeking to enforce R&W claims against the Warrantors or declaring Events of Default against the Master Servicers/Servicers, as it would endanger HSBC's RMBS trustee business and the income derived therefrom, as well as future prospects for such financial gain.

22.     HSBC also had another conflict with plaintiff and the class.  HSBC's trustee fees for managing the Covered Trusts were paid by Wells Fargo Bank, N.A. ("Wells Fargo").  *But Wells Fargo was the Master Servicer or Servicer for each of the three Covered Trusts.*  Thus, HSBC was not going to "bite the hand that fed it" by declaring Events of Default against Master Servicer/Servicer Wells Fargo, the payor of its trustee fees.

23.     Moreover, HSBC had yet another conflict of interest with plaintiff and the class. HSBC itself was participating in the Master Servicers' and Servicers' Events of Default with respect to the Mortgage Loans in the Covered Trusts.  Thus, disclosing such Events of Default would also expose HSBC's participation in that misconduct and further expose HSBC to liability to plaintiff and the class under the Governing Agreements and the TIA for such misconduct.  HSBC therefore chose to remain silent in the face of known Events of Default.

24.     Finally, HSBC had a conflict with plaintiff and the class because HSBC itself also serviced loans for other RMBS trusts and for U.S. Government agencies, and was engaging in the

same types of misconduct as the Covered Trusts' Master Servicers/Servicers were as to the Covered Trusts. Because it desired to keep its own loan servicing misconduct hidden, HSBC did not "rat out" its fellow misbehaving Master Servicers and Servicers for fear that HSBC's loan servicing misconduct would also be exposed by a retaliating Master Servicer or Servicer.[4]

25.     Because of the foregoing conflicts of interest with plaintiff and the class, HSBC deliberately chose to refuse to perform its duties under the Governing Agreements and the TIA and thereby put its own interests ahead of plaintiff's and the class's, and benefitted therefrom, breaching its common law duty of trust to plaintiff and the class.  Moreover, HSBC has engaged in multiple additional breaches of its duty of trust by continuing to put its interests ahead of those of plaintiff and the class by continuing to refuse to perform its duties under the Governing Agreements, allowing Warrantor R&W breaches and Master Servicer/Servicer Events of Default to go on unremedied.

26.     Numerous media reports and RMBS experts have confirmed these conflicts of interest. For example, in December 2010, law professor Kurt Eggert appeared before the U.S. Senate's Banking, Housing and Urban Affairs Committee and testified that ***RMBS trustees like HSBC were not likely to be of "much help for investors," because "a trustee may derive much of its income from" those that set up the trusts and appoint the trustees***.  In addition, an article in the *Yale Journal of Regulation* stated: "***[T]here is often a very close relationship between the servicer and the trustee; many originators and servicers have a 'pet' or 'pocket' trustee that they use for most of their deals***."  Moreover, in a June 16, 2013 article, *The New York Times* reported the following:

---

[4]    HSBC was ultimately unsuccessful in hiding its misconduct.  As alleged *infra*, in April 2011, HSBC (and most of the Covered Trusts' Master Servicers and Servicers) entered into consent orders with the Government wherein its misconduct was revealed.  In addition, just very recently, in July 2014, HSBC ***admitted*** in a settlement with the U.S. Government that it was improperly charging inflated foreclosure-related fees and expenses.  HSBC paid the Government $10 million to settle the July 2014 charges and much more to settle the April 2011 charges.

*[W]hen mortgages soured, trustees declined to pursue available remedies for investors, such as pushing a [Warrantor] to buy back loans that did not meet quality standards . . . because trustees are hired by the big banks that package and sell the securities[.] [Therefore] their allegiances are divided. Sure, investors are paying the fees, but if a trustee wants to be hired by sellers of securities in the future, being combative on problematic loan pools may be unwise.*

The article concluded that "*they [RMBS trustees like HSBC] are a dog that could have barked but didn't.*"

27.    As a result of HSBC's failures to act with respect to Master Servicer/Servicer loan servicing Events of Default, the Mortgage Loans have experienced numerous illegal, invalid and improper foreclosures causing lengthy and expensive delays and delinquencies, the imposition of excessive and improper Master Servicer/Servicer fees, and the disposition of Mortgage Loans that financially benefitted the Master Servicers/Servicers but negatively impacted the interests of plaintiff and the class.  As a further result of HSBC's failures to enforce the R&W claims (and the Master Servicers'/Servicers' Events of Default of failing to notify HSBC of Warrantor R&W breaches), the Covered Trusts are also full of defective Mortgage Loans that have experienced historically unprecedented numbers of defaults, delinquencies, foreclosures, liquidations and losses.

28.    HSBC's failures to act as required by the Governing Agreements and the TIA have caused plaintiff, the class and the Covered Trusts to suffer over $1.25 billion in damages, caused failures and shortages in the payment of principal and interest to plaintiff and the class, and caused steep declines in the value of plaintiff's and the class's RMBS.  Indeed, due to HSBC's inaction, ***all of RPI's RMBS in the Covered Trusts are now nearly or completely worthless***.  Accordingly, HSBC is liable to plaintiff and the class for damages caused by its breaches of the Governing Agreements and its duty of trust, and its violations of the TIA.

## II.   JURISDICTION AND VENUE

29.   This Court has federal question jurisdiction over this action pursuant to 28 U.S.C. §1331 for violations of the TIA, and supplemental jurisdiction over the breach of contract and breach of trust claims.  The Court also has diversity jurisdiction pursuant to 28 U.S.C. §1332(a).

30.   Venue is proper in this District pursuant to 28 U.S.C. §1391(b), as HSBC's principal place of business is within this District and HSBC's contacts with this District are sufficient to confer personal jurisdiction over it here.

## III.   PARTIES

31.   Plaintiff RPI is a limited liability company incorporated under the laws of Belgium, with its principal place of business in Brussels, Belgium.  RPI acquired RMBS in each of the Covered Trusts on or about the dates indicated below, and has continuously held such RMBS since then:

| Covered Trusts | Tranche/Class | Initial Face Amount of Certificate | Date Acquired |
| --- | --- | --- | --- |
| DBALT 2006-AR5 | 1A3 | $30,000,000 | May 12, 2009 |
| FHLT 2006-C | M1 | $15,000,000 | May 6, 2010 |
| WFHET 2006-2 | M6 | $6,757,000 | June 23, 2010 |

32.   All of the foregoing RMBS were initially rated as "investment grade" by the credit ratings agencies.  However, because of HSBC's failures to act as alleged herein, each of the foregoing RMBS are now total or near total losses, having been written down to the point that they are worthless or virtually worthless, and each RMBS is now in default.

33.   With respect to the above RMBS which RPI acquired on or about May 12, 2009, RPI acquired such RMBS from the initial purchaser of such RMBS, and the initial purchaser acquired such RMBS at or about the time the RMBS were offered to the investing public in 2006.  The initial purchaser, when it transferred such RMBS to RPI on or about May 12, 2009, also transferred all right, title and interest in such RMBS to RPI, including all litigation rights and claims the initial purchaser

- 13 -

had, such as the initial purchasers' claims against HSBC asserted in this action. As to the remaining RMBS that were acquired by RPI in 2010, these RMBS were originally included within collateralized debt obligations ("CDOs") in which RPI acquired interests on or about May 12, 2009 from the initial purchasers. RPI was assigned all right, title and interest (including litigation and claim rights) the initial purchasers had in the interests in these CDOs at that time. Subsequently, the CDOs were liquidated in 2010 and RPI acquired the RMBS within the CDOs along with all rights, title and interest in such RMBS. Given that the CDOs were *liquidated in full*, and thus the CDOs were selling *all* rights and interests in the RMBS within them, RPI also obtained all litigation rights and claims that the CDOs' initial purchasers had in the RMBS. Furthermore, pursuant to New York General Obligations Law §13-107, RPI obtained all the rights and causes of action against HSBC held by all of the previous holders of RPI's RMBS.

34.     Defendant HSBC is a national association with its main offices in Virginia. Defendant HSBC conducts substantial business in this District. HSBC serves as trustee for hundreds, if not thousands, of RMBS trusts, including the Covered Trusts. HSBC has served as the Trustee for each of the Covered Trusts since they were formed in 2006.

## IV.     FACTUAL ALLEGATIONS

### A.     The Securitization Process for the Mortgage Loans

35.     The Warrantors that sold the Mortgage Loans that were ultimately transferred into the Covered Trusts engaged in a nearly identical securitization process that was repeated thousands of times by them and others during 2006, the time period when the Mortgage Loans were originated, warranted and transferred to the Covered Trusts. Investor demand for RMBS was skyrocketing during this period, and the Warrantors and other RMBS securitizers were hard pressed to meet that demand. RMBS securitizations proliferated during 2006 and were extremely profitable for all involved in their sale. Hundreds of billions of dollars of RMBS were packaged and sold to the

investing public, and billions of dollars in profits were pocketed by the Warrantors, Master Servicers/Servicers and other securitizers.  HSBC also profited handsomely, and continues to profit, from the explosion in RMBS trusts caused by the skyrocketing sales, as it is an RMBS trustee to hundreds, if not thousands, of RMBS trusts, including the Covered Trusts.

36.     RMBS securitizations involve the conversion of thousands of illiquid residential mortgage loans like the Mortgage Loans into bond-like instruments – the RMBS certificates at issue herein – which trade over the counter in capital markets.

37.     The first step in creating RMBS is the "origination" of mortgage loans, that is, the lending of money to borrowers to purchase residences.  The Mortgage Loans that were ultimately transferred to the Covered Trusts were originated by lenders that then sold them to the Warrantors, or were originated by the Warrantors themselves, and then ultimately transferred to the Covered Trusts.

38.     Typically, after aggregating the Mortgage Loans, the Warrantors then grouped the Mortgage Loans into large pools, which they then sold and transferred to the Covered Trusts' "Depositors" for ultimate transfer to the Covered Trusts and HSBC as Trustee.  In many cases, the Depositors were shell companies related to the Warrantors and/or Master Servicers/Servicers.  These sales from the Warrantors to the Depositors were typically accomplished via agreements called "Mortgage Loan Purchase Agreements," or similarly titled agreements (collectively, the "MLPAs").

39.     The Governing Agreements refer to and incorporate the MLPAs.  In the Governing Agreements or MLPAs, the Warrantors: (i) make numerous R&Ws concerning the credit quality and characteristics of the Mortgage Loans and vouch for the accuracy of all data they provided about the Mortgage Loans; (ii) promise to cure, substitute or repurchase Mortgage Loans that do not comply with those R&Ws; and (iii) state that the Trustee will ultimately have the right to enforce the R&Ws against the Warrantors.

- 15 -

40.    After the Mortgage Loans are sold and transferred from the Warrantors to the Covered Trusts' Depositors, the Depositors then transfer the Mortgage Loans, along with the rights to enforce the Warrantors' R&Ws, to the Trustee for the benefit of plaintiff and the class, and in exchange, the Trustee transfers the RMBS certificates to the Depositors.

41.    The Depositors then sell the RMBS certificates to securities underwriters, in many cases another entity related to the Warrantors and Master Servicers/Servicers.  The Depositors remit the money from those underwriter sales to the Warrantors so that they can purchase additional loans and repeat the RMBS securitization process.  Meanwhile, the securities underwriter markets and sells the RMBS certificates to investors such as plaintiff and the class and retains a portion of the purchase price as its fee.

42.    After the Covered Trusts' securitizations are closed and their RMBS certificates are sold to investors, the Mortgage Loans must be serviced.  Thus, the Governing Agreements designate certain entities to be the Master Servicers and/or Servicers of the Mortgage Loans and require that they service the Mortgage Loans legally, and with the same degree of skill and care as *"prudent"* loan servicers.  Whenever a Master Servicer/Servicer fails to ensure the legal and "prudent" servicing of the Mortgage Loans, an Event of Default occurs and the Trustee is required to take certain actions to protect plaintiff and the class when it becomes aware of the default.

43.    Plaintiff's and the class's RMBS certificates entitle them to the cash flows generated by the Mortgage Loans.  The Covered Trusts, as with other RMBS trusts, are structured such that the risk of loss is divided among different "classes" or "tranches" of RMBS in each Covered Trust.  Each class or tranche of the Covered Trusts has a different level of credit risk and reward (the interest or yield), including different levels and types of credit enhancement or protection, and different priorities to payment from the cash flows generated by the Mortgage Loans (the payment priority and

distribution is called the payment "waterfall"). Because the classes/tranches have different credit enhancements and different priorities of claim to the cash flow, they are assigned different credit ratings by the credit rating agencies and they sell at different yields or coupons. However, nearly all of the classes/tranches of the RMBS are required to be rated as "investment grade" securities by a credit ratings agency before they can be sold. As previously alleged, the credit ratings agencies require that the Warrantors make R&Ws, and they base their credit ratings of the RMBS certificates on such R&Ws.

44.     All of the classes/tranches of the RMBS certificates, as well as the plaintiff, the class and all of the Covered Trusts, are dependent on the Trustee to act as required under the Governing Agreements in order to ensure that the Covered Trusts and RMBS perform as expected and designed, and are profitable. Thus, the Trustee must act promptly to properly discharge its duties and obligations under the Governing Agreements. Here, HSBC utterly failed to discharge its duties mandated by the Governing Agreements and the TIA. Therefore, it breached the Governing Agreements and further violated the TIA, thus entitling plaintiff, the class and the Covered Trusts to damages. HSBC exacerbated this problem by having numerous improper conflicts of interest with plaintiff and the class which motivated HSBC to refrain from discharging its duties.

**B.     HSBC's Duties as Trustee for the Covered Trusts**

45.     The Governing Agreements set forth HSBC's powers and its duties to plaintiff and the class. All of the Covered Trusts are governed by PSAs (Pooling and Servicing Agreements) and related agreements such as the MLPAs (Mortgage Loan Purchase Agreements) and/or SAs (Servicing Agreements), which the PSAs reference and incorporate when relevant. Each Governing Agreement for each Covered Trust is substantially similar and imposes substantially similar duties on HSBC. Accordingly, the DBALT 2006-AR5 PSA (Exhibit A hereto) is incorporated herein by reference and is used as a representative example of all of the Governing Agreements for all of the Covered Trusts.

46.     While the Governing Agreements set forth certain powers and responsibilities of HSBC, the TIA supplements the Governing Agreements.  The TIA was enacted in 1939 because Congress recognized that previous abuses by trustees had adversely affected investors and the national interest.  In enacting the TIA, Congress desired to ensure that there were certain minimum federal protections available to investors, which are deemed to be incorporated into the Governing Agreements.  Those minimum protections are discussed *infra* at ¶¶60-63.

47.     When the Covered Trusts were formed, the Covered Trusts' Depositors transferred the Mortgage Loans to HSBC along with "***all the right, title and interest . . . in and to the [Mortgage] Loans[,] . . . the rights of the Depositor under the Mortgage Loan Purchase Agreement, the Servicing Agreements [and] the Assignment Agreements [assigning the Servicing Agreements to the Depositor]*" "*for the benefit of the Certificateholders.*"   DBALT 2006-AR5 PSA §2.1. Furthermore, HSBC "*acknowledge[d] receipt*" of all of the foregoing assets "*and [further] declare[d] that it holds . . . all such assets . . . in trust for the exclusive use and benefit of all present and future Certificateholders,*" *i.e.*, plaintiff and the class. *Id.* §2.2.

### 1.     HSBC's Duty to Enforce the Warrantors' Obligations to Cure, Substitute or Repurchase Mortgage Loans that Breached Their R&Ws

48.     The PSAs (and/or the related MLPAs), contained numerous R&Ws made by the Warrantors about the Mortgage Loans in the Covered Trusts.  The Warrantors' R&Ws attested to the credit quality of the Mortgage Loans conveyed to the Covered Trusts and warranted the accuracy of the data the Warrantors conveyed about such Mortgage Loans.  The Warrantors also attested to other characteristics of the Mortgage Loans and their origination.  The following are examples of the R&Ws the Warrantors typically made: (1) that the data and other information the Warrantors conveyed concerning the Mortgage Loans in schedules, exhibits, and other compilations of data in connection with the transfer of the Mortgage Loans to the Covered Trusts was "true and correct"; (2)

- 18 -

that the Mortgage Loans complied with and were originated and serviced in compliance with all federal, state and local laws and "will not involve the violations of any such laws"; (3) that the Mortgage Loans were not "High-Cost," "High-Risk," "predatory" or "abusive" loans as defined by law; (4) that the Mortgage Loans were originated in accordance with the lender's underwriting guidelines; and (5) that each mortgaged property had an appraisal that conformed to certain standards and was performed by a qualified appraiser. *See, e.g.*, DBALT 2006-AR5 MLPA §6(i); §6(v); §6(xxiv); §6(xxvi); §6(xxix); §6(xxxiv); §6(xix) (Ex. B hereto). The Warrantors made numerous other R&Ws concerning the Mortgage Loans in the Covered Trusts, *see generally id.* §6(i)-(xliii), as well as R&Ws about the Warrantors themselves. *Id.* §5(i)-(x).

49.     The Warrantors' R&Ws are specifically referenced in the Governing Agreements, along with the Warrantors' obligations to cure, substitute and/or repurchase any defective Mortgage Loans. *See* DBALT 2006-AR5 PSA §2.3(a).

50.     Importantly, the Governing Agreements also provide that whenever HSBC discovers a breach of a Warrantor's R&Ws that materially affects plaintiff and the class, HSBC "***shall promptly notify***" the breaching Warrantor. *Id.* Thereafter, the breaching Warrantor is required to promptly "cure such defect or breach." *Id.* If the Warrantor fails to cure the breach within a specified time period, then "the Trustee shall ***enforce*** the obligations [of the Warrantor] under the [MLPA] to repurchase such Loan" or "substitute" a new loan in place of the defective Mortgage Loan. *Id.*

51.     HSBC's foregoing duties are embodied in §2.3(a) of the DBALT 2006-AR5 PSA, which provides:

> ***Upon discovery . . . of a breach by the [Warrantor] of any representation, warranty or covenant under the [MLPA] in respect of any [Mortgage] Loan that materially and adversely affects the value of such [Mortgage] Loan or the interest therein of the Certificateholders, the Trustee shall promptly notify the [Warrantor] of such . . . breach and request that the [Warrantor] . . . cure such . . . breach within 60 days from the date the [Warrantor] was notified of such . . . breach, and if the***

> *[Warrantor] does not . . . cure such . . . breach in all material respects during such period, the Trustee shall enforce the obligations of the [Warrantor] under the [MLPA] to repurchase such [Mortgage] Loan from the Trust Fund . . . within 90 days after the date on which the [Warrantor] was notified of such . . . breach . . . . In lieu of repurchasing any such [Mortgage] Loan as provided above, . . . the [Warrantor] may cause such [Mortgage] Loan to be removed from the Trust Fund . . . and substitute one or more Substitute Loans . . . .*

### 2.    HSBC's Duties upon the Occurrence of an Event of Default

52.    HSBC also has obligations under the Governing Agreements and TIA whenever it learns of an "Event of Default" by a Master Servicer or Servicer.  Under the Governing Agreements, an "Event of Default"[5] by a Master Servicer or Servicer occurs whenever there is

> *any failure on the part of the Master Servicer [or Servicer as applicable] duly to observe or perform in any material respect any other of the covenants or agreements on the part of the Master Servicer [or Servicer as applicable] contained in this Agreement, or the breach by the Master Servicer [or Servicer as applicable] of any representation and warranty contained in [the Governing Agreements], which continues unremedied for a period of 30 days after the date on which written notice of such failure, . . . requiring the same to be remedied, shall have been given to the Master Servicer [or Servicer as applicable] by the . . . Trustee . . . .*

DBALT 2006-AR5 PSA §8.1(a)(ii).

53.    The chief obligation of the Master Servicers and Servicers under the Governing Agreements is to ensure that the Mortgage Loans in the Covered Trusts are properly, legally and prudently serviced and administered.  Thus, the Governing Agreements require the Master Servicers and Servicers (as well as any sub-servicers they use) to ensure the service of the Mortgage Loans "in a manner consistent with Accepted Master Servicing Practices."  DBALT 2006-AR5 PSA §3.1.  This

---

[5]    The Governing Agreements refer to the Master Servicers' or Servicers' "Events of Default" in different nomenclature, calling such Events of Default "Master Servicer Event of Default" (DBALT 2006-AR5 PSA §8.1), "Servicer Event of Default" (FHLT 2006-C PSA §7.01(a)), "Master Servicer Events of Termination" (*id.* §7.01(c)), or "Servicer Events of Termination" (WFHET 2006-2 PSA §7.01).  Nonetheless, the terms are all used to describe the same failures by the Master Servicers or Servicers to service, or ensure the proper servicing of, the Mortgage Loans as required by the Governing Agreements.  Thus, the term "Event of Default" is used herein to include all of the foregoing terms.

means that the Master Servicers/Servicers must service (or ensure the service of) the Mortgage Loans using "those customary mortgage servicing practices of **prudent** mortgage servicing institutions." *Id.* §1.1 (defining "Accepted Master Servicing Practices"). This also means that Master Servicers and Servicers are to service the Mortgage Loans legally. *See, e.g., id.* §2.5(iii) (Master Servicer represents and covenants that "fulfillment of or compliance" with its duties under the Governing Agreements "will not . . . result in a . . . violation . . . of . . . any statute, order or regulation . . . ."). If a Master Servicer or Servicer fails to do so, an Event of Default occurs. *Id.* §8.1(a)(ii).

54.     In order to properly, legally and "prudently" service the Mortgage Loans pursuant to the Governing Agreements, the Master Servicers and Servicers must, *inter alia*: (1) ensure that the payments by borrowers are properly and legally collected and promptly submitted to the Covered Trusts; (2) ensure that timely and legal notices are sent to borrowers; (3) ensure that appropriate insurance is in place when required; (4) ensure that accurate information about the Mortgage Loans is maintained; (5) ensure that the Covered Trusts' "REO" properties[6] are properly maintained; (6) ensure that the Mortgage Loans are legally, prudently and properly modified or foreclosed; and (7) otherwise do whatever is needed to ensure that the Mortgage Loans are properly, legally and "prudent[ly]" serviced and administered for the benefit of plaintiff and the class. *See generally* DBALT 2006-AR5 PSA, Art. III; *id.* §2.5(iii)(B); *cf.* DBALT 2006-AR5 MLPA §6(v) (Mortgage Loans serviced in compliance with "any and all" laws).

55.     In addition, Master Servicers and Servicers also commit an Event of Default whenever they discover breaches of the Warrantors' R&Ws but fail to promptly notify HSBC and the other parties to the Governing Agreements. *See* DBALT 2006-AR5 PSA §2.3(a) ("***should the Master***

---

[6]     "REO" properties are "real estate owned" by the Covered Trusts. These properties typically have been vacated or abandoned and foreclosed on or otherwise taken back from defaulted borrowers.

- 21 -

*Servicer become aware of . . . the breach of the representation or covenant of the [Warrantor] set forth in Section 5(x) of the [MLPA] which materially and adversely affects the interests of [certain Certificateholders] . . . the Master Servicer shall promptly notify the [Warrantor] and the Trustee of such breach*"); *id.* §2.3(c) ("*Upon discovery by the . . . Master Servicer . . . that any [Mortgage] Loan does not constitute a 'qualified mortgage' within the meaning of Section 860G(a)(3) of the [Internal Revenue] Code, the party discovering such fact shall within two Business Days give written notice thereof to the other parties [to the Governing Agreements, including the Trustee]*.").

56.     Because the failure to properly service the Mortgage Loans or report breaches of the Warrantors' R&Ws is so harmful to plaintiff, the class and the Covered Trusts, when HSBC becomes aware of an Event of Default it is required by the Governing Agreements to act quickly.  Thus, upon becoming aware of an Event of Default, HSBC is required by the Governing Agreements and TIA: (1) to notify the offending Master Servicer or Servicer of its Event of Default and require its cure (DBALT 2006-AR5 PSA §8.1(a)(ii)); and (2) to give notice of uncured Events of Default to plaintiff and the class.  *Id.* §8.3(b); *see also* 15 U.S.C. §77ooo(b).  In addition, if the offending Master Servicer or Servicer does not cure its Event of Default within the prescribed period of time, the Governing Agreements give HSBC the power to terminate and replace the offending Master Servicer or Servicer, or take over its servicing duties.  DBALT 2006-AR5 PSA §§8.1, 8.2.

### 3.     HSBC's Heightened Duty to Prudently Protect Plaintiff's and the Class's Interests as Though They Were HSBC's Own Interests During an Event of Default

57.     Moreover, once HSBC becomes aware that a Master Servicer or a Servicer is committing an Event of Default, HSBC's duty of care to plaintiff and the class – under both the Governing Agreements and the TIA – is significantly increased.  In the case of a known Event of Default, the Governing Agreements mandate that HSBC *"shall exercise such of the rights and powers vested in it by this Agreement, and use the same degree of care and skill in its exercise as a*

*prudent person would exercise or use under the circumstances in the conduct of such person's own affairs*." DBALT 2006-AR5 PSA §9.1.[7]  In other words, when HSBC learns of an Event of Default, it must act essentially like a fiduciary to plaintiff and the class and "*shall exercise" all* of HSBC's rights and powers as Trustee under the Governing Agreements to prudently protect plaintiff's and the class's interests as though those interests were HSBC's very own.  *Id.*

58.     Moreover, this heightened duty is not limited or applied only to Master Servicers'/Servicers' Events of Default.  Instead, under the Governing Agreements, once an Event of Default exists, "*[HSBC] shall exercise" all* of the "*rights and powers vested in it by th[e] [Governing] Agreement[s]*," not just those pertaining to the Master Servicers/Servicers.  *Id.*  *Thus, HSBC's heightened duty of care also requires it to prudently enforce the R&W claims against the Warrantors as though HSBC were seeking to protect its own interests*.

### 4.      HSBC's "Duty of Trust" to Avoid Conflicts of Interest with Plaintiff and the Class

59.     HSBC also has a common law "duty of trust" to plaintiff and the class.  HSBC, as "'the trustee[,] *is at all times obligated to avoid conflicts of interest with the beneficiaries [of the Covered Trusts, i.e., plaintiff and the class]*."  *Knights of Columbus v Bank of N.Y. Mellon*, No. 651442/2011, slip op. at 15 (N.Y. Sup. Ct., N.Y. Cnty. Apr. 26, 2013) (order granting in part and denying in part motion to dismiss) (quoting *AMBAC Indem. Corp. v. Bankers Trust Co.*, 573 N.Y.S. 2d 204, 206-08 (Sup. Ct. 1991)).  Under this duty to avoid conflicts of interest, HSBC is prohibited from advancing its own interests at the expense of plaintiff and the class, or benefitting from such actions at any time, including *before, during and after any default*.  *Id.*

---

[7]     As discussed *infra*, the TIA also requires the same heightened prudent person standard of care when a default of any kind occurs.  *See* 15 U.S.C. §77ooo(c).

### 5.   HSBC's Duties and Obligations Under the TIA

60.    The TIA imputes certain terms into the Governing Agreements to protect investors. The TIA imposes two sets of duties and obligations on HSBC – one set "prior to default," and the other set "in case of default," much like the Governing Agreements.

61.    Under the TIA, prior to a default, a Trustee must perform "such duties as are specifically set out in" the Governing Agreements.  15 U.S.C. §77ooo(a)(1).  This requirement reflects the Governing Agreements' pre-default provisions that HSBC "perform such duties and only such duties as are specifically set forth in this Agreement." DBALT 2006-AR5 PSA §9.1. Thus, the TIA requires HSBC to perform the duties assigned to it by the Governing Agreements.

62.    In addition, under the TIA, a Trustee must "give to the indenture security holders . . . notice of all defaults known to the trustee, within ninety days after the occurrence thereof." 15 U.S.C. §77ooo(b) (citing 15 U.S.C. §77mmm(c)).  Thus, HSBC is required to inform plaintiff and the class of any Events of Default *and any other "defaults," i.e., the Warrantors' breaches of their R&Ws, within 90 days*.

63.    Moreover, whenever HSBC is aware of a default, it is required under the TIA (like the Governing Agreements) to exercise a fiduciary-like duty of care toward plaintiff and the class: *HSBC is required to exercise "such of the rights and powers vested in it by [the Governing Agreements], and to use the same degree of care and skill in their exercise, as a prudent man would exercise or use under the circumstances in the conduct of his own affairs*." 15 U.S.C. §77ooo(c). Thus, upon the occurrence of a Master Servicer or Servicer Event of Default, or the Warrantors' R&W breaches alleged herein, HSBC was obligated to exercise a fiduciary-like "prudent person" duty of care to protect plaintiff and the class, and exercise *all* of the "rights and powers vested in it by" the Governing Agreements as though HSBC was protecting its own interests.

- 24 -

64.     As set forth herein, HSBC is liable to plaintiff and the class for failing to discharge the duties required of it by the Governing Agreements, the TIA and common law.  In addition, all of HSBC's duties mandated by the Governing Agreements, the common law, and the TIA as alleged herein were continuing in nature, and required HSBC to continuously discharge such duties as long as HSBC was Trustee of the Covered Trusts.   When HSBC discovered R&W breaches by the Warrantors and learned of Events of Default by the Master Servicers/Servicers, as alleged herein, HSBC was required to act prudently, quickly and continuously to protect plaintiff and the class. HSBC utterly failed to act as required, thereby breaching the Governing Agreements and common law, and violating the TIA, causing plaintiff, the class and the Covered Trusts to suffer over $1.25 billion in damages.

**C.     The Covered Trusts Suffer from Serious Defects Because HSBC Failed to Perform the Duties Required of It Under the Governing Agreements, the TIA and Common Law**

**1.     HSBC Discovered No Later than April 13, 2011 that the Covered Trusts' Warrantors Breached Their R&Ws, Thus Triggering HSBC's Duty to Enforce the R&W Claims**

65.     The Warrantors (and loan originators) to the Covered Trusts are set forth below:

**Covered Trusts' Warrantors**

|   | Covered Trust | Warrantors | Loan Originators Identified in Prospectuses or by Credit Rating Agencies |
|---|---|---|---|
| 1. | DBALT 2006-AR5 | ▪ DB Structured Products, Inc. ("DBSP") | ▪ IndyMac Bank FSB ("IndyMac")<br>▪ American Home Mortgage Corp. ("AHM")<br>▪ GreenPoint Mortgage Funding, Inc. ("GreenPoint") |
| 2. | FHLT 2006-C | ▪ Fremont Investment & Loan ("Fremont") | ▪ Fremont |
| 3. | WFHET 2006-2 | ▪ Wells Fargo<br>▪ Wells Fargo Asset Securities Corporation | ▪ Wells Fargo |

- 25 -

66.     When the Covered Trusts were formed and settled in 2006, the global financial collapse occurred shortly thereafter.  Later, most blamed the collapse on the residential lending industry and "Wall Street," claiming that they had corrupted lending standards and caused pervasive lending misconduct to occur because of Wall Street's insatiable demand for mortgage loans to securitize.  *The former Chairman of the Federal Reserve, Alan Greenspan, told Congress in October 2008 that "'[t]he evidence strongly suggests'" that "'excess demand from [RMBS] securitizers'" and "'subprime mortgage originations'" were "'undeniably the original source of the [global financial] crisis.'"*  Facts then began to publicly emerge revealing endemic misconduct within the lending industry at the time the Mortgage Loans were originated, warranted and transferred to the Covered Trusts.  Many of the revelations disclosed that the Warrantors and loan originators to the Covered Trusts were involved in conduct which would have rendered their R&Ws highly suspect.

### a.     Prior to April 2011, HSBC Learned that Some of the Warrantors' R&Ws Were False

67.     During the period from 2007 through 2008, numerous news stories were published, numerous private and governmental lawsuits were filed, and abundant congressional testimony was taken.  The foregoing events revealed that many of the Warrantors to the Covered Trusts routinely engaged in lending practices that would have likely rendered their R&Ws false.  A summary of the events are set forth in Appendix 1 to this Complaint.  These events revealed that lending misconduct was widespread during the time period when the Mortgage Loans were originated, warranted and transferred to the Covered Trusts.  The events further revealed that Warrantors and loan originators to the Covered Trusts had engaged in, or were accused of engaging in, widespread lending misconduct, including the issuance of extremely risky, highly questionable, predatory and/or illegal loans; making loans to borrowers who could not afford them; committing, or acquiescing in the commission of, mortgage fraud; and abandoning the underwriting guidelines they represented that they and other

- 26 -

lenders followed. *See* Appendix 1. The events occurring during 2007 and 2008 also revealed that many of the Warrantors and loan originators to the Covered Trusts were routinely making loans based on applications that contained inflated appraisals and borrower incomes, understated borrower debts, and suspect qualifying documentation, as well as other lending misconduct. *Id.*

68.    By the beginning of 2009, it became clear that the Warrantors and the loan originators for the Covered Trusts had engaged in conduct that would have rendered at least several of the Warrantors' R&Ws false, including R&Ws that: (1) the Mortgage Loans were originated in conformance with the lender's underwriting guidelines; (2) the Mortgage Loans were lawfully originated; (3) the Mortgage Loans were not "predatory" or "abusive"; (4) proper appraisals were performed; and (5) all of the data provided about the Mortgage Loans was true and correct.

69.    By the beginning of 2009, the lending abuses described above, when coupled with the extremely poor performance of the Mortgage Loans in the Covered Trusts, also made it clear that the Warrantors had breached their R&Ws concerning the Mortgage Loans in the Covered Trusts, thus causing HSBC to have actual knowledge of such breaches. Indeed, by January 2009, the Covered Trusts had shockingly high Mortgage Loan default rates.[8] These historically unprecedented default rates were so incredibly high that it caused HSBC to have actual knowledge that the Warrantors' R&Ws were false. After all, if the R&Ws were accurate, the Mortgage Loans would not have defaulted at such astounding rates. All of the Covered Trusts had Mortgage Loan default rates that were much, much higher than historical averages. ***All of the Covered Trusts had Mortgage Loan default rates in excess of 40%, with two of the three Covered Trusts having default rates in excess of 51%, meaning that over half of the Mortgage Loans were in default in those two Covered Trusts.***

---

[8]    The term "default rates," as used in this Complaint, refers to the percentage of the Mortgage Loans' aggregate principal balance for each Covered Trust that is delinquent, in bankruptcy, in foreclosure or REO at that particular point in time.

The Covered Trusts had also already sustained extraordinarily heavy losses by January 2009 – *over $257 million in just a few years of existence* – another indicator that the Warrantors' R&Ws were breached, because if the R&Ws were true, such heavy losses would not have occurred. HSBC was aware of all this information because it either prepared the monthly reports containing this information for the Covered Trusts or had access to such information. The chart below sets forth the Mortgage Loan default rates and the cumulative realized losses for each Covered Trust reported in January 2009:

| Covered Trusts' Mortgage Loan Default Rates and Cumulative Realized Losses Reported in January 2009 | | |
|---|---|---|
| Covered Trust | Mortgage Loan Default Rates | Cumulative Realized Losses |
| DBALT 2006-AR5 | 40.42% | $  64,839,294.56 |
| FHLT 2006-C | 52.09% | $ 167,297,355.69 |
| WFHET 2006-2 | 51.46% | $  25,738,782.31 |
| Covered Trusts' Total Realized Losses: | | $ 257,875,432.56 |

70.     Thus, as early as January 2009, HSBC was aware that there were breaches of the Warrantors' R&Ws, although it may not then have realized the magnitude of the breaches. Even so, additional events occurred during 2009, 2010 and the beginning of 2011 that repeatedly alerted HSBC to the fact that the Warrantors' R&Ws were false and thus that the Warrantors were in breach. Those events also alerted HSBC to new and additional Warrantor R&W breaches. These events are set forth in Appendix 2 hereto, and they revealed that the Warrantors and the loan originators to the Covered Trusts had engaged in, or had been accused of engaging in, *inter alia*, the routine abandonment of their underwriting guidelines; the routine fabrication of borrower and loan information; massive breaches of their R&Ws; and the engagement in predatory and abusive lending. *See* Appendix 2 hereto. These additional events caused HSBC to discover that the Warrantors to the Covered Trusts had breached their R&Ws concerning the Mortgage Loans.

- 28 -

### b. By April 13, 2011, HSBC Absolutely Knew that the Warrantors Had Breached Their R&Ws Concerning the Mortgage Loans in the Covered Trusts

71.     By the beginning of 2011 there was little doubt that the Warrantors had breached their R&Ws concerning the Mortgage Loans in the Covered Trusts.  And by April 13, 2011, HSBC absolutely *knew,* without a doubt, that the Warrantors had breached their R&Ws.  This is so primarily because of two Government-issued reports – the "FCIC Report" and the "Senate Report" – which were released on January 27, 2011 and April 13, 2011, respectively.  First, on January 27, 2011, the 633-page FCIC Report[9] was made available to the public, and between February 11 and 13, 2011, the FCIC also made public nearly 2,000 pages of supporting documentary evidence and more than 300 witness interviews.  The FCIC Report was supported by voluminous evidence and confirmed in detail most if not all of the prior news accounts and events indicating that there were widespread lending

---

[9]     The FCIC Report was authored by the Financial Crisis Inquiry Commission ("FCIC").  The FCIC was created to "examine the causes, domestic and global, of the . . . financial and economic crisis in the United States" that began in 2008.  The FCIC was established as part of the Fraud Enforcement and Recovery Act (Public Law 111-21) passed by Congress and signed by the President in May 2009.  The FCIC was composed of private citizens with experience in areas such as housing, economics, finance, market regulation, banking and consumer protection.  The FCIC's statutory mandate set out 22 specific topics for inquiry and called for the examination of the collapse of major financial institutions that failed or would have failed if not for exceptional assistance from the government.  These topics included, *inter alia*:

- fraud and abuse in the financial sector, including fraud and abuse toward consumers in the mortgage sector;
- federal and state financial regulators, including the extent to which they enforced, or failed to enforce, statutory, regulatory, or supervisory requirements;
- credit rating agencies in the financial system, including reliance on credit ratings by financial institutions and federal financial regulators, the use of credit ratings in financial regulation, and the use of credit ratings in the securitization markets;
- lending practices and securitization, including the "originate-to-distribute" model for extending credit and transferring risk;
- the legal and regulatory structure of the United States housing market;
- the legal and regulatory structure governing investor and mortgagor protection; and
- the quality of due diligence undertaken by financial institutions.

abuses that resulted in widespread breaches of the Warrantors' R&Ws regarding the Mortgage Loans in the Covered Trusts.

72.     The FCIC Report confirmed the systemic breakdown in residential loan underwriting standards during the time period when the Mortgage Loans were originated, warranted and transferred to the Covered Trusts.  The FCIC Report described in detail the lending abuses that emerged and that were virtually universal during that time period.  Significantly, *for the first time, the FCIC Report also revealed evidence of a pervasive, deliberate and intentional <u>fraud</u> that was being committed by RMBS securitizers with respect to mortgage loans being transferred to RMBS trusts like the Covered Trusts.  <u>The FCIC Report specifically identified several of the Covered Trusts' Warrantors and loan originators as being active participants in this fraud.  The conclusion from the FCIC Report was that the Covered Trusts had been intentionally filled with Mortgage Loans that breached the Warrantors' R&Ws</u>*.

73.     First, the FCIC confirmed the extraordinary numbers of R&W breaches that had occurred with respect to mortgage loans that were originated at the same time the Covered Trusts' Mortgage Loans were originated.  The FCIC found, in light of the pervasive lending abuses that occurred during the period that "*in the years [thereafter], [loan] representations and warranties would prove to be inaccurate*."  FCIC Report at 77.

74.     The FCIC Report supported its findings by citing to evidence of massive R&W breaches, including breaches by one of the Warrantors to the Covered Trusts.  The FCIC reported that Covered Trust Warrantor Wells Fargo had breached its R&Ws concerning billions of dollars of mortgage loans it sold to "government-sponsored entities" Fannie Mae and Freddie Mac (sometimes collectively referred to herein as the "GSEs").  The FCIC Report revealed that *Wells Fargo faced $3.5 billion in repurchase claims* from the GSEs because of its pervasive R&W breaches.  FCIC

- 30 -

Report at 224-25. The FCIC Report also stated that "during the three years and eight months ending August 31, 2010, *Freddie [Mac] and Fannie [Mae] required sellers to repurchase 167,000 loans totaling $34.8 billion*." *Id*. at 224. This showed that R&W breaches were endemic. Indeed, the sheer magnitude of the repurchase claims reported by the FCIC indicated that Warrantors and loan originators routinely issued false R&Ws in the normal course of their businesses. The FCIC Report further reported that "[a]s of mid-2010, *court actions embroiled almost all major loan originators and underwriters [and] there were more than 400 lawsuits related to breaches of representations and warranties*." *Id*. at 225. Given the FCIC Report's revelation of the pervasive falsity of R&Ws issued at the same time the Mortgage Loans were similarly warranted, HSBC obtained knowledge that the Mortgage Loans in the Covered Trusts were similarly affected.[10]

75.    The FCIC Report also specifically noted that RMBS trustees and servicers, such as HSBC and the Covered Trusts' Master Servicers/Servicers, were essentially assisting warrantors in defending R&W claims by refusing to provide information to investors from which the breaches could be established. FCIC Report at 225. The FCIC Report pointed to the situation of the GSEs and stated: "*Frustrated with the lack of information from the securities' servicers and trustees, in many cases large banks, on July 12, 2010, the GSEs through their regulator, the Federal Housing Finance Agency, issued 64 subpoenas to various trustees and servicers in transactions in which the GSEs lost money*." *Id*. Given the large number of subpoenas issued and the limited number of RMBS trustees and servicers, plaintiff alleges on information and belief that HSBC and the Covered Trusts' Master Servicers/Servicers were among the parties subpoenaed for refusing to provide

---

[10]    The FCIC Report further revealed that "private mortgage insurance" ("PMI") companies – which insured lenders against defaults by borrowers – were finding extensive breaches of R&Ws concerning mortgage loans they had insured. FCIC Report at 225. The FCIC reported that, "[a]s of October 2010, the seven largest PMI companies, which share 98% of the market, had rejected about 25% of the claims (or $6 billion of $24 billion) brought to them, *because of violations of origination guidelines, improper employment and income reporting, and issues with property valuation.*" *Id.*

information to the GSEs. Of course, if HSBC and the Master Servicers/Servicers were uncooperative, they were acting against the best interests of RMBS holders, *i.e.*, the GSEs, contrary to their mandate under RMBS governing agreements.

76.     ***The FCIC also "conclude[d] that there was untrammeled growth in risky mortgages [and that] [u]nsustainable, toxic loans polluted the financial system and fueled the housing bubble," while government regulators "failed to . . . establish and maintain prudent mortgage lending standards and to protect against predatory lending*.**" FCIC Report at 101. The FCIC Report confirmed that "***[l]ending standards collapsed, and there was a significant failure of accountability and responsibility throughout each level of the lending system*.**" *Id.* at 125. In addition, testimony released in connection with the FCIC Report confirmed "***systemic*" misconduct which led to uniformly false loan R&Ws at the time the Mortgage Loans were originated, warranted and transferred to the Covered Trusts. In testimony given to the FCIC, former Clayton Holdings, Inc. ("Clayton") executive D. Keith Johnson testified that he had previously worked at lender Washington Mutual Bank ("WaMu") as well as at WaMu's subsidiary, Long Beach Mortgage Company ("Long Beach"), prior to working for Clayton. When Johnson moved to Clayton, he was exposed to the lending practices of nearly all of the lenders in the mortgage loan industry because Clayton was hired by nearly all of the RMBS securitizers to sample and test mortgage loans that the securitizers were originating or purchasing from numerous lenders throughout the nation and then re-selling and transferring to RMBS trusts, including the Covered Trusts. WaMu and Long Beach were two of the worst lenders during 2005-2007, as they routinely engaged in egregiously fraudulent lending practices, as documented in the Senate Report discussed *infra*. Johnson testified in an interview with the FCIC on September 2, 2010, concerning the lending practices he observed both before and after he worked at WaMu/Long Beach and Clayton:

> *I had a really unique perspective working in an environment that turned out bad loans, Long Beach, right? **Then I go to Clayton and I'm dealing with the top factories in the world. And you know what? They're just like Long Beach. There's no difference. I mean, this was not a one-off situation; it was systemic. And all of them** – a lot of them had quality control departments internal, but eventually **all of those internal quality control departments became compromised**.*

77.    The FCIC Report further revealed that, in 2005, federal examiners and agencies conducted a "confidential . . . study of mortgage practices at six lenders that together had originated . . . *almost half the national total*" of mortgage loans in 2005. FCIC Report at 172. *The study* "*showed a very rapid increase in the volume of these irresponsible loans, very risky loans*," according to Sabeth Siddique, then head of credit risk at the Federal Reserve Board's Division of Banking Supervision and Regulation. *Id.* *For "[a] large percentage of the[] loans" reviewed, "the underwriting standards . . . had deteriorated*." *Id.* The lenders involved in making these "'irresponsible loans, very risky loans'" included Wells Fargo, a Warrantor and loan originator for the WFHET 2006-2 Covered Trust. *Id.*

78.    The FCIC Report also confirmed that several of the Warrantors and loan originators to the Covered Trusts were deeply involved in lending abuses which resulted in pervasive breaches of their R&Ws. For example, Darcy Parmer, a former quality assurance and fraud analyst for Wells Fargo, reported to the FCIC that she was aware of "'*hundreds and hundreds and hundreds of fraud cases*'" in Wells Fargo's home equity loan division. FCIC Report at 162. She also told the FCIC that "*at least half the loans she flagged for fraud were nevertheless funded, over her objections*." *Id.* This obviously led to "'hundreds and hundreds and hundreds'" of false loan R&Ws. *Id.*

79.    The FCIC also found that Warrantor/loan originator Fremont had a company policy whereby any loan that was rejected by a securitizer because it did not comply with Fremont's underwriting guidelines (and therefore its R&Ws) was nonetheless put into a subsequent pool of Fremont loans and offered for sale to another securitizer. These defective loans remained in the pools

until they were either sold or were rejected by securitizers at least three times. This practice ensured that loans that did not comply with Fremont's R&Ws were included into RMBS trusts like the Covered Trusts. D. Keith Johnson, the former President of Clayton, jokingly called this practice the "'three strikes, you're out rule.'" FCIC Report at 168. In another instance, the FCIC reported on the case of a real estate appraiser in Bakersfield, California, that had discovered multiple instances of lending fraud. When he contacted a quality assurance officer at Fremont to inform him of the fraudulent activity he was told: "'Don't put your nose where it doesn't belong.'" *Id.* at 14-15. This indicated that Fremont intentionally made false R&Ws.

80.     The FCIC Report also confirmed the industry-wide use of falsely inflated appraisals during the period when the Mortgage Loans were originated, which also resulted in false R&Ws. According to the FCIC Report, "*[a]s the housing market expanded, another problem emerged, in subprime and prime mortgages alike: inflated appraisals*." FCIC Report at 91. Testimony released with the FCIC Report confirmed the customary use of falsely inflated appraisals – which was a breach of the Warrantors' R&Ws – during the time the Mortgage Loans were originated. Jim Amorin, the President of the Appraisal Institute, testified to the FCIC that "*[i]n many cases, appraisers are ordered or severely pressured to doctor their reports and to convey a particular, higher value for a property, or else never see work from those parties again. . . . [T]oo often state licensed and certified appraisers are forced into making a 'Hobson's Choice.'*"

81.     *Most Importantly, the FCIC Report also specifically revealed for the first time that it was a customary and regular business practice of RMBS securitizers, including some of the Warrantors and loan originators to the Covered Trusts, to deliberately transfer thousands of mortgage loans that did not comply with applicable laws or underwriting guidelines (and therefore breached the R&Ws made about them) into RMBS trusts offered and sold to investors. This*

- 34 -

*widespread intentionally fraudulent practice occurred during the exact same time period when the Mortgage Loans were originated, warranted and transferred to the Covered Trusts*. This startling revelation – that RMBS securitizations like the Covered Trusts had been *deliberately filled with loans that breached their R&Ws* – was based on Clayton's "Trending Reports," which were provided to the FCIC.  As previously alleged, Clayton was hired by virtually every RMBS securitizer – *including several Warrantors and loan originators to the Covered Trusts* – during 2006 and 2007 to perform due diligence on mortgage loans that were being securitized, warranted and transferred to RMBS trusts.  Clayton tested samples of the loans during the period from January 2006 through June 2007 to determine whether the loans complied with the applicable lending laws and underwriting guidelines (laws and guidelines that were designed to prevent the making of loans to borrowers who could not afford them), or were otherwise defective.   Clayton's Trending Reports revealed that large percentages of the sampled loans *for several of the Warrantors and loan originators* did not comply with lending laws or the applicable underwriting guidelines, or were otherwise defective, *i.e.*, the loans were in breach of R&Ws made about them.  *Incredibly, even after being informed of the specific defective loans, these Warrantors and loan originators to the Covered Trusts did not remove all of the defective loans, but rather, "waived" a large portion of them in, i.e., transferred the breaching loans into the RMBS trusts, warranted them as being fine and then sold them to investors*!  These same Warrantors and loan originators also did no further testing of the remaining loans in the pools – tens of thousands of loans – even though it was highly probable from a statistical perspective that they would have the same defect rates as the sampled loans.  Instead, they bought the unsampled loans sight unseen, falsely warranted that the loans were free of defects, and dumped them into the RMBS trusts they were selling to investors like plaintiff and the class.  The following chart summarizes the FCIC's findings concerning some of the Covered Trusts' specific Warrantors and

- 35 -

loan originators and their deliberate inclusion of defective loans breaching their R&Ws into RMBS trusts:

| Covered Trust Loan Warrantor and/or Loan Originator Identified by FCIC Report | Covered Trusts Involving Identified Warrantor or Loan Originator | Percentage of Loans in Test Samples that Breached R&Ws | Percentage of Loans that Breached R&Ws but Were "Waived" into the RMBS Trusts and Sold to Investors |
|---|---|---|---|
| DBSP | DBALT 2006-AR5 | 34.9% | 50.1% |
| Fremont | FHLT 2006-C | 15%-25% | 10%-35% |

82.     Indeed, the FCIC Report and Clayton Trending Reports revealed that even HSBC was engaged in the same fraudulent practices.  HSBC was informed that 27% of its loans had R&W breaches yet it still "waived" 62% of those defective loans into its RMBS securitizations.

83.     The FCIC Report, via the Clayton Trending Reports, also made it clear that the inclusion of defective, breaching mortgage loans into RMBS trusts was not limited only to those warrantors and loan originators specifically identified in the FCIC Report.  Rather the FCIC Report made clear that this fraudulent behavior was ubiquitous.  Clayton's Trending Reports included information about "*All Others*" that originated loans for RMBS trusts, or in other words, those lenders and warrantors that had not been specifically identified in Clayton's reports.  Such information showed that all the other unidentified loan originators and warrantors had also deliberately transferred defective mortgage loans into RMBS trusts.  On information and belief, and based on the evidence in the FCIC Report (including the Clayton Trending Reports and D. Keith Johnson's testimony that these abuses were "systemic"), plaintiff alleges that all of the Covered Trust Warrantors and loan originators were intentionally transferring defective mortgage loans into RMBS trusts – including the Covered Trusts – which breached their R&Ws.  Indeed, the FCIC Report

revealed that false R&Ws permeated virtually every RMBS trust created during the time period the Covered Trusts were formed. Thus, HSBC learned from the FCIC Report (and also later, from the April 2011 Senate Report) that the Warrantors had breached their R&Ws concerning the Mortgage Loans in the Covered Trusts, particularly after comparing the soaring default rates of the Mortgage Loans in the Covered Trusts in April 2011 to historical averages, and from the Covered Trusts' obscene losses by then. *See infra* ¶93 (chart).

84. Then, on April 13, 2011, the Senate Report[11] was publicly released. The Senate Report confirmed (again) for HSBC that the lending industry in general, and the Warrantors to the Covered Trusts in particular, had uniformly breached their R&Ws. The 635-page Senate Report was supported by thousands of pages of documentary evidence and the testimony of numerous witnesses subpoenaed by the Senate Subcommittee on Investigations. The Senate Report not only confirmed the FCIC Report's findings, but also provided amplified additional evidence that the Warrantors had breached their R&Ws. The Senate Report also provided an inside look at a lending industry run amok during the period the Mortgage Loans were originated, warranted and transferred to the Covered Trusts, exposing an industry that uniformly and intentionally churned out thousands of defective mortgage loans in breach of the R&Ws made about them, leading to the inescapable conclusion that the Mortgage Loans in the Covered Trusts suffered from extensive breaches of the Warrantors' R&Ws.

---

[11] The Senate Report was issued by U.S. Senators Carl Levin and Tom Coburn for the United States Senate Permanent Subcommittee on Investigations concerning their inquiry into key causes of the financial crisis. The Senate Report examined four aspects of the financial crisis: (1) high-risk mortgage lending; (2) regulatory inaction; (3) inflated credit ratings that misled investors; and (4) the role played by investment banks in creating and selling structured finance products such as RMBS that foisted billions of dollars of losses on investors while the banks profited from betting against the mortgage market.

85.     First, the Senate Report re-confirmed that from 2005 through 2007 "*[l]enders*

*introduced new levels of risk into the U.S. financial system by selling . . . home loans with . . . poor*

*underwriting*," and that "*<u>a host of financial institutions . . . knowingly originated, sold, and</u>*

*<u>securitized billions of dollars in high risk, poor quality home loans</u>*." Senate Report at 12, 50.

86.     In addition, due in part to a lack of proper regulatory oversight by the Government, the

Senate Report also found that, shortly after the Mortgage Loans in the Covered Trusts were

originated, warranted and transferred to the trusts, there existed

> *a mortgage market saturated with risky loans, and financial institutions [and investors]*
> *that were supposed to hold predominantly safe investments . . . instead held portfolios rife*
> *with high risk, poor quality mortgages. When those loans began defaulting in record*
> *numbers and mortgage related securities plummeted in value, financial institutions*
> *around the globe suffered hundreds of billions of dollars in losses, triggering an economic*
> *disaster.*

Senate Report at 5.

87.     These conclusions caused HSBC to know that the Covered Trusts were also "rife with

high risk, poor quality mortgages" in breach of the Warrantors' R&Ws.

88.     The Senate Report also identified many of the abusive lenders that made loans that

breached their R&Ws. Not surprisingly, the Senate Report singled out Covered Trust Warrantors

and/or loan originators IndyMac and Fremont (among others), reporting that:

> *The fact is that each of these lenders issued billions of dollars in high risk, poor*
> *quality home loans. By allowing these lenders, for years, to sell and securitize*
> *billions of dollars in poor quality, high risk home loans, regulators permitted them*
> *to contaminate the secondary market and introduce systemic risk throughout the*
> *U.S. financial system.*

Senate Report at 239.

89.     The Senate Report also confirmed that Covered Trust Warrantor Fremont was "*known*

*for issuing poor quality subprime loans,*" but "*[d]espite [its] reputation[] for poor quality loans,*

- 38 -

*leading investment banks [such as the other Warrantors] continued to do business with [it] and helped [it] sell or securitize . . . billions of dollars in home mortgages.*" Senate Report at 21.

90.     The Senate Report also revealed that traders at Warrantor DBSP's related "Deutsche Bank" companies knew that AHM, an originator of Mortgage Loans in the DBALT 2006-AR5 Covered Trust which DBSP had warranted, was "considered bad" because of its defective loans. Senate Report at 338 & n.1277.  Thus, the Deutsche Bank traders were recommending to their select clients that RMBS backed by AHM loans be shorted.  *Id.*  This should have indicated to HSBC that any R&Ws made by DBSP regarding the AHM Mortgage Loans in the DBALT 2006-AR5 Covered Trust were false.

91.     Indeed, the Senate Report indicated that DBSP's sister companies had extensive knowledge that numerous RMBS – including DBSP's very own – were full of loans that breached DBSP's and other Warrantors' R&Ws.  The Senate Report set forth several examples of Deutsche Bank's institutional knowledge that numerous mortgage loans underlying RMBS were defective, as illustrated by the following comments made by Deutsche Bank's traders about various RMBS and CDOs backed by loans from numerous lenders:

- *"this bond blows"*
- *"half of these are crap"*
- *"weak"*
- *"bad"*
- *"pig"*
- *"I can probably short this name to some ... fool"*
- *"This kind of stuff rarely trades in the synthetic market and will be tough for us to cover i.e. short to a ...fool.  That said if u gave us an order at 260 we would take it and try to dupe someone."*
- *"crap bond"*
- *"crap we shorted"*
- *"this bond sucks"*
- *"generally horrible"*
- *"u have picked some crap"*
- *"this is an absolute pig"*
- *"crap deal"*

- 39 -

- *"deal is a pig!"*

Senate Report at 338-40. Deutsche Bank took advantage of this inside information, as it bet that numerous RMBS (and their underlying loans) would fail. According to the Senate Report, Deutsche Bank made a massive $5 billion "short" bet on RMBS, from which it derived the largest profit ever made on a single position in Deutsche Bank's history when the mortgage loans ultimately failed, as Deutsche Bank knew they would, and the RMBS collapsed. *Id.* at 10.

92.     The Senate Report served to make it exceedingly clear that the Mortgage Loans in the Covered Trusts were subjected to the same misconduct as reported therein. Therefore, by no later than April 13, 2011, the date of the Senate Report's release, and based on the tsunami of previously reported information, including the FCIC Report and the volumes of evidence it disclosed, HSBC "discovered," as that term is used in the Governing Agreements, that there were pervasive breaches of the Warrantors' R&Ws concerning thousands of Mortgage Loans within the Covered Trusts.

93.     Further supporting the conclusion that HSBC discovered by April 2011 that thousands of Mortgage Loans in the Covered Trusts breached the Warrantors' R&Ws is the fact that, by that time, the Mortgage Loans in the Covered Trusts had continued to default at rates never seen before, and the Covered Trusts' losses were skyrocketing to levels that could only have been caused by massive breaches of the Warrantors' R&Ws. Indeed, by April 2011, the Covered Trusts' Mortgage Loan default rates ranged from 42% to over 54%.[12] In addition, the Covered Trusts' losses had

---

[12]   It should be noted that the foregoing Mortgage Loan default rates actually *understate the aggregate default rates for all of the Mortgage Loans that were originally within the Covered Trusts*. To explain, the foregoing default rates are derived from the monthly Covered Trust reports which disclose the default rates *for only those Mortgage Loans still remaining within the Covered Trusts*. In other words, these default rates *do not include all those Mortgage Loans that were originally within the Covered Trusts that had been in default and were already liquidated and therefore removed from the Covered Trusts before the specific report was issued*. Thus, the actual aggregate default rates for all of the Mortgage Loans that were originally in the Covered Trusts is actually *much, much higher*.

mushroomed from approximately $257 million in January 2009 (*see supra* ¶69), to ***over $891 million by April 2011***, due in large part to HSBC's failure to enforce the Warrantors' R&W obligations. These default rates and losses were known to HSBC because it either prepared the monthly reports containing this information or it had access to such information.  The Covered Trusts' default rates and losses reported in April 2011 were as follows:

| Covered Trusts' Mortgage Loan Default Rates and Cumulative Realized Losses Reported in April 2011 | | |
|---|---|---|
| Covered Trust | Mortgage Loan Default Rates | Cumulative Realized Losses |
| DBALT 2006-AR5 | 42.87% | $292,187,299.54 |
| FHLT 2006-C | 54.50% | $503,911,099.31 |
| WFHET 2006-2 | 44.52% | $ 95,200,573.89 |
| Covered Trusts' Total Realized Losses: | | $891,298,972.74 |

94.    Even after April 2011, there were hundreds of additional events that came to light that publicly and repeatedly re-informed HSBC that the Warrantors had systematically breached their R&Ws concerning the Mortgage Loans in the Covered Trusts, and further educated HSBC about new and additional breaches.  These events are far too numerous to list in this Complaint, but they all corroborated the fact that the Warrantors had breached their R&Ws concerning thousands of Mortgage Loans in the Covered Trusts.

> c.    **Specific Claims Made About the Mortgage Loans in the Specific Covered Trusts Caused HSBC to Discover Breaches of the Warrantors' R&Ws**

95.    Two lawsuits also specifically informed HSBC of breaches of the Warrantors' R&Ws as to Mortgage Loans in two of the Covered Trusts.  First, on April 20, 2011, the Federal Home Loan Bank of Boston filed an action in Massachusetts State Court against Covered Trust Warrantor DBSP, among others, alleging that it had made numerous misrepresentations about the Mortgage Loans within the DBALT 2006-AR5 Covered Trust.  *See* Complaint, *Fed. Home Loan Bank of Boston v. Ally Financial, Inc., et al.*, No. SUCV-11-1533 (Mass. Super. Ct., Suffolk Cnty. Apr. 20, 2011).  The

complaint in that action alleged that DBSP and other defendants had represented that the Mortgage

Loans in the DBALT 2006-AR5 Covered Trust were originated pursuant to specific underwriting

guidelines, when in fact such guidelines were ignored.  The complaint further alleged that DBSP and

others had falsely reported the loan-to-value ratios of many of the Mortgage Loans in the DBALT

2006-AR5 Covered Trusts by using falsely inflated appraisals.  The complaint also alleged that many

of the Mortgage Loans in the DBALT 2006-AR5 Covered Trust were illegal predatory loans.  This

lawsuit put HSBC on direct notice and caused it to discover that DBSP had breached its R&Ws as to

numerous Mortgage Loans in the DBALT 2006-AR5 Covered Trust.

96.     Then, on September 2, 2011, a lawsuit was filed by purchasers of the RMBS in the

FHLT 2006-C Covered Trust alleging that numerous misrepresentations had been made about the

specific Mortgage Loans in that specific Covered Trust.  *See* Complaint, *Fed. Hous. Fin. Agency v.*

*Barclays Bank PLC, et al.*, No. 11-cv-6190 (S.D.N.Y. Sept. 2, 2011).  The lawsuit alleged that false

statements had been made about the Mortgage Loans in the FHLT 2006-C Covered Trust, including

that misrepresentations had been made to the effect that the Mortgage Loans had been originated

pursuant to specific underwriting guidelines.  Moreover, it was alleged that falsified Mortgage Loan

data had been disseminated.  These allegations indicated that the R&Ws about the Mortgage Loans in

the FHLT 2006-C Covered Trust were false, and thus Fremont, the Warrantor for this Covered Trust,

had breached its R&Ws under the Governing Agreements.

97.     The foregoing lawsuits, involving the *specific* Covered Trusts at issue herein, and the

*specific* Mortgage Loans within them, caused HSBC to discover that the Warrantors had breached

their R&Ws as to the Mortgage Loans in those two Covered Trusts.

- 42 -

### d.   HSBC Also Learned of the Warrantors' R&W Breaches from Borrowers' Bankruptcies

98.     In addition to all of the foregoing information that HSBC was aware of, HSBC was also aware of additional *specific information about the specific Mortgage Loans in the specific Covered Trusts* from the bankruptcies of the Mortgage Loans' borrowers, which also indicated that the Warrantors had breached their R&Ws.   This information indicated that fraud or misrepresentations had occurred in connection with the origination of the Mortgage Loans, that borrowers were given Mortgage Loans they could not afford, that lenders' underwriting guidelines were ignored, and that the Mortgage Loans were not legally originated, as either predatory lending or mortgage fraud had occurred.   Plaintiff's counsel has obtained information concerning Mortgage Loans within the Covered Trusts from bankruptcy filings by the borrowers.   HSBC was aware of this information since it made appearances in, monitored, and/or made claims or filed or defended actions in the bankruptcies by or against the Mortgage Loans' borrowers.   This information from the bankruptcies, as set forth below, shows that the Warrantors breached their R&Ws.

### (i)    DBALT 2006-AR5 Covered Trust

99.     Two borrowers obtained a Mortgage Loan for $1,000,000 in 2006.   The Mortgage Loan was purchased by Warrantor DBSP and transferred to the DBALT 2006-AR5 Covered Trust. The borrowers had joint income of $3,002 per month in 2006 – the year they obtained the Mortgage Loan – according to the borrowers' sworn bankruptcy filings.   *However, the borrowers' monthly debt payments were at least $15,495, far in excess of the borrowers' monthly income*.   The borrowers' monthly debt payments were in addition to the borrowers' monthly expenses for things such as taxes, utilities, groceries, health care, transportation, and the like.   Clearly, these borrowers could not afford to repay this Mortgage Loan, and the Mortgage Loan was not originated under any lender's underwriting guidelines for such a loan, contrary to Warrantor DBSP's R&Ws.   The

foregoing also appears to show that the Mortgage Loan was made in violation of predatory or abusive lending laws since the borrowers clearly could not afford the Mortgage Loan.  In addition, the apparent misrepresentation of the borrowers' income and/or debts that occurred to "qualify" the borrowers for the Mortgage Loan in the first place appears to also violate mortgage fraud laws, and contradicts DBSP's representations that the Mortgage Loan data it provided was true and correct. The fact that the foregoing breaches of DBSP's R&Ws occurred is corroborated by the additional fact that the borrowers declared bankruptcy shortly after obtaining the Mortgage Loan at issue, in 2007.

(ii)     <strong>FHLT 2006-C Covered Trust</strong>

100.    A borrower obtained a Mortgage Loan for $706,350 in 2006 from Warrantor and loan originator Fremont, which was contained within the FHLT 2006-C Covered Trust. ***The borrower had income of $0 per month in 2006 according to the borrower's sworn bankruptcy filings. However, the borrower's monthly debt payments were at least $6,533, far in excess of the borrower's monthly income.***  The borrower's monthly debt payments were in addition to the borrower's monthly expenses for things such as taxes, utilities, groceries, health care, transportation, and the like.  Clearly, this borrower could not afford to repay this Mortgage Loan, and the Mortgage Loan was not originated under any lender's underwriting guidelines for such a loan, contrary to Warrantor Fremont's R&Ws.  The foregoing also appears to show that the Mortgage Loan was made in violation of predatory lending laws, also contrary to Fremont's R&Ws, since the borrower clearly could not afford the Mortgage Loan.  In addition, the apparent misrepresentation of the borrower's income and/or debts that occurred to "qualify" the borrower for the Mortgage Loan in the first place appears to also violate mortgage fraud laws, and contradicts Fremont's representations that the Mortgage Loan data it provided was true and correct.  The fact that the foregoing breaches of Fremont's R&Ws occurred is corroborated by the additional fact that the borrower declared bankruptcy shortly after obtaining the Mortgage Loan at issue, in 2007.

- 44 -

(iii)      **WFHET 2006-2 Covered Trust**

101.    A borrower obtained a Mortgage Loan for $552,000 in 2006 from Warrantor and loan originator Wells Fargo, which was contained within the WFHET 2006-2 Covered Trust. *The borrower had income $0 per month in 2006 according to the borrower's sworn bankruptcy filings. However, the borrower's monthly debt payments were at least $7,332, far in excess of the borrower's monthly income.* The borrower's monthly debt payments were in addition to the borrower's monthly expenses for things such as taxes, utilities, groceries, health care, transportation, and the like. The foregoing shows that the Mortgage Loan was made in violation of predatory and/or abusive lending laws since the borrower clearly could not afford the Mortgage Loan, contrary to Warrantor Wells Fargo's R&Ws. In addition, the apparent misrepresentation of the borrower's income and/or debts that must have occurred to "qualify" the borrower for the Mortgage Loan appears to contradict Wells Fargo's representations that the Mortgage Loan data it provided was true and correct. The fact that the foregoing breaches of Wells Fargo's R&Ws occurred is corroborated by the additional fact that the borrower declared bankruptcy shortly after obtaining the Mortgage Loan at issue, in 2007.

102.    As the foregoing demonstrates, Mortgage Loans in the Covered Trusts were extended to borrowers who, in light of their extremely heavy pre-existing debt loads and/or lack of income, clearly had no ability to repay the Mortgage Loans. The foregoing information also reveals that: (1) the Mortgage Loans were obtained by providing falsified information; (2) lenders ignored their stated underwriting guidelines; and (3) illegal mortgage fraud and/or predatory or abusive lending by either lenders or borrowers, or both, had occurred.

103.    The foregoing examples are not isolated or extreme, or aberrations or outliers. In fact, there are a large number of Covered Trust Mortgage Loan borrowers that went bankrupt under similar

circumstances, and HSBC learned of widespread breaches of the Warrantors' R&Ws through such bankruptcies.

104.     Despite HSBC's discovery and actual knowledge of systemic R&W breaches concerning Mortgage Loans in the Covered Trusts by the Warrantors, HSBC did not enforce the Warrantors' obligations to cure, substitute or repurchase thousands of defective Mortgage Loans as required by the Governing Agreements and the TIA. Moreover, HSBC's continuing failure to act, after learning of the breaches and of new breaches, has resulted in HSBC engaging in numerous additional breaches of its continuing duties under the Governing Agreements and the TIA to enforce the R&W claims after April 2011, and has caused the loss of hundreds of millions of dollars in meritorious R&W claims that are now barred by the statute of limitations. By these failures, HSBC breached the Governing Agreements and violated the TIA, thereby causing plaintiff, the class and the Covered Trusts to suffer massive damages.

### 2.     HSBC Had Actual Knowledge of Events of Default No Later than April 13, 2011, Thus Triggering Its Duties to Act Under the Governing Agreements and the TIA

105.     As previously alleged, HSBC was also required by the Governing Agreements and the TIA to act as a quasi-fiduciary whenever it became aware of Events of Default by the Covered Trusts' Master Servicers or Servicers. That is, whenever the Master Servicers/Servicers failed to ensure that the Mortgage Loans in the Covered Trusts were being serviced in accordance with the law and as "prudent" servicers, an Event of Default occurred. In addition, an Event of Default occurred whenever HSBC learned that the Master Servicers/Servicers knew of Warrantor R&W breaches but did not report them to HSBC. When HSBC learned of these Events of Default, it was required to notify the offending Master Servicer or Servicer and require a cure of the default, and also notify plaintiff and the class of the Event of Default, and take other actions if necessary. *Most importantly, HSBC was required to exercise all of its powers under the Governing Agreements as a "prudent*

- 46 -

***person" would, and seek to protect plaintiff's and the class's interests as if they were HSBC's very own interests whenever there was an uncured Event of Default.*** HSBC's powers included terminating and replacing the offending Master Servicer or Servicer or taking over its responsibilities. However, as alleged more fully below, even though HSBC obtained actual knowledge of rampant Master Servicer/Servicer Events of Default with respect to the Mortgage Loans in the Covered Trusts by no later than April 13, 2011, HSBC breached the Governing Agreements and violated the TIA by failing to take any of the actions required of it or allowed by the Governing Agreements and the TIA. Moreover, even though numerous new Events of Default have occurred after April 13, 2011, HSBC has continued to fail to act, and thus has committed numerous additional breaches of its duties under the Governing Agreements and the TIA.

106.    The Master Servicers and Servicers to the Covered Trusts as designated in the Governing Agreements, and their successors, if any, are set forth in the chart below.  To plaintiff's knowledge, none of these Master Servicers or Servicers have been terminated or replaced by HSBC due to any of the Events of Default alleged herein, nor has HSBC notified plaintiff and the class of such Events of Default:

**Covered Trusts' Master Servicers and Servicers**

| Covered Trust | Master Servicer | Original Servicer(s) and Successor Servicer(s) |
|---|---|---|
| DBALT 2006-AR5 | ▪ Wells Fargo | ▪ **American Home Mortgage Servicing, Inc. ("AHM Servicing")** (AHM Servicing was acquired by **Ocwen Financial Corporation ("Ocwen")**[13] in 2012)<br>▪ **Countrywide Home Loan Servicing LP** (changed its name to BAC Home Loan Servicing LP after being acquired by Bank of America in 2008) **(hereinafter "CHLS/BACHLS")**<br>▪ **GMAC Mortgage, LLC ("GMAC")**<br>▪ **GreenPoint**<br>▪ **IndyMac** (IndyMac was acquired by **OneWest Bank ("OneWest")** in 2009; **Ocwen** acquired the loan servicing rights in 2013)<br>▪ **National City Mortgage Co. ("National City")** (National City was acquired by **PNC Financial Services ("PNC")** in 2008)<br>▪ **PHH Mortgage Corporation ("PHH")**<br>▪ **Select Portfolio Servicing Inc. ("SPS")**<br>▪ **Wells Fargo** |
| FHLT 2006-C | ▪ Wells Fargo | ▪ **Fremont** (the loan servicing rights were acquired by **Litton Loan Servicing ("Litton")** in 2008; **Litton** was acquired by **Ocwen** in 2011) |
| WFHET 2006-2 | ▪ None | ▪ **Wells Fargo** |

107.    Due to the large number of defective Mortgage Loans in breach of the Warrantors' R&Ws that remained in the Covered Trusts because of HSBC's failures to act as alleged above, a flood of defaults started occurring in late 2007 and early 2008, which in turn led to a flood of subsequent foreclosure proceedings.    Under the Governing Agreements, the Master Servicers/Servicers were responsible for properly instituting and prosecuting foreclosures on behalf of HSBC, and were required to conduct such foreclosures *legally and "prudent[ly]*."[14]  Another RMBS

---

[13]  "Ocwen" is meant to refer to Ocwen Financial Corporation and all of its affiliates, subsidiaries and predecessor companies, including Ocwen Federal Bank FSB and Ocwen Loan Servicing LLC.

[14]  *See* DBALT 2006-AR5 PSA §3.1 ("the Master Servicer shall act in a manner consistent with Accepted Master Servicing Practices"); *id.* §1.1 ("Accepted Master Servicing Practices" defined as "those customary mortgage servicing practices of *prudent* mortgage servicing institutions"); *id.* §2.5(iii)(B) (Master Servicer will not violate laws); *id.* §3.5 ("The Master Servicer shall … have full

- 48 -

trustee has characterized an RMBS trustee's and the master servicers'/servicers' duties with respect to servicing and foreclosing on loans as follows: "*our legal duty [is] to protect the interests of*" RMBS investors.

        **a.    Shortly After the Covered Trusts Were Formed, HSBC Became Aware of Widespread Loan Servicing Abuses that May Have Affected the Covered Trusts, and by the End of October 2010, HSBC Learned that the Master Servicers and Servicers Were Committing Events of Default as to the Mortgage Loans in the Covered Trusts**

     108.    Beginning as early as the summer of 2008 and continuing thereafter, HSBC became aware of several loan servicing issues involving several of the Covered Trust Master Servicers/Servicers.  For example, as early as March 2008, news reports surfaced concerning SPS, a Servicer for the DBALT 2006-AR5 Covered Trust.  The reports revealed that SPS had been sued by an RMBS investor alleging that **SPS had engaged in predatory loan servicing practices, charging improper fees to borrowers, and making servicing advances that improperly diverted money from RMBS investors to SPS.**

     109.    In addition, in June 2010, the United States Trustee Program ("USTP"), a component of the U.S. Department of Justice, announced that it had conducted an investigation (with the FTC) of CHLS/BACHLS, also a Servicer for the DBALT 2006-AR5 Covered Trust.  The USTP revealed that it had started its investigation of CHLS/BACHLS "*after receiving complaints of chronic . . . irregularities by mortgage servicing companies." CHLS/BACHLS was charged with "improper business practices" and "improper accounting and billing practices," including the filing of false and improper claims in bankruptcy proceedings against borrowers, inflating mortgage claims,*

---

power and authority . . . to effectuate foreclosure . . . of the Mortgaged Property securing any Loan . . . ."); *id.* ("The Trustee shall furnish the Master Servicer . . . with any powers of attorney . . . empowering the Master Servicer or the related Servicer . . . to foreclose upon or otherwise liquidate Mortgaged Property . . . .").

*failing to credit borrowers for payments made, and failing to notify borrowers of extra and/or improper charges added to their bills*.[15] CHLS/BACHLS entered into a consent order promising to reform its loan servicing practices, compensate wronged borrowers, and establish internal controls to ensure that CHLS/BACHLS's bills and claims in bankruptcy were accurate and provided accurate and useful information to borrowers. *CHLS/BACHLS paid $108 million to settle these charges.*

110.    On July 1, 2010, it was reported that a regulatory agency of the State of Maryland required Covered Trust Servicer Litton (Litton was a Servicer for the FHLT 2006-C Covered Trust) to refund approximately $71,000 to borrowers for "*violations of Maryland law, primarily related to restrictions on the imposition of prepayment penalties.*"

111.    Also in July 2010, excerpts of the deposition transcript of Jeffrey Stephan, an employee of GMAC, were made publicly available.  GMAC was a Servicer for the DBALT 2006-AR5 Covered Trust. *The deposition excerpts established that GMAC had a pattern and practice of signing and filing hundreds of false foreclosure affidavits without confirming the truth of the facts within them, without checking them to ensure the correct exhibits were even attached to the affidavits, and without personal knowledge of the facts asserted in the affidavits* (this practice became known as "robo-signing").  Below are excerpts from Stephan's deposition:

> *Q:  In your capacity as the team leader for the document execution team, do you have any role in the foreclosure process, other than the signing of documents?*
>
> *[Stephan:] No.*

---

[15]   The USTP also noted that, in 2009, U.S. bankruptcy trustees *had taken "more than 9,000 formal and informal consumer protection actions, including a large number of actions against mortgage servicing companies*."  This demonstrated the enormity and reach of the improper loan servicing practices engaged in by some in the loan servicing industry and the fact that such misconduct was being committed by many of the Covered Trusts' Master Servicers and Servicers. *The USTP also stated in its 2010 Annual Report that there were "pervasive and longstanding problems regarding mortgage loan servicing*," again revealing that these improper loan servicing practices were widespread.

                        *        *        *

*Q: When you sign a summary judgment affidavit, do you check to see if all of the
exhibits are attached to it?*

*[Stephan:] No.*

*Q: Does anybody in your department check to see if all the exhibits are attached to
it at the time that it is presented to you for your signature?*

*[Stephan:] No.*

*Q: When you sign a summary judgment affidavit, do you inspect any exhibits
attached to it?*

*[Stephan:] No.*

                        *        *        *

*Q: Is it fair to say when you sign a summary judgment affidavit, you don't know
what information it contains, other than the figures that are set forth within it?*

*[Stephan:] Other than the borrower's name, and if I have signing authority for
that entity, that is correct.*

                        *        *        *

*Q: Mr. Stephan, do you recall testifying in your Florida deposition in December
with regard to your employees, and you said, quote, they do not go into the system
and verify that the information is accurate?*

*[Stephan:] That is correct.*

112.    On August 30, 2010, the Attorney General of Texas charged AHM Servicing – another

Servicer for the DBALT 2006-AR5 Covered Trust – "*with using illegal debt collection tactics and*

*improperly misleading struggling homeowners*."  The Attorney General's news released stated:

> *According to state investigators, AHMS [i.e., AHM Servicing] collections
> agents used aggressive and unlawful tactics to collect payments from Texas
> homeowners who had difficulty meeting their payment obligations.  The defendant
> also failed to credit homeowners who properly submitted their payments on time.*
>
> *In other cases, AHMS agents falsely claimed that homeowners did not
> make payments so the agents could justify profitable late fees or escrow accounts.
> The defendant also failed to properly credit homeowners after AHMS agents
> withdrew funds from the homeowners' checking accounts.  Because of the*

*defendant's unlawful conduct, homeowners defaulted on their loans, leading to foreclosure proceedings.*

Additionally, the defendant claimed to have a Home Retention Team to assist distressed homeowners. Many customers found that AHMS could not qualify homeowners and that they were of no help to halt the foreclosure process. *Some homeowners who actually obtained loan modifications found that their monthly payments increased rather than decreased, which worsened their problem with foreclosure.*

*Today's enforcement action charges AHMS with multiple violations of the Texas Debt Collection Act and the Texas Deceptive Trade Practices Act (DTPA). The State is also seeking civil penalties of up to $20,000 per violation of the DTPA.*

113. The foregoing events put HSBC on notice that some Covered Trust Servicers were engaged in practices that amounted to Events of Default.

114. In addition, starting in 2008 and 2009, all RMBS trustees, including HSBC, were beginning to experience serious foreclosure issues. HSBC and the other RMBS trustees were having difficulties foreclosing on defaulted mortgage loans because of widespread loan servicing errors and misconduct. Courts were denying, delaying, halting, dismissing and even invalidating many foreclosures because of egregiously shoddy foreclosure practices or fraudulent misconduct by loan servicers. Because of these improper practices, RMBS trustees were having difficulties establishing that they owned or possessed the notes and mortgages at the time they filed suit or foreclosed, as required by law. In addition, RMBS trustees were facing long delays in foreclosing caused by faulty, or in many cases false or fraudulent, mortgage documentation created and filed by the master servicers and servicers, as well as their assertions of erroneous or deliberately false facts. Over time, and by the end of October 2010, it became apparent that loan servicers, including the Covered Trusts' Master Servicers and Servicers, were systematically filing fraudulent affidavits that were not legally notarized in many cases, and were also creating bogus mortgage and note assignments, as well as filing foreclosure complaints and other court documents that contained blatantly false allegations and

assertions. Such loan servicing practices were clearly not proper, legal or "prudent," as required by the Governing Agreements.

115.    Indeed, HSBC has experienced hundreds, if not thousands, of denials, dismissals, delays and invalidations of its foreclosure proceedings filed by its servicers, and numerous motions for relief from bankruptcy stays being denied or delayed, because of misconduct by its loan servicers. By the end of October 2010, it was apparent that HSBC's loan servicers, including the Covered Trusts' Master Servicers and Servicers, were not foreclosing legally or "prudent[ly]" as required by the Governing Agreements. Instead, they were engaging in slipshod behavior, committing grossly negligent or intentional errors, filing defective documents, making inconsistent or deliberately fraudulent representations in pleadings and affidavits, and engaging in illegal, improper and deceptive behavior, including ignoring and violating court orders and violating state foreclosure laws, all of which were Events of Default.[16]

---

[16] *See, e.g., Davenport v. HSBC Bank USA*, 739 N.W.2d 383, 385 (Mich. Ct. App. 2007) ("***In this case, defendant [HSBC] did not own the mortgage or an interest in the mortgage on October 27, 2005. Nonetheless, defendant proceeded to commence foreclosure proceedings at that time. Quite simply, defendant did not yet own the indebtedness that it sought to foreclose.*** The circuit court erred by determining that defendant's noncompliance with the statutory requirements did not nullify the foreclosure proceedings. ***Because defendant lacked the statutory authority to foreclose, the foreclosure proceedings were void ab initio. We vacate the foreclosure proceedings and remand for proceedings consistent with this opinion.***"); *HSBC Bank USA v. Betts*, No. 21336/2007, 2008 N.Y. Misc. LEXIS 8051, at *8, *11-*13 (N.Y. Sup. Ct. Apr. 23, 2008) (HSBC's order of reference denied; court held HSBC's motion was defective because of ***suspicious and insufficient affidavits, assignments and issues related to Covered Trust Servicer Ocwen's employee Scott Anderson (who was later found to be a robo-signer in subsequent cases)***; ***court held it was "concern[ed] about possible fraud by HSBC, or at least malfeasance***"), *aff'd in part and modified in part*, 888 N.Y.S.2d 203 (2d Dep't 2009); *HSBC Bank USA v. Valentin*, 873 N.Y.S. 512, 2008 N.Y. Misc. LEXIS 6385, at *4-*5 (Sup. Ct. 2008) (***court dismissed HSBC's foreclosure action because it failed to comply with court orders and submitted an affidavit from Covered Trust Servicer Ocwen employee Scott Anderson in which the court found Anderson "lied"*** and had conflicts of interest by acting as both the assignor and assignee of the mortgage loan at issue); *HSBC Bank USA v. Miller*, 889 N.Y.S.2d 430, 431-32 (Sup. Ct. 2009) (court denied HSBC's motion for reargument, holding that "***[HSBC's] counsel is apparently abandoning the arguments which she made in opposition to the defendant's prior motion to dismiss, in which she first cited nonexistent language in the assignment, claiming***

*that the assignment explicitly assigned the mortgage 'together with the bond or obligation described in said mortgage, and the moneys due to grow thereon with interest,'" and also asserted "that '[a]s a matter of course, the note also follows the mortgage,' and that 'title to the Note passed upon physical delivery from MERS to the Plaintiff,'"* <u>*even though the "assertion that the note follows the mortgage is unsupported by any law,* and the assertion that the original note was transferred by physical delivery to the plaintiff is . . . *unsupported by any evidentiary factual support from a person with personal knowledge of the facts*</u>"); *HSBC Bank USA, N.A. v. Perez*, No. EQ4870, slip op. at 8-9 (Iowa Dist. Ct., Wash. Cnty. Dec. 17, 2009) (***HSBC's motion for summary judgment was denied because evidence provided by Covered Trust Servicer Litton showed that "this mortgage was inappropriately transferred to the Plaintiff [HSBC]"; the court also noted that HSBC (through Litton) requested an extension of time to supplement [its] summary judgment motion, which the court granted, "but the Plaintiff [HSBC] failed to do so.  Nor did the Plaintiff request or apply for any further extension of time . . . .***"); Transcript at 5:24, 8:6-11, 9:18, 18:1-3, *HSBC Bank USA, N.A. v. Eslava*, No. 1-2008-CA-055313 (Fla. Cir. Ct., Miami-Dade Cnty. May 6, 2010) (***In a hearing on an order to show cause,* <u>*the court sanctioned HSBC, holding that "[t]he basis for this sanction is the contemptuous noncompliance with the Court's order to post the bond.*</u>"  ***The court noted that HSBC (or its servicer) "lost the note" and "that notwithstanding whatever kind of sloppy operation the plaintiff [HSBC and its servicer] is running, . . . court orders [should be] complied with."*** <u>***The court's sanctions consisted of a dismissal of HSBC's case with prejudice, cancelling the borrower's note, finding it null and void and relieving the borrower of the debt.  The court also granted the borrower's request for fees and costs.***</u>) (hearing transcript is attached hereto as Ex. C); *HSBC Bank USA, N.A. v. Yeasmin*, 911 N.Y.S.2d 693, 2010 N.Y. Misc. LEXIS 1143, at *1-*4, *14-*16 (Sup. Ct. 2010) (***The court denied HSBC's renewed motion for order of reference,* <u>*dismissed HSBC's case with prejudice,* and cancelled notice of pendency on the subject property.  *The court held that HSBC and Covered Trust Master Servicer/Servicer Wells Fargo failed to comply with a court order, filed the renewed motion 204 days late, filed a defective affidavit from Wells Fargo, filed a defective assignment of the mortgage and note, and failed to properly address a blatant conflict of interest.  The court further held that HSBC's/Wells Fargo's attorney's representations to the court "are so incredible, outrageous, ludicrous and disingenuous that they should have been authored by the late Rod Serling, creator of the famous science-fiction television series, The Twilight Zone.  [HSBC's and Wells Fargo's] counsel . . . appears to be operating in a parallel mortgage universe, unrelated to the real universe.*</u>"); *HSBC Bank USA, N.A. v. Foreman*, No. 2008 CA 2076 S, slip op. at 5-6 (Fla. Cir. Ct., Okaloosa Cnty. July 28, 2010) (***court dismissed HSBC's action, finding that HSBC (or its servicer) failed to pay proper amount of Documentary Stamp Tax before instituting the action and, in addition, after receiving leave of court to file an amended complaint to omit a promissory note that was supposedly mistakenly attached to HSBC's original complaint, HSBC then failed to omit the purportedly mistaken note when it filed the amended complaint; court held that borrower is entitled to fees and costs***); Order Adjudicating Plaintiff's Attorneys in Contempt of Court, *HSBC Bank USA, N.A. v. De Freitas*, No. 2007-CA-007993 (Fla. Cir. Ct., Manatee Cnty. Sept. 2, 2010) (***<u>court held HSBC's attorneys in contempt and sanctioned law firm $49,000 for intentional and flagrant violations of Florida creed of professionalism, Oath to Florida Bar, and court calendar and administrative rules</u>***) (copy of July 30, 2010 hearing transcript attached hereto as Ex. D); *HSBC Bank USA, N.A. v. Thompson*, No. 23761, 2010 Ohio App. LEXIS 3525, at *12-*13, *19-*21, *30-*33 (Ohio Ct. App. Sept. 3, 2010) (***court of appeals affirmed trial court order granting summary judgment against***

*HSBC and dismissing HSBC's complaint, holding that <u>trial court properly struck affidavit of employee of Covered Trust Servicer Ocwen because it contained "inconsistencies," such as the affiant testifying in the affidavit that he signed the affidavit in Florida while the jurat to the affidavit certified that it was executed before a notary public in New Jersey; court further held that HSBC/Ocwen also filed two other defective affidavits that incorrectly identified the borrower, failed to establish that purported "allonges" were properly affixed to note or that note and mortgage were properly assigned to HSBC; court further held that "[c]onsistent with [its] observation, recent decisions in the State of New York have noted numerous irregularities in HSBC's mortgage documentation and corporate relationships with Ocwen</u>" (citing numerous cases); <u>court noted that Ocwen "Vice-President" Scott Anderson executed assignment on behalf of both the assignor and assignee (Anderson is identified as a "known robo-signer" in Taher action below</u>)); Ruscalleda v. HSBC Bank USA, 43 So. 3d 947, 948 (Fla. Dist. Ct. App. 2010) (<u>summary judgment in favor of HSBC reversed; appellate court found that both HSBC and Covered Trust Servicer AHM Servicing "were simultaneously attempting to foreclose the same mortgage," and "[t]he complaint filed by HSBC falsely alleged that it was the current owner and holder of the mortgage and note, when, in reality, [AHM Servicing] was still the holder of the note and mortgage</u>"); Sandoro v. HSBC Bank, 55 So. 3d 730, 731-32 (Fla. Dist. Ct. App. 2011) (appeals court <u>reversed summary judgment in HSBC's favor</u>, holding that there were genuine issues of material fact concerning whether the mortgage was properly assigned to HSBC and whether "notice of acceleration" was properly provided to borrower by servicer; court noted that evidence regarding assignment supplied by HSBC/servicer sloppily stated that assignment was made on "'September November 11, 2006 [sic]'"); HSBC Bank USA, N.A. v. Palladino, 1 N.E.3d 666, 2011 Ill. App. Unpub. LEXIS 931, at \*11-\*12 (Ill. App. Ct. 2011) (Summary judgment in HSBC's favor was reversed and remanded; the court held: "In the present case, there are genuine issues of material fact with respect to whether there was an assignment of the mortgage and note from Fremont to HSBC Bank. Although HSBC Bank represents that it produced the assignment, the document on which it relies, by its very terms, was, at worst, not an assignment and, at best, <u>inherently inconsistent</u> as to whether it was an assignment. . . . In addition to the purported assignment's inconsistent terms, the document upon which HSBC Bank relies is <u>vague with respect to the date of the purported assignment. The document has a stamp which appears to reflect that it was recorded on December 17, 2008, but states that the assignment was made "prior to" November 13, 2008. The document itself is undated, as is the notary's certificate. The date of the assignment is material because standing to sue must exist at the time the action is commenced.</u>"); Order for Sanctions, HSBC Bank, N.A. v. Patton, No. 2010-CA-010995 (Fla. Cir. Ct., Brevard Cnty. May 11, 2011) (<u>court sanctioned HSBC for willfully violating court order to provide discovery and dismissed HSBC's case</u>); Morgan v. HSBC Bank USA, N.A., No. 2009-CA-000597-MR, 2011 Ky. App. Unpub. LEXIS 560, at \*6-\*8 (Ky. Ct. App. July 29, 2011) (<u>court reversed summary judgment in HSBC's favor, holding that it was "troubling" that HSBC provided two different versions of the note during the litigation; the first note did not indicate that it was transferred to HSBC; however, later, at summary judgment, HSBC magically produced another version of the note with an undated allonge transferring the note to HSBC signed by Covered Trust Servicer Litton</u>); HSBC Bank USA, N.A. v. Taher, 941 N.Y.S.2d 538, 2011 N.Y. Misc. LEXIS 6147, at \*1-\*2, \*8-\*9, \*22-\*24, \*38 (Sup. Ct. Dec. 22, 2011) (<u>court cited numerous instances of misconduct by HSBC and Covered Trust Servicer Ocwen and imposed sanctions of $10,000 on HSBC for "'frivolous conduct'" in violation of 22 NYCRR §130-1.1(c), "because HSBC's use of robosigners in the</u>*

*instant action 'is completely without merit in law,'" and because HSBC "'asserts material factual statements that are false'"; court also sanctioned HSBC's counsel $5,000; court held that Ocwen employed numerous "robosigners" which executed false and/or defective documents in the case, including "known robosigner" Scott Anderson, who was identified in the Thompson and Valentin cases supra; court further held that "HSBC has a history of foreclosure actions before me with affidavits . . . that 'contain serious irregularities that make them inherently untrustworthy'"; court also noted that HSBC advanced a "Pontius Pilate and Sergeant Schultz" defense by claiming that Servicer Ocwen was responsible for the misconduct and did not inform HSBC about this action "'until last week,'" even though it filed action over two years beforehand; court held that HSBC's defense of the misconduct consists of "wash[ing] its hands of any responsibility and plac[ing] any blame upon OCWEN" while claiming ""I know nothing! Nothing!'"; court further noted that HSBC's CEO failed to appear at hearing despite being ordered to do so, "demonstrating her personal contempt for the Supreme Court of New York"*), rev'd, 104 A.D.3d 815, 962 N.Y.S.2d 301 (2d Dep't 2013) (reversed on the law but not on the facts); *HSBC Bank USA, N.A. v. Sene*, 950 N.Y.S.2d 608, 2012 N.Y. Misc. LEXIS 834, at \*4-\*6 (Sup. Ct. Feb. 28, 2012) (***Two different, conflicting versions of an assignment of a note to HSBC were filed with the court by Covered Trust Servicer Ocwen; the court held: "This Court emphatically now joins the judicial chorus who have been wary of the paperwork supplied by plaintiffs and their representatives. . . . It is clear in this case, without further hearings, that a fraud has been committed upon this Court. . . . This Court is . . . reporting the matter to the District Attorney, . . . the Attorney General of the State of New York and the U.S. Attorney . . . .***"); *HSBC Bank USA v. Beirne*, No. 10CA0113-M, 2012 Ohio App. LEXIS 1200, at \*13 (Ohio Ct. App. Mar. 30, 2012) (***Summary judgment for HSBC was reversed***; the court held: "In the affidavit that was attached to the supplement to the motion for summary judgment, ***Mr. Spradling averred that HSBC had been assigned the loan on June 5, 2009, and that '[a] true and accurate copy of the Assignment was attached to the Complaint filed by HSBC.'*** However, a review of the complaint and the exhibits attached thereto reveals that ***there was no evidence that the note had been assigned to HSBC. Moreover, an assignment dated June 5, 2009, could not have been attached to the complaint which was filed on May 11, 2009.***"); *Richards v. HSBC Bank USA*, 91 So. 3d 233, 235 (Fla. Dist. Ct. App. 2012) (***The court reversed summary judgment for HSBC*** on appeal, holding: "While the assignment reflected that the mortgage had been assigned from Century 21 to HSBC, the allonge to the note reflected that Bishops Gate Residential Mortgage Trust was to be the note's payee. . . . ***Thus the allonge was inconsistent with the assignment and contradicted the allegation in the complaint that HSBC was the holder of the note. . . . Furthermore, the affidavits filed by HSBC did not explain the relationship between HSBC and Bishops Gate Residential Mortgage Trust, nor otherwise aver facts conclusively showing that HSBC was the holder of the note.***"); *Gascue v. HSBC Bank*, 97 So. 3d 263, 264 (Fla. Dist. Ct. App. 2012) (reversing and remanding order denying motion to vacate judgment in HSBC's favor, holding that "***[t]here is no evidence on the record indicating that [HSBC] was the holder of the mortgage at the time the complaint was filed*** as required by law"); *Serrano v. HSBC Bank USA*, 107 So. 3d 527 (Fla. Dist. Ct. App. Feb. 20, 2013) (***summary judgment in HSBC's favor reversed because genuine issue of fact existed concerning whether servicer provided required pre-suit notice of acceleration***); Complaint, *Lopez v. HSBC Bank USA, N.A.*, No. 1:13-cv-21104-KMW (S.D. Fla. Mar. 28, 2013) (class action complaint filed by borrowers against HSBC, its sister company and insurers alleging ***HSBC received illegal "kickbacks" from insurers by requiring borrowers to purchase grossly overpriced "force-placed" insurance; in August 2014, a settlement***

- 56 -

116.    The foregoing cases, and others, also illustrate that not only was HSBC acutely aware of its loan Servicers' Events of Default, *HSBC was also either acquiescing in or actively participating in such misconduct*, as HSBC itself was sometimes accused of, or found to have engaged in, fraud, sanctionable misconduct or contempt in connection with its foreclosures.[17]

117.    HSBC was also aware that, in October and November 2010, a New York state court had issued scores of orders delaying foreclosures by HSBC and many other RMBS trustees and loan servicers because of these very same loan servicing issues. *See* Exhibit E hereto (numerous orders from Justice Tanenbaum of the Supreme Court of New York).[18]

---

*was announced wherein plaintiff announced it had obtained over $126 million in benefits for borrowers from HSBC and the other defendants*); *HSBC Bank USA v. Hamilton*, 116 A.D. 3d 663, 983 N.Y.S.2d 585 (2d Dep't 2014) (*appellate division reversed order granting HSBC the right to foreclose because HSBC did not properly serve borrower with foreclosure action*); *HSBC Bank USA, N.A. v Gilbert*, 991 N.Y.S.2d 358 (App. Div., 2d Dep't 2014) (*summary judgment in favor of HSBC reversed because HSBC failed to establish it held the note at commencement of action*).

[17]   *See supra* n. 16; *see also Canning v. Beneficial Maine, Inc.*, Adv. Pro. No. 09-02080, slip op. at 11 (Bankr. D. Me. Feb. 17, 2011) (*court held that HSBC's sister companies HSBC Mortgage Services, Inc. and HSBC Mortgage Corp. <u>violated a bankruptcy discharge injunction</u> by demanding payment from borrowers on a mortgage loan that was discharged in bankruptcy; <u>court set hearing to address nature and extent of sanctions to be issued against HSBC companies</u>*); *HSBC Mortg. Servs. v. Murphy*, 19 A.3d 815, 817, 821-22 (Me. 2011) (*HSBC's sister company had summary judgment in its favor reversed due to affidavits that contained numerous defects, such as "a notary's jurat dated . . . four days <u>before</u> [the affiant] signed the affidavit," and an affidavit falsely testifying to "information, vital to the entry of a judgment, that was not available until more than four months <u>after the affidavit was sworn to by</u>" the affiant; <u>court "determine[d] that the affidavits submitted by HSBC are inherently untrustworthy"</u>*); *Duke v. HSBC Mortg. Servs., LLC*, 79 So. 3d 778, 781 (Fla. Dist. Ct. App. 2012) (*court reversed summary judgment in favor of HSBC's sister company and denied motion for rehearing, holding that while HSBC's sister company claimed that the original note showed it was assigned to it, "neither the trial court file nor the appellate record contained the actual note," and thus there was no evidence supporting the claim*); Complaint, *Harry v. HSBC Mortg. Servs., Inc.*, No. 12-cv-00990-SRN-JJK (D. Minn. Apr. 20, 2012) (*class action complaint filed against HSBC's sister company alleging that it violated federal law by illegally foreclosing on hundreds of military servicemen and women; case settled for confidential amount in 2013*).

[18]   Similarly, the *Mortgage Daily* reported in 2011 that New York Supreme Court Justice F. Dana Winslow "*dismissed or froze 20 percent of his [foreclosure] cases [in 2010] due to evidence disputes*."

118.    By October 2010, a flood of news stories and other events began publicly revealing these illegal, improper and abusive practices (and others) by the Covered Trust Master Servicers/Servicers. *See* Appendix 3 hereto for a sample of some of the stories and events involving the Master Servicers/Servicers to the Covered Trusts that were reported during October 2010.  By October 2010, the public became aware of what was called the "robo-signing" scandal, which involved the mass signing and filing of false affidavits and other false documents in foreclosure proceedings by either fictitious persons or persons without personal knowledge of the facts asserted in the affidavits, which were also improperly and illegally notarized.  Robo-signing also included the filing of fraudulently altered note and mortgage assignments.  These public revelations showed that many of the Covered Trust Master Servicers and Servicers were engaged in the robo-signing scandal. They also revealed that the Master Servicers/Servicers had been sued, or were being investigated, by multiple federal and state governmental agencies for loan servicing misconduct.  Moreover, several Master Servicers/Servicers revealed that they were forced to halt or delay foreclosures, obviously because of their robo-signing misconduct, which drastically increased the time to foreclose and the expense to the Covered Trusts. *See generally* Appendix 3.

119.    The upshot of these public revelations – when they were coupled with HSBC's firsthand experience with its master servicers and servicers, including the Covered Trusts' Master Servicers/Servicers, and the dismal performance of the Mortgage Loans in the Covered Trusts – was that HSBC had actual knowledge by the end of October 2010 that the Master Servicers and Servicers were engaged in pervasive Events of Default concerning the Mortgage Loans in the Covered Trusts. Indeed, by October 2010, the effects of the Master Servicers'/Servicers' Events of Default were graphically reflected in the Covered Trusts' continuing, extremely high Mortgage Loan default rates and mushrooming losses.  In October 2010, the Mortgage Loan default rates were at unprecedented

levels (45+% to 59+%), while the Covered Trusts' cumulative realized losses by October 2010 *increased to more than $797 million*, as set forth below.  HSBC was aware of this information because it either prepared monthly reports containing this information or had access to such information:

| Covered Trusts' Mortgage Loan Default Rates and Cumulative Realized Losses Reported in October 2010 | | |
|---|---|---|
| **Covered Trust** | **Default Rates** | **Cumulative Realized Losses** |
| DBALT 2006-AR6 | 45.76% | $252,028,533.06 |
| FHLT 2006-C | 59.44% | $461,376,911.42 |
| WFHET 2006-2 | 47.41% | $ 84,225,694.32 |
| **Covered Trusts' Total Realized Losses:** | | **$797,631,138.80** |

120.    Nonetheless, even after October 2010, additional public events occurred that repeatedly confirmed for HSBC that the Master Servicers and Servicers were continuing to commit the same, as well as new and additional, Events of Default as to the Mortgage Loans in the Covered Trusts.  *See* Appendix 4 hereto for a summary of such events.  Several of these events specifically identified HSBC as a participant in conduct amounting to Events of Default.  *See id.* at 1 (second and third bullet points) (New Jersey identifies HSBC as involved in robo-signing.).

121.    Indeed, on February 28, 2011, a company affiliated with HSBC filed a Securities and Exchange Commission Form 10-K wherein it stated that HSBC had "*suspended foreclosures until such time as we have substantially addressed the noted deficiencies in our processes," essentially admitting that HSBC was having major issues with its loan servicers*.  By April 13, 2011, however, there was absolutely no doubt that HSBC had actual knowledge of Master Servicer/Servicer Events of Default as to the Mortgage Loans in the Covered Trusts.

> **b.    By April 13, 2011, HSBC Had Actual Knowledge that
> the Covered Trusts' Master Servicers and Servicers
> Had Committed Events of Default with Respect to the
> Mortgage Loans in the Covered Trusts**

122.    On April 13, 2011, major events never seen before transpired in the loan servicing industry, conclusively establishing that the Master Servicers and Servicers to the Covered Trusts were systematically engaging in the commission of Events of Default under the Governing Agreements, and that such misconduct extended to the Mortgage Loans in the Covered Trusts.  On April 13, 2011, the U.S. Government released a report on an investigation it had conducted on loan servicers entitled the "Interagency Review of Foreclosure Policies and Practices" (hereinafter the "Government Foreclosure Report").  On the same day, it also took sweeping legal actions against 14 loan servicers, which comprised nearly 70% of the loan servicing industry and nearly 36.7 million mortgage loans. *The Government's investigation found "foreclosure-processing weaknesses that [had] occurred industrywide."*  Government Foreclosure Report at 1.  The Government stated that it was taking action against the 14 loan servicers because it had identified "*unsafe and unsound [foreclosure] practices and violations of applicable . . . law" by them.  Id.* at 3.  Among the 14 offending loan servicers were *nearly all of the Master Servicers and Servicers to the Covered Trusts* (and/or their parent companies).  Each had entered into "consent cease and desist orders" or "consent orders" with the U.S. Treasury's Office of the Comptroller of the Currency ("OCC"), the Federal Reserve, the Office of the Thrift Supervision ("OTS") and/or the Federal Deposit Insurance Corporation ("FDIC"), wherein they all essentially admitted to (*i.e.*, they did not deny or contest) facts that conclusively established that they had systematically failed to service mortgage loans in accordance with the standards set forth in the Governing Agreements.  Acting Comptroller of the Currency, John Walsh, stated the following concerning the Government's investigations: "*We found significant deficiencies*

_. . . . **This is a very serious problem that servicers are going to have to do substantial work . . . to**_

_**fix**_."

123.    The Master Servicers and Servicers to the Covered Trusts are set forth again in the

chart below, and those that entered into consent orders with the Government appear in bold, italics

and underline:

### Covered Trusts' Master Servicers and Servicers Entering into Consent Orders

| Covered Trust | Master Servicers | Servicers |
|---|---|---|
| DBALT 2006-AR5 | • _**Wells Fargo**_ | • AHM Servicing<br>• _**CHLS/BACHLS (through its parent company Bank of America)**_<br>• _**GMAC**_<br>• GreenPoint<br>• _**IndyMac (through its parent company OneWest)**_<br>• _**National City (through its parent company PNC)**_<br>• PHH<br>• SPS<br>• _**Wells Fargo**_ |
| FHLT 2006-C | • _**Wells Fargo**_ | • Fremont* |
| WFHET 2006-2 | • None | • _**Wells Fargo**_ |
| *    Litton succeeded Fremont as the Servicer to the FHLT 2006-C Covered Trust in 2008 and entered into a substantially similar consent order, through its parent company Goldman Sachs, on September 1, 2011. _See_ Appendix 5 at 5 (first bullet point). In addition, Ocwen, which later succeeded Litton as Servicer to the FHLT 2006-C Covered Trust, entered into a substantially similar consent order in December 2013. _See infra_ ¶¶137-138. | | |

124.    As the chart above shows, _**nearly all of the Master Servicers and Servicers to the**_

_**Covered Trusts entered into consent orders with the Government**_.  In addition, the "_**industrywide**_"

nature of the misconduct by these Master Servicers and Servicers made it clear that it reached the

Mortgage Loans in the Covered Trusts.  The misconduct described in the orders was an unequivocal

Event of Default under the Governing Agreements.

125.    In the 14 consent orders, each consenting Master Servicer and Servicer did not dispute the Government's findings that they had engaged in the following illegal and improper loan servicing practices (or misconduct substantially similar to it) that were *not* prudent or legal:

- engaging in "unsafe or unsound practices in residential mortgage servicing and . . . foreclosure proceedings";

- filing false affidavits in foreclosure proceedings in "which the affiant represented that the assertions in the affidavit were made based on personal knowledge . . . when . . . they were not based on . . . personal knowledge";

- filing false affidavits in foreclosure proceedings which were not legally or "properly notarized";

- "fail[ing] to devote to [their] foreclosure processes adequate oversight, internal controls, policies, and procedures, compliance risk management, internal audit, third party management, and training";

- "fail[ing] to sufficiently oversee outside counsel and other third-party providers handling foreclosure-related services"; and

- engaging in "unsafe or unsound banking practices." [19]

126.    It was stunning that *nearly 70% of the loan servicing industry had essentially admitted that they systematically engaged in widespread robo-signing, the filing of false affidavits, the filing of false foreclosure documents, improper notarizations, and other illegal conduct*. It was even more stunning that nearly all of the Master Servicers and Servicers to the Covered Trusts essentially admitted that they had committed Events of Defaults by agreeing with the Government to form action plans to "*ensure compliance with . . . [the loan] servicing guides of . . . investors,*" an

---

[19]    As previously alleged, Covered Trust Servicer Litton entered into a nearly identical consent order in September 2011 through its parent company Goldman Sachs. *See* Appendix 5 at 5 (first bullet point). And successor Covered Trust Servicer Ocwen also entered into a very similar order in 2013. *See infra* ¶¶137-138.

*admission that they had not previously been complying with their duties mandated by the Governing Agreements.*[20]

127.    In light of the above information, HSBC unquestionably had actual knowledge no later than April 13, 2011 that Events of Default had been committed by the Master Servicers and Servicers with respect to Mortgage Loans within the Covered Trusts.

128.    The Government Foreclosure Report further confirmed that the Master Servicers and Servicers to the Covered Trust had committed Events of Default.  The Government Foreclosure Report, written by the Federal Reserve, OCC and OTS, found that the loan servicing industry in general – and the Master Servicers and Servicers that entered into the consent orders in particular –

---

[20]    The Master Servicers'/Servicers' improper servicing practices were so widespread and so severe that the Government required sweeping reforms.  The Master Servicers/Servicers (and their related companies) were required by the consent orders to:

- submit a plan to the Government to strengthen their board of directors' oversight of loan servicing;
- submit a "comprehensive action plan" describing how they would comply with the consent orders and properly service loans;
- submit a compliance program designed to ensure the proper servicing and foreclosure of mortgage loans;
- submit policies and procedures to ensure the proper supervision of third-party vendors and outside law firms;
- submit a plan to ensure proper controls over and supervision of MERS, used by the Master Servicers/Servicers in connection with loan servicing, foreclosures and title transfers;
- retain an independent outside consultant to conduct a review of the Master Servicers'/Servicers' past foreclosure practices and submit a report to the Government concerning such review;
- submit a plan to ensure the proper functioning of the Master Servicers'/Servicers' MIS systems and the accuracy of loan data;
- submit a plan to ensure proper, timely and effective communications with borrowers and to prevent the impedance or discouragement of loan modifications;
- submit a risk assessment and management plan concerning the Master Servicers'/Servicers' loan servicing operations; and
- submit a quarterly progress report detailing all actions taken to comply with the consent orders.

had engaged in "*violations of applicable federal and state law requirements*" and "*notary practices which failed to conform to state legal requirements.*"   Government Foreclosure Report at 3, 8. These findings that the Master Servicers and Servicers operated illegally were absolute Events of Default.

129.    The Government Foreclosure Report also specifically focused on facts that gave HSBC actual knowledge of numerous other Events of Default committed by the Master Servicers and Servicers with respect to the Mortgage Loans in the Covered Trusts.  For example, the Government Foreclosure Report revealed the following "industrywide" practices by the Master Servicers and Servicers to the Covered Trusts that amounted to Events of Default under the Governing Agreements:

- "*violations of applicable federal and state law requirements," such as violations of the Service Members Civil Relief Act, the bankruptcy laws, and "notary practices which failed to conform to state legal requirements*";

- "*inadequate* organization and staffing of foreclosure units";

- "*inadequate* policies, procedures, and independent control infrastructure covering all aspects of the foreclosure process";

- "*inadequate* monitoring and controls" over third-party vendors;

- "*lack of sufficient audit trails*" between information contained in affidavits and "the servicers' internal records";

- "*inadequate* quality control and audit reviews to ensure compliance with legal requirements";

- "*inadequate* identification of financial, reputational, and legal risks" by "boards of directors and senior management";

- *false affidavits*;

- *false mortgage documents*;

- *improper notarizations*; and

- "*weaknesses in quality-control procedures at all servicers, which resulted in servicers not . . . ensuring accurate foreclosure documentation, including documentation pertaining to the fees assessed.*"

*Id.* at 3, 11.

130.  ___The Government Foreclosure Report also specifically found that the Master___
___Servicers' and Servicers" "industrywide" misconduct "pose[d] a variety of risks to [RMBS]___
___investors,"___ *id.* at 6, ___because they had failed to satisfactorily "evaluat[e] and test[] compliance with___
___applicable . . . pooling and servicing agreements."___ *Id.* at 11.  This finding unequivocally established
that the Master Servicers and Servicers were engaging in Events of Default under the Governing
Agreements.

131.  Thus, between the consent orders entered into by nearly all of the Master Servicers and
Servicers to the Covered Trusts on April 13, 2011 – consenting to conduct that demonstrated that they
had not serviced loans legally or "prudent[ly]," and thus had committed Events of Default – and the
Government Foreclosure Report's simultaneous finding that such Events of Default "___occurred___
___industrywide___," HSBC had actual knowledge of Events of Default committed by the Master Servicers
and Servicers concerning the Mortgage Loans in the Covered Trusts ___no later than April 13, 2011.___[21]
The Covered Trusts' ridiculously high Mortgage Loan default rates (42+% to 54+%) and large losses
(over $891 million) by April 2011, *see supra* ¶93 (chart), further confirmed the existence of the
Master Servicers' and Servicers' Events of Default.

132.  Indeed, HSBC had ___unique and direct knowledge of___ the improper loan servicing
practices by the Master Servicers and Servicers to the Covered Trusts.  ___HSBC obtained this unique___

---

[21]  Later, it was announced that the consent orders had been amended because many of the Master
Servicers and Servicers had agreed to pay $3.6 billion to borrowers and further provide borrowers
with another $5.2 billion in relief through loan modifications and loan forgiveness, for a total of $8.8
billion in relief.  Some news outlets reported that the actual total relief equaled $10 billion.  Of
course, the $5.2 billion in loan modifications and loan forgiveness improperly came mainly out of
RMBS investors' pockets and not the Master Servicers'/Servicers'.  *See* Appendix 5 at 10 (fourth
bullet point) (June 7, 2012 testimony by Professor Levitin).  In any event, this agreement to pay such
a huge penalty was further proof that the Covered Trusts' Master Servicers/Servicers committed
pervasive Events of Default which reached the Mortgage Loans in the Covered Trusts.

*knowledge because it was also one of the loan servicers that was then engaged in the misconduct. To explain, HSBC was one of the 14 loan servicers that consented, on April 13, 2011, to the entry of a consent cease and desist order against it by the U.S. Government. Indeed, on April 13, 2011, HSBC consented to the entry of a consent order against it by the U.S. Government's OCC wherein HSBC did not dispute or contest that HSBC had engaged in "unsafe or unsound practices in residential mortgage servicing and in [HSBC's] initiation and handling of foreclosure proceedings," filed false affidavits that were not based on personal knowledge or properly or legally notarized, failed to devote adequate oversight, policies, controls, procedures, management and training in connection with its foreclosure processes, and failed to sufficiently oversee outside counsel and third-party providers handling foreclosure-related services, all of which resulted in "unsafe or unsound banking practices."* HSBC was thus engaged in the same Events of Default as the Master Servicers and Servicers to the Covered Trusts, and HSBC knew from its own participation in the misconduct that such practices were occurring "industrywide."

133.    However, notwithstanding HSBC's actual knowledge of these Events of Default, HSBC never did any of the things required of it under the Governing Agreements. HSBC's failures to act with respect to these known Events of Default breached the Governing Agreements and violated the TIA, and caused plaintiff and the class to suffer millions of dollars in damages, as foreclosures were stopped, withdrawn, dismissed, denied, delayed or invalidated due to the Master Servicers' and Servicers' misconduct, which HSBC was aware of and deliberately participated in. In addition, millions of dollars in bogus and excessive fees and costs were improperly charged to the Covered Trusts by the Master Servicers and Servicers because of their misconduct. Moreover, HSBC also knew that the Master Servicers and Servicers had engaged in other Events of Default by April 2011 – such as their failure to notify HSBC of the Warrantors' R&W breaches as alleged above (in

many cases the Master Servicers/Servicers were also the Warrantors and thus knew of their own

breaches). This also caused plaintiff, the class and the Covered Trusts to suffer massive damages.

HSBC also knew no later than April 13, 2011 of the Master Servicers'/Servicers' practice of servicing

the Mortgage Loans for their own financial benefit instead of plaintiff's and the class's – which was

also an Event of Default – yet failed to act in breach of the Governing Agreements and the TIA,

which also caused plaintiff, the class and the Covered Trusts to suffer additional substantial damages.

<strong>c.  After April 2011, HSBC Had Actual Knowledge that<br/>
the Master Servicers and Servicers Were Continuing to<br/>
Commit the Same Events of Default with Respect to the<br/>
Mortgage Loans in the Covered Trusts and Were Also<br/>
Committing New and Additional Events of Default</strong>

134.    Incredibly, even *after* the U.S. Government's sweeping actions on April 13, 2011

against most of the Master Servicers and Servicers to the Covered Trusts, and even *after* those Master

Servicers/Servicers promised to stop engaging in Events of Default via the consent orders, *they*

*thereafter continued to engage in the same Events of Default and also engaged in new Events of*

*Default*. And, even though HSBC had actual knowledge of these continuing and new Events of

Default, it did nothing, and has continued to do nothing, allowing the Events of Default to go on

unabated and uncured to the present. HSBC thereby breached the Governing Agreements and

violated the TIA numerous additional times after April 2011 by failing to fulfill its duties under the

Governing Agreements and TIA to act when the new Events of Default occurred or the existing

defaults continued. News and public information concerning the Master Servicers'/Servicers'

numerous continuing and new Events of Default after April 13, 2011 are summarized in Appendix 5

hereto. Given the repeated, egregious, public nature of these numerous Events of Default, HSBC had

actual knowledge of the new and continuing Events of Default also. *See* Appendix 5 hereto. Indeed,

it was even reported that HSBC continued to illegally and improperly use "known robo-signers." *See*

*id.* at 3-4 (*Reuters* special investigative report).

- 67 -

### d.   HSBC Also Knew that Successor Servicer Ocwen Was Committing Events of Default

135.    Starting in 2011, many master servicers and servicers began selling their loan servicing rights to Ocwen.  For example, Ocwen had become a Servicer to at least the DBALT 2006-AR5 and FHLT 2006-C Covered Trusts by 2012.  *See supra* ¶106 (chart of Master Servicers/Servicers and their successors).  Ocwen was a "non-bank" loan servicer and it was purchasing massive amounts of loan servicing rights from the much more heavily regulated "bank" master servicers and servicers during 2011, 2012 and 2013.  Regulators were becoming increasingly concerned that Ocwen was growing too quickly to properly service the many loans it was acquiring.  In addition, Ocwen, as a non-bank servicer, faced much less regulatory scrutiny than bank servicers, and Ocwen had already compiled a thoroughly infamous track record of loan servicing abuses.  Thus, in February 2014, New York Superintendent of Financial Services, Benjamin Lawsky, halted Ocwen's attempted purchase of $39 billion in servicing rights from Covered Trust Master Servicer/Servicer Wells Fargo.  Lawsky put a halt to the sale and ordered Ocwen to provide information sufficient to demonstrate that Ocwen could satisfactorily handle the increased loan servicing load, particularly in light of previous loan servicing misconduct Lawsky's office had discovered and taken Ocwen to task for, and for which Lawsky had required the appointment of a monitor to oversee Ocwen's conduct.  *See* Appendix 6 at 8 (December 5, 2012 actions by N.Y. Dept. Fin. Servs.).[22]

136.    In any event, well prior to Ocwen's acquisition of the servicing rights to the Mortgage Loans in the DBALT 2006-AR5 Covered Trust in 2012 and 2013 and in the FHLT 2006-C Covered Trust in 2011 (*see supra* ¶106 (chart)), HSBC had actual knowledge that Ocwen was an awful loan servicer that had a long history of loan servicing abuses amounting to Events of Default.  *See, e.g.,*

---

[22]   Shortly after Lawsky halted the Wells Fargo loan servicing rights sale to Ocwen and asked Ocwen for information, Ocwen announced that the Wells Fargo deal was on indefinite hold.  To date, the acquisition has not been allowed to move forward.

Appendix 6 hereto. HSBC also knew that Ocwen's history of Events of Default continued after Ocwen began servicing the Mortgage Loans. *Id.* Indeed, HSBC had numerous experiences using Ocwen as a loan servicer where courts had invalidated foreclosures because of Ocwen's misconduct. *See supra* n.16 (several HSBC foreclosures dismissed or denied because of Ocwen's misconduct). As shown in Appendix 6 and in n.16 *supra*, Ocwen was found by governmental agencies, juries, courts and news reporters to have engaged in numerous instances of egregious, illegal and sanctionable misconduct meriting punitive damages in some cases for its loan servicing abuses, demonstrating that it routinely engaged in Events of Default.

137.    The repeated misconduct by Ocwen alone should have alerted HSBC to the fact that Ocwen had a pattern and practice of committing Events of Default. However, if there was any doubt, it was erased by December 2013. At that time, Ocwen entered into a consent order with the U.S. Government's Consumer Financial Protection Bureau ("CFPB"), 49 States and the District of Columbia. Pursuant to the consent order, Ocwen did not dispute or contest any of the facts alleged against it by the multiple government entities, and it agreed to provide borrowers with an astounding *$2 billion in principal reduction and further refund $127.3 million to nearly 185,000 borrowers it had improperly foreclosed on*. The misconduct covered by the consent order extended for an unlimited period of years, up to and including December 2013, and covered every State in the nation except one, demonstrating that Ocwen had engaged in serial Events of Default on a nationwide basis right up to the time it entered into the consent order in December 2013. Richard Cordray, the Director of the CFPB, stated in a conference call that "*[w]e believe that Ocwen violated federal consumer financial laws at every stage of the mortgage servicing process*," a clear Event of Default. The huge size of the relief agreed to by Ocwen (over $2 billion), the comprehensive misconduct "at every stage," the broad geographic scope (49 of 50 States and the District of Columbia), the

expansive temporal range of the misconduct ("years"), and the huge number of borrowers affected, confirmed that Ocwen's misconduct occurred nationwide and infected all of its loan servicing operations, including those provided to the DBALT 2006-AR5 and FHLT 2006-C Covered Trusts (and any other Covered Trusts it was sub-servicing).  The CFPB stated that Ocwen had engaged in "*years of systemic*" misconduct amounting to Events of Default, including :

- *Failing to timely and accurately apply payments made by borrowers and failing to maintain accurate account statements;*

- *Charging borrowers unauthorized fees for default-related services;*

- *Imposing force-placed insurance on consumers when Ocwen knew or should have known that they already had adequate home-insurance coverage; . . .*

- *Providing false or misleading information in response to consumer complaints.*

*       *       *

- *Failing to provide accurate information about loan modifications and other loss mitigation services;*

- *Failing to properly process borrowers' applications and calculate their eligibility for loan modifications;*

- *Providing false or misleading reasons for denying loan modifications;*

- *Failing to honor previously agreed upon trial modifications with prior servicers; . . .*

- *Deceptively seeking to collect payments under the mortgage's original unmodified terms after the consumer had already begun a loan modification with the prior servicer.*

- *Engaged in illegal foreclosure practices . . . .*

- *Providing false or misleading information to consumers about the status of foreclosure proceedings where the borrower was in good faith actively pursuing a loss mitigation alternative also offered by Ocwen; and*

- 70 -

- ***Robo-signing foreclosure documents, including preparing, executing, notarizing, and filing affidavits in foreclosure proceedings with courts and government agencies without verifying the information.***

138.   These "systemic" illegal and improper practices (which Ocwen did not deny), and which had gone on for "years" in 49 States and the District of Columbia, clearly imparted to HSBC actual knowledge that Ocwen was engaging in Events of Default as to the Covered Trusts' Mortgage Loans.

139.   However, even after this massive settlement, Ocwen ***continued to commit Events of Default***. For example, *see* Appendix 7 hereto for a summary of such continuing Events of Default. These events caused HSBC to have actual knowledge of new and continuing Events of Default by Ocwen as to the Mortgage Loans in the Covered Trusts even after December 2013. In fact, these Events of Default, and other new ones, have continued unabated to the present.

140.   As the numerous foregoing events demonstrate, the original Master Servicers and Servicers to the Covered Trusts and their successors engaged in, and have continued to engage in, numerous, repeated, systemic Events of Default as to the Mortgage Loans in the Covered Trusts. Such misconduct is so ingrained in their cultures that they do not know of any other way to "service" mortgage loans.  Indeed, as recently as May 29, 2014, Ira Rheingold, Director of the National Association of Consumer Advocates in Washington, D.C., stated: "'***You've got a lot of people trying to clean up the servicing industry, but the truth is we are seeing the same servicing problems over and over* . . . .'"** Given this widespread, repetitious and brazen misconduct, which shows no signs of stopping and which has caused either long delays in foreclosures of the Mortgage Loans in the Covered Trusts or outright denials of HSBC's attempts to foreclose, along with extremely long delinquencies and excessive and improper fees and expenses added by the Master Servicers/Servicers during their induced delays, the Covered Trusts have experienced huge losses and persistently high

- 71 -

Mortgage Loan default rates. These large losses and unprecedented default rates corroborate and confirm to HSBC that the Mortgage Loans have suffered, and are continuing to suffer, from pervasive Events of Default by the Master Servicers and Servicers. The chart below sets forth the continuing high Mortgage Loan default rates and the Covered Trusts' cumulative realized losses, which exceeded $1.25 billion by September 2014. HSBC was well aware of this information because it prepared monthly reports containing this information, or had access to such information:

| Covered Trusts' Mortgage Loans Default Rates and Cumulative Realized Losses Reported in September 2014 | | |
|---|---|---|
| Covered Trust | Mortgage Loan Default Rates | Cumulative Realized Losses |
| DBALT 2006-AR5 | 31.45% | $ 399,634,062.09 |
| FHLT 2006-C | 41.08% | $ 704,612,104.05 |
| WFHET 2006-2 | 42.51% | $ 146,118,580.51 |
| Covered Trusts' Total Realized Losses: | | $1,250,364,746.65 |

### 3. HSBC Has Conflicts of Interest with Plaintiff and the Class and Improperly Put Its Interests Ahead of the Interests of Plaintiff and the Class to Benefit Itself

141. As previously alleged, HSBC also owes a common law "duty of trust" to plaintiff and the class. As such, HSBC is required to avoid conflicts of interest with plaintiff and the class. This means that HSBC is not permitted to put its interests ahead of plaintiff's and the class's, nor is HSBC permitted to benefit therefrom.

142. HSBC provides and has provided RMBS trustee services to the RMBS industry for some time and has derived substantial income from the RMBS trusts set up and "sponsored" by the Warrantors, loan originators, and Master Servicers and Servicers to the Covered Trusts, and their related companies. The Warrantors and loan originators to the Covered Trusts (and their related companies) handpicked HSBC for the RMBS trustee positions, as they knew that HSBC would not cause trouble for them by making significant R&W claims against them, to plaintiff's and the class's

detriment.[23]   Similarly, the Master Servicers and Servicers (and their related companies) also handpicked HSBC because they knew HSBC would not accuse them of committing Events of Default, or replace them, as they too provided substantial RMBS trustee business to HSBC.  The relationship between HSBC and the Warrantors, loan originators and Master Servicers/Servicers is exactly the type of relationship that the *Yale Journal of Regulation* warned of: "*[T]here is often a very close relationship between the servicer and the trustee; many originators and servicers have a 'pet' or 'pocket' trustee that they use for most of their deals*."  HSBC, the "pet" or "pocket" Trustee for the Warrantors and Master Servicers/Servicers, put its financial interests ahead of plaintiff's and the class's, and refrained from discharging its duties under the Governing Agreements and the TIA.

143.    Because the Warrantors and Master Servicers/Servicers to the Covered Trusts and their related companies were the source of substantial income for HSBC, HSBC did not seek to enforce the Warrantors' obligations to cure, substitute or repurchase Mortgage Loans in the Covered Trusts which breached their R&Ws, or declare Events of Default against the Master Servicers and Servicers or replace them.  By doing so, HSBC put its own interests ahead of plaintiff's and the class's interests, and benefitted by doing so.

144.    HSBC also had another conflict with plaintiff and the class.  HSBC's trustee fees for managing the Covered Trusts were paid by Wells Fargo.  *See, e.g.*, DBALT 2006-AR5 PSA §9.5 ("*[t]he fees of the Trustee . . . shall be paid . . . at the sole expense of the Master Servicer*").  *Wells Fargo was a Master Servicer or Servicer for each of the three Covered Trusts*.  Thus, "pet" or "pocket" trustee HSBC was not going to "bite the hand that fed it" by declaring Events of Default against Master Servicer/Servicer Wells Fargo, the payor of its trustee fees.

---

[23]   Indeed Warrantor DBSP installed HSBC as trustee to numerous RMBS trusts sponsored by DBSP.

145.    HSBC also refrained from discharging its duties under the Governing Agreements and the TIA with respect to the Master Servicer/Servicer loan servicing Events of Default, because HSBC itself was also involved in and participated in their misconduct. By informing plaintiff and the class of such Events of Default, as it was required to do by the Governing Agreements and the TIA, HSBC would have also revealed its own participation in such wrongdoing and its failure to abide by the Governing Agreements, and thereby subjected itself to liability to plaintiff and the class. Given this conflict of interest, HSBC chose to protect its interests instead of plaintiff's and the class's, and refrained from doing anything that might reveal the Events of Default or HSBC's participation therein.

146.    Finally, HSBC had a conflict of interest with plaintiff and the class because it was also a loan servicer involved in the very same misconduct as its fellow Master Servicers/Servicers. Thus, HSBC would not call Events of Default as to the Mortgage Loans by the Covered Trusts' Master Servicers/Servicers because: (1) HSBC did not want to "rat out" its industry colleagues; and (2) HSBC would then face retaliatory revelations of its own loan servicing misconduct by the Master Servicers/Servicers.

147.    Because of the foregoing conflicts of interest, HSBC refused to perform its duties required by the Governing Agreements and the TIA for the benefit of plaintiff and the class, and instead put its own interests ahead of plaintiff's and the class's, which benefitted HSBC but injured plaintiff and the class.

**D.    HSBC Failed to Discharge Its Critical Duties and Obligations Under the Governing Agreements, the TIA and Common Law and Thereby Breached and Violated the Governing Agreements, the TIA and Common Law**

148.    Despite its discovery and actual knowledge of information requiring HSBC to act to protect plaintiff and the class under the Governing Agreements and the TIA, HSBC failed to act as

required and thus breached the Governing Agreements and violated the TIA.  Moreover, by failing to avoid conflicts of interest with plaintiff and the class, HSBC breached the common law duty of trust it owed to plaintiff and the class.  HSBC's failures to act, and its breaches and violations alleged herein, were grossly negligent and willful misconduct.

> **1.    HSBC Failed to Enforce the Warrantors' Obligations to Cure, Substitute or Repurchase Mortgage Loans Breaching the Warrantors' R&Ws, as Required by the Governing Agreements and the TIA**

149.    As alleged above, HSBC discovered breaches of the Warrantors' R&Ws concerning thousands of Mortgage Loans in the Covered Trusts no later than April 13, 2011, yet failed to enforce the Warrantors' obligations to cure, substitute or repurchase the defective Mortgage Loans, as required by the Governing Agreements.  HSBC discovered the breaches of the Warrantors' R&Ws concerning the Mortgage Loans through:

- The numerous news reports, congressional testimony and other information that publicly indicated that the lending industry in general was engaging in widespread lending abuses during the time the Mortgage Loans were originated, warranted and transferred to the Covered Trusts, thus making it highly likely that any R&Ws by the Warrantors concerning the Mortgage Loans were false;

- The numerous news stories, reports, lawsuits and governmental investigations and actions concerning most of the specific Warrantors to the Covered Trusts indicating that their R&Ws were systematically false;

- HSBC's participation in and monitoring of bankruptcy proceedings by the borrowers of the Mortgage Loans in the Covered Trusts, from which HSBC learned of specific R&W breaches by the Warrantors as to the Mortgage Loans;

- The lawsuits filed by others against the Warrantors detailing the high numbers of defective loans that breached their R&Ws;

- The lawsuits alleging misrepresentations concerning the specific Mortgage Loans in the specific Covered Trusts, which indicated that the Warrantors' R&Ws had been breached as to the Mortgage Loans;

- The Covered Trusts' historically unprecedented, extremely high, and prolonged Mortgage Loan default rates and huge realized losses;

- The OCC's "Worst Ten in the Worst Ten" report, identifying the areas of the United States with the highest foreclosure rates – rates that were from 13 to 22 times higher than historical averages – from loans originated by nearly all of the Covered Trusts' Warrantors and loan originators;

- Numerous governmental investigations of and actions against the Warrantors for lending abuses which rendered their R&Ws false;

- The FCIC Report detailing: (1) the huge numbers of loans Covered Trust Warrantor Wells Fargo was being required to repurchase because of systemic breaches of its R&Ws; (2) the fact that some of the Covered Trusts' Warrantors *intentionally* put defective loans that breached their R&Ws into RMBS trusts just like the Covered Trusts as a matter of course; and (3) the routine practice of many of the Covered Trusts' Warrantors of engaging in lending abuses and fraud that guaranteed their R&Ws would be false; and

- The Senate Report demonstrating that the lending industry in which the Covered Trusts' Warrantors participated was engaged in systematic lending abuses which rendered any R&Ws by those Warrantors false.

150.    After discovering the breaches of the R&Ws by the Covered Trusts' Warrantors, HSBC breached the Governing Agreements and TIA and was grossly negligent and engaged in willful misconduct by failing and refusing to act as required by the Governing Agreements and the TIA. Moreover, after learning of the R&W breaches, as well as of new breaches of the Warrantors' R&Ws, HSBC has engaged in numerous new and additional breaches of the Governing Agreements and TIA by failing to perform its continuing duties to enforce the Warrantors' R&Ws, thereby engaging in continuous breaches of the Governing Agreements and the TIA. HSBC's failures to act caused the loss, to the statutes of limitations, of hundreds of millions of dollars of meritorious R&W claims against the Warrantors, and thereby caused substantial damages to plaintiff, the class and the Covered Trusts.

**2.    HSBC Failed to Perform Its Duties with Respect to Events of Default as Required by the Governing Agreements and the TIA**

151.    As previously alleged, HSBC obtained actual knowledge that the Master Servicers and Servicers committed Events of Default with respect to the Mortgage Loans in the Covered Trusts no

later than April 13, 2011, yet failed to: (1) notify the Master Servicers and Servicers and require them to cure such Events of Default; (2) give notice of the Events of Default to plaintiff and the class; and (3) take other prudent actions to remedy the Events of Default, such as terminating and replacing the defaulting Master Servicers or Servicers or assuming their duties.  All of these failures to act breached the Governing Agreements and the TIA.  As previously alleged, HSBC had actual knowledge of the Events of Default through:

- Numerous news reports, congressional testimony and governmental investigations and actions publicly indicating that there were systemic loan servicing abuses, including foreclosure fraud and robo-signing, throughout the loan servicing industry and the nation, and that most of the Master Servicers/Servicers were involved in such misconduct;

- Numerous news reports about and governmental investigations directed at many of the specific Master Servicers and Servicers to the Covered Trusts concerning their improper loan servicing practices;

- HSBC's firsthand experience with, observance of, and participation in, loan servicers' Events of Default through the many cases in which HSBC was an RMBS trustee in foreclosure actions and bankruptcy proceedings, wherein the loan servicers and/or HSBC made false statements, filed false affidavits and documents, and engaged in other misconduct that delayed, invalidated or led to dismissals of HSBC's foreclosures;

- HSBC's knowledge that the Master Servicers and Servicers were engaging in Events of Default by failing to report Warrantor R&W breaches to HSBC;

- HSBC's awareness that loan servicers' abuses were systemic and were similarly affecting all RMBS trustees;

- Numerous governmental enforcement actions against many of the specific Master Servicers and Servicers to the Covered Trusts for loan servicing abuses;

- The disclosure of deposition transcripts of employees of the Master Servicers and Servicers that indicated that they had engaged in pervasive robo-signing and loan servicing abuses;

- The large number of Mortgage Loans in the Covered Trusts that were extremely delinquent because of delays caused by the Master Servicers' and Servicers' Events of Default;

- The huge losses being suffered by the Covered Trusts due to the Master Servicers' and Servicers' robo-signing, foreclosure frauds and delays (during which they improperly imposed additional excessive fees and costs on the Covered Trusts);

- The FCIC Report (Appendix 4 at 4-5) and Legal Services of New Jersey Report (*see id.* at 1-2) confirming nationwide Events of Default by the Master Servicers and Servicers to the Covered Trusts;

- The April 13, 2011 consent orders entered into by many of the Master Servicers and Servicers to the Covered Trusts, *and by HSBC*, in which they all essentially admitted that they committed Events of Default, and the Government Foreclosure Report, which confirmed "*industrywide*" Events of Default by the Master Servicers and Servicers to the Covered Trusts *and HSBC*;

- HSBC's intimate knowledge of industrywide Events of Default through its own participation in such misconduct, and HSBC's entering into a consent order on April 13, 2011 concerning its *own* loan servicing misconduct;

- Covered Trust Servicer Litton's entry into a consent order in September 2011 (through its parent company Goldman Sachs) wherein it essentially admitted that Litton engaged in Events of Default (*see* Appendix 5 at 5);

- Covered Trust Servicer Ocwen's entry into a consent order with the CFPB, 49 States and the District of Columbia wherein it essentially admitted to company-wide Events of Default (*see supra* ¶¶137-138);

- The billions of dollars in settlement relief paid by many of the Covered Trusts' Master Servicers and Servicers to settle private and government claims that they engaged in company-wide loan servicing misconduct amounting to Events of Default; and

- The numerous and continuing news reports and governmental actions after April 2011 indicating that the Master Servicers and Servicers to the Covered Trusts were and are continuing to engage in loan servicing misconduct amounting to Events of Default.

152.    Even after obtaining actual knowledge of Events of Default as to Mortgage Loans in the Covered Trusts, and even after obtaining actual knowledge that such Events of Default were continuing to the present, and that new Events of Default were also occurring, HSBC was and is grossly negligent and engaged and continues to engage in willful misconduct by refusing to do any of the things required of it by the Governing Agreements or TIA. Therefore, HSBC has breached the Governing Agreements and TIA numerous times by repeatedly failing to fulfill its duties with respect

to existing, new and continuing Events of Default, as it has allowed existing Events of Default, as well as new Events of Default, to continue unabated.

### 3.    HSBC Failed to Exercise All of Its Rights and Duties Under the Governing Agreements as a Prudent Person Would, as Required by the Governing Agreements and the TIA

153.    As alleged above, when HSBC became aware of the Events of Default and the Warrantors' breaches of their R&Ws alleged herein, HSBC was required to use all of its rights and powers under the Governing Agreements to protect plaintiff's and the class's interests, as a prudent person would and as though HSBC were attempting to protect its own interests.  HSBC failed to act as required by the Governing Agreements by:

- Failing to enforce the Warrantors' obligations to cure, substitute or repurchase Mortgage Loans that breached the Warrantors' R&Ws after discovering such breaches, as a reasonable and prudent person would do in trying to protect his/her own interests; and

- Failing to discharge its contractual and statutory duties after obtaining knowledge of uncured Events of Default, as a reasonable and prudent person would do in trying to protect his/her own interests.

154.    HSBC has continued its failure to act prudently while the Events of Default have continued unabated, and after it learned of the Warrantors' R&W breaches, and thus HSBC has engaged in numerous continuing and additional breaches of its duties under the Governing Agreements and the TIA.  Such failures were grossly negligent and amounted to willful misconduct.

### 4.    HSBC Failed to Discharge Its Common Law Duty of Trust Owed to Plaintiff and the Class

155.    As alleged above, HSBC did not perform the duties required of it by the Governing Agreements and TIA because HSBC desired to economically benefit currently and in the future from its ongoing business relationships with the Covered Trusts' Warrantors, loan originators, Master Servicers and Servicers, from which HSBC derived significant amounts of its RMBS trustee business. HSBC also refrained from performing its duties under the Governing Agreements and TIA because

discharging such duties would have revealed that HSBC was participating in the Events of Default with the Master Servicers/Servicers and thus exposed its failure to act as required and its liability to plaintiff and the class under the Governing Agreements. HSBC also refrained from acting because it did not want to expose its fellow servicers' misconduct, and face retaliatory disclosures for its own loan servicing misconduct. Finally, HSBC was further motivated to refrain from discharging its duties as to Master Servicer/Servicer Wells Fargo because Wells Fargo paid HSBC its trustee fees.

156.    By deliberately refraining from performing its duties mandated by the Governing Agreements and TIA, HSBC failed to avoid conflicts of interest with plaintiff and the class and benefitted thereby, breaching its duty of trust to plaintiff and the class. HSBC's failures to act were grossly negligent and amounted to willful misconduct. HSBC's continuing and repeated failures to properly discharge its duty of trust also resulted in new and additional breaches of its duty of trust up to and through the present.

> ### E.    Plaintiff and the Class Have Suffered Significant Damages Due to HSBC's Breaches of the Governing Agreements and Common Law and Its Violations of the TIA

157.    Because HSBC has failed to act as required by the Governing Agreements as alleged herein, plaintiff, the class and the Covered Trusts have suffered over $1.25 billion in damages.

158.    HSBC's failure to enforce the R&W claims against the Warrantors for thousands of breaching Mortgage Loans has caused plaintiff, the class and the Covered Trusts to suffer significant damages in the form of hundreds of millions of dollars in R&W claims that could have been successfully asserted against the Warrantors but were not. HSBC's failure to assert these claims was a breach of the Governing Agreements and the TIA for which HSBC could foresee that plaintiff, the class and the Covered Trusts would be damaged. Moreover, HSBC's continuing failure to act on those R&W claims, causing the claims to become time-barred, resulted in breaches of the Governing Agreements and TIA, and caused damages that were foreseeable to HSBC.

159.    HSBC's failure to act as required by the Governing Agreements when Events of Default occurred has also caused plaintiff, the class and the Covered Trusts to suffer millions of dollars in additional damages.  Such damages were foreseeable to HSBC.

160.    HSBC's failures to act prudently during the Events of Default and R&W breaches as alleged herein also caused plaintiff, the class and the Covered Trusts to suffer damages.  If HSBC had acted prudently as required by the Governing Agreements and the TIA, most, if not all, of the foregoing damages and losses to plaintiff, the class and the Covered Trusts could have been avoided. It was foreseeable to HSBC that plaintiff and the class would suffer such massive damages if it failed to act prudently, as required by the Governing Agreements and the TIA.

161.    Similarly, HSBC's decision to repeatedly refuse to act and instead to put its financial interests ahead of plaintiff's and the class's because of its conflicts of interest, caused plaintiff, the class and the Covered Trusts to suffer damages which were foreseeable to HSBC.

162.    By virtue of its breaches of the Governing Agreements and its common law duties, and its violations of the TIA, HSBC has caused at least $1.25 billion in damages to plaintiff, the class and the Covered Trusts for which HSBC is responsible.

**F.    Plaintiff May Sue HSBC as Trustee**

163.    The Governing Agreements provide certain limitations on the rights of RMBS holders like plaintiff and the class that are not applicable to this lawsuit.  More specifically, the Governing Agreements may limit in part the rights of RMBS holders like plaintiff and the class to bring lawsuits relating to the Governing Agreements against the Depositor, the Securities Administrator, the Master Servicer or Servicer, or any successor to such parties.

164.    However, the Governing Agreements do not so limit suit against HSBC.  In fact, the Governing Agreements provide that "[n]o provision of this Agreement shall be construed to relieve

the Trustee . . . from liability for its own negligent action, its own negligent failure to act or its own misconduct." DBALT 2006-AR5 PSA §9.1.

165.     Additionally, under the TIA and New York law, these so-called "no action" clauses do not apply to actions by RMBS owners like plaintiff and the class against trustees like HSBC for HSBC's own wrongdoing.  This is not a situation where plaintiff and the class are demanding that HSBC initiate a suit in its own name to enforce their rights and obligations under the Governing Agreements.  Rather, this is an instance where plaintiff and the class are bringing a direct action *against* HSBC for breaching its statutory, contractual and common law duties under the Governing Agreements, common law and the TIA.  Because this is not an "action, suit or proceeding" that HSBC is capable of bringing in its own name as Trustee under the Governing Agreements, the "no action" clause of the Governing Agreements does not apply and does not bar plaintiff and the class from proceeding with this lawsuit.

## V.     CLASS ACTION ALLEGATIONS

166.     Plaintiff brings this action as a class action on behalf of a class consisting of all current and former investors who acquired RMBS certificates in the Covered Trusts (the "class") and who held such certificates at or after the time when HSBC discovered breaches of the Warrantors' R&Ws or HSBC had actual knowledge of Events of Default by the Master Servicers and Servicers to the Covered Trusts, and suffered damages as a result of HSBC's breaches of the Governing Agreements, TIA and common law.  Excluded from the class are HSBC, the loan originators, the Warrantors, the Master Servicers and the Servicers to the Covered Trusts, and their officers and directors, their legal representatives, successors or assigns, and any entity in which they have or had a controlling interest.

167.     The members of the class are so numerous that joinder of all members is impracticable.  While the exact number of class members is unknown to plaintiff at this time and can only be ascertained through appropriate discovery, plaintiff believes that there are at least hundreds of

members of the proposed class.  Record owners and other members of the class may be identified

from records maintained by HSBC, Depository Trust Company, or others, and may be notified of the

pendency of this action by mail, using the form of notice similar to that customarily used in securities

class actions.

168.    Plaintiff's claims are typical of the claims of the members of the class as: (1) they all

acquired RMBS certificates in the Covered Trusts and held them at or after the time when HSBC

discovered breaches of R&Ws concerning the Mortgage Loans by the Warrantors or HSBC had

actual knowledge of Master Servicer and Servicer Events of Default and failed to act as required by

the Governing Agreements, common law and TIA; (2) all the claims are based upon the Governing

Agreements, substantially in the same form as the DBALT 2006-AR5 PSA (*see* Ex. A), the TIA and

the same common law; (3) HSBC's alleged misconduct was substantially the same with respect to all

class members; and (4) all class members suffered similar harm as a result.  Thus, all members of the

class are similarly affected by HSBC's statutory, contractual and common law breaches and

violations that are alleged herein.

169.    Plaintiff will fairly and adequately protect the interests of the members of the class and

has retained counsel competent and experienced in class action and RMBS litigation.

170.    Common questions of law and fact exist as to all members of the class and

predominate over any questions solely affecting individual members of the class.  Among the

predominating questions of law and fact common to the class are:

(a)    Whether HSBC breached its contractual duties under the Governing

Agreements and its common law duties owed to plaintiff and the class by:

(i)    failing to enforce R&W claims against the Covered Trusts' Warrantors

when HSBC discovered breaches of the Warrantors' R&Ws;

- 83 -

(ii)     failing to discharge its duties under the Governing Agreements when HSBC obtained actual knowledge of Events of Default;

(iii)     failing to exercise the rights and powers vested in HSBC by the Governing Agreements, and failing to use the same degree of care and skill as a prudent person would under the circumstances in the conduct of his or her own affairs, after obtaining actual knowledge of Events of Default; and

(iv)     failing to avoid conflicts of interest with plaintiff and the class while advancing its own interests at the expense of plaintiff and the class, and benefitting therefrom;

(b)     Whether HSBC violated the TIA by:

(i)     prior to default, failing to perform the duties specifically assigned to it under the Governing Agreements;

(ii)     failing to inform the class of defaults under the Governing Agreements within 90 days after their occurrence; and

(iii)     during a default, failing to exercise its rights and powers under the Governing Agreements as a prudent person would; and

(c)     Whether and to what extent members of the class have suffered damages as a result of HSBC's breaches of its statutory, contractual and common law duties and the proper measure of damages.

171.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all class members is impracticable.  There will be no difficulty in the management of this action as a class action.

## VI.     DERIVATIVE ACTION ALLEGATIONS

172.     Alternatively, plaintiff brings this case as a derivative action against HSBC in the right and for the benefit of the Covered Trusts to redress losses suffered by the Covered Trusts as a direct

result of HSBC's breaches of the Governing Agreements and violations of the TIA. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

173.    Plaintiff will adequately and fairly represent the interests of the Covered Trusts in enforcing and prosecuting their rights. Plaintiff is the owner of RMBS in each of the Covered Trusts during all or a large portion of HSBC's wrongful course of conduct alleged herein. Moreover, by operation of law, under New York General Obligations Law §13-107, RPI obtained all rights and causes of action of all prior holders of RPI's RMBS.

174.    Plaintiff did not make a pre-suit demand on HSBC to pursue this action because such a demand would have been futile. The wrongful acts alleged herein were committed by HSBC itself and HSBC would not agree to sue itself, particularly since it faces claims for losses by the Covered Trusts in excess of $1.25 billion. In addition, since HSBC itself committed the wrongdoing complained of herein, and is accused of grossly negligent and willful misconduct, it therefore is not disinterested and lacks independence to exercise business judgment. Moreover, HSBC has benefitted from, and continues to benefit from, its wrongdoing as alleged herein (*i.e.*, failures to act), as HSBC has maintained and preserved its business relationships with the Warrantors, Master Servicers and Servicers and has thereby continued to derive financial benefits from serving as Trustee to the Covered Trusts, and many other RMBS trusts, due to its continuing wrongdoing as alleged herein.

175.    The Covered Trusts can only act through HSBC since HSBC is the Trustee of each Covered Trust. When HSBC failed to act as required by the Governing Agreements and the TIA to protect the Covered Trusts and their assets –including the Mortgage Loans and the rights attendant to them – HSBC caused the Covered Trusts to suffer massive losses. HSBC deliberately failed to perform the following duties required of it under the Governing Agreements and the TIA, which injured the Covered Trusts: (1) enforce the Covered Trusts' rights to pursue and enforce breach of

R&W claims against the Warrantors; (2) notify and require that the Master Servicers and Servicers cure their Events of Default, provide notice of defaults to plaintiff and the class, and take further actions, such as terminating or replacing the Master Servicers and Servicers; and (3) act as a prudent person during the defaults.

176.     HSBC's failures to act amounted to gross negligence and willful misconduct on its part and caused the Covered Trusts to suffer losses in excess of $1.25 billion.  Plaintiff seeks to recover, for the benefit of the Covered Trusts: (i) the losses suffered by the Covered Trusts to date, which are in excess of $1.25 billion; (ii) all future losses caused by HSBC's failures to act as required by the Governing Agreements and the TIA; and (iii) equitable relief enjoining HSBC from continuing to breach the Governing Agreements and the TIA.

## COUNT I
### Violation of the Trust Indenture Act of 1939, 15 U.S.C. §77aaa, *et seq.*

177.     Plaintiff repeats and realleges each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

178.     Congress enacted the TIA, 15 U.S.C. §77aaa, *et seq*., to ensure, among other things, that investors in RMBS, bonds and similar instruments have adequate rights against, and receive adequate performance from, the responsible trustees.  15 U.S.C. §77bbb.  The Covered Trusts' Governing Agreements are "indentures" and HSBC is an "indenture trustee" within the meaning of the TIA.  15 U.S.C. §77ccc(7), (10).  Moreover, the TIA applies to and is deemed to be incorporated into the Governing Agreements and the related RMBS.  15 U.S.C. §77ddd(a)(1).  HSBC violated multiple provisions of the TIA.

179.     First, the TIA requires that, prior to default, the indenture trustee shall be liable for its failure to perform any duties specifically set out in the indenture.  15 U.S.C. §77ooo(a)(1).  As

alleged above, HSBC failed to perform the following duties specifically assigned to it by the Governing Agreements, including the duties to:

(a)    enforce the Warrantors' obligations to cure, substitute or repurchase Mortgage Loans when HSBC discovered breaches of the Warrantors' R&Ws concerning such Mortgage Loans;

(b)    notify the Master Servicers and Servicers of their Events of Default and require a cure; and

(c)    exercise the rights and powers conferred on it by the Governing Agreements to take further actions, including terminating or replacing a Master Servicer or Servicer that was engaging in an Event of Default, or assuming its duties.

180.    Second, the TIA requires that HSBC inform plaintiff and the class of all defaults under the Governing Agreements known to HSBC within 90 days after their occurrence.  15 U.S.C. §77ooo(b) (citing 15 U.S.C. §77mmm(c)).  As alleged herein, there were numerous Events of Default by the Master Servicers and Servicers under the Governing Agreements of which HSBC was aware. In addition, as alleged herein, HSBC had knowledge of massive breaches of the Warrantors' R&Ws, which were also defaults under the TIA.  HSBC was required to provide notice of those defaults to plaintiff and the class within 90 days, yet HSBC failed to provide such notice to plaintiff and the class, thereby violating 15 U.S.C. §77ooo(b) of the TIA.

181.    Third, during a default, the TIA requires HSBC to exercise all of its rights and powers under the Governing Agreements as a prudent person would in the conduct of his or her own affairs. 15 U.S.C. §77ooo(c).  Given the obvious negative impacts of the defaults alleged herein, any prudent person under those circumstances would have exercised all of his or her rights and powers to, among other things, compel and enforce the cure, substitution or repurchase of defective Mortgage Loans

that breached the Warrantors' R&Ws in a timely fashion, and take actions to remedy the Master Servicer and Servicer Events of Default, and notify plaintiff and the class of the same. Indeed, with the huge numbers of breaching and defaulting Mortgage Loans in the Covered Trusts, and the pervasive Events of Default that were and are occurring, plaintiff, the class and the Covered Trusts could have been protected in large part from the damages they suffered only through HSBC's prompt and prudent exercise of those rights. By failing to prudently exercise its rights in those circumstances, HSBC violated 15 U.S.C. §77ooo(c) of the TIA.

182.    HSBC is therefore liable to plaintiff, the class and the Covered Trusts for their actual losses and damages incurred as a result of HSBC's violations of the TIA.

## COUNT II
### Breach of Contract

183.    Plaintiff repeats and realleges each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

184.    As set forth above, the Governing Agreements are contracts setting forth the duties HSBC owed to plaintiff, the class and the Covered Trusts with respect to their RMBS and the Mortgage Loans in the Covered Trusts. As a matter of law, the Governing Agreements incorporate the provisions of the TIA. Under the Governing Agreements and the TIA, HSBC owed plaintiff, the class and the Covered Trusts duties to perform certain obligations, including, without limitation, the following:

(a)    the duty to enforce the Warrantors' breaches of their R&Ws upon discovery, by seeking the cure, substitution or repurchase of any and all defective Mortgage Loans;

(b)    the duty to notify the Master Servicers and Servicers of their Events of Default within the period prescribed in the Governing Agreements upon obtaining knowledge of such defaults and requiring the cure of said Events of Default;

(c)     the duty to notify plaintiff and the class of Events of Default and the Warrantors' breaches/defaults;

(d)     the duty to take additional actions during Events of Default, including taking actions to terminate or replace Master Servicers and Servicers that fail to cure their Events of Default, or assuming their responsibilities; and

(e)     the duty to exercise all of HSBC's rights and powers under the Governing Agreements during Events of Default for the benefit of plaintiff and the class and as a reasonable and prudent person would in the conduct of his or her own affairs.

185.    As alleged herein, HSBC failed to perform the above duties required of it by the Governing Agreements and therefore breached them.  HSBC's breach of its duties set forth in the Governing Agreements deprived plaintiff, the class and the Covered Trusts of the benefit of their bargain, *i.e.*, they did not receive RMBS that were collateralized by Mortgage Loans that were warranted to be of a certain credit quality, and breaches of these R&Ws were not enforced as required by the Governing Agreements.  These breaches of the Governing Agreements by HSBC caused plaintiff, the class and the Covered Trusts to suffer damages.

186.    In addition, plaintiff and the class did not receive the benefit of their bargain under the Governing Agreements when HSBC failed to perform the obligations required of it by the Governing Agreements when it knew of uncured and ongoing Events of Default.  HSBC's failure to act breached the Governing Agreements and caused plaintiff, the class and the Covered Trusts to suffer damages.

187.    Furthermore, plaintiff, the class and the Covered Trusts did not receive the benefit of their bargain, to wit, that HSBC would act as a prudent person and exercise all of its rights and powers under the Governing Agreements to protect plaintiff and the class as though it were seeking to

protect its own interests when HSBC knew of Events of Default.  HSBC's failure to so act breached the Governing Agreements and caused plaintiff, the class and the Covered Trusts to suffer damages.

188.    HSBC and its responsible officers discovered and/or had actual knowledge of the Warrantors' breaches of their R&Ws and the Master Servicers' and Servicers' Events of Default, as they learned of them as alleged herein.

189.    As a result of HSBC's multiple breaches of the Governing Agreements alleged herein, HSBC is liable to plaintiff, the class and the Covered Trusts for the damages they suffered as a direct result of HSBC's failure to perform its contractual obligations under the Governing Agreements.

190.    In addition, HSBC has engaged in continuing breaches, as well as multiple new and additional breaches, of the Governing Agreements by failing to fulfill its duties to act as alleged herein and has caused plaintiff, the class and the Covered Trusts to suffer additional damages.

### COUNT III
### Breach of Trust

191.    Plaintiff repeats and realleges each and every allegation set forth in the preceding paragraphs above as if fully set forth herein.

192.    Under common law, HSBC had a duty to plaintiff and the class to affirmatively avoid conflicts of interest with them at all times.  Further, that duty also required HSBC to refrain from advancing its own interests at the expense of plaintiff and the class, or benefitting therefrom.

193.    HSBC breached its duty of trust owed to plaintiff and the class by failing to avoid conflicts of interest and by advancing its own interests at the expense of plaintiff and the class, by failing to demand that the Warrantors cure, substitute, or repurchase Mortgage Loans that breached their R&Ws, and by failing to act, and failing to act prudently, as was required when it became aware of uncured Events of Defaults by the Master Servicers and Servicers.

194.    By doing so, HSBC breached its common law duty of trust to plaintiff and the class.

195.    HSBC has continued to breach its duty of trust and has also engaged in new and additional breaches of its duty of trust, and thus has continually failed to fulfill its duty of trust.

196.    As a result of HSBC's breaches of its duty of trust, defective Mortgage Loans were not remedied and Events of Default were not corrected, and continued unabated, causing plaintiff and the class to suffer damages.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for relief and judgment, as follows:

A.    Determining that this action is a proper class action, certifying plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure, and appointing the undersigned as class counsel;

B.    Alternatively, allowing this action to proceed as a derivative action in the right and for the benefit of the Covered Trusts;

C.    Awarding damages and/or equitable relief in favor of plaintiff, the class and/or the Covered Trusts against HSBC for breaches of its statutory, contractual and common law duties, in an amount to be proven at trial, including interest thereon;

D.    Awarding plaintiff, the class and the Covered Trusts their reasonable costs and expenses incurred in this action, including counsel and expert fees; and

E.    Such other relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all claims so triable.

DATED: October 10, 2014

ROBBINS GELLER RUDMAN
  & DOWD LLP
SAMUEL H. RUDMAN

SAMUEL H. RUDMAN

58 South Service Road, Suite 200
Melville, NY  11747
Telephone: 631/367-7100
631/367-1173 (fax)

ROBBINS GELLER RUDMAN
  & DOWD LLP
ARTHUR C. LEAHY
655 West Broadway, Suite 1900
San Diego, CA  92101-8498
Telephone: 619/231-1058
619/231-7423 (fax)

Attorneys for Plaintiff

## VERIFICATION

I, Thierry Buytaert, hereby declare as follows:

I am a Member of the Board of Directors of Royal Park Investments SA/NV ("RPI"), plaintiff in the within entitled action. RPI owns the RMBS in the Covered Trusts alleged herein and owned such RMBS at the time of most of the wrongdoing complained of herein. RPI further understands that it has acquired the rights and claims of the previous holders of the RMBS that held during the time of the wrongdoing complained of herein either contractually or by operation of New York General Obligations Law § 13-107. RPI has continuously held such RMBS since acquiring them. RPI has retained competent counsel and is ready, willing and able to pursue this action vigorously on behalf of the Covered Trusts. I have read the Class Action Complaint and Alternative Verified Derivative Action for Breach of the Trust Indenture Act, Breach of Contract and Breach of Trust. Based upon discussion with, and reliance upon, my counsel, and as to those facts of which I have personal knowledge, the Complaint is true and correct to the best of my knowledge, information and belief.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Signed and Accepted:

DATED: _10 october 2014_

ROYAL PARK INVESTMENTS SA/NV

By: _____

Thierry Buytaert
Board Member

## APPENDIX 1

- **March 2007**: The FDIC issued a "*cease and desist*" order against *Fremont, a Warrantor and loan originator for the FHLT 2006-C Covered Trust*. *The FDIC required Fremont to end its lending business, due to "unsafe or unsound banking practices," "violations of law," "unsatisfactory lending practices," "approving borrowers without . . . verification of their income . . . [and] making mortgage loans without adequately considering the borrower's ability to repay the mortgage according to its terms.*"

- **October 4, 2007**: The Massachusetts Attorney General sued *Covered Trust Warrantor/loan originator Fremont for* "*unfair and deceptive business conduct,*" *including: (a) "approv[ing] borrowers without considering or verifying the . . . borrower's income"; (b) "approv[ing] borrowers for loans . . . that [did] not properly consider the borrowers' ability to meet their overall level of indebtedness"; (c) "approv[ing] borrowers for these ARM loans . . . without regard for borrowers' ability to pay"; and (d) "mak[ing] loans based on information that Fremont knew or should have known was inaccurate or false, including, but not limited to, borrowers' income, property appraisals, and credit scores.*"[1]

- **October 2007**: Alan Hummel, Chair of the Appraisal Institute, testified to a U.S. House Committee *that appraisers "experience[d] systemic problems with coercion" and were "ordered to doctor their reports' or else they would never 'see work . . . again' and/or would be placed on 'exclusionary appraiser lists.'"*

- **December 30, 2007**: *The Kansas City Star* reported that Kurt Eggert, a law professor and member of the Federal Reserve's Consumer Advisory Panel, stated: "*'Originators were making loans based on quantity rather than quality . . . . They made loans even when they didn't make sense from an underwriting standpoint.'*" The article also stated: "Mark Duda, a research affiliate at Harvard University's Joint Center for Housing Studies, said that because *brokers were so intent to quickly sell off loans to investors, they had little incentive to make sure the loans were suitable for borrowers.* '*They were setting people up to fail,*' Duda said."

- **January 2008**: It was reported that Cleveland, Ohio had sued 21 mortgage lenders and investment banking firms, alleging that *they had caused "entire neighborhoods" in the city to become full of "abandoned and boarded up*

---

[1] On December 9, 2008, a Massachusetts appeals court affirmed the lower court's order enjoining Fremont from foreclosing on thousands of its loans issued to Massachusetts residents. The appellate court found that the factual record supported the lower court's conclusions that "*Fremont made no effort to determine whether borrowers could 'make the scheduled payments under the terms of the loan,'*" and that "*Fremont knew or should have known that [its lending practices and loan terms] would operate in concert essentially to guarantee that the borrower would be unable to pay and default would follow.*" *Commonwealth v. Fremont Inv. & Loan*, 897 N.E.2d 548, 556, 558 (Mass. 2008).

*properties" because the lenders and investment bankers "routinely ma[de] loans to borrowers who had no ability to pay them back." **The defendants included Warrantors and loan originators for each of the Covered Trusts (or their related companies): IndyMac, Wells Fargo, Fremont and DBSP (through related "Deutsche Bank" companies).**[2] **Even HSBC (through its parent company) was sued**.*

- **March 2008**: An article in *The Wall Street Journal* reported on the criminal conviction of AHM sales executive Kourash Partow. ***AHM was a loan originator for the DBALT 2006-AR5 Covered Trust. Partow admitted that he falsified borrowers' incomes and assets in order to get loans approved.*** After his conviction, Partow sought a lighter sentence on the grounds that ***AHM had knowledge of the falsified incomes and assets and in fact encouraged manipulation by intentionally misrepresenting the performance of the loans and the adequacy of how the loans were underwritten***.

- **Early 2008 (and 2009)**: ***Wells Fargo – a Warrantor and loan originator for the WFHET 2006-2 Covered Trust*** – was sued by the Cities of Baltimore and Memphis, who alleged that Wells Fargo abandoned its underwriting guidelines and made fraudulent loans. The Cities alleged that ***Wells Fargo extended loans without regard to "the borrower's ability to repay," that borrowers' incomes were falsified, and that Wells Fargo "fail[ed] to underwrite African-American borrowers properly." The allegations were supported by sworn declarations from former Wells Fargo employees***.

- **June 30, 2008**: The Center for Responsible Lending issued a report on ***IndyMac – a Warrantor and loan originator for the DBALT 2006-AR5 Covered Trust***. The report was based on information obtained from 19 former IndyMac employees and reported that ***IndyMac "engaged in unsound and abusive lending," "routinely [made] loans without regard to borrowers' ability to repay," and "push[ed] through . . . loans based on bogus appraisals and income data that exaggerated borrowers' finances."***

- **November 13, 2008**: The U.S. Government's OCC released a report entitled the "Worst Ten in the Worst Ten," identifying the ten metropolitan areas in the United States with the highest foreclosure rates in the first half of 2008, and the lenders that made the loans. The report studied loans originated from 2005 through 2007 – covering the time period the Mortgage Loans were originated, warranted and transferred to the Covered Trusts – and revealed that they had astoundingly high foreclosure rates: ***from 13.9% to 22.9% of the loans were in foreclosure in the ten areas during the first half of 2008. These foreclosure rates were far higher than the historical average because "[p]rior to 2007, the foreclosure rate was historically less than 1%."*** FCIC Report at 402. ***The list of offending lenders identified in the OCC report included AHM, Fremont, GreenPoint, IndyMac and***

---

[2]   DBSP was ultimately owned by Deutsche Bank AG.

> *Wells Fargo, every Warrantor and loan originator to the three Covered Trusts except one, DBSP.  And even DBSP purchased loans from the previously mentioned entities (see, e.g., supra ¶65i8 (chart of Warrantors; DBALT 2006-AR5 Covered Trust Warrantor was DBSP and loan originators were IndyMac, AHM and GreenPoint).*

- **November 2008**: *Business Week* published an exposé on the mortgage lending industry.  The *Business Week* article reported that industry "*[loan] wholesalers . . . offered bribes to fellow employees [to approve unacceptable loan applications], fabricated documents, and coached brokers on how to break the rules. . . . [Loan] [b]rokers, who work directly with borrowers, altered and shredded documents. [In addition, loan] [u]nderwriters, the bank employees who actually approve mortgage loans, also skirted boundaries, demanding secret payments from wholesalers to green-light loans they knew to be fraudulent.*" The Business Week article quoted *a former Wells Fargo loan wholesaler (Wells Fargo was the Warrantor and loan originator for the WFHET 2006-2 Covered Trust) who admitted that "he regularly used the copiers at a nearby Kinko's to alter borrowers' pay stubs and bank statements.  He would embellish job titles – turning a gardener, for instance, into the owner of a landscaping company – and inflate salaries."* Said the former Wells Fargo employee: "*'I knew how to work the system.'*"  The article also discussed *GreenPoint, a loan originator for the DBALT 2006-AR5 Covered Trust:* "*Employees who resisted making bad loans ran the risk of being penalized. Shortly after Rachel Steinmetz joined GreenPoint's Manhattan branch as a senior underwriter in September 2005, wholesalers at the bank started asking her to approve loans 'under terms that the borrower did not qualify for,' according to a wrongful termination suit filed in June by Steinmetz in New York federal court. She says she told her superiors that the applications contained suspect details and that the loan files didn't have enough paperwork to back up borrowers' claims. 'Notwithstanding [her] concerns, management overrode her decisions' and approved the loans anyway, the complaint says.  In April 2006, Steinmetz claims, she rejected a loan application that inflated the borrower's income and the home's appraisal value.  While Steinmetz was out of the office celebrating Passover, she says in the complaint, her superiors signed off on the loan.  A month later, Steinmetz says, her boss asked her to compile the paperwork on the same loan in preparation for closing.  'Although she protested,' the complaint notes, 'the loan was funded in her name.'  Steinmetz says through her attorney that there was retribution for her reluctance to make bad loans.*"  The article further discussed Deutsche Bank (and therefore *DBSP, the Warrantor for the DBALT 2006-AR5 Covered Trust*) and how it pushed loan originators to churn out defective mortgage loans: "*As a national account director for Deutsche Bank (DB), Mark D. Toomey bought loans from mortgage lenders to turn into securities.  Sometimes, he says, he 'twisted arms' to get more loans.  'Nobody had the [guts] to say no,' says Toomey, who left the bank in 2007.*"

**APPENDIX 2**

- **February 5, 2009**: ***GreenPoint, a loan originator for the DBALT 2006-AR5 Covered Trust***, was sued for breach of its R&Ws.  An RMBS trustee sought the repurchase of "***nearly 30,000 residential loans***" by GreenPoint due to breaches of GreenPoint's R&Ws, finding that ***an astounding "93% of a sample of 1,030 Loans . . . did not comply with GreenPoint's representations and warranties***." Complaint, *U.S. Bank, N.A., et al. v. GreenPoint Mortgage Funding, Inc.*, No. 600352/2009 (N.Y. Sup. Ct., N.Y. Cnty. Feb. 5, 2009), ¶¶1, 35.  The complaint further alleged that the breaches of GreenPoint's R&Ws consisted of "***pervasive***" misrepresentations concerning borrowers' incomes, assets and employment, "***pervasive violations of GreenPoint's own underwriting guidelines***," and many falsely inflated appraisals. *Id.*, ¶35.  The complaint also alleged: "***The large number and seriousness of the breaches . . . suggest a pervasive pattern of malfeasance, misconduct and/or negligence in connection with GreenPoint's loan-origination practices as a whole***." *Id.*, ¶36.

- **February 26, 2009**: The Office of Inspector General issued a report on ***IndyMac, a loan originator for the DBALT 2006-AR5 Covered Trust***.  The report found that "***IndyMac often did not perform adequate underwriting***," made loans with "***little, if any, review of borrower qualifications, including income, assets, and employment***," and "***made [loans] to many borrowers who simply could not afford to make their payments***."

- **March 2009**: A class action lawsuit was filed against JPMorgan on behalf of investors in its RMBS, alleging false and misleading statements in connection with the offering and sale of RMBS in numerous RMBS trusts.  ***That action contained allegations concerning AHM, a loan originator for the DBALT 2006-AR5 Covered Trust***.  The complaint alleged that AHM failed to follow its loan underwriting guidelines and fabricated loan information, obvious breaches of its R&Ws, when originating mortgage loans during much of the same period the Mortgage Loans in the Covered Trusts were originated. ***In 2010, an amended complaint was filed that contained detailed statements from numerous former AHM employees confirming the wholesale abandonment of AHM's origination guidelines and the widespread fabrication of loan data***. *See* Second Amended Complaint, *Fort Worth Employees' Retirement Fund v. J.P. Morgan Chase & Co., et al.*, No. 1:09-cv-03701-JGK (S.D.N.Y. July 8, 2010).

- **April 2009**: ***The SEC filed fraud charges against the former top executives of AHM's parent company***, American Home Investment Corp. ("American Home"), for their role in misleading investors regarding AHM's systematic disregard of sound underwriting standards and risky lending practices that led to the lender's bankruptcy in August of 2007.  "'***These senior [American Home] executives did not just occupy a front row seat to the mortgage meltdown – they were part of the show***,'" said *Robert Khuzami, Director of the SEC Division of Enforcement in a press release. The SEC charged that AHM was not the "prime" lender it claimed to be, but*

*rather routinely issued high-risk loans to borrowers with poor credit in order to drive growth and capture additional market share*. American Home's former CEO subsequently paid $2.5 million to settle the SEC's fraud charges.

- **May 2009**: A reporter for *The New York Times* published a news report recounting his experience in obtaining a loan from **AHM**. *The reporter revealed how **AHM** actively concealed and omitted negative information on his loan application in order to qualify him for a loan*. Not surprisingly, shortly after obtaining the AHM loan – a loan the reporter could not afford – the reporter defaulted.

- **July 31, 2009**: It was reported that *Wells Fargo – a Warrantor and loan originator for the WFHET 2006-2 Covered Trust* – was sued by the Attorney General of Illinois and charged with "'*engag[ing] in unfair and deceptive business practices by misleading Illinois borrowers about their mortgage terms,'" and placing borrowers into loans that were "'unaffordable and unsustainable.'"* Wells Fargo was also sued in a separate class action on behalf of RMBS purchasers alleging that *Wells Fargo had misrepresented that the loans in its RMBS trusts were originated in conformance with Wells Fargo's underwriting guidelines*. Wells Fargo subsequently paid $125 million to settle the case.

- **September 2009**: National Public Radio interviewed former Morgan Stanley employee Mike Francis, who worked as an Executive Director on Morgan Stanley's residential mortgage trading desk. Francis revealed that there was *industrywide* misconduct occurring during the time period the Mortgage Loans were originated, warranted and transferred to the Covered Trusts. Francis stated: "*No income no asset loans, that's a liar's loan. We are telling you to lie to us, effectively. I mean, we're hoping you don't lie, but – tell us what you make. Tell us what you have in the bank. But we're not going to actually verify it? We're setting you up to lie. Something about that transaction feels very wrong. It felt wrong way back when. And I wish we had never done it. Unfortunately what happened, we did it because everybody else was doing it*."

- **June 23, 2010**: *DBSP, the Warrantor for the DBALT 2006-AR5 Covered Trust*, was sued by an RMBS insurer alleging that DBSP breached its R&Ws as to hundreds of loans within an RMBS trust in which *Covered Trust loan originator GreenPoint originated the loans*. *See* Complaint, *Assured Guar. Mun. Corp. v. DB Structured Prods., Inc., et al.*, No. 650705/2010 (N.Y. Sup. Ct., N.Y. Cnty. June 23, 2010). The complaint alleged that *nearly 95% of the reviewed loans breached the R&Ws DBSP had made about them, and that the R&W breaches consisted of items such as* "*[r]ampant fraud*" and "*[p]ervasive violations of GreenPoint's own underwriting guidelines*."

- **October 25, 2010**: *DBSP was sued again by the same RMBS insurer*, alleging that DBSP breached its R&Ws as to thousands of loans in two other RMBS trusts. *See* Complaint, *Assured Guar. Corp. v. DB Structured Prods., Inc., et al.*, No. 651824/2010 (N.Y. Sup. Ct., N.Y. Cnty. Oct. 25, 2010). *The complaint alleged that in one trust over 83% of the reviewed loans breached DBSP's R&Ws and in the*

*other trust more than 86% of the reviewed loans were in breach*.  The complaint alleged that the breaches consisted of "*[r]ampant fraud*" and "*[p]ervasive violations of underwriting guidelines*."

- **December 2010**: It was reported that JPMorgan analysts estimated "that 'put-back risk'" for loan warrantors, *i.e.*, loans subject to repurchase demands due to breaches of R&Ws, ranged *from $60 to $110 billion for RMBS trusts like the Covered Trusts*.

**APPENDIX 3**

- **October 4, 2010**: California state assemblyman Ted Lieu, in discussing the rash of improper loan servicing and foreclosure issues, stated: "*[W]hat we have here is massive fraud being perpetrated on the courts. . . . We're talking about hundreds of thousands of foreclosures that are now at risk because of what these robo-signers are doing. . . . [Credit rating agency] Fitch . . . has come out and stated that they believe that this is an industry wide practice. . . . [Y]ou just had [a] basic level failure to follow existing laws.  And you have people that are falsifying documents in front of judges. . . . [Just] [y]ou imagine what is going on in [the] 27 other [non-judicial foreclosure] states where you don't have any judicial oversight.*"

- **October 2010**: *The Ohio Attorney General sued GMAC – a Servicer for the DBALT 2006-AR5 Covered Trust – charging it with routinely filing false affidavits in foreclosure proceedings.  The Ohio Attorney General stated the following with respect to GMAC's conduct: "This is fraud being perpetuated against the courts."  In addition, the Ohio Attorney General  began scrutinizing CHLS/BACHLS (through its parent Bank of America) and Wells Fargo, sending them letters seeking information about their robo-signing practices.  CHLS/BACHLS was a Servicer for the DBALT 2006-AR5 Covered Trust, and Wells Fargo was the Master Servicer and/or Servicer for each of the three Covered Trusts.*

- **October 2010**: *The U.S. House Judiciary Committee sent similar letters to* most of the major loan servicers demanding the production of documents relating to their robo-signing and foreclosure practices.  *Master Servicers and Servicers to the Covered Trusts receiving letters from the House Judiciary Committee included Wells Fargo, PNC (and thus Covered Trust Servicer National City), GMAC and CHLS/BACHLS (through its parent company Bank of America)*.

- **October 2010**: The *Miami Daily Business Review* reported on a Florida attorney who had 150 deposition transcripts from people who robo-signed false foreclosure affidavits for loan servicers.  *The news article reported that the deposition transcripts included testimony from employees of Covered Trust Master Servicers/Servicers CHLS/BACHLS, AHM Servicing and Wells Fargo.*  The attorney was quoted as saying that the 150 depositions "*prove flawed foreclosure documents are part of a fraudulent system*, not sloppy procedures" by loan servicers.  The attorney stated: "'*We are not talking about a mistake.  We are talking about perjury, crime . . . . This is system-wide* . . . .'"  The *Miami Daily Business Review* article reported the following information concerning Wells Fargo, the Master Servicer and/or Servicer for each of the Covered Trusts:

> In one of the depositions provided by [attorney] Tiktin, a Wells Fargo employee, Xee Moua, admitted signing 300 to 500 documents including affidavits, substitutions of plaintiff, deeds and judgment affidavits in a two hour period on any given day.

Moua said she only attended six months of college before dropping out. She then worked as an office clerk and customer service representative at a medical supplies firm and a blinds and shades company in North Carolina before she was hired by Wells Fargo as a document processor. *According to the transcript of the deposition, asked if she checked the information on the documents she was signing, Moua said, "I do not. That's not part of my job."*

She said she only checked to see if her own information, such as her title, was correct.

Her understanding, she said, was that either the law firm handling the foreclosure or a Wells Fargo processor assigned to the loan had checked the information. Yet, she was the person authorized by the bank to sign the documentation.

*The documents she signed identified her as vice president of loan documentation, according to the transcript, but that wasn't her actual title.*

*She said she was given that title to sign documents. She said other employees were given the same title for signing court documents.*

- **October 2010**: It was reported that *U.S. regulators were "conducting an intensive probe of reportedly false foreclosure affidavits used by major U.S. financial institutions to evict thousands of American homeowners."*

- **October 2010**: Multiple news reports surfaced about many of the Master Servicers or Servicers to the Covered Trusts, reporting that they were widely and routinely engaged in robo-signing and other improper loan servicing practices. For example, *it was reported that Covered Trust Master Servicer/Servicer Wells Fargo admitted that its employees signed hundreds of foreclosure documents daily without reading them*. In addition, *it was reported that Covered Trust Servicer AHM Servicing was using false, robo-signed foreclosure documents*. A separate news report in October 2010 revealed that *Covered Trust Servicer IndyMac was also using false affidavits in foreclosure proceedings, even after IndyMac had been taken over by the FDIC*. The *Providence Journal* reported that *a former IndyMac employee involved in signing the false affidavit had previously admitted in a deposition to signing about 6,000 documents a week which she did not read before signing*.

- **October 2010**: *Covered Trust Servicers CHLS/BACHLS (through its parent company Bank of America), National City (through its parent PNC), Litton and GMAC were forced to halt their foreclosures on hundreds of thousands of mortgage loans. Similarly, Covered Trust Master Servicer/Servicer Wells Fargo submitted revised documents for approximately 55,000 of its foreclosures*.

- **October 2010**:   The *Mortgage Daily* reported that **_Covered Trust Servicer CHLS/BACHLS's parent company, Bank of America,_** had released statistics *indicating that "80 percent of its borrowers who faced foreclosure had not even made a payment in more than a year, while the average foreclosed loan was 560 days past due,"* or over 18 months past due, graphically illustrating the long delays caused by CHLS/BACHLS's servicing misconduct.   Similarly, **_Covered Trust Master Servicer/Servicer Wells Fargo_** *reported that its average foreclosed loan as of September 2010 was 16 months past due, obviously due to its servicing misconduct which caused long delays.*[1]

- **October 28, 2010**:   *Bloomberg reported that* <u>*Covered Trust Servicer AHM Servicing*</u> *was facing a barrage of lawsuits, including lawsuits by the States of Texas and Ohio, at least one class action, and numerous individual suits, alleging that it was engaged in widespread loan servicing misconduct that amounted to Events of Default.*

- **Late October 2010**: It was reported that *the Attorneys General of all 50 states were investigating "whether mortgage lenders falsified affidavits attesting to their review and verification of foreclosure documents, as well as whether they failed to sign the affidavits in the presence of a notary public."*   Illinois Attorney General Lisa Madigan stated: *"The same mortgage giants and big banks that fraudulently put people into unfair loans are now fraudulently throwing people out of their homes. They should not be above the law. Illinois homeowners are legally entitled to a foreclosure process that is transparent, accurate and fair."*

---

[1]   Subsequently, a report by Amherst Securities Group LP ("Amherst") in February 2012 noted that the average delinquency time for liquidated loans grew from 21 months in September 2010 to 26 months by February 2012, an increase in delays of nearly 25%. In addition, Amherst reported that the average delinquency time for non-performing (*i.e.*, non-liquidated) loans increased from 19 months in September 2010 to 24 months by February 2012, an increase in delays of over 26%. Amherst reported that these statistics *demonstrated "the delay created by the [loan servicers'] robo-signing actions."*   The report further stated that *"we believe the remaining loans will stay in the [delinquency] pipeline for another 12-15 months,"* further demonstrating the compounding effect of the delays caused by the Master Servicers'/Servicers' ongoing robo-signing.

## APPENDIX 4

- **November 2010**: *U.S. Treasury Department Assistant Secretary Michael Barr* provided an update on the investigation of loan servicers by U.S. banking regulators. Barr announced that they were uncovering "*widespread" and "inexcusable" breakdowns in loan servicing practices*. Barr stated: "*These problems must be fixed*."

- **November 4, 2010**: *Legal Services of New Jersey provided a report to the New Jersey Supreme Court* detailing numerous instances of robo-signing and false affidavits in connection with foreclosure proceedings in New Jersey and throughout the nation. The report, which was supported by evidentiary exhibits such as deposition transcripts of robo-signers indicating that they lied in court documents and falsified and back-dated documents, and other evidence of fraud, *concluded that "[a] great volume of national information . . . suggests a pervasive, industry-wide pattern of false statements and certifications at various stages of foreclosure proceedings." The report specifically implicated many of the Covered Trusts Master Servicers and Servicers in the misconduct, including CHLS/BACHLS, GMAC, IndyMac, PHH, AHM Servicing and Wells Fargo, and even noted that HSBC was involved in a number of fraudulent foreclosures*.[1]

- **December 20, 2010**: New Jersey Administrative Director of the Courts, Judge Grant, issued an administrative order requiring 24 loan servicers and RMBS trustees to file certifications demonstrating that there were no irregularities in the handling of their foreclosure proceedings. The order was directed at, among others, *PHH and National City (through its parent PNC), Servicers to the Covered Trusts. The order was also directed at HSBC and its sister companies, because they had been involved in numerous questionable foreclosures. Judge Grant's order cited specific instances of improper foreclosures by Covered Trust Master Servicers/Servicers CHLS/BACHLS (through Bank of America), GMAC, IndyMac (through OneWest) and Wells Fargo, and also cited cases in which HSBC was involved with improper foreclosures. Judge Grant's order identified Covered Trust Master Servicers and Servicers who collectively serviced Mortgage Loans in each of the three Covered Trusts*.

- **December 20, 2010**: Judge Jacobson of the Superior Court of New Jersey in Mercer County *issued an order to show cause directed at, inter alia, Covered Trust Master Servicers/Servicers CHLS/BACHLS, GMAC, IndyMac (through OneWest) and*

---

[1]   The report noted that the "*[c]ommon practices and characteristics*" that Legal Services of New Jersey found in its nationwide investigation included: (a) affiants claiming personal knowledge of facts that the affiant had no personal knowledge of; (b) failure to review documents and evidence on which certifications were based; (c) false statements about when and how a loan was transferred;(d) false identification of signatories (*e.g.*, an employee of a servicer will be identified as a vice president, or similar title, of the foreclosing mortgagee); (e) forged signatures; and (f) improperly and illegally notarized documents.

*Wells Fargo*.  *The order to show cause held that these Master Servicers and Servicers were selected for scrutiny because of their "<u>public record of questionable practices</u>," "deposition testimony provided by employees" of these Master Servicers and Servicers that "raised serious questions about the accuracy and reliability of documents submitted to courts," and "the execution of affidavits, certifications, assignments, and other documents in numerous residential mortgage foreclosure actions in New Jersey and elsewhere [that] may not have been based on personal knowledge in violation of the Rules of Court and may thus be unreliable*."

- **December 2010**:  In testimony before the U.S. House Judiciary Committee, Thomas Cox, an attorney for the Maine Attorneys Saving Homes Project, presented compelling evidence against *<u>Covered Trust Servicer GMAC</u>*, revealing that it was engaged in systemic foreclosure fraud.  *Cox revealed how GMAC used thousands of false foreclosure affidavits signed by "robo-signer" Jeffrey Stephan, which falsely attested under oath that he had personal knowledge of the facts in his affidavits, that he had custody and control of loan documents, and that the documents attached to his affidavits were "true and accurate" copies of notes or mortgages. <u>Cox testified that GMAC "filed thousands of Stephan's [false] affidavits in foreclosure cases all over the country in cases involving its own loans as well as cases where it was servicing loans for Fannie Mae, Freddie Mac, and trustees of mortgage-backed securitized trusts</u>."*  Cox also testified to the prevalence of foreclosure fraud by the loan servicing industry in general: *"I know from my personal experience over the past two and one half years that this kind of servicer fraud-on-the-court activity is not isolated to GMAC Mortgage.  <u>It has been the norm across the entire foreclosure industry</u>, including the other servicers represented here today, JPMorgan Chase and Bank of America [and thus <u>Covered Trust Servicer CHLS/BACHLS]</u>."*  Cox's testimony expressly stated that fraudulent foreclosure practices amounting to Events of Default were occurring "*across the entire foreclosure industry*" and were thus not isolated or infrequent.  Indeed, over two years later, after the massive scope of this misconduct finally became known to those outside of the loan servicing and RMBS trustee industries, Yale Law School Professor Raymond Brescia stated: "'*<u>I think it's difficult to find a fraud of this size on the U.S. court system in U.S. history . . . . I can't think of one where you have literally tens of thousands of fraudulent documents filed in tens of thousands of cases</u>*.'"

- **December 2010**:  An article published in the *Yale Journal on Regulation* and written by law professor Adam Levitin and attorney Tara Twomey concluded:

  > *[T]he residential mortgage servicing business . . . suffers from an endemic principal-agent conflict between investors and servicers.  Securitization separates the ownership interest in a mortgage loan and the management of the loan.  <u>Securitization structures incentivize servicers to act in ways that do not track investors' interests</u>, and these structures limit investors' ability to monitor servicer behavior.*

*     *     *

> ***As a result, <u>servicers are frequently incentivized to foreclose on defaulted loans rather than restructure the loan, even when the restructuring would be in the investors' interest</u>.***

- **December 2010**: In a U.S. Senate Banking, Housing and Urban Affairs Committee hearing, law professor Kurt Eggert testified that ***loan servicers were incentivized to initiate foreclosures and then extend them for long periods of time since it allowed the servicers time to add improper and excessive "junk fees" to the amounts owed by borrowers***. Then, when the mortgages were finally foreclosed and the properties sold, the loan servicers' improper "junk fees" would be paid first, before the remaining amounts, if any, were remitted to the RMBS trusts, thus generating substantial (but bogus) fees for the servicers while improperly diverting money away from RMBS investors like plaintiff and the class.

- **December 2010**: Professor Eggert also testified that ***loan servicers were often also the originators and warrantors of the mortgage loans in the trusts, and therefore would have firsthand knowledge of any breaches of their R&Ws (similarly, many of the Warrantors to the Covered Trusts were also the Master Servicers or Servicers of the very same Mortgage Loans they warranted)***. Under RMBS trust agreements, master servicers and servicers were required to notify the trustee whenever they discovered breaches of their own (or their related companies') R&Ws. *See, e.g.*, DBALT 2006-AR5 PSA §2.3(a), (c). Eggert testified that ***master servicers and servicers of RMBS did not notify anyone of their own breaches, because they would basically be turning themselves in and, therefore, would have to pay for their breaches*** by curing, substituting or repurchasing defective loans. ***<u>Two of the Covered Trusts – the FHLT 2006-C and WFHET 2006-2 Covered Trusts – had at least one Warrantor that was also a Master Servicer or Servicer to the Covered Trusts at the same time</u>***.

- **December 2010**: Professor Eggert further testified that loan servicers owned large numbers of second lien loans while the RMBS trusts owned the majority of first lien loans. ***This incentivized loan servicers to refuse to modify first lien loans in ways that would benefit RMBS investors because it would harm the servicers' interests in their second lien loans***, which second liens were typically extinguished in a modification of a first lien loan, causing losses to the loan servicers. Thus, ***loan servicers would encourage borrowers of second lien loans owned by the servicers to make payments due on such second lien loans instead of the RMBS trusts' first lien loans***. These perverse incentives, which caused loan servicers to service the mortgage loans in ways which hurt RMBS investors, instead of benefitting them as required by the Governing Agreements, were yet additional Events of Default under the Governing Agreements.

- **January 26, 2011**: ***The U.S. Inspector General released a report*** in which the following observations were made about the loan servicing industry:

- 3 -

> *Anecdotal evidence of [loan servicers'] failures [have] been well chronicled. From the repeated loss of borrower paperwork, to blatant failure to follow program standards, to unnecessary delays that severely harm borrowers while benefiting servicers themselves, stories of servicer negligence and misconduct are legion, and . . . they too often have financial interests that don't align with those of either borrowers or investors.*

- **January 27, 2011**: *The FCIC Report further confirmed the existence of loan servicers' conflicts of interests with RMBS investors which led to Events of Default by the Covered Trusts' Master Servicers/Servicers*. The FCIC reported that loan servicers were improperly denying borrowers' loan modifications under the U.S. Government's "HAMP" program, which was created to assist borrowers with obtaining mortgage loan modifications to avoid foreclosures. FCIC Report at 405. Most of the Master Servicers and Servicers had joined the HAMP program and had agreed to modify qualifying loans and borrowers in exchange for monetary incentives from the government. The FCIC Report noted that Diane Thompson of the National Consumer Law Center had testified before the U.S. Senate's Banking, Housing, and Urban Affairs Committee, and had stated that "'[o]nly a very few of the potentially eligible borrowers have been able to obtain permanent modifications. *Advocates continue to report that borrowers are denied improperly for HAMP . . . and that some servicers persistently disregard HAMP applications.*'" *Id.* The FCIC Report also noted that a Moody's Investors Service managing director "*learned that a survey of servicers indicated that very few troubled mortgages were being modified.*" *Id.* at 223.

- **January 27, 2011**: *The FCIC Report confirmed that loan servicers had incentives to push loans into foreclosure rather than to modify them in a manner that would benefit RMBS investors because the servicers collected large fees from foreclosures*. Loan modifications in many cases were beneficial to RMBS investors because a borrower that continued to make loan payments – even reduced modified payments – could be much more profitable to RMBS investors over time than a borrower who had ceased making payments and who was foreclosed on in a depressed real estate market with excessive loan servicing fees being deducted from the proceeds going to the RMBS trusts.

- **January 27, 2011**: *The FCIC Report further re-confirmed the robo-signing scandal*, noting testimony given by New York State Supreme Court Justice F. Dana Winslow to the U.S. House Judiciary Committee. Justice Winslow testified that the loan servicing issues had become so prevalent in New York that an RMBS trustee's standing to foreclose had "'become . . . a pervasive issue.'" FCIC Report at 407. The FCIC Report further documented numerous other improper loan servicing practices that Justice Winslow had observed in foreclosure cases, such as:

> *[T]he failure to produce the correct promissory notes in court during foreclosure proceedings; gaps in the chain of title, including printouts of the title that have differed substantially from*

> *information provided previously; retroactive assignments of notes and mortgages in an effort to clean up the paperwork problems from earlier years; questionable signatures on assignments and affidavits attesting to the ownership of the note and mortgage; and questionable notary stamps on assignments.*

Id. at 407-08.

- **March 23, 2011:**  *It was reported that a Fort Benning soldier was awarded more than $20 million by a jury in a trial against <u>Covered Trust Servicer PHH</u>.  The award included punitive damages due to PHH's egregious loan servicing conduct – conduct that was an Event of Default.*

# APPENDIX 5

- **April 14, 2011**: *Just one day after the April 13, 2011 consent orders*, *Covered Trust Servicer IndyMac* (through its parent company OneWest) had an order to show cause issued against it because of its misconduct, which mirrored that described in the consent orders. *See In re Doble*, No. 10-11296-MM13, 2011 Bankr. LEXIS 1449 (Bankr. S.D. Cal. Apr. 14, 2011). The bankruptcy court pointed out that in bankruptcy proceedings "*servicers routinely file inaccurate claims, some of which may not be lawful.*" *Id.* at *21.

- **May 2011**: *Just one month after the April 2011 consent orders, Covered Trust Servicer CHLS/BACHLS entered into an additional consent order* with the U.S. Department of Justice for additional loan servicing misconduct. CHLS/BACHLS was charged by the Department of Justice with wrongfully and *intentionally foreclosing on active duty servicemembers in violation of federal law*, clear Events of Default. CHLS/BACHLS paid $20 million to compensate and resolve claims that it illegally foreclosed on approximately 160 servicemembers between January 2006 and May 2009. It also agreed to extensive loan servicing reforms and agreed to pay additional compensation to any other servicemembers it illegally foreclosed on between June 2009 through 2010.

- **June 23, 2011**: The Illinois Department of Financial and Professional Regulation fined *PHH – a Servicer for the DBALT 2006-AR5 Covered Trust* – $290,000 for signing foreclosure affidavits that the company knew would later be altered by its attorneys and for signing affidavits using someone else's name. The Illinois regulator found that "*at least four different people used one employee's name to sign . . . affidavits,*" and also "*discovered other evidence of improprieties on the part of PHH employees.*" It further found that PHH had violated Illinois law.

- **June 2011**: Bank of America entered into an *$8.5 billion settlement concerning 530 RMBS trusts arising out of loan servicing abuses by Covered Trust Servicer CHLS/BACHLS*. (A portion of the settlement was also for massive breaches of Countrywide's R&Ws.)

- **July 2011**: The *Associated Press* reported that "*[m]ortgage industry employees are still signing documents they haven't read and using fake signatures more than eight months after big banks and mortgage companies promised to stop the illegal practices that led to a nationwide halt of home foreclosures.*" The *Associated Press* article further reported:

  > *County officials in at least three states say they have received thousands of mortgage documents with questionable signatures since last fall, suggesting that the practices, known collectively as "robo-signing," remain widespread in the industry.*

  *       *       *

- 1 -

> *Lenders say they are working with regulators to fix the problem but cannot explain why it has persisted.*
>
> *Last fall, the nation's largest banks and mortgage lenders, including . . . [Covered Trust Master Servicers/Servicers] Wells Fargo, [CHLS/BACHLS through] Bank of America and [Litton] an arm of Goldman Sachs, suspended foreclosures as they investigated how corners were cut to keep pace with the crush of foreclosure paperwork.*
>
> *Critics say the new findings point to a systemic problem with the paperwork involved in home mortgages and titles. And they say it shows that banks and mortgage processors haven't acted aggressively enough to put an end to widespread document fraud in the mortgage industry.*
>
> *"Robo-signing is not even close to over," says Curtis Hertel, the recorder of deeds in Ingham County, Mich., which includes Lansing. "It's still an epidemic."*

- **July 2011**: Michael Calhoun, President of the Center for Responsible Lending, told the U.S. Senate Banking, Housing and Urban Affairs Committee that "*[a]busive [loan servicing] practices have become so ingrained in the servicing culture that they are now endemic to the industry*." He then testified concerning multiple ongoing servicing abuses he had observed, such as:

  - "dual track[ing]," an improper servicing practice where the borrower is foreclosed on in the middle of ongoing loan modification negotiations or after a trial modification was agreed to and being performed by the borrower;
  - "[f]oreclosing even when [RMBS] investors would receive more from a sustainable modification";
  - "[i]mproper denial and delay of loan modification requests . . . because fees, which eventually flow directly to servicers . . . continue to accrue";
  - "[f]orcing homeowners into multiple temporary modifications [which is] a best-of-both-worlds situation for servicers, who continue to charge fees";
  - "[f]orce-placed insurance [which is] very expensive . . . often driving an otherwise current borrower into delinquency and even foreclosure";
  - "[i]mproper fees";
  - "[m]isapplication of borrower payments";
  - "[m]ismanaged escrow accounts";
  - "[f]ailing or refusing to provide payoff quotations to borrowers";
  - "[a]buses in the default and delinquency process"; and
  - "*fail[ure] to adhere to loss mitigation requirements of [RMBS] investors," i.e., failure to abide by the Governing Agreements.*

- **July 18, 2011**: *In a special investigative report titled "Banks continue robo-signing," Reuters reported that many of the Master Servicers and Servicers to the Covered Trusts were continuing to engage in Events of Default on a grand scale.* *Reuters*' investigation found that loan servicers "*continue[d] to file questionable foreclosure documents with courts and county clerks*," and that "*servicers have filed thousands of documents that appear to have been fabricated or improperly altered, or have sworn to false facts*." *Reuters* also reported that "*[o]ne of the industry's top representatives admits that the federal settlements [in April 2011] haven't put a stop to questionable practices*," and that "*many [servicers] are still taking the same shortcuts they promised to shun, from sketchy paperwork to the use of 'robo-signers.'*" *The Reuters investigative report cited multiple examples of continuing improper loan servicing by many of the Master Servicers and Servicers to the Covered Trusts, including Bank of America (CHLS/BACHLS), IndyMac (through OneWest), GMAC, SPS, Wells Fargo and Ocwen.* *Reuters* reported that *Master Servicer/Servicer Wells Fargo* had assigned mortgages on behalf of lender New Century to others in 2011, four years *after* New Century ceased to exist, and that in "*court files of Florida foreclosure cases by Wells Fargo . . . none of the promissory notes filed as exhibits in 10 cases found by Reuters had any endorsements on them*." *Wells Fargo was a Master Servicer and/or Servicer to each of the three Covered Trusts.* *Bank of America (which includes Covered Trust Servicer CHLS/BACHLS)* was also singled out by the *Reuters* article:

> *Bank of America [and thus CHLS/BACHLS], meanwhile, is coming under fire from a New York federal bankruptcy judge.*
>
> *Last Tuesday, Judge Robert Drain ordered an investigation involving a foreclosure case brought by the bank. Two earlier copies of a promissory note filed in court had lacked any endorsement, but then one appeared on the note when bank lawyers produced the original.*
>
> *The judge said the sudden appearance of an endorsement, and his own close look at it, raised questions about whether it had been added illegally to make the note look legitimate.*
>
> *It "raises a sufficiently serious issue as to when and more importantly by whom this note was endorsed," the judge said.*

The *Reuters* article confirmed ongoing, rampant Events of Default:

> Reuters reviewed records of individual county clerk offices in five states – Florida, Massachusetts, New York, and North and South Carolina – with searchable online databases. Reuters also examined hundreds of documents from court case files, some obtained online and others provided by attorneys.

> *The searches found more than 1,000 mortgage assignments that for multiple reasons appear questionable: promissory notes missing required endorsements or bearing faulty ones; and "complaints" (the legal documents that launch foreclosure suits) that appear to contain multiple incorrect facts.*

> *The Reuters article also reported that defendant HSBC was taken to task by a judge for using "known robo-signer[s]."*

- **August 4, 2011**: *Covered Trust Master Servicer/Servicer CHLS/BACHLS was again caught engaging in Events of Default.* In states providing for non-judicial foreclosures, Bank of America (and thus CHLS/BACHLS) utilized a subsidiary of Bank of America called ReconTrust Company, N.A. ("ReconTrust"), to foreclose on homeowners. On August 4, 2011, *the Attorney General for the State of Washington filed an action against ReconTrust alleging that the company "failed to comply with the procedures of [Washington state foreclosure laws] in each and every foreclosure it has conducted since at least June 12, 2008" and "systematically conceals, misrepresents or inaccurately divulges the true parties to the mortgage transaction," including misrepresenting the ownership of mortgage notes.*

- **August 2011**: *American Banker* reported that "*the largest mortgage servicers are still fabricating documents*" filed in foreclosure proceedings. The article reported the following:

> *Several dozen documents reviewed by American Banker show that as recently as August some of the largest U.S. banks, including Bank of America Corp. [CHLS/BACHLS], Wells Fargo, Ally Financial Inc. [aka GMAC] and OneWest [IndyMac's successor] were essentially backdating paperwork necessary to support their right to foreclose.*

> *Some of documents reviewed by American Banker included signatures by current bank employees claiming to represent lenders that no longer exist.*

> *   *   *

> "*It's one thing to not have the documents you're supposed to have even though you told investors and the SEC you had them,*" says Lynn E. Szymoniak, a plaintiff's lawyer in West Palm Beach, Fla. "*But they're making up new documents.*"

> *   *   *

> *North Carolina consumer bankruptcy lawyer O. Max Gardner III says servicers and trustees often submit promissory notes in court without proper endorsements, which show the chain of title from one lender to another. Then, after the fact, there will be*

- 4 -

> *"a magically appearing note with a stamped endorsement,"*
> *Gardner said.*
>
> *When plaintiff's lawyers then try to depose the person whose*
> *name is stamped on the endorsement, "we're being told the person*
> *is no longer employed by the servicer or by the party for whom they*
> *signed," Gardner says.*
>
> *Linda Tirelli, a New York bankruptcy lawyer, calls such*
> *mortgage documents "Ta-Da!" assignments because they seem to*
> *appear out of nowhere.*
>
> *"Why are they creating their own assignments to begin*
> *with?" asks Tirelli, who represents borrowers. "Why is this even an*
> *issue?"*

- **September 1, 2011**: *Goldman Sachs entered into a consent order with the Federal Reserve for* <u>*Covered Trust Servicer Litton's*</u> *loan servicing misconduct. The consent order entered into by Goldman Sachs on behalf of Litton was virtually identical to the April 13, 2011 consent orders entered into by other Covered Trust Master Servicers/Servicers, as it did not contest the Federal Reserve's findings that Litton had engaged in the filing of false affidavits in foreclosure proceedings which were not made on personal knowledge and which were not properly notarized, engaged in "unsafe or unsound" foreclosure practices, and failed to devote sufficient resources and oversight to Litton's foreclosures. Goldman Sachs also agreed to institute major remedial measures and to obtain an independent consultant to review Litton's practices and make payments to aggrieved borrowers.*

- **September 1, 2011**: The New York Department of Financial Services announced that it had entered into an agreement with ***<u>Covered Trust Servicers Ocwen and Litton</u>***, as well as Litton's parent company, Goldman Sachs, to have Ocwen and Litton refrain from committing numerous types of loan servicing misconduct amounting to Events of Default. The agreement was required by the New York regulator as a pre-condition to Ocwen's acquisition of Litton from Goldman Sachs. In addition, ***Goldman Sachs was required to forgive $53 million in loan principal balances that were owned by Goldman Sachs and serviced by Litton, because of Litton's servicing misconduct***. The New York regulator's news release indicated that the agreement was intended to put an end to Litton's and Ocwen's misconduct amounting to Events of Default:

> *The new Agreement on Mortgage Servicing Practices that*
> *Goldman, Ocwen and Litton have signed makes important changes*
> *in the mortgage servicing industry which, as a whole, has been*
> *plagued by troublesome and unlawful practices. Those practices*
> *include: "Robo-signing," referring to affidavits in foreclosure*
> *proceedings that were falsely executed by servicer staff without*
> *personal review of the borrower's loan documents and were not*

-5-

> *notarized in accordance with state law; weak internal controls and oversight that compromised the accuracy of foreclosure documents; unfair and improper practices in connection with eligible borrowers' attempts to obtain modifications of their mortgages or other loss mitigation, including improper denials of loan modifications, and imposition of improper fees by servicers.*

- **September 1, 2011**:  *The Federal Reserve issued a press release lambasting Goldman Sachs and <u>Covered Trust Servicer Litton's</u> loan servicing practices. The press release stated*:

> *The Federal Reserve Board on Thursday announced a formal enforcement action against the Goldman Sachs Group, Inc. and Goldman Sachs Bank USA to address a pattern of misconduct and negligence relating to deficient practices in residential mortgage loan servicing and foreclosure processing involving its former subsidiary, Litton Loan Servicing LP.*

*       *       *

> *The action orders Goldman Sachs to retain an independent consultant to review foreclosure proceedings initiated by Litton that were pending at any time in 2009 and 2010. The review is intended to provide remediation to borrowers who suffered financial injury as a result of wrongful foreclosures or other deficiencies identified in a review of the foreclosure process. The foreclosure review will be conducted consistent with the reviews currently underway at the 14 large mortgage servicers that consented to enforcement actions brought by the banking agencies on April 13, 2011.*

*       *       *

> *As noted in the April press release, the Federal Reserve believes monetary sanctions are appropriate and plans to announce monetary penalties. These monetary penalties against Goldman Sachs will be in addition to the corrective actions that Goldman Sachs will be taking pursuant to today's action. Goldman Sachs has acknowledged in today's action that it will be responsible for satisfying any civil money penalty that the Board of Governors could have assessed against Litton for its conduct.*

- **October 6, 2011**: Neil Barofsky, former Special Inspector General for the Troubled Asset Relief Program, or TARP, testified before a U.S. House Financial Services Subcommittee and stated that the Government Accountability Office ("GAO") *"confirmed . . . widespread anecdotal evidence of [loan] servicers' failures"* to properly service mortgage loans.  Barofsky also confirmed that *"the widespread abuse suffered . . . at the hands of the mortgage servicers . . . has gone largely*

- 6 -

*unaddressed . . . even though [the Government] has been aware of servicer misconduct since 2009*," and further confirmed that "*rampant mortgage servicer abuse that has so strongly characterized the [financial] crisis . . . continues to go unpunished.*"

- **November 10, 2011**: New York's Department of Financial Services announced it had entered into an agreement with ***Covered Trust Servicer AHM Servicing*** and several other loan servicers, to reform their loan servicing practices. Benjamin Lawsky, Superintendent of Financial Services, stated: "'*Today's agreements are an important step forward in cleaning up some of the mortgage industry's most troubling practices.*'" According to the Department of Financial Services' press release, the agreements were made to address the following misconduct by AHM Servicing and the other loan servicers:

  - "Robo-signing," where servicer staff signed affidavits stating they reviewed loan documents when they had not actually done so.

  - Weak internal controls and oversight that compromise the accuracy of foreclosure documents.

  - Referring borrowers to foreclosure at the same time as those borrowers are attempting to obtain modifications of their mortgages or other loss mitigation.

  - Improper denials of loan modifications.

  - Failing to provide borrowers with access to a single customer service representative, resulting in delays or failure of the loss mitigation process.

  - Imposition of improper fees by servicers.

The press release further outlined the servicers' agreements to reform their practices as follows:

1. End Robo-signing and impose staffing and training requirements that will prevent Robo-signing.

2. Require servicers to withdraw any pending foreclosure actions in which filed affidavits were Robo-signed or otherwise not accurate.

3. End "dual tracking," i.e., referring a borrower to foreclosure while the borrower is pursuing loan modification or loss mitigation, and prohibit foreclosures from advancing while denial of a borrower's loan modification is under an independent review, which is also required by the agreements.

4.      Provide a dedicated single point of contact representative for all borrowers seeking loan mitigation or in foreclosure so borrowers are able to speak to the same person who knows their file every time they call.

5.      Require servicers to ensure that any force-placed insurance be reasonably priced in relation to claims incurred, and prohibit force-placing insurance within an affiliated insurer.

6.      Impose more rigorous pleading requirements in foreclosure actions to ensure that only parties and entities possessing the legal right to foreclose can sue borrower.

7.      For borrowers found to have been wrongfully foreclosed, require servicers to ensure that their equity in the property is returned, or, if the property was sold, compensate the borrower.

8.      Impose new standards on servicers for application of borrowers' mortgage payments to prevent layering of late fees and other servicer fees and use of suspense accounts in ways that compounded borrower delinquencies and defaults.

9.      Require servicers to strengthen oversight of foreclosure counsel and other third party vendors, and impose new obligations on servicers to conduct regular reviews of foreclosure documents prepared by counsel and to terminate foreclosure attorneys whose document practices are problematic or who are sanctioned by a court.

- **December 2011**: It was reported that *an Alabama bankruptcy court judge ruled that Wells Fargo, a Master Servicer and/or Servicer for each of the Covered Trusts, had filed at least 630 sworn foreclosure affidavits containing false facts*, including claims that borrowers were in arrears for amounts not actually due. Judge Margaret A. Mahoney had declared that *"Wells Fargo 'took the law into its own hands'" and disregarded perjury laws*.

- **December 28, 2011**:  *A United States Bankruptcy Court issued an order sanctioning Covered Trust Servicer AHM Servicing* based on numerous instances of loan servicing misconduct that were Events of Default. *The court held that AHM Servicing's "conduct [was] willful" in violating the court's Chapter 13 reorganization plan repeated times, and "that AHM[] [Servicing's] attitude and conduct in this matter is indefensible." The court awarded the borrowers $10,000 in damages and $40,000 in punitive damages, payable by AHM Servicing. The court further awarded the borrowers their attorneys' fees and prohibited AHM Servicing from raising the borrowers' payments without court approval*.

- 8 -

- **January 2012**: The *Chicago Tribune* reported:

  > *Foreclosure-related case files in just one New York federal bankruptcy court, for example, hold at least a dozen mortgage documents known as promissory notes bearing evidence of recently forged signatures and illegal alterations, according to a judge's rulings and records reviewed by Reuters. Similarly altered notes have appeared in courts around the country.*

  > *Banks in the past two years have foreclosed on the houses of thousands of active-duty U.S. soldiers who are legally eligible to have foreclosures halted. Refusing to grant foreclosure stays is a misdemeanor under federal law.*

  > *The U.S. Treasury confirmed in November that it is conducting a civil investigation of 4,500 such foreclosures. Attorneys representing service members estimate banks have foreclosed on up to 30,000 military personnel in potential violation of the law.*

  > *   *   *

  > *And in thousands of cases, documents required to transfer ownership of mortgages have been falsified. Lacking originals needed to foreclose, mortgage servicers drew up new ones, falsely signed by their own staff as employees of the original lenders – many of which no longer exist.*

- **February 9, 2012**: The U.S. Department of Justice and 49 states obtained "*a landmark $25 billion settlement,*" "*the largest federal-state civil settlement ever obtained,*" against the nation's five largest loan servicers for continuing "*mortgage loan servicing and foreclosure abuses*" (hereafter the "National Mortgage Settlement"). U.S. Attorney General Eric Holder called the servicers' misconduct "*reckless and abusive mortgage practices.*" *The five loan servicers charged by the U.S. and 49 states were repeat offenders – they had previously entered into the April 13, 2011 consent orders. Three of the five serial offenders were <u>Bank of America (which includes Covered Trust Servicer CHLS/BACHLS), Ally Financial (which includes Covered Trust Servicer GMAC) and Covered Trust Master Servicer/Servicer Wells Fargo</u>.* These repeat offenders were charged with

  > *violations of state and federal law[;] . . . [the] use of "robo-signed" affidavits in foreclosure proceedings; deceptive practices in the offering of loan modifications; failures to offer non-foreclosure alternatives before foreclosing on borrowers with federally insured mortgages; and filing improper documentation in federal bankruptcy court.*

- **February 2012**: *The New York Attorney General sued <u>Covered Trust Master Servicers/Servicers Wells Fargo and Bank of America (and therefore CHLS/BACHLS)</u>*. The New York Attorney General also sued MERSCORP Inc. and its subsidiary Mortgage Electronic Registration Systems, Inc. (collectively, "MERS"). The lawsuit alleged that these Master Servicers and Servicers and MERS repeatedly submitted documents to courts in foreclosure proceedings that contained misleading and false information. The New York Attorney General stated: "'***Once the mortgages went sour, these same banks brought foreclosure proceedings en masse based on deceptive and fraudulent court submissions, seeking to take homes away from people with little regard for basic legal requirements or the rule of law.***'"

- **February 2012**: *<u>PNC, which had acquired National City, a Servicer for the DBALT 2006-AR5 Covered Trust</u>, reported that it was accruing $240 million of expenses related to "residential mortgage foreclosure-related expenses, <u>primarily as a result of ongoing governmental matters," a confession that it was engaged in widespread Events of Default</u>.*

- **March 5, 2012**: U.S. Secretary of Housing and Urban Development, Shaun Donovan, stated in televised comments that "***as high as 60 percent of foreclosures were [still] being done wrong***."

- **June 7, 2012**: Law professor Adam Levitin testified before a U.S. House Subcommittee, stating that ***the National Mortgage Settlement would "not deter future consumer fraud by too-big-to-fail" master servicers/servicers***, calling their conduct "***<u>one of the most pervasive violations of procedural rights in history</u>,***" ***supported by "evidence of widespread fraud [that] was too great to ignore***." Regarding the National Mortgage Settlement, Professor Levitin stated: "Critically for the purposes of this hearing, ***the settlement permits the banks to receive credit under the settlement by reducing principal or refinancing on mortgages that they service, but <u>do not own</u>,***" ***and therefore "servicers have strong incentives not to engage in principal write-downs on loans they own"; instead, "it appears likely that most of the principal reductions will come from <u>investor-owned mortgages</u>," i.e., Mortgage Loans like those in the Covered Trusts***. Professor Levitin concluded: "***<u>I would expect servicers to perform some [principal reductions] that violate PSAs in order to get . . . settlement credit</u>.***"

- **January 2013**: *Bank of America (and therefore <u>Covered Trust Servicers CHLS/BACHLS</u>) was reported to still be committing Events of Default, as it had to pay Fannie Mae $1.3 billion "to make up for dropping the ball on servicing mortgages . . . by delaying contacts with delinquent borrowers or failing to process foreclosures properly***."

- **February 2013**: In a lawsuit to approve an $8.5 billion settlement between Bank of America and an RMBS trustee concerning, *inter alia*, improper loan servicing by ***<u>Covered Trust Servicer CHLS/BACHLS</u> in 530 RMBS trusts, objectors to the settlement provided evidence to the court establishing that CHLS/BACHLS***

*breached the PSAs for 468 of the 530 trusts by improperly modifying first lien loans owned by the trusts, and thus causing losses to the investors, while simultaneously refusing to modify second lien loans it or Bank of America owned in order to avoid losses to themselves.*

- **June 2013**: The *Charlotte Business Journal* reported that the monitor overseeing the administration of the National Mortgage Settlement found that ***Bank of America (and thus* Covered Trust Servicer CHLS/BACHLS*) was not complying with the required servicing standards.*** The article stated: ***"These aren't new allegations."*** [1] *The New York Times* reported that, in addition to Bank of America, *Covered Trust Master Servicers/Servicers Wells Fargo and GMAC were also not complying with the settlement.* *The New York Times* reported that the servicers had received "*almost 60,000 complaints*" from borrowers about their servicing misconduct, while

> *state officials have expressed deep disappointment with the banks' performance in other areas. Last month, lawyers in the office of Martha Coakley, the attorney general of Massachusetts, detailed what they said were hundreds of violations of the settlement, including a failure to adhere to the required timetable or provide reasons for the denial of an application.*
>
> *They also pointed to cases where they said banks had improperly inflated the value of a loan before writing it down so as to claim a greater amount of relief, or where they had reverted to a higher interest rate while delaying, for months, the decision to make a trial loan modification permanent.*
>
> *Soon after, Eric T. Schneiderman, the attorney general of New York, announced plans to sue Bank of America [and therefore Covered Trust Servicer CHLS/BACHLS] and [Master Servicer/Servicer] Wells Fargo, saying they were repeatedly violating the terms of the settlement.*
>
> *Lisa Madigan, the attorney general of Illinois, said there was an "alarming pattern" of violations of the servicing standards. In a review of servicer handling of loan modification requests in Illinois, she found that in 60 percent, servicers failed to comply with the time frame for notifying borrowers of missing documents and in 45 percent they made multiple requests for the same documents.*
>
> *Pam Bondi, the attorney general of Florida, has written letters to Bank of America and Wells Fargo detailing similar complaints that are resolved only by the intervention of her office.*

---

[1]  In fact, Bank of America/CHLS/BACHLS would subsequently be found to not be in compliance by the monitor several additional times.

- 11 -

- **June 2013**: *CBC News* reported that *former employees of Bank of America (which included <u>Covered Trust Servicer CHLS/BACHLS</u>) had filed sworn affidavits in cases against the bank revealing conduct amounting to Events of Default*:

> *Former Bank of America employees say in court documents that the bank routinely lies to customers about their mortgages, and denies their requests for modifications without even looking at the paperwork.*

> *In sworn affidavits, four former employees, for example, describe policies in place at the bank that they say are designed to subvert the Home Affordable Modification Program (HAMP), 2009 government-sponsored initiative that was designed to keep distressed homeowners above water during the depths of the housing crises.*

> *The affidavits are part of multiple court cases against the bank brought by homeowners who say they were unfairly foreclosed upon.*

> *                    *          *          *

> *The former workers allege there's a bank-wide policy that encourages mortgage officers to delay and avoid that process as much as possible, to foreclose on customers who shouldn't have been, and to generally lie and mislead.*

> *According to one affidavit, a mortgage processor who put 10 or more houses into foreclosure in any given month was eligible for a $500 cash bonus, or gift cards at a major retailer.*

> *The sworn affidavits were made public recently on the website of ProPublica, an independent, non-profit news service that produces investigative journalism in the public interest.*

> *The employees say the bank also went out of its way to mislead, stall and delay paperwork so that customers would be denied changes to their mortgages, and forced into arrangements that were more profitable to the bank than HAMP arrangements were.*

> *"We were told to lie to customers and claim that Bank of America had not received documents it had requested, and that it had not received trial payments [when in fact it had]," said Simone Gordon, a senior collector of loss mitigation at the bank for five years until early 2012.*

- 12 -

*Another ex-worker, Theresa Terrelonge, agreed that subverting HAMP to the bank's benefit was an overarching goal for the bank.*

*"Based on what I observed, Bank of America was trying to prevent as many homeowners as possible from obtaining permanent HAMP loan modifications while leading the public and the government to believe that it was making efforts to comply with HAMP," she said.*

\*        \*        \*

*"It was well known among managers and many employees that the overriding goal was to extend as few HAMP loan modifications to homeowners as possible."*

*She also said that Bank of America "collectors" who failed to meet their quotas were fired for not putting enough customers into foreclosure. "Several of my colleagues were terminated on that basis," she said.*

*Another former employee, William Wilson, said the bank would routinely delay filing appropriate paperwork after receiving it, in order to have certain penalties kick in. After waiting 60 days, the bank would automatically reject them all.*

*"During a blitz, a single team would decline between 600 and 1,500 modification files at a time for no reason other than the documents were more than 60 days old," Wilson said.*

*"Once an applicant was finally rejected after a long delay, the bank would offer them an alternative. Bank of America would charge a higher interest rate . . . ."*

*Wilson alleges he was fired in August 2012 for refusing to go along with the scheme any longer.*

\*        \*        \*

*The employees allege the bank would routinely file false paperwork [with] [the] government suggesting it had far more HAMP-backed loans on its books than was the reality.*

*"It was well known among Bank of America employees that the numbers Bank of America was reporting to the government and to the public were simply not true," Steven Cupples said. Cupples worked at the bank until June 2012. He previously worked at Countrywide, the lender at the center of America's subprime*

- 13 -

*mortgage crisis that was subsequently taken over by Bank of America.*

- **November 2013**: Standard & Poor's estimated that the largest loan servicers' exposure for improper loan servicing conduct was *an astounding $30 billion*.

- **December 2013**: *The Star-Ledger* reported that the New Jersey Attorney General had charged <u>**Covered Trust Servicer PHH**</u> with misleading borrowers and violating New Jersey law by "*not giving homeowners accurate information about how long it would take to process loan modifications, misleading them about foreclosure proceedings and imposing improper fees*." PHH paid $6.35 million to settle the charges which affected "*[a]t least 2,000 borrowers*," demonstrating a company-wide pattern of misconduct by PHH.

- **January 29, 2014**: *The CFPB announced it was initiating administrative proceedings against* <u>*Covered Trust Servicer PHH*</u>, *charging it with inducing borrowers to purchase mortgage insurance at inflated prices in order to "collect illegal kickback payments and unearned fees" over a 15-year period.*

- **February 2014**: Steven Antonakes, Deputy Director of the CFPB, confirmed that the loan servicing industry as a whole was continuing its servicing abuses and Events of Default. At the Mortgage Bankers Association's National Mortgage Servicing Conference in February 2014, Antonakes gave a speech which took the industry to task, stating: "<u>*Nearly eight years have passed and I remain deeply disappointed by the lack of progress the mortgage servicing industry has made*</u>." Antonakes stated that *the CFPB was still receiving "around 4,900 complaints per month" concerning mortgage servicing, and "too many [borrowers] continue to receive erratic and unacceptable treatment. . . . This kind of continued sloppiness is difficult to comprehend and not acceptable. It is time for the paper chase to end. . . . It has felt like 'Groundhog Day' with mortgage servicing for far too long.*" Antonakes also said the pervasive practice of successor servicers failing to honor loan modification agreements with prior servicers "would not be tolerated," and that the servicing industry's continuing deceptive practices would not be allowed: "*There will be no more shell games where the first servicer says the transfer ended all of its responsibility . . . and the second servicer" claims ignorance about the modification.* Antonakes summed up his speech as follows, which clearly indicated that the industry still had not stopped committing Events of Default:

> *My message to you today is a tough one. I don't expect a standing ovation when I leave. But I do want you to understand our perspective. I would be remiss if I did not share it with you.*
>
> *In our view, the intense human suffering inflicted on American consumers by an all-too-frequently indifferent mortgage servicing system has required us to change the paradigm in mortgage servicing forever. Frankly, the notion that government*

*intervention has been required to get the mortgage industry to perform basic functions correctly – like customer service and record keeping – is bizarre to me but, regrettably, necessary. . . .*

*But please understand: if you choose to operate in this space, the fundamental rules have changed forever. It's not just about collecting payments. It's about recognizing that you must treat Americans who are struggling to pay their mortgages fairly before exercising your right to foreclose. We have raised the bar in favor of American consumers and we are ready, willing and able to vigorously enforce that bar.*

*Ultimately, these profound changes will be good for all Americans, including industry. But please understand, business as usual has ended in mortgage servicing. Groundhog Day is over. Thank you.*

- **March 2014**: *The Washington Post reported on a foreclosure lawsuit filed in federal court in New York in which an internal "foreclosure manual" of <u>Covered Trust Master Servicer/Servicer Wells Fargo</u> was obtained and filed. The borrower's attorney asserted that the internal manual instructed attorneys working for Wells Fargo on how to essentially perform robo-signing and create false foreclosure documents*. The borrower's attorney was reported to have stated: "'<u>**This is a blueprint for fraud. . . . The idea that this bank is instructing people how to produce these documents is appalling**</u>.'" *The Washington Post* further reported that *the borrower's attorney "has long suspected Wells Fargo of manufacturing documents. A number of her past cases involving the bank featured mortgage notes that were not endorsed by anyone, but when she brought it to Wells Fargo's attention the bank would 'magically' produce[] the document." It happened so frequently to this attorney and her colleagues "that they started to call paperwork 'ta-da' documents*." This revealed unequivocal evidence that Wells Fargo had an established, uniform *and written practice manual* that directed the company-wide manufacture of falsified, robo-signed documents, a clear Event of Default.

- **May 23, 2014**: *<u>Covered Trust Master Servicer/Servicer Wells Fargo</u> settled a derivative action by its shareholders* against Wells Fargo executives *alleging they allowed foreclosure abuses to occur, including improper robo-signing and the filing of false affidavits not based on personal knowledge. Wells Fargo paid $67 million to settle the case.*

- **May 29, 2014**: *News reports indicated that the U.S. Attorney's office in Manhattan was investigating five loan servicers, including <u>Covered Trust Servicers PHH and National City (through PNC)</u>, for overcharging the Government for expenses incurred during foreclosures*.

- **July 21, 2014**: *It was reported that <u>Covered Trust Servicer PHH</u> was ordered to pay $16 million to a borrower by a California jury – including punitive damages of*

*$15.7 million – for its egregious conduct in servicing the borrower's mortgage loan. The report also stated "PHH is no stranger to legal woes. In January, the company was accused of orchestrating a massive kickback scheme. The company is also being investigated by the US Attorney's Office for allegedly overcharging the government for foreclosure expenses on federally backed mortgages."*

- **September 10, 2014**: A *Bloomberg* article discussed the recent financial crisis and made the following observations about loan servicers' ongoing misconduct:

  *[T]he banks took many short cuts and did so on purpose and with the goal of improperly expediting the process. They failed to review the documents of the mortgages they were foreclosing on, then told the courts they had. They didn't verify information, but claimed to have done so in sworn affidavits. They hired $8 an hour burger-flippers to "robosign" these documents, pretending the underlying legal work had been done. They knowingly used falsified records, some of which they bought en masse. They were aided by a company called DocX, which had a price list of fabricated documents for use in court. (DocX, by the way was eventually indicted on charges of mortgage fraud).*

  *After creating phony dossiers on borrowers, the banks signed and notarized affidavits stating they had taken all of the legal steps. In many cases, even the notarizations were fakes. Submitting a falsified notarized affidavit to a court is perjury and fraud.*

## APPENDIX 6

- **April 2004**: The OTS instituted an enforcement action against Ocwen Federal Bank. The OTS found that Ocwen had *engaged in illegal, unsafe and unsound loan collection practices*. As a result, Ocwen entered into a written "supervisory agreement" with the OTS, in which it agreed to improve its compliance with numerous federal laws, including the Real Estate Settlement Procedures Act, the Fair Debt Collection Practices Act and the Fair Credit Reporting Act. The *Palm Beach Post* reported that Ocwen entered into the agreement with the OTS after being *"[f]looded" with "hundreds" of complaints by borrowers, consumer advocates and class-action attorneys, and "several proposed class-action suits against Ocwen."* [1]

- **November 29, 2005**: In a lawsuit in which an RMBS trustee, Ocwen and others were co-defendants, a jury rendered *an $11.5 million verdict in favor of a borrower and against Ocwen arising out of Ocwen's mis-servicing of the loan.* *See Davis v. Ocwen Loan Servicing LLC, et al.*, No. 2004 CV 1469 (Tex. Dist. Ct., Galveston Cnty. Nov. 29, 2005) (Criss, J.). The jury award included $10 million in punitive damages against Ocwen because of the egregious misconduct it engaged in (the jury award was later reduced to $1.8 million by agreement of the parties). According to borrower Davis's attorney, in February 2002, Davis, 64, took out a $31,000 home equity loan on the Texas City residence where she had lived since 1942. In 2003, Davis became ill and spent four days in the hospital, which forced her to miss one loan payment. Ocwen told her it would put her on a payment plan, but never did. Ocwen also failed to credit Davis for the money she paid and began to foreclose on her house while continuing to falsely assure her she was on a payment plan. Ocwen eventually foreclosed on Davis's home, and she filed for bankruptcy in the hopes of ending Ocwen's harassment. During the bankruptcy, however, Ocwen requested an additional $390 to cover its costs and fees related to a default she had already cured. *At trial, a former Ocwen employee provided uncontradicted testimony concerning Ocwen's unfair business practices, which included paying incentives to its loan collectors for improperly moving loans on properties with equity into foreclosure. The former employee testified that Ocwen employees would review their records to identify loans in which the borrowers had equity, and then prey on the borrowers by improperly manufacturing ways to falsely foreclose on them.* The former employee testified that they selected loans with equity because it ensured that there was money to pay the Ocwen employees their incentive payments once they wrongfully foreclosed. The evidence also showed that *Ocwen engaged in predatory servicing by not informing borrowers of how to make their loans current, and failing to give credit for payments when they were made, in order to artificially manufacture foreclosures. The jury found that Ocwen made fraudulent, deceptive and*

---

[1]  In order to escape further scrutiny from the OTS, and to avoid being held accountable under the supervisory agreement, Ocwen then quickly dissolved Ocwen Federal Bank and created non-bank loan servicer Ocwen Loan Servicing LLC, taking itself outside of the OTS's jurisdiction. In this way, Ocwen could continue to operate its fraudulent business model without OTS interference.

*misleading representations to Davis when she missed her loan payment while hospitalized in 2003.* Davis's attorney, Robert Hilliard of Corpus Christi, said: *"The jury believed that Ocwen has a scheme of stealing homes"* by classifying timely payments as late and then beginning foreclosure proceedings.

- **January 23, 2006**: The *South Florida Business Journal* reported:

    *The Business Journal's review of court filings shows Ocwen and affiliates are defendants in more than 500 civil suits filed in federal courts since 2002. Many of the cases have more than one customer among plaintiffs. About 100 of the cases are still pending.*

    \*     \*     \*

    *Plaintiff lawyers are currently seeking class action status for 57 federal cases being consolidated in Chicago and the West Palm Beach company says it is facing 331 lawsuits altogether. . . .*

    *The allegations are sometimes harsh - one plaintiff describes the company's actions as "naked fraud"* . . . .

    \*     \*     \*

    *Ocwen probably isn't done with [Attorney] Hilliard. The attorney said he is preparing to file about 100 suits for Texas residents who claim Ocwen falsified mortgage payments and began foreclosure proceedings.*

- **March 2009**: *ProPublica* published an article examining Ocwen, which stated:

    *[Ocwen's] business practices have also drawn a wide array of criticism from customers, consumer advocates and the federal government itself.*

    \*     \*     \*

    Ocwen got a lucrative contract in 2003 to manage and sell thousands of foreclosed properties owned by the Department of Veterans Affairs, but a report from the Government Accountability Office in 2007 panned Ocwen's performance and said the *"VA also has not been satisfied with Ocwen's performance"*: Ocwen racked up $1.3 million in penalties from the VA in the last three quarters of 2005 (at the height of the housing boom) for failing to meet sales targets.

    There were other problems too: *Ocwen charged the VA for home-upkeep repairs that were never made, the GAO reported.*

*Houses fell into disrepair and were covered in "trash and debris,"
which the GAO suspects might have lowered property values.*

&ast;  &ast;  &ast;

But that wasn't Ocwen's only run-in with the federal
government.

*In 2000, Ocwen Federal Bank, a now-defunct subsidiary,
paid $50,000 to settle . . . charges from HUD concerning various
rule violations on its loan servicing. Four years later, the Office of
Thrift Supervision forced Ocwen Federal Bank to sign an
agreement . . . promising to improve its compliance with fair-
lending laws.*

*John Taylor, president of the National Community
Reinvestment Coalition, cited those regulatory actions when
criticizing the VA's choice of Ocwen in 2003. "Why would you
want, when you have a repeated history of problems, to expose VA
housing to a potential predator?" he asked in American Banker.*

&ast;  &ast;  &ast;

*Ocwen has ranked last in J.D. Power and Associates' survey of
customer service at mortgage servicers for the last three years in a
row. Frustrated customers point specifically to its tortuous and
unhelpful phone services.*

&ast;  &ast;  &ast;

*Ocwen didn't fare much better with the Better Business
Bureau of Central Florida, which has received 520 complaints
about Ocwen in the last 36 months and slapped it with an F, its
lowest rating.*

&ast;  &ast;  &ast;

*Ocwen has in fact been accused of predatory practices in a slew of
lawsuits in the last few years. Frequent allegations include that
Ocwen falsely classifies timely payments as late, charges
unwarranted fees and improperly starts foreclosure proceedings.*

- **May 2009**: A Louisiana bankruptcy court judge blasted Ocwen after being subjected
to its repeated violations of the bankruptcy code for which the court had repeatedly
sanctioned it. *See In re McKain*, No. 08-10411, 2009 Bankr. LEXIS 2519, at \*5-\*8,
\*10-\*11 (Bankr. E.D. La. May 1, 2009), *rev'd on other grounds, Ocwen Loan
Servicing, LLC v. McKain*, No. 09-3662, slip op. (E.D. La. Aug. 15, 2011). The court
held:

### *Ocwen's History*

*This is not the first time Ocwen has appeared before the Court for improperly administering a loan or attempting to collect fees and costs to which it was not entitled. The Court has been involved with six other cases [fn] in the last four years where Ocwen either included improper fees in its claim; attempted to collect, post-discharge, fees and costs that were undisclosed but assessed during a bankruptcy; or attempted to foreclose on disallowed or discharged debt.*

*   *   *

*Ocwen has consistently shown an inability or refusal to comply with the[] basic statutory tenets [of the bankruptcy code]. As a result, discharged debtors have continued to incur the threat of foreclosure and collection of debts that have been discharged or disallowed. Ocwen has failed to disclose the assessment of postpetition charges to others, misleading them into a false sense that a fresh start was theirs to enjoy.*

*   *   *

*Ocwen has repeatedly abused the claims process and failed to honor the discharge injunction by attempting to collect from debtors and their bankruptcy estate disallowed or undisclosed debts. The Court finds that this practice is in bad faith. . . . The record reflects that this is an ongoing pattern . . . . The Court has repeatedly struck improper charges and has issued monetary sanctions against Ocwen. Ocwen's continuing disregard for bankruptcy law and procedure is a clear indication that monetary sanctions are simply ineffective.*

*   *   *

*[fn]It is likely that there are many additional cases where this activity has occurred, but not all debtors' counsel carefully monitor creditors' proof of claims.*

- **August 2009**: The *Southeast Texas Record* reported on a lawsuit filed against Ocwen for **wrongfully foreclosing on a borrower even though she was current on her mortgage loan payments**. The complaint alleged that Ocwen did not properly apply loan payments that were made in order to improperly manufacture a foreclosure, fraudulently assessed improper fees, costs, interest and charges, and violated state laws.

- 4 -

- **December 2010**: The Florida Attorney General's office compiled a presentation titled "Unfair, Deceptive and Unconscionable Acts in Foreclosure Cases." The Attorney General's presentation contained "copies of allegedly forged signatures, false notarizations, bogus witnesses and improper mortgage assignments," including *documents signed by Ocwen employee "Scott Anderson." Anderson's signature had been signed by at least four different persons, an obvious act of robo-signing*.

- **January 2011**: The United States District Court for the Eastern District of North Carolina entered an order affirming a bankruptcy court order *holding Ocwen in contempt of court for violating a discharge injunction and a bankruptcy court order*. *See In Re Adams*, No. 5:10-CV-340-BR, 2011 U.S. Dist. LEXIS 158090, at *13 (E.D.N.C. Jan. 24, 2011). The District Court held that "*Ocwen's conduct was . . . reprehensible*" and that Ocwen "transmitted an inaccurate payoff quote and loan history; . . . assessed discharged principal, fees, and costs; reported inaccurate information to credit reporting agencies; *and, most importantly, after the inaccurate information had been brought to its attention a number of times, failed to correct the information.*" *The District Court found that the foregoing misconduct by Ocwen was "willful and intentional," id.* at *21, *and thus merited punitive damages*.

- **March 2011**: The FTC began investigating Ocwen's foreclosure practices and demanded the production of documents relating to Ocwen's loan servicing activities.

- **June 2011**: The U.S. Treasury Department found that Ocwen's loan servicing practices were in need of "substantial improvement."

- **July 2011**: *A foreclosure action by HSBC was dismissed with prejudice by a New York State court judge in large part because three Ocwen employees had improperly "robo-signed" foreclosure documents in the case*. *See HSBC Bank USA, N.A. v. Taher*, 932 N.Y.S.2d 760, 2011 N.Y. Misc. LEXIS 3171 (Sup. Ct. July 1, 2011), *rev'd*, 104 A.D.3d 815, 962 N.Y.S.2d 301 (2d Dep't 2013) (reversed on the law, not the facts). *The court specifically singled out the aforementioned Ocwen robo-signer, Scott Anderson, and noted that it too had observed that there were at least four different variations of his signature in the cases before the court.*

- **July 2011**: *Reuters* reported that Ocwen was still engaging in widespread robo-signing:

  > *Reuters . . . identified at least six "robo-signers," individuals who in recent months have each signed thousands of mortgage assignments – legal documents which pinpoint ownership of a property. These same individuals have been identified – in depositions, court testimony or court rulings – as previously having signed vast numbers of foreclosure documents that they never read or checked.*

> *Among them: Christina Carter, an employee of Ocwen. . . . Her signature – just two "C"s – has appeared on thousands of mortgage assignments and other documents this year.*
>
> *In a case involving a foreclosure [the HSBC action discussed above], a New York state court judge called Carter a "known robo-signer" and said he'd found multiple variations of her two-letter signature on documents, raising questions about whether others were using her name.*

Reuters also reported that it had found that "in recent months," **Ocwen "filed foreclosure documents of questionable validity."**

- **September 1, 2011**:  In connection with Ocwen's acquisition of Covered Trust Servicer Litton, the New York Department of Financial Services required Ocwen to enter into an agreement to reform its robo-signing practices by, among other things, ensuring that foreclosure affidavits were true, accurate and correct, were based on personal knowledge and were properly notarized, and by withdrawing any of its pending foreclosure proceedings that used false affidavits, as well as agreeing to a host of other reforms designed to stop its improper loan servicing activities.

- **September 2011**: *Ocwen was held in contempt by the court in In re Phillips, No. 02-66299, 2011 Bankr. LEXIS 3780 (Bankr. N.D. Ohio Sept. 29, 2011)* (Ocwen and an RMBS trustee both held in contempt for Ocwen's violations of bankruptcy discharge injunction). *See also In re Englert*, 495 B.R. 266, 269 (Bankr. W.D. Pa. 2013) ("*[T]he Court . . . found Ocwen in further contempt for which further sanctions would be addressed at the Rule to Show Cause hearing*.").

- **April 30, 2012**: The Sixth Circuit Court of Appeals reversed an order dismissing a borrowers' complaint alleging that an RMBS trustee and Ocwen were violating the Fair Debt Collection Practices Act. *See Bridge v. Ocwen Fed. Bank, FSB*, 681 F.3d 355, 356-57 (6th Cir. 2012).  The Court of Appeals held:

> *The Fair Debt Collection Practices Act was passed to protect consumers against both abusive and mistaken collection activity. This case reveals why.  It began with seemingly innocuous accounting errors on the part of a bank that were corrected. Despite repeated proof of that correction, unremitting collection activity was undertaken, foreclosure proceedings were instituted, and the credit of two consumers was seriously impaired.*
>
> \*    \*    \*
>
> *Ocwen . . . began dunning Bridge and her husband, who is not a co-borrower on the mortgage loan, for the May payment claimed to be overdue, despite proof [that is was not overdue because] of the double payment submitted by Bridge to Ocwen and Aames.  Since*

> *then Ocwen has: made endless collection calls by phone to Mr. and Mrs. Bridge, despite cease and desist requests and registry on the federal "Do Not Call" directory; threatened foreclosure; assessed monthly late fees; and reported derogatory information to the credit reporting agencies. Additionally, the law firm . . . allegedly retained by Ocwen, sent a collection letter to Bridge threatening foreclosure.*

- **July 19, 2012**: A bankruptcy court in Kentucky issued its decision, findings of fact and conclusions of law after a trial in an adversary proceeding involving Ocwen and a borrower. *See In re Tolliver*, No. 09-21742, 2012 Bankr. LEXIS 3333, at *3, *6-*7 (Bankr. E.D. Ky. July 19, 2012). *The court blasted Ocwen for its misconduct:*

> *Defendants [Ocwen and the co-defendant RMBS trustee] breached the terms of the Note and Mortgage by applying unauthorized late charges, costs and fees to [the borrower's] account and breached an implied contractual duty of good faith and fair dealing. . . . Ocwen misrepresented the status of the Plaintiff's Loan to fraudulently induce her to enter into [improper forbearance] agreements when, but for Ocwen's unauthorized acts, the Plaintiff had paid her Loan in full. The Plaintiff, having overpaid her Loan, is entitled to compensatory and punitive damages for the Defendants' breach of contract and implied covenant of good faith and fair dealing, fraud, and conversion.*

>              \*        \*        \*

> *Ocwen proceeded to mishandle the servicing of the Plaintiff's Loan by misapplying her payments contrary to the terms of the Note and Mortgage and assessing unauthorized fees and charges. This forced the Plaintiff into a constant state of default, allowing Ocwen to profit by continuing to assess more fees and charges based on her default status. Ocwen knew or should have known that it could not charge these fees and charges, yet Ocwen misrepresented to the Plaintiff that her Loan was in default thereby forcing the Plaintiff to enter into a series of meaningless oral and written forbearance agreements, none of which allowed her to cure her alleged default and two of which contained provisions that Ocwen ultimately argues excuses its misbehavior. These provisions, found in the 2004 and 2005 written forbearance agreements, allowed Ocwen to charge these unauthorized fees to the Plaintiff's account and required the Plaintiff to waive any claims it had against Ocwen. But for Ocwen's misapplication of her payments, and contrary to Ocwen's representations, the Plaintiff had actually paid her Loan in full by October 2004. As a result of Ocwen's actions, the Plaintiff has overpaid her Loan by thousands of dollars.*

- **December 5, 2012**: *The New York Department of Financial Services announced that Ocwen was violating its prior agreement with the Department to refrain from engaging in loan servicing misconduct.  The Department's press release stated*:

> "*[W]e conducted a targeted exam of Ocwen's performance and discovered gaps in the company's compliance.  The Department is requiring the company to hire a monitor so that we can be sure that the reforms are implemented and homeowners have a real chance to avoid foreclosure.*"

*   *   *

> *The Department's examination of Ocwen's mortgage servicing practices found that, in some instances, the company failed to demonstrate that it had sent out required 90-day notices before commending foreclosure proceedings or even that it had standing to bring the foreclosure actions.  The exam also revealed gaps in Ocwen's Servicing Practices, including indications that in some instances it failed to provide the single point of contact for borrowers; pursued foreclosure against borrowers seeking a loan modification; failed to conduct an independent review of denials of loan modifications; and failed to ensure that borrower and loan information was accurate and up-to-date.*

**APPENDIX 7**

- **February 2014**: Large institutional investors Pimco and BlackRock were reported to be considering legal action against Ocwen concerning its misconduct relating to loan modifications.

- **February 12, 2014**: *National Mortgage News* reported that New York banking Superintendent Benjamin Lawsky "unleashed a verbal assault on nonbank servicer Ocwen" in a speech to the New York Bankers Association.  The article reported:

     *Lawsky said Ocwen's public documents make "for startling reading."  He sees "corners being cut," by nonbank servicers that have touted their ability to help distressed borrowers.*

     *"We have serious concerns that some of these nonbank mortgage servicers are getting too big, too fast," Lawsky told New York bankers. . . .  "We see far too many struggling homeowners getting caught in a vortex of lost paperwork, unexplained fees and avoidable foreclosures."*

                    *            *            *

     *But he took particular umbrage by Ocwen's assertions that it can service delinquent loans at a cost that is 70% lower than the rest of the industry, calling into question its entire servicing model.*

     *"Those kinds of cost-saving claims bear special scrutiny," Lawsky said.  "Regulators have to ask whether the purported efficiencies at nonbank mortgage servicers are too good to be true."*

                    *            *            *

     Lawsky made specific references to servicers' difficulty in handling the transfer of documents and dealing with distressed borrowers.

     *"We see electronic loan files strewn around the globe with no one who knows how to pull them together," Lawsky said.  "We see a virtual potpourri of computer systems containing critical borrower information, but no one who knows how to extract that information at the right time and for the right purpose.*"

- **February 26, 2014**: Lawsky's office sent a letter to Ocwen.  As reported by *HousingWire*, Lawsky was very concerned about a

  > ***"number of potential conflicts of interest" [Ocwen had] with other public companies it's dealing with, and he wants his questions answered.***

  >        *       *       *

  > Lawsky's letter demands that Ocwen more specifically detail the relationship and financial connection between the companies' executives and employees, and for information regarding any other agreements between Ocwen and other companies.

  > ***"Presently, Ocwen's management owns stock or stock options in the affiliated companies.  This raises the possibility that management has the opportunity and incentive to make decisions concerning Ocwen that are intended to benefit the share price of affiliated companies, resulting in harm to borrowers, mortgage investors, or Ocwen shareholders as a result."***

  > In addition to information on Ocwen's officers, directors and employees, Lawsky's office wants all documents sufficient to show the nature and extent of services provided to Ocwen by each of the affiliated companies, including all agreements for such services, and copies of all agreements between Ocwen and the affiliated companies concerning procurement of third party services.  Ocwen is also being probed about its agreements concerning the outsourcing of information management to the affiliated companies.

- **February 27, 2014**: *Bloomberg BusinessWeek* reported:

  > ***As of mid-February, American homeowners had filed more than 9,000 mortgage-related complaints against Ocwen – the highest number of any non-bank servicer, according to data from the Consumer Financial Protection Bureau in Washington.***

  >        *       *       *

  > ***"Ocwen is one of the most complained about servicers when we ask housing counselors and lawyers what they are seeing," said Kevin Stein, associate director of the California Reinvestment Coalition, a San Francisco-based consumer advocacy group. "We're hearing a lot about foreclosing because of bad servicing practices."***

- **March 2014**: A New York federal court denied Ocwen's motion to dismiss and allowed a class action to proceed against it and others alleging that Ocwen misled

- 2 -

borrowers about loan modifications. *See Dumont v. Litton Loan Servicing, LP*, No. 12-cv-2677-ER-LMS, 2014 U.S. Dist. LEXIS 26880 (S.D.N.Y. Mar. 3, 2014).

- **April 2014**: *Reuters* reported that New York Banking Superintendent Lawsky was going after Ocwen again and demanding information. The *Reuters* article stated:

> *New York's banking regulator is probing Ocwen Financial Corp, which collects mortgage payments, for potentially over charging borrowers and investors to auction off foreclosed properties it services.*
>
> Benjamin Lawsky, superintendent of New York's Department of Financial Services, sent a letter to Ocwen saying *he was concerned the company and an affiliate, Altisource Portfolio Solutions SA, were engaged in so-called self-dealing through an online auction site called Hubzu.*
>
> Self-dealing is when a company represents its own interests in a transaction, rather than those of a client.
>
> Ocwen uses Hubzu, an Altisource Portfolio subsidiary, to auction off borrower homes facing foreclosure and foreclosed investor-owned properties. When Ocwen selects Hubzu to host foreclosure or short sale auctions, the letter said, the Hubzu auction fee is 4.5 percent; when Hubzu is competing for business on the open market, its fee is as low as 1.5 percent.
>
> *"The relationship between Ocwen, Altisource Portfolio and Hubzu raises significant concerns regarding self-dealing," the letter said, adding that it raises questions about whether the companies are charging inflated fees through conflicted business relationships that may hurt homeowners and investors.*

- **May 2014**: Superintendent Lawsky spoke at the Mortgage Bankers Association Secondary Market Conference on May 20, 2014. *HousingWire* reported the following:

> *Lawsky says that part of the DFS's focus on Ocwen is because his office's review of nonbank servicers has also turned up another enormous profit center associated with these MSRs that could put homeowners and mortgage investors at risk: the provision of what they call ancillary services.*
>
> *"Now, in most circumstances, there's nothing inherently wrong with companies and their affiliates providing a range of ancillary services," Lawsky said. "This is the extraordinary circumstance where there effectively is no customer to select its*

- 3 -

*vendor for ancillary services. Nonbank servicers have a captive and often confused consumer in the homeowner.*

*"So who makes the decision about where to procure these ancillary services, and how much of the investor's or the borrower's money to pay for them? It's usually the servicer, seemingly with no oversight whatsoever. The very same servicer that benefits – either directly or indirectly – from the profitability of the affiliated companies that provide these services," Lawsky said.*

*Specifically, Lawsky is referring to the latest move DFS made against Ocwen, when it sent a letter to Ocwen's general counsel demanding answers to questions about Ocwen and how it operates in relation to its subsidiaries, Hubzu and Altisource.*

*"<u>The potential for conflicts of interest and self-dealing here are perfectly clear</u>. Servicers have every incentive to use these affiliated companies exclusively for their ancillary services, and they often do. The affiliated companies have every incentive to provide low-quality services for high fees, and they appear in some cases to be doing so," Lawsky said. "In the context of the nonbank mortgage servicing market, homeowners and <u>investors are at risk of becoming fee factories</u>.*"

- **May 2014**: Ocwen was sued again by another class of borrowers alleging Ocwen failed to timely file notices of satisfaction of loans the borrowers had paid off in violation of federal and state laws. *See* Complaint, *Dempsey v. Ocwen Loan Servicing LLC*, No. 14-CV-2824 (E.D. Pa. May 15, 2014).

- **August 4, 2014**: *Bloomberg* news service reported that New York banking Superintendent Lawsky asked Ocwen "about an insurance agreement" between Ocwen and one of its affiliates. *The report stated that Lawsky "says [the agreement is] designed to funnel [inflated] fees to [the] affiliate for minimal work."* The report also indicated that Ocwen's chairman, William Erbey, owns 27% of the affiliate and that *Lawsky's department had "'serious concerns about the apparently conflicted role' played by Erbey and potentially other officers and directors [of Ocwen] in directing profits to" the affiliate. The news report also indicated that such conduct violated state laws. These conflicts of interest and inflated fees indicated yet another situation where Servicers such as Ocwen were improperly and illegally profiting at the expense of plaintiff and the class.*