## IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ROYAL PARK INVESTMENTS SA/NV, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> HSBC BANK USA, NATIONAL ASSOCIATION, as Trustee, <br><br> Defendant. | Civil Action No. 14-CV-8175 |
| BLACKROCK BALANCED CAPITAL PORTFOLIO (FI), et al., <br><br> Plaintiffs, <br><br> v. <br><br> HSBC BANK USA, NATIONAL ASSOCIATION, <br><br> Defendant. | Civil Action No. 14-CV-9366 |
| PHOENIX LIGHT SF LIMITED, et al., <br><br> Plaintiffs, <br><br> v. <br><br> HSBC BANK USA, NATIONAL ASSOCIATION, <br><br> Defendant. | Civil Action No. 14-CV-10101 |

**MEMORANDUM IN SUPPORT OF HSBC BANK USA, N.A.'S
MOTION TO DISMISS PURSUANT TO FEDERAL RULE OF
CIVIL PROCEDURE 12(b)(6) AND MOTION TO STRIKE
PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 12(f)**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................ ii

OTHER AUTHORITIES............................................................................................ vii

PRELIMINARY STATEMENT ...................................................................................1

BACKGROUND ............................................................................................................4

    A.    The Trusts at Issue. .............................................................................4

    B.    The Limited Role of the Indenture Trustee......................................5

    C.    The Role of Other Parties Under the Agreements. ...........................9

    D.    The Allegations of the Complaints. .................................................11

ARGUMENT ...............................................................................................................12

I.     The Breach of Contract Claims Should Be Dismissed. ................................13

    A.    Plaintiffs Fail To State a Claim for Breach of HSBC's Obligations with Respect to Mortgage Loan Representations and Warranties. ...............................13

    B.    Plaintiffs Fail To State a Claim for Breach of HSBC's Post-Event-of-Default Obligations....................................................................18

    C.    Plaintiffs' Breach of Contract Claim Is Barred by "No-Action" Clauses. ............25

    D.    Plaintiffs Lack Standing To Enforce Any Obligations Set Forth in the Contracts Containing Negating Clauses. .........................................27

    E.    BlackRock Fails To Allege Specific Contract Provisions upon Which Its Breach of Contract Claim Is Based.........................................28

    F.    Phoenix Light Seeks To Impose Additional Duties on HSBC that Are Contrary To the Terms of the Agreements. ...............................29

II.    Plaintiffs' Tort and Breach of Trust/Fiduciary Duty Claims Should Be Dismissed.........31

    A.    Indenture Trustees Do Not Owe Fiduciary Duties To Holders. .............................31

    B.    Plaintiffs' Tort and Breach of Trust/Fiduciary Duty Claims Are Duplicative of Their Contract Claims...................................................32

    C.    The Economic Loss Doctrine Bars Plaintiffs' Claims............................................35

    D.    Phoenix Light's Negligent Misrepresentation Claim Fails.....................................35

    E.    Plaintiffs' Conflict of Interest Allegations Are Insufficient As a Matter of Law. .......................................................37

III.   The Court Should Strike Plaintiffs' Demand for Consequential Damages As To Agreements Under Which Such Damages Are Unavailable. ............................................40

IV.   The Plaintiffs' TIA Claims Should Be Dismissed.............................................41

    A.    The TIA Does Not Apply To Trusts Governed by PSAs. ......................................41

    B.    Plaintiffs Fail To State a Claim Under the TIA for the Indenture Trusts. .............42

V.    Phoenix Light's Streit Act Claim Should Be Dismissed. ..................................43

VI.   The Court Should Dismiss All Derivative Claims.............................................44

    A.    These Claims Are Direct, Not Derivative. .............................................................44

    B.    The BlackRock Plaintiffs' Derivative Claims Fail Under the Delaware Statutory Trust Act...............................................................47

    C.    BlackRock and Royal Park Cannot Satisfy the Contemporaneous Ownership Requirement. ..................................................................48

    D.    BlackRock Fails to Plead Demand Futility As To the Owner Trustee. .................50

CONCLUSION............................................................................................................50

## <u>TABLE OF AUTHORITIES</u>

### FEDERAL CASES

*Ace Secs. Corp. Home Equity Loan Trust, Series 2007-HE3 v. DB Structured Prods., Inc.*, 5 F. Supp. 3d 543 (S.D.N.Y. 2014)...................................................6

*AHW Inv. P'ship v. Citigroup, Inc.*, 980 F. Supp. 2d 510 (S.D.N.Y. 2013)................................46

*Allen v. Westpoint-Pepperell, Inc.*, 11 F. Supp. 2d 277 (S.D.N.Y. 1997) ....................................36

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ...............................................................................31, 39

*Bank of N.Y. v. Tyco Int'l Grp., S.A.*, 545 F. Supp. 2d 312 (S.D.N.Y. 2008) ................................6

*Baxter v. A.R. Baron & Co.*, 1995 WL 600720 (S.D.N.Y. Oct. 12, 1995)...................................12

*Bluebird Partners, L.P. v. First Fid. Bank*, 896 F. Supp. 152 (S.D.N.Y. 1995)...........................43

*BNP Paribas Mortg. Corp. v. Bank of Am., N.A.*, 949 F. Supp. 2d 486 (S.D.N.Y. 2013) ...............................................................................................................36, 37, 45

*Caplin v. Marine Midland Grace Trust Co.*, 406 U.S. 416 (1972)...............................................45

*Century Metal Recycling, Pvt. Ltd. v. Dacon Logistics, LLC*, 2013 WL 5929816 (D. Conn. Nov. 4, 2013) ........................................................................................................4

*CFIP Master Fund, Ltd. v. Citibank, N.A.*, 738 F. Supp. 2d 450 (S.D.N.Y. 2010)......................39

*Chemtex, LLC v. St. Anthony Enters., Inc.*, 490 F. Supp. 2d 536 (S.D.N.Y. 2007).....................18

*Consol. Edison, Inc. v. Ne. Utils.*, 318 F. Supp. 2d 181 (S.D.N.Y.) ............................................49

*Dallas Cowboys Football Club, Ltd. v. Nat'l Football League Trust*, 1996 WL 601705 (S.D.N.Y. Oct. 18, 1996) .......................................................................................46

*DiStiso v. Cook*, 691 F.3d 226 (2d Cir. 2012)...........................................................................18

*Dresner Co. Profit Sharing Plan v. First Fid. Bank, N.A.*, 1996 WL 694345 (S.D.N.Y. Dec. 4, 1996).....................................................................................................43

*E.F. Hutton Sw. Props. II, Ltd. v. Union Planters Nat'l Bank*, 953 F.2d 963 (5th Cir. 1992) ...........................................................................................................................39

*Ellington Credit Fund, Ltd. v. Select Portfolio Servicing, Inc.*, 837 F. Supp. 2d 162 (S.D.N.Y. 2011).......................................................................................... passim

*Elliott Assocs. v. J. Henry Schroder Bank & Trust Co.*, 838 F.2d 66 (2d Cir. 1988)...............6, 39

*Excelsior Fund, Inc. v. JP Morgan Chase Bank, N.A.*, 2007 WL 950134
(S.D.N.Y. Mar. 28, 2007) ........................................................................50

*FHFA v. HSBC N. Am. Holdings, Inc.*, --- F. Supp. 2d ---, 2014 WL 3702587
(S.D.N.Y. July 25, 2014) ........................................................................16

*FHFA v. UBS Ams., Inc.*, 2013 WL 3284118 (S.D.N.Y. June 28, 2013) ...................15

*FHFA v. UBS Ams., Inc.*, 858 F. Supp. 2d 306 (S.D.N.Y. 2012) .........................17

*Friedman v. Chesapeake & Ohio Ry.*, 261 F. Supp. 728 (S.D.N.Y. 1966), *aff'd*,
395 F.2d 663 (2d. Cir. 1968).................................................................25

*Gravatt v. City of N.Y.*, 226 F.3d 108 (2d Cir. 2000).................................15

*Harsco Corp. v. Segui*, 91 F.3d 337 (2d Cir. 1996)....................................36

*I. Meyer Pincus & Assocs., P.C. v. Oppenheimer & Co.*, 936 F.2d 759 (2d Cir.
1991) ..........................................................................................12

*In re Bank of New York Derivative Litig.*, 320 F.3d 291 (2d Cir. 2003) ..............48

*Karmilowicz v. Hartford Fin. Servs. Grp.*, 2011 WL 2936013 (S.D.N.Y. July 14,
2011) ..........................................................................................12

*King Cnty., Wash. v. IKB Deutsche Industriebank AG*, 863 F. Supp. 2d 288
(S.D.N.Y. 2012)................................................................................35

*Landesbank Baden-Württemberg v. RBS Holdings USA Inc.*, 14 F. Supp. 3d 488
(S.D.N.Y. 2014) ..............................................................................36

*LaSalle Bank Nat'l Ass'n v. Nomura Asset Capital Corp.*, 180 F. Supp. 2d 465
(S.D.N.Y. 2001)................................................................................46

*LaSalle Bank Nat'l Ass'n v. Nomura Asset Capital Corp.*, 424 F. Supp. 3d 195 (2d Cir.
2005) ..........................................................................................22

*LNV Invs., Inc. v. First Fid. Bank*, 935 F. Supp. 1333 (S.D.N.Y. 1996) ...............45

*Mass. Mut. Life Ins. Co. v. Residential Funding Co.*, 843 F. Supp. 2d 191 (D.
Mass. 2012)....................................................................................17

*Mayor & City Council of Balt. v. Citigroup, Inc.*, 709 F.3d 129 (2d Cir. 2013) ...........12, 19

*Meckel v. Cont'l Res. Co.*, 758 F.2d 811 (2d Cir. 1985)..............................6, 45

*Millennium Partners., L.P. v. U.S. Bank National Association*, 2013 WL 1655990
(S.D.N.Y. Apr. 17, 2013)......................................................................20

iii

*Morris v. Cantor*, 390 F. Supp. 817 (S.D.N.Y. 1975) .................................................45

*Nathel v. Siegal*, 592 F. Supp. 2d 452 (S.D.N.Y. 2008) ..............................................16

*Okla. Police Pension & Ret. Sys. v. U.S. Bank Nat'l Ass'n*, 291 F.R.D. 47 (S.D.N.Y. 2013) .................................................................................................43

*Page Mill Asset Mgmt. v. Credit Suisse First Bos. Corp.*, 2000 WL 877004 (S.D.N.Y. June 30, 2000) ...................................................................................39

*Peak Partners, LP v. Republic Bank*, 191 F. App'x 118 (3d Cir. 2006) ........................5

*Policemen's Annuity & Benefit Fund of Chi. v. Bank of Am.*, 943 F. Supp. 2d 428 (S.D.N.Y. 2013) ..............................................................................................20

*Racepoint Partners LLC v. JPMorgan Chase Bank*, 2006 WL 3044416 (S.D.N.Y. Oct. 26, 2006) ...............................................................................................45, 49

*Ret. Bd. of Policemen's Annuity & Benefit Fund of Chi. v. Bank of N.Y. Mellon*, --- F.3d ---, 2014 WL 7272269 (2d Cir. Dec. 23, 2014) ............................... passim

*Ret. Bd. of Policemen's Annuity & Benefit Fund of Chi. v. Bank of N.Y. Mellon*, 914 F. Supp. 2d 422 (S.D.N.Y. 2012) ....................................................20, 42, 43

*Ret. Sys. of Miss. v. Goldman Sachs Grp., Inc.*, 2011 WL 135821 (S.D.N.Y. Jan 12, 2011) ........................................................................................................17

*Rosner v. Bank of China*, 2008 WL 5416380 (S.D.N.Y. Dec. 18, 2008) ....................16

*Russell Publ'g Grp., Ltd. v. Brown Printing Co.*, 2014 WL 6790762 (S.D.N.Y. Dec. 2, 2014) ..............................................................................................40, 41

*Schonfeld v. Hilliard*, 218 F.3d 164 (2d Cir. 2000) ....................................................41

*Schupak Grp., Inc. v. Travelers Cas. & Sur. Co.*, 716 F. Supp. 2d 262 (S.D.N.Y. 2010) .......................................................................................................28

*Semi-Tech Litig., LLC v. Bankers Trust Co.*, 272 F. Supp. 2d 319 (S.D.N.Y. 2003) ...................49

*Sterling Federal Bank v. DLJ Mortgage Capital, Inc.*, 2010 WL 3324705 (N.D. Ill. Aug. 20, 2010) .....................................................................................20, 38

*Tran v. Bank of N.Y.*, 2014 WL 1225575 (S.D.N.Y. Mar. 24, 2014) ...........................9

*Valentini v. Citigroup, Inc.*, 837 F. Supp. 2d 304 (S.D.N.Y. 2011) ...........................28

*Zeffiro v. First Pa. Banking & Trust Co.*, 623 F.2d 290 (3d Cir. 1980) .......................45

## STATE CASES

*Abrahami v. UPC Constr. Co.*, 638 N.Y.S.2d 11 (1st Dep't 1996)................................36

*Ace Secs. Corp. v. DB Structured Prods., Inc.*, 977 N.Y.S.2d 229 (1st Dep't 2013), *leave to appeal granted*, 992 N.Y.S.2d 795 (N.Y. 2014)................................1

*AG Capital Funding Partners, L.P. v. State St. Bank & Trust Co.*, 866 N.Y.S.2d 578 (N.Y. 2008) ................................................................6, 31, 32, 40

*Arrowgrass Master Fund Ltd. v. Bank of New York Mellon*, 2012 WL 8700416 (N.Y. Sup. Ct. Feb. 24, 2012)...................................................................23, 24

*Beck v. Mfrs. Hanover Trust Co.*, 632 N.Y.S.2d 520 (1st Dep't 1995)....................32

*Clark-Fitzpatrick, Inc. v. Long Island R.R.*, 521 N.Y.S.2d 653 (N.Y. 1987) ..............32

*CML V, LLC v. Bax*, 28 A.3d 1037 (Del. 2011) ......................................47

*Cortlandt St. Recovery Corp. v. Hellas Telecomms., S.a.r.l.*, 996 N.Y.S.2d 476 (N.Y. Sup. Ct. 2014) .............................................................27

*Edward B. Fitzpatrick, Jr. Constr. Corp. v. Cnty. of Suffolk*, 525 N.Y.S.2d 863 (2d Dep't 1988) ....................................................................28

*Ely-Cruikshank Co. v. Bank of Montreal*, 599 N.Y.S.2d 501 (N.Y. 1993) ..............31

*Fleisher v. Farmers' Loan & Trust Co.*, 69 N.Y.S. 437 (1st Dep't 1901) ..................45

*Hazzard v. Chase Nat'l Bank*, 287 N.Y.S. 541 (N.Y. Sup. Ct. 1936) .........................45

*In re Accounts of Separate Trusts*, 916 N.Y.S.2d 77 (1st Dep't 2011) .......................38

*Knights of Columbus v. Bank of N.Y. Mellon*, 2013 WL 1822565 (N.Y. Sup. Ct. Apr. 26, 2013)....................................................................38

*Magten Asset Mgmt. Corp. v. Bank of N.Y.*, 841 N.Y.S.2d 219, *available at* 2007 WL 1326795 (N.Y. Sup. Ct. May 8, 2007).....................................20, 24, 45

*Metro. Life Ins. Co. v. Noble Lowndes Int'l, Inc.*, 618 N.Y.S.2d 882 (N.Y. 1994)....................41

*Pessin v. Chris-Craft Indus., Inc.*, 586 N.Y.S.2d 585 (1st Dep't 1992) .......................49

*Prudence Realization Corp. v. Atwell*, 35 N.Y.S.2d 1001 (1st Dep't 1942) ................44

*Racepoint Partners, LLC v. JP Morgan Chase Bank, N.A.*, 902 N.Y.S.2d 14 (N.Y. 2010)....................................................................44

*Ray v. Marine Midland Grace Trust Co.*, 359 N.Y.S.2d 28 (N.Y. 1974).....................45

*RBC Capital Mkts., LLC v. Educ. Loan Trust IV*, 2011 WL 6152282 (Del. Ch. Dec. 6, 2011) ....................................................................................................25

*Roy v. Vayntrub*, 841 N.Y.S.2d 221 (N.Y. Sup. Ct. 2007) ......................................49

*Sommer v. Fed. Signal Corp.*, 583 N.Y.S.2d 957 (N.Y. 1992)...............................35

*Springwell Navigation Corp. v. Sanluis Corporacion, S.A.*, 849 N.Y.S.2d 34 (1st Dep't 2007) .........................................................................................................28

*Thompson v. Wallin*, 301 N.Y. 476 (1950) .............................................................44

*Tooley v. Donaldson, Lufkin, & Jenrette, Inc.*, 845 A.2d 1031 (Del. 2004)..........45, 46

*Yudell v. Gilbert*, 949 N.Y.S.2d 380 (1st Dep't 2012)............................................45

*Zinn v. Salomon, Smith Barney, Inc.*, 787 N.Y.S.2d 309 (1st Dep't 2005) .............38

## STATUTES, RULES, AND REGULATIONS

17 C.F.R. § 229.1100 *et seq.*..................................................................................29

17 C.F.R. § 249.323 ................................................................................................31

12 Del. C. § 3801 ....................................................................................................47

12 Del. C. § 3816 ..........................................................................................47, 48, 50

70 Fed. Reg. 1506-01 ..............................................................................................29

15 U.S.C. § 77ooo...............................................................................................42, 43

Fed. R. Civ. P. 9(b) .................................................................................................35

Fed. R. Civ. P. 12(f) ...............................................................................................40

N.Y. BCL § 626 ......................................................................................................48

N.Y. CPLR § 202 .....................................................................................................31

N.Y. CPLR § 213 .....................................................................................................31

N.Y. Real Prop. Law § 124.................................................................................43, 44

N.Y. Real Prop. Law § 126......................................................................................44

N.Y. Real Prop. Law § 130-k..................................................................................44

N.Y. Gen. Oblig. Law § 13-107...............................................................................49

# OTHER AUTHORITIES

American Bar Foundation, *Commentaries on Model Debenture Indenture Provisions* (1971)................................................................................................25, 42

Bogart, et al., *The Law of Trusts and Trustees* ............................................................45

Restatement (Third) of Trusts (2007). ..................................................................37, 38

Tamar Fankel, *Securitization: Structured Finance, Financial Asset Pools, and Asset-Backed Securities* (2d ed. 2005)..................................................................4

Uniform Statutory Trust Entity Act ............................................................................44

## PRELIMINARY STATEMENT

Since the United States residential real-estate market experienced a macroeconomic collapse nearly eight years ago, financial and governmental entities have brought claims against those deemed to be responsible for that collapse, including the sellers, depositors, and issuers that created and marketed mortgage-backed securities, and the originators and servicers associated with the underlying mortgage loans. The instant actions, however, are among the first to assert that trustees of securitization trusts ("indenture trustees"), who perform a limited and largely ministerial role in the trusts holding mortgage-backed securities, should be liable for massive economic losses allegedly caused by other parties (none of whom were included in these Complaints).

Unlike common-law trustees, indenture trustees do not owe broad fiduciary duties to trust beneficiaries. Instead, indenture trustees undertake limited duties specifically enumerated by contract. Reflecting this circumscribed role, Defendant HSBC Bank USA, N.A. ("HSBC") was paid the nominal fee of $3,500 to $4,000 per year for each trust in which it served as indenture trustee. Yet, Plaintiffs—financial entities with vast experience in the mortgage-backed securities market—now seek to hold the indenture trustee liable for potentially billions of dollars in alleged investment losses. This novel claim is a direct consequence of recent case law suggesting that sophisticated investors, like Plaintiffs in these cases, sat idle for too long and are now time barred from pursuing the actual parties allegedly responsible for their loss. *See Ace Secs. Corp. v. DB Structured Prods., Inc.*, 977 N.Y.S.2d 229 (1st Dep't 2013), *leave to appeal granted*, 992 N.Y.S.2d 795 (N.Y. 2014).

Plaintiffs' claims rely upon the theory that HSBC did not fulfill its duties as indenture trustee under circumstances in which Plaintiffs assert it was required to act. To plausibly plead their claims, Plaintiffs must allege specific facts which set forth the alleged breach of HSBC's

obligations under the relevant agreements—individual Indentures or Pooling and Servicing Agreements ("PSAs") (collectively, "Agreements").  HSBC's obligation to act under these Agreements generally requires a showing that defined "Events of Default" have occurred and that "Responsible Officers" of HSBC had actual knowledge of these Events of Default.

Plaintiffs' Complaints do not plead specific facts showing that Events of Default, as defined in individual trust documents, have occurred or that HSBC had actual knowledge of Events of Default.  Indeed, as the Second Circuit recently made clear, such allegations "must be proved loan-by-loan and trust-by-trust."  *Ret. Bd. of Policemen's Annuity & Benefit Fund of Chi. v. Bank of N.Y. Mellon*, --- F.3d ---, 2014 WL 7272269, at *7 (2d Cir. Dec. 23, 2014) ("*Policemen's Annuity*").  Plaintiffs attempt to sidestep their obligation to allege specific breaches and actual knowledge by relying on generalized and high-level allegations of problems in the mortgage industry.  These generalized allegations, at most, suggest that some unidentified loans in some unspecified trusts might have had problems.  But they do not create a plausible inference that HSBC failed to perform its contractual obligations—particularly because those contracts imposed no obligation on HSBC to conduct any investigation (thereby depleting trust funds) absent investor direction.

Plaintiffs' claims suffer from many legal flaws, and this motion seeks dismissal of (1) the Complaint filed by BlackRock Balanced Capital Portfolio (FI) and others (collectively, "BlackRock") to the extent that it is based on twenty-seven indenture trusts; (2) the Complaint filed by Royal Park Investments N/A ("Royal Park"), covering three trusts; and (3) the Complaint filed by Phoenix Light SF Limited and others (collectively, "Phoenix Light"),

covering eleven trusts.[1]  This motion also seeks to strike Plaintiffs' demand for investment loss in trusts with Agreements prohibiting recovery of consequential damages.

First, Plaintiffs' contract claims fail.  Plaintiffs fail to allege specific breaches of representations and warranties or that HSBC had actual knowledge of such breaches.  Plaintiffs do not, therefore, allege any pre-Event-of-Default duty to act.  Plaintiffs also do not adequately allege the occurrence of Events of Default, which are specifically defined by the Agreements, or that HSBC had actual knowledge of any Events of Default.  These contract claims are further barred by No-Action Clauses in the Agreements, and a number of Agreements contain Negating Clauses under which Plaintiffs do not have contractual standing to bring these claims.

Second, Plaintiffs' tort claims fail.  These claims are duplicative of Plaintiffs' contract claims and barred by New York's economic loss rule.  Moreover, Plaintiffs' conflict of interest claims fail as a matter of law or are conclusory and fail under the *Iqbal* pleading standard.

Third, many of the Agreements prohibit the award of consequential damages.  Plaintiffs' demand for potentially billions of dollars in alleged investment losses from a party paid a nominal fee, and that had no role in originating, selling, pooling, or servicing the mortgages backing those investments, runs afoul of this provision.

Fourth, Plaintiffs' Trust Indenture Act of 1939 ("TIA") claims and Phoenix Light's Streit Act claims fail.  Under the Second Circuit's recent decision in *Policemen's Annuity,* the TIA does not govern PSA trusts.  Plaintiffs' TIA claims as to indenture trusts also fail because Plaintiffs have not adequately alleged the occurrence of an Event of Default or any damages

---

[1] As directed by the Court at the January 6, 2015 hearing, HSBC has moved separately to dismiss the BlackRock Complaint for lack of subject-matter jurisdiction as to the claims based on the 244 PSA (non-indenture) trusts.  If that motion is not granted, HSBC reserves its right to move to dismiss or to strike the BlackRock Complaint under Rules 12(b)(6) and 12(f) as to those trusts.

under the TIA.  The Streit Act does not apply and Phoenix Light likewise does not adequately

allege an Event of Default under the Act.

Fifth, the BlackRock Plaintiffs and Royal Park cannot bring valid derivative claims.  All

of their claims are direct, not derivative.  In the case of the Delaware statutory trusts on whose

behalf the BlackRock Plaintiffs purport to sue, the BlackRock Plaintiffs are not the proper parties

to bring a derivative action.  Moreover, the BlackRock Plaintiffs and Royal Park fail to meet the

contemporaneous ownership requirement for derivative suits.  In addition, the BlackRock

Plaintiffs have not adequately alleged demand futility.[2]

## BACKGROUND

### A.     The Trusts at Issue.

Plaintiffs assert claims arising from mortgage-backed securities issued by securitization

trusts.  Securitization is a process by which financial assets (in these cases, individual mortgage

loans) are bundled and interests in the resulting revenue streams are sold to investors.  Royal

Park Complaint ("RP Compl.")  ¶ 36.[3]  Thirty-nine securitization trusts are at issue in this

motion: twenty-seven in *BlackRock*, three in *Royal Park*, and eleven in *Phoenix Light*.[4]  These

trusts fall into one of two general categories:  (1) indenture trusts and (2) PSA trusts (sometimes

---

[2] Additionally, HSBC reserves the right to raise Phoenix Light's failure to plead subject matter jurisdiction over the nine non-indenture trusts.  *See Policemen's Annuity*, 2014 WL 7272269, at *9-14.  Phoenix Light's Complaint alleges only each plaintiff's place of incorporation and does not allege facts establishing diversity jurisdiction.  Phoenix Light must "clarify under what country's law it is organized or incorporated, and whether as an entity it is structured or organized as an equivalent to either a corporation or a limited liability company under United States law."  *Century Metal Recycling, Pvt. Ltd. v. Dacon Logistics, LLC*, 2013 WL 5929816, at *3 (D. Conn. Nov. 4, 2013).  By pre-motion letter, HSBC has notified Phoenix Light of this pleading defect, and Phoenix Light responded by asserting that diversity exists and stating that it will not amend its Complaint at this time.  HSBC will continue to attempt to resolve this issue without involving the Court, but Phoenix Light must establish requisite jurisdictional facts.

[3] *See also, e.g.*, 1 Tamar Fankel, *Securitization: Structured Finance, Financial Asset Pools, and Asset-Backed Securities* § 1.1, at 1-5 (2d ed. 2005).

[4] Two Phoenix Light trusts overlap with trusts in other complaints:  FBR 2005-2 is also in the BlackRock case and FHLT 2006-C is also in the Royal Park case.

referred to as non-indenture trusts).[5]  Under either type of trust, the initial step in the securitization process is similar:  mortgage loans from an Originator are pooled, so that they can be conveyed by other entities called Sellers or Depositors into trusts.

Twenty-eight of the trusts are indenture trusts and issued debt obligations, or notes.[6] Indenture trusts involve three primary agreements:  a trust agreement creating the Delaware statutory trust that issues the notes; an indenture containing the terms of the notes; and a sales and servicing agreement ("SSA")[7] setting forth the servicing obligations as to the underlying mortgage loans.

The remaining eleven trusts—all three trusts in the Royal Park Complaint and nine of the Phoenix Light trusts[8]—are PSA trusts.[9]  These PSA trusts issued certificates, representing ownership interests in trust assets, which were sold to investors.  The principal agreement in a PSA trust is the PSA itself, which governs the terms of the certificates and the servicing of the loans.

### B.   The Limited Role of the Indenture Trustee.

Each securitization trust has an indenture trustee.  An indenture trustee—a creature of contract—is a "different legal animal" than an ordinary trustee.  *Peak Partners, LP v. Republic Bank*, 191 F. App'x 118, 122 (3d Cir. 2006).  "[U]nlike the ordinary trustee, who has historic common-law duties imposed beyond those in the trust agreement, an indenture trustee is more

---

[5] The term "indenture trustee" is used in this Memorandum to refer to HSBC's role as trustee under any of the thirty-nine securitization trusts in these cases.  Courts have used the term "indenture trustee" to distinguish trustees in commercial trusts, such as those involved in mortgage-backed securitizations (both indenture and PSA, or non-indenture, trusts), from "common law" or "ordinary" trustees of traditional gratuitous trusts.  *See, e.g.*, *Ellington Credit Fund, Ltd. v. Select Portfolio Servicing, Inc.*, 837 F. Supp. 2d 162, 191-93 (S.D.N.Y. 2011).

[6] A list of indenture trusts is included in Exhibit 6 Chart 1 ("Indenture Trusts").

[7] These agreements are sometimes referred to as "transfer and servicing agreements" or simply "servicing agreements."  For ease of reference, we refer to all such agreements as "SSAs" herein.

[8] These nine include the overlapping FHLT 2006-C trust.

[9] A list of the PSA, or non-indenture, trusts is included in Exhibit 6 Chart 2 ("PSA Trusts").

like a stakeholder whose duties and obligations are exclusively defined by the terms of the indenture agreement." *Bank of N.Y. v. Tyco Int'l Grp., S.A.*, 545 F. Supp. 2d 312, 324 n.79 (S.D.N.Y. 2008) (quoting *Meckel v. Cont'l Res. Co.*, 758 F.2d 811, 816 (2d Cir. 1985)); *see also AG Capital Funding Partners, L.P. v. State St. Bank & Trust Co.*, 866 N.Y.S.2d 578, 583-84 (N.Y. 2008).  Except for an implied duty to avoid clear conflicts of interest and perform its ministerial duties with due care, an indenture trustee's obligations are strictly defined by and limited to the terms of the contract.  *See Elliott Assocs. v. J. Henry Schroder Bank & Trust Co.*, 838 F.2d 66, 71 (2d Cir. 1988).

Each of the thirty-nine trusts has its own PSA or Indenture that defines the indenture trustee's rights and duties.[10]  These Agreements set forth a very limited role for the indenture trustee, as reflected in the nominal compensation HSBC received—$3,500 to $4,000 per year for each trust.[11]  Prior to an Event of Default, the indenture trustee undertakes to perform only those duties specifically set forth in the Agreements, is not liable except for the performance of such duties and obligations, and is not subject to any implied covenants or obligations.  *See, e.g.*, DBALT 2006-AR5 PSA § 9.1(i); FBR 2005-2 Indenture § 6.1(b)(i).

---

[10] Plaintiffs have submitted only one of the many Agreements on which they are suing (the DBALT 2006-AR5 PSA attached as Exhibit 1 to the Royal Park Complaint).  Although the Complaints attempt to minimize the differences between the various Agreements, these documents contain variations.  By suing on these Agreements, the Complaints incorporate their terms.  *See Ace Secs. Corp. Home Equity Loan Trust, Series 2007-HE3 v. DB Structured Prods., Inc.*, 5 F. Supp. 3d 543, 547-50 (S.D.N.Y. 2014).  "If a document relied on in the complaint contradicts allegations in the complaint, the document, not the allegations, control, and the court need not accept the allegations in the complaint as true."  *Id.* at 551 (internal quotation marks omitted).  Where appropriate, we refer to specific Agreement provisions from the FBR 2005-2 Indenture, the FBR 2005-2 SSA, and the DBALT 2006-AR5 PSA as exemplars.  Excerpts from these documents are attached as Exhibits 1, 2, and 4, respectively, to the Declaration of George A. Borden.  Exhibits cited within this Memorandum refer to exhibits to that Declaration.  Where necessary, we refer to Exhibit charts, which contain the relevant text of multiple Agreements.

[11] Although trustees in securitizations sometimes receive additional compensation for taking on additional roles, such as "Securities Administrator" or "Custodian," HSBC did not perform these other roles—and did not receive additional compensation.

Upon the occurrence of an Event of Default, the indenture trustee is to exercise those rights and powers that are vested in it by the Agreements using the same degree of care and skill as a prudent person would exercise under the circumstances in the conduct of his or her own affairs. *See, e.g.*, DBALT 2006-AR5 PSA § 9.1; FBR 2005-2 Indenture § 6.1(a). Consistent with the indenture trustee's limited role as understood by all parties, the operative Agreements define Event of Default narrowly.

The Indentures define Events of Default to refer to breaches by the Issuer, such as failing to make interest or principal payments to Noteholders. *See, e.g.*, FBR 2005-2 Indenture § 5.1(c). The SSAs for indenture trusts also define Servicer Events of Default to refer to specific failings on the part of the Servicer. *See, e.g.*, FBR 2005-2 SSA §§ 5.11, 6.11(a). The PSAs likewise define Events of Default to refer to specific failings on the part of the Servicer.[12] *See, e.g.*, DBALT 2006-AR5 PSA § 8.1(a).

The indenture trustee's post-Event-of-Default duties only arise when a Responsible Officer working in the relevant corporate trust department of the indenture trustee has actual knowledge or written notice of an Event of Default. *See, e.g.*, DBALT 2006-AR5 PSA § 9.2(a)(ix); FBR 2005-2 Indenture § 6.1(c)(iv). Indeed, under many of the Agreements, the indenture trustee may conclusively assume there is no Event of Default (absent actual knowledge or written notice). *See, e.g.*, FBR 2005-2 Indenture § 6.1(c)(iv).

Even during an Event of Default, the indenture trustee's obligations are limited. For example, the indenture trustee is not liable for errors of judgment made in good faith, unless it is proven that the indenture trustee was negligent in ascertaining the pertinent facts. *See, e.g.*, DBALT 2006-AR5 PSA § 9.1(ii); FBR 2005-2 Indenture § 6.1(c)(ii). Additionally, the

---

[12] The term "Event of Default" is used to refer to all three definitions.

indenture trustee is not required to expend, advance, or risk its own funds, or incur financial liability in the performance of any duty or exercise of any right or power, if it has a reasonable ground to believe repayment or indemnity is not assured.  *See, e.g.*, DBALT 2006-AR5 PSA § 9.2(a)(xii); FBR 2005-2 Indenture § 6.1(g).

The Agreements contain other provisions reflecting the indenture trustee's limited role in trust activities.  For example, the indenture trustee has no obligation to investigate any facts or matters represented in any document, certificate, or other paper, and it may rely on any document it believes to be genuine.  *See, e.g.*, DBALT 2006-AR5 PSA § 9.2(a)(v); FBR 2005-2 Indenture § 6.2(a).  The indenture trustee is not responsible for and makes no representations as to the validity or adequacy of the operative agreements, the notes, or the trust fund (other than the indenture trustee's own representations relating to its capacity to perform as trustee).  *See, e.g.*, DBALT 2006-AR5 PSA § 9.3; FBR 2005-2 Indenture § 6.4.  The indenture trustee is not responsible for any statement of an Issuer or Servicer in the Agreement or any document issued in connection with the sale of notes.  *See, e.g.*, DBALT 2006-AR5 PSA § 9.3; FBR 2005-2 Indenture § 6.4.  Finally, the permissive rights of the indenture trustee, and its right to perform any discretionary act, shall not be construed as duties.  *See, e.g.*, DBALT 2006-AR5 PSA § 9.1; FBR 2005-2 Indenture §§ 6.2(b), 6.2(g).  This is true even during Events of Default, at which time many of the Agreements provide that certain trustee powers are discretionary, not mandatory.  For example, if an Indenture Event of Default is continuing, the indenture trustee may, in its discretion, institute proceedings.  *See, e.g.*, FBR 2005-2 Indenture §§ 5.3(b), 5.4(a).

The limited role of the indenture trustee reflects the economic reality of the trusts. Investigations and proceedings can be time-consuming, complicated, and expensive.  The indenture trustee's nominal fee is not designed to finance these activities.  The only funds

8

available to finance investigations or litigation are trust assets. The indenture trustee's fee would need to increase substantially if it were expected to undertake such acts unilaterally, or have the broad liability suggested by Plaintiffs. If the indenture trustee had to launch an investigation or initiate a proceeding every time a news article or government report about the mortgage industry was released, the trust would quickly run out of funds, and the indenture trustee would be tasked full-time with pursuing such actions. Sophisticated investors in mortgage-backed securities, such as Plaintiffs, did not invest in securities having a more active trustee, and as discussed below, the Agreements limit the circumstances in which the indenture trustee can undertake such expensive activities.

## C. The Role of Other Parties Under the Agreements.

The Agreements contemplate that parties other than the indenture trustee will have responsibility for certain tasks. For example, Servicers are appointed to collect payments on the underlying mortgage loans and enforce loan terms.[13] *See Tran v. Bank of N.Y.*, 2014 WL 1225575, at *1 & n.5 (S.D.N.Y. Mar. 24, 2014). In addition, Servicers—not the indenture trustee—interact with individual borrowers, provide customer service, collect payments, work with borrowers upon default, modify loans, and, if necessary, foreclose. The indenture trustee has no duty to monitor, oversee, or manage Servicers; rather, the Master Servicer typically performs those duties. *See, e.g.*, DBALT 2006-AR5 PSA §§ 3.1, 3.3(a); FBR 2005-2 SSA § 6.1. The Servicers annually certify to the indenture trustee, the Depositor, or the Securities Administrator that they complied with applicable servicing criteria, and the indenture trustee is entitled to "conclusively rely" upon the accuracy of such certificates that it believes in good faith

---

[13] Some PSAs appoint a Master Servicer to monitor the performance of other servicers. Except as specifically stated herein, the term "Servicers" includes both Servicers and Master Servicers.

to be genuine.  *See, e.g.*, DBALT 2006-AR5 §§ 3.16(a), 9.1(i), 9.2(a)(i); FBR 2005-2 Indenture § 6.2(a), SSA § 5.4(a), (b).

Sellers and Depositors in mortgage-backed securitizations make representations and warranties concerning the quality of the loans in the trusts.  The indenture trustee makes no such representations and warranties.  To the contrary, the indenture trustee is entitled to rely upon other parties' representations and warranties and, as with the servicing certifications, has no obligation to investigate their veracity.  *See, e.g.*, DBALT 2006-AR5 PSA § 9.2(a)(v); FBR 2005-2 Indenture § 6.2(a).  The Agreements limit the indenture trustee's duties concerning breaches of representations and warranties to situations in which it obtained actual knowledge, or received formal notice from another party, of specific breaches.

The Agreements also impose responsibilities on the sophisticated investors who purchased interests in the mortgage-backed securities to inform the indenture trustee of certain occurrences (including Events of Default) and to direct the indenture trustee if certain actions need to be taken.  The Certificateholders or Noteholders (collectively and individually, "Holders") can direct the indenture trustee to initiate proceedings by (1) giving written notice of an Event of Default; (2) requesting, with the agreement of a specified percentage of Holders, that the indenture trustee institute a proceeding; and (3) offering the indenture trustee reasonable indemnity for the costs, expenses, and liabilities to be incurred.  *See, e.g.*, DBALT 2006-AR5 PSA § 12.3; FBR 2005-2 SSA § 5.6.  Unless they follow this procedure, Holders have no right to institute any proceeding for any remedy.  *See, e.g.,* DBALT 2006-AR5 PSA § 12.3; FBR 2005-2 Indenture § 5.6.  Indeed, in mortgage-backed-securities-related actions brought in this very district, BlackRock and other institutional investors have acknowledged the indenture trustee's

limited role as well as the investors' responsibility to provide direction and indemnity before the

trustee is obligated to act:

> [E]ven in a post-default world, the Trustee is not required to act beyond its
> contractually conferred rights and powers. . . . Under these agreements, the
> Trustee does not have—and will never have—an obligation to expend its own
> funds to pursue years of contentious and difficult litigation on behalf of the
> Trusts.   The Trustee does not have, and will never have, an obligation to
> investigate facts to determine whether an Event of Default has occurred unless
> 25% of the Certificateholders instruct it to do so.  Even after an Event of Default,
> if the Certificateholders seek to compel the Trustee to take action, they must offer
> the Trustee an indemnity of the expenses it will incur to do so.

Ex. 5 (Excerpt of Institutional Investors' Memorandum of Law in Support of Settlement, *Bank of*

*N.Y. Mellon v. Walnut Place, LLC*, No. 1:11-cv-0598 (S.D.N.Y. Oct. 31, 2011), ECF No. 124) at

14 (internal citations and footnotes omitted).  Plaintiffs do not allege that they directed or

indemnified HSBC here.

### D.     The Allegations of the Complaints.

Plaintiffs assert, in three complaints, a total of fourteen counts for breach of contract,

breach of trust and fiduciary duty, violation of the TIA and New York's Streit Act, negligence,

gross negligence, and negligent misrepresentation.  Royal Park and BlackRock also allege in two

counts that HSBC breached its duty of trust because it had conflicts of interest.  Royal Park

brings its claims as direct claims on behalf of a putative class of similarly situated investors, and

alternatively as a derivative suit on behalf of the trusts.  BlackRock styles its Complaint as a

derivative suit and, alternatively, a class action.[14]  Phoenix Light brings only direct claims.

The crux of all these claims is that HSBC allegedly failed to perform duties, arising under

the Agreements, the TIA, and the common law, to protect investors in the trust securities from

the effects of the financial crisis and the collapse of the housing market.  But HSBC did not

---

[14] Should this action reach the class certification stage, HSBC intends to, among other things,
demonstrate that Royal Park and BlackRock lack class standing for many of the investors they
purport to represent.  *See Policemen's Annuity*, 2014 WL 7272269, at *7-8.

agree to undertake such a broad and far-ranging duty, nor does any law impose such a duty on HSBC as indenture trustee.  The Complaints acknowledge that HSBC did not have the principal obligations they posit unless HSBC had actual knowledge of alleged defects that constituted specific Events of Default under the operative agreements.  Yet Plaintiffs make no allegations of specific Events of Default under specific trust agreements or specific allegations of actual knowledge by a Responsible Officer of HSBC.  Instead, Plaintiffs attempt to plead such Events of Default and knowledge based on systemic problems in the mortgage industry, which have been discussed widely in publicly available information, and of which these sophisticated Plaintiffs would have been aware for years.

## ARGUMENT

To survive a motion to dismiss, a plaintiff must "state a claim to relief that is plausible on its face." *Mayor & City Council of Balt. v. Citigroup, Inc.*, 709 F.3d 129, 135 (2d Cir. 2013). Here, "[P]laintiffs have compiled an exceedingly long . . . complaint . . . consisting of [hundreds of paragraphs] . . . of references to rumors, complaints filed in other lawsuits, and allegations appearing in press reports." *Baxter v. A.R. Baron & Co.*, 1995 WL 600720, at *3 (S.D.N.Y. Oct. 12, 1995).  Yet, adequate pleading "is not to be confused with length." *Id.*  When the contracts upon which the complaint is based "contradict Plaintiff[s'] claims . . . [the contracts'] clear language—not the complaint[s'] allegations—prevail." *Karmilowicz v. Hartford Fin. Servs. Grp.*, 2011 WL 2936013, at *7 (S.D.N.Y. July 14, 2011), *aff'd*, 494 F. App'x 153 (2d Cir. 2012).[15]  Moreover, Plaintiffs cannot "evade a properly argued motion to dismiss simply because [P]laintiff[s] ha[ve] chosen not to attach" the contract upon which their claims rely.  *I. Meyer Pincus & Assocs., P.C. v. Oppenheimer & Co.*, 936 F.2d 759, 762 (2d Cir. 1991).

---

[15] The Agreements at issue state that they are governed by New York Law.

## I.       The Breach of Contract Claims Should Be Dismissed.

Plaintiffs' breach of contract claims should be dismissed in their entirety because Plaintiffs fail to allege facts necessary to support their claims and because the facts they do allege are contradicted by the express terms of the Agreements.

### A.       Plaintiffs Fail To State a Claim for Breach of HSBC's Obligations with Respect to Mortgage Loan Representations and Warranties.

The Complaints allege that HSBC breached the Agreements by failing (1) to provide notice that other parties breached their own representations and warranties in connection with the mortgage loans underlying the securitizations, and (2) to enforce the representations and warranties against the breaching parties.  BlackRock Complaint ("BR Compl.") ¶¶ 256-257 & 475-476; RP Compl. ¶¶ 48-51 & 149-150; Phoenix Light Complaint ("PL Compl.") ¶¶ 400-403, 408 & 466-468.  These allegations fail to state a claim.

#### 1.       HSBC Has No Enforcement Obligation with Respect to Breaches of Representations and Warranties in Thirteen of the Trusts.

Contrary to Plaintiffs' allegations, twelve of the trusts do not require HSBC to enforce representations and warranties.[16]  An additional trust does not require HSBC to enforce breaches of representations and warranties unless HSBC has received a specified, written notice from the Custodian or Securities Administrator.[17]  Plaintiffs do not allege that HSBC received such notice.

#### 2.       Plaintiffs Fail To Allege Loan-by-Loan, Trust-Specific Breaches of Representations and Warranties.

---

[16] These trusts are: FHLT 2006-C; FMIC 2004-3; FMIC 2004-4; FMIC 2004-5; FMIC 2005-1; FMIC 2005-2; FMIC 2005-3; FMIC 2006-1; FMIC 2006-2; FMIC 2006-3; STALT 2006-1F; and NAA 2005-AR6.

[17] WFHET 2006-2 PSA § 2.03(f) (the Trustee shall enforce the Depositor's obligations to cure "[i]f the Trustee receives written notice from the Custodian or Securities Administrator that the defect is not cured by the Depositor within 60 days after the Trustee's notice").

As the Second Circuit recently held, the type of claim asserted by Plaintiffs here requires proof of misconduct "loan-by-loan and trust-by-trust." *Policemen's Annuity*, 2014 WL 7272269, at *7. To establish a breach of HSBC's obligations with respect to representations and warranties of other parties, Plaintiffs must show "which loans, in which trusts, were in breach of the representations and warranties." *Id.* Plaintiffs' Complaints fail to plead HSBC's knowledge of breaches of any specific representations and warranties made in connection with specific loans in specific trusts in these cases.

The Agreements likewise confirm that only representation-and-warranty breaches made in connection with specific loans trigger HSBC's obligations. For example, the Agreements specifically state that parties need to give notice of a representation-and-warranty breach only if that breach materially and adversely affects any "Mortgage Loan" [*i.e.*, singular], and if necessary "cause such Loan [again singular] to be removed from the Trust Fund." *See, e.g.*, DBALT 2006-AR5 PSA § 2.3(a).[18] In short, HSBC's obligations under the Agreements are loan specific.

Despite the mandate from the Second Circuit and requirements of the Agreements, Plaintiffs spend hundreds of paragraphs of their Complaints discussing generalized allegations with respect to Sponsor and Originator practices. These generic and high-level allegations are not tied to the actual mortgage loans in the trusts in these cases. *See, e.g.*, BR Compl. ¶¶ 285-380; RP Compl. ¶¶ 65-94; PL Compl. ¶¶ 178-399. Plaintiffs do not identify which representations and warranties were breached; they do not identify the mortgage loans in which the breaches occurred; and they do not identify the trusts to which those mortgage loans applied. Without these basic facts, Plaintiffs fail to adequately plead breach in accordance with the

---

[18] All the Agreements contain materially similar language. *See* Ex. 7 at Chart 3 ("Provisions Regarding Breach of Representations and Warranties").

contracts and the law.  Accordingly, Plaintiffs fail to state a claim for breach of HSBC's alleged representation-and-warranty obligations.

### 3.   Plaintiffs Fail To Allege Facts Showing that HSBC Had Actual Knowledge of Specific Breaches of Representations and Warranties.

The Agreements impose representation-and-warranty obligations on HSBC only when HSBC has actual knowledge of loan-level, specific representation-and-warranty breaches involving mortgage loans in the particular trusts at issue.[19]  To attempt to plead such knowledge, the Complaints allege that generalized, public information "caused" HSBC to learn of breaches. BR Compl. ¶¶ 381-413; RP Compl. ¶¶ 65-104; PL Compl. ¶¶ 159-177.  These allegations are insufficient to show that HSBC had actual knowledge of any specific representation-and-warranty breaches for any specific loans.

It is black-letter law that "'should-have-known' constructive knowledge is insufficient to meet the actual knowledge requirement." *Gravatt v. City of N.Y.*, 226 F.3d 108, 127 n.17 (2d Cir. 2000).  Instead, actual knowledge requires knowledge that is particularized and specific: "[T]here is no authority for the proposition that evidence of generalized knowledge necessarily qualifies as circumstantial evidence of particularized, actual knowledge." *FHFA v. UBS Ams., Inc.*, 2013 WL 3284118, at *15 (S.D.N.Y. June 28, 2013).  Plaintiffs make no attempt to allege actual knowledge of any particular breach of any representation and warranty for a mortgage loan in the thirty-nine at-issue trusts.  Rather, Plaintiffs attempt to allege actual knowledge by relying upon general information concerning mortgage industry misconduct that was reported in news articles, government reports, and lawsuits.  Plaintiffs allege such information should have tipped HSBC off that there could be breaches of representations and warranties in the relevant mortgage loans.  *See, e.g.*, RP Compl. ¶ 66 (pleading that public revelations indicated that the

---

[19] Notice and enforcement duties sometimes apply when HSBC has received notice of such breaches.   Plaintiffs, however, make no allegations that HSBC received such notice.

Warrantors "were involved in conduct which would have rendered their [representations and warranties] highly suspect").  Plaintiffs' effort to paint with a broad brush is plainly insufficient.

"[C]ourts overwhelmingly recognize" that evidence of a party's "suspicions or ignorance of . . . 'red flags'" is not sufficient to raise an inference of actual knowledge.  *See Rosner v. Bank of China*, 2008 WL 5416380, at *6 (S.D.N.Y. Dec. 18, 2008) (citing cases), *aff'd*, 349 F. App'x 637 (2d Cir. 2009); *see also, e.g.*, *Nathel v. Siegal*, 592 F. Supp. 2d 452, 469-70 (S.D.N.Y. 2008).  Moreover, in the commercial securitization context, courts consistently reject generalized public allegations and instead give effect to the language of the agreements that require actual knowledge of loan-level, trust-specific breaches of representations and warranties before any notice or enforcement obligations are triggered.

*FHFA v. HSBC North American Holdings, Inc.*, --- F. Supp. 2d ---, 2014 WL 3702587 (S.D.N.Y. July 25, 2014), is directly on point.  The court held as a matter of law that the type of general information alleged by Plaintiffs relating to an Originator's weak underwriting practices or increased default and foreclosure rates—even when it related to the same Originator involved in the case—did not demonstrate "actual knowledge" of breaches of loan-related representations.  *Id.* at *20-21.  The court explained:

> [K]nowledge about a general population—here, the set of all loans generated by a particular Originator—cannot be conflated with knowledge concerning a specific subset of that population . . . .  Actual knowledge of falsity means just that. Mere awareness of the ever-present risk that an issuer is mistaken, and that certain representations might be inaccurate, will not support a finding of actual knowledge of falsity. Even suspicion of falsity, before it ripens into actual knowledge, will not suffice.

*Id.*  The *FHFA* decision demonstrates, for example, that even assuming the truth of Plaintiffs' allegations that HSBC was aware of underwriting practices and default and foreclosure rates in general, *see, e.g.*, BR Compl. ¶¶ 382-385 & 388-389; RP Compl. ¶¶ 68-70; PL Compl. ¶ 168,

this awareness cannot, as a matter of law, support a claim that HSBC "discovered" loan-specific breaches of representations and warranties, *see FHFA*, 2014 WL 3702587, at *20 (There is "no necessary connection between an Originator's general way of doing business and the characteristics of a particular group of loans that have been examined and assembled into a securitization by a defendant entity.").  These conclusions have been echoed many times in the mortgage-backed securities context.  *See, e.g.*, *FHFA v. UBS Ams., Inc.*, 858 F. Supp. 2d 306, 321 (S.D.N.Y. 2012) ("[W]hen the [plaintiff] learned of the loan orginators' dubious underwriting practices says little about when [it] discovered the facts that form the basis of this complaint."); *Mass. Mut. Life Ins. Co. v. Residential Funding Co.*, 843 F. Supp. 2d 191, 208 (D. Mass. 2012) (news about originators' lending practices "did not alert Plaintiff to potential fraud in any specific securitization it had purchased."); *Pub. Emps.' Ret. Sys. of Miss. v. Goldman Sachs Grp., Inc.*, 2011 WL 135821, at *9 (S.D.N.Y. Jan 12, 2011) (public information regarding originators disregarding underwriting guidelines did not give plaintiffs notice about the underwriters' misstatements or omissions).

Suspicion does not constitute the requisite knowledge.  Moreover, absent investor direction (which Plaintiffs do not allege), HSBC had no obligation to undertake an investigation to discover if there were loan-level, trust-specific breaches.[20]  The Agreements do not require, and Plaintiffs do not allege, that HSBC had to conduct any due diligence with respect to the mortgage loans or other parties' representations and warranties.  By contrast, the Agreements provide that HSBC is entitled to rely conclusively on the other parties' representations and

---

[20] *See* Ex. 10 Chart 11 ("No Duty to Investigate").

warranties and has no obligation to conduct any investigation.[21]  Plaintiffs do not allege that

Holders with the requisite voting rights demanded an investigation or offered indemnification.[22]

Even assuming a relevant officer in HSBC's corporate trust department did review

articles or reports relating to general industry practices, or even the general practices of particular

Sponsors or Originators, such activities would not support an allegation that HSBC had

knowledge of specific loan-level breaches of representations and warranties.  None of these

sources allegedly disclosed information regarding specific loans in the specific trusts, let alone

specific breaches of representations and warranties.  The only way for HSBC to have discovered

loan-level breaches of representations and warranties from these sources would have been to

launch an investigation based upon the non-trust specific and non-loan specific information

allegedly raised by these sources.  But HSBC had no obligation to do so and is not alleged to

have done so.  The Complaints err by attempting to rely on "presumptions and speculation to

support an inference . . . [of] actual knowledge[.]"  *DiStiso v. Cook*, 691 F.3d 226, 249 (2d Cir.

2012); *see also Chemtex, LLC v. St. Anthony Enters., Inc.*, 490 F. Supp. 2d 536, 547 (S.D.N.Y.

2007) ("[W]hen a defendant is under no independent duty, even alleged ignorance of obvious

warning signs of fraud will not suffice to adequately allege 'actual knowledge.'").

**B.    Plaintiffs Fail To State a Claim for Breach of HSBC's Post-Event-of-Default Obligations.**

Plaintiffs allege that HSBC breached contractual obligations upon an Event of Default by

failing to notify Holders of its occurrence and/or by failing to act as a prudent person in the

exercise of its rights and powers under the Agreements.  *See* BR Compl. ¶ 515; RP Compl.

---

[21] *See* Ex. 8 Chart 4 ("Trustee Right to Conclusively Rely on Servicer Certification").

[22] In addition, the Agreements expressly require that investors obtain a required level of consensus before they can demand action by the indenture trustee, and the indenture trustee may refuse to take such action if the required consensus (and indemnification) is not met.  *See* Ex. 8 Chart 5 ("No Action Clauses").

¶ 184; PL Compl. ¶ 490.  This allegation fails to state a claim.  First, the Complaints do not adequately allege (1) the occurrence of Indenture Events of Default, SSA Servicer Events of Default, or PSA Events of Default; or (2) actual knowledge of such events on HSBC's part.  In addition, "prudent person obligations" upon an SSA Servicer Event of Default do not exist in twenty-seven of the twenty-eight indenture trusts.

### 1.   Plaintiffs Do Not Adequately Allege that an Indenture Event of Default Occurred.

Unlike the PSAs (in which an Event of Default is dependent on the Servicer's conduct), the Indentures define Event of Default to encompass only the conduct of the Issuer (the trust itself).[23]  *See* Ex. 8 Chart 6 ("Indenture Event of Default Definitions").  The BlackRock Complaint contains no allegations of any duties that the Issuer breached.  *See* BR Compl. ¶¶ 510-522 (breach of contract allegations).[24]  In the 517 paragraphs of the Phoenix Light Complaint, the Plaintiffs assert only a single conclusory allegation of an alleged Issuer breach—that the Issuer "failed to protect the collateral."  PL Compl. ¶ 420.  Tellingly, Phoenix Light does not tie this alleged failure to "protect collateral" to a contractual obligation of HSBC, nor does it provide any details as to this alleged breach.  Accordingly, neither Complaint adequately pleads an Indenture Event of Default.  *See Mayor & City Council of Balt.*, 709 F.3d at 135.

### 2.   Plaintiffs' Allegation that Events of Default Occurred Is Contradicted by the Plain Terms of the PSAs.

Plaintiffs' allegations concerning Events of Default in non-indenture trusts contradict the terms of the PSAs.[25]  An "Event of Default" is typically defined to occur only after the Servicer:

---

[23] Indeed, Plaintiffs concede this major difference.  *See, e.g.*, BR Compl. ¶ 280; PL Compl. ¶ 417.

[24] As explained below, this failure also dooms Plaintiffs' TIA claims.

[25] This argument applies with equal force to the SSA Servicer Events of Default, which are defined in the same way as PSA Events of Default.  *See* Ex. 8 Chart 7 ("SSA Servicer Event of Default Definitions").

(1) materially breaches its contractual obligations; (2) is notified in writing of its breach by specified parties (for example, by the Securities Administrator, the Depositor, the indenture trustee, or Certificateholders with a specified share of Voting Rights); and (3) does not cure the breach within a specified time period.[26]  The Court need not determine whether the first element, a breach, occurred, because Plaintiffs do not allege the final two necessary elements: (1) written notice and (2) failure to cure.

There can be no claim for alleged breach of HSBC's post-Event of Default duties when the elements of an Event of Default have not been alleged.  For example, in *Millennium Partners, L.P. v. U.S. Bank National Association*, 2013 WL 1655990, at *4 (S.D.N.Y. Apr. 17, 2013), the plaintiff failed to allege that written notice was provided under a provision nearly identical to the ones at issue here.  The court held that the plaintiff had not properly alleged an Event of Default and dismissed the plaintiff's claims alleging breach of the trustee's post-Event of Default obligations.  *Id.*  Likewise, in *Sterling Federal Bank v. DLJ Mortgage Capital, Inc.*, 2010 WL 3324705, at *8 (N.D. Ill. Aug. 20, 2010), the court dismissed a claim for breach of a trustee's post-Event of Default obligations because the plaintiff had not alleged that the servicer's breaches had continued unremedied after receiving written notice of breach as required by the PSA.  *See also Magten Asset Mgmt. Corp. v. Bank of N.Y.*, 841 N.Y.S.2d 219, *available at* 2007 WL 1326795, at *4-8 (N.Y. Sup. Ct. May 8, 2007) (Event of Default did not occur where plaintiff did not allege occurrence of an event contained in the definition of Event of Default).[27]

---

[26] *See* Ex. 9 Chart 8 ("PSA Event of Default Definitions").

[27] By contrast, courts that have found allegations of an Event of Default to be sufficient either did not address or analyze "notice and opportunity to cure" requirements like those that are present in the trusts at issue here, *see Ret. Bd. of Policemen's Annuity & Benefit Fund of Chi. v. Bank of N.Y. Mellon*, 914 F. Supp. 2d 422, 431-32 (S.D.N.Y. 2012) ("*Policemen's/BNY*"), *abrogated by Policemen's Annuity*, 2014 WL 7272269, or were analyzing the PSA Event of Default provisions under a TIA standard, which has now been rejected by the Second Circuit, *see Policemen's*

Moreover, under the Agreements, Holders could provide written notice that an Event of Default had occurred.[28]  Yet, none of the Plaintiffs allege they provided such a notice.  Because no Event of Default has been adequately alleged, no claim against HSBC can be maintained based on alleged breach of post-Event-of-Default duties.

### 3.    For Twenty-Seven Trusts, SSA Servicer Events of Default Do Not Trigger Prudent Person Obligations.

Plaintiffs' claims that HSBC violated its prudent person obligations following an SSA Servicer Event of Default should be dismissed as to twenty-seven trusts because those trusts do not assign HSBC any such obligations.[29]  Rather, prudent person obligations only attach in those trusts upon an Issuer Event of Default.[30]

### 4.    For Twelve Trusts, SSA Servicer Events of Default Do Not Trigger Notice Requirements.

Plaintiffs' claims that HSBC failed to give notice upon an SSA Servicer Event of Default, *see, e.g.*, BR Compl. ¶ 284, should be dismissed as to twelve trusts because those trusts do not contain any such requirement.[31]

### 5.    Plaintiffs Fail To Allege Facts Showing that a Responsible Officer of HSBC Had "Actual Knowledge" of an Event of Default as Required To Trigger Post-Event-of-Default Obligations Under the Agreements.

Plaintiffs cannot state a claim against HSBC for breach of post-Event-of-Default obligations because Plaintiffs do not allege that a "Responsible Officer"[32] of HSBC had "actual

---

*Annuity & Benefit Fund of Chi. v. Bank of Am.*, 943 F. Supp. 2d 428, 440-42 (S.D.N.Y. 2013) ("*Policemen's/BoA*"), *abrogated by Policemen's Annuity*, 2014 WL 7272269.

[28] *See* Ex. 8 Chart 7 & Ex. 9 Chart 8.

[29] These trusts are all indenture trusts except PHHMC 2008-CIM2.

[30] Ex. 9 Chart 9 ("Indenture Prudent Person Clauses").

[31] These trusts are: OWNIT 2005-2; OWNIT 2005-3; OWNIT 2005-4; RAMC 2005-1; RAMC 2005-2; RAMC 2005-4; RAMC 2006-1; RAMC 2006-2; RAMC 2006-3; RAMC 2006-4; RAMC 2007-1; RAMC 2007-2.

[32] *See, e.g.*, DBALT 2006-AR5 PSA § 1.1 (defining "Responsible Officer," in relevant part, as "any officer in the corporate trust department or similar group of the Trustee with direct

knowledge" of an Event of Default or received written notice thereof.[33]  Such conditions are required to trigger the indenture trustee's post-Event-of-Default obligations under the Agreements.  *See, e.g.*, DBALT 2006-AR5 PSA § 8.1(a)  ("the Trustee shall not be deemed to have knowledge of a Master Servicer Event of Default unless a Responsible Officer of the Trustee assigned to and working in the Trustee's Corporate Trust Office has actual knowledge thereof"); Ex. 9 at Chart 10 ("Knowledge By Responsible Officer Requirement").

### a.   Plaintiffs Make No Allegations Concerning Actual Knowledge of a Responsible Officer.

Nowhere in the Complaints do Plaintiffs allege that an HSBC Responsible Officer had actual knowledge of an alleged Event of Default, as required by the plain terms of the Agreements.  This failure to allege what is required by the Agreements is fatal to Plaintiffs' claims that HSBC had post-Event-of-Default duties.  Plaintiffs simply cannot read the Responsible Officer requirement out of the Agreements.  *See LaSalle Bank Nat'l Ass'n v. Nomura Asset Capital Corp.*, 424 F.3d 195, 206 (2d Cir. 2005) ("An interpretation of a contract that has the effect of rendering at least one clause superfluous or meaningless is not preferred" (alterations and internal quotation marks omitted)).

### b.   Plaintiffs' Generalized Allegations Are Insufficient To Plausibly Allege Actual Knowledge of Events of Default.

Plaintiffs attempt to sidestep the plain requirements of the Agreements by alleging that HSBC obtained actual knowledge of Events of Default through news articles, government reports, lawsuits, and other sources discussing alleged activities of loan servicers generally.  BR Compl. ¶¶ 462-472; RP Compl. ¶¶ 105-141; PL Compl. ¶ 464.  For the same reasons discussed

---

responsibility for the administration of this Agreement and also, with respect to a particular corporate trust matter, any other officer to whom such matter is referred because of his or her knowledge of and familiarity with the particular subject.").

[33] Plaintiffs make no allegations that HSBC received the requisite written notice.  Accordingly, we address only the inadequacy of Plaintiffs' knowledge allegations.

in section I.A.3 above, these generalized allegations are insufficient to show that HSBC had

actual knowledge of any Event of Default.  Indeed, those principles of law have been applied

directly to the same types of Event-of-Default knowledge allegations made by Plaintiffs and

have been rejected.  For example, in *Arrowgrass Master Fund Ltd. v. Bank of New York Mellon*,

the plaintiff investors, like Plaintiffs here, alleged that the indenture trustee's "knowledge of

facts from news reports and documents relevant to the transaction[] was 'sufficient to put [the

indenture trustee] on notice that an event of default had occurred and was continuing.'"  2012

WL 8700416, at *9 (N.Y. Sup. Ct. Feb. 24, 2012).  In rejecting this argument, the court chastised

the plaintiff for "blatantly attempting to excise [the] 'actual knowledge' requirement and replace

it with 'notice' as that term is defined in contexts outside of a trust indenture."  *Id.* at *10, *aff'd*,

965 N.Y.S.2d 473, 475 (1st Dep't 2013) ("We have considered plaintiffs' argument that the

complaint sufficiently alleges defendant's actual knowledge of a Default or Event of Default (as

those terms are defined in the indenture) and find it unavailing.").[34]

    In addition to flouting the clear case law holding that general information does not equate

to actual knowledge, Plaintiffs' approach is inconsistent with the text and structure of the

Agreements.  Alongside HSBC's right to conclusively rely on servicer certifications, *see* Ex. 8

Chart 4, absent Certificateholder direction and indemnity (which Plaintiffs do not allege), HSBC

has no obligation to investigate any facts or matters represented in any document, certificate, or

other paper, *see* Ex. 10 Chart 11.  Similarly, the Agreements do not assign HSBC any duties to

monitor servicers.  Instead, that duty is typically assigned to the Master Servicer.  *See* Ex. 10

Chart 12 ("Master Servicer Oversight Obligations").

---

[34] Indeed, Plaintiffs acknowledge that their allegations are insufficient to rise to the level of
actual knowledge.  *See, e.g.*, RP Compl. ¶ 113 ("The foregoing events put HSBC on notice that
some Covered Trusts Servicers were engaged in practices that amounted to Events of Default."
(emphasis added)).

The reasons for the "no-investigation" provision are simple: HSBC's role is limited, and investigations can be time-consuming, complicated and expensive.  The only funds available to finance such investigations are trust assets.  Before HSBC undertakes an investigation—that could cost the trust and thus investors potentially millions of dollars—Holders with the required percentage of voting rights must direct such an investigation in writing, and agree to indemnify HSBC.  *See, e.g.*, DBALT 2006-AR5 PSA §§ 9.2(a)(iii), (v).  The same goes for the "right to conclusively rely" provisions, which enable HSBC to accept the certifications of others and the accuracy of documents, rather than undertake independent inquiry and expend trust money investigating certificates, notices, and other documents.  Similarly, that HSBC had no duty to monitor (and thus spend money monitoring) Servicers reflects the narrow, contractually-defined role of the indenture trustee.  If HSBC had to launch an investigation into the servicing practices of all the Servicers for each trust every time a news article or government report was released, the trust would quickly run out of funds, and HSBC would be tasked full-time with conducting investigations, contrary to the limited role required under the Agreements.  *See Magten Asset Mgmt.*, 2007 WL 1326795, at *7 ("[The indenture trustee's] duty did not extend to undertaking a complicated and unavoidably speculative investigation in order to decide whether there was or would be an event of default.").  Examining provisions such as these, it is no surprise that courts have relied upon them to reject attempts to use generalized allegations to establish actual knowledge.  *See, e.g.*, *Arrowgrass*, 2012 WL 8700416, at *9 (trustee "had no independent duty to inquire as to whether . . . any default had occurred under the Indenture, and, in fact, was permitted to assume no default had occurred").

24

Because Plaintiffs muster nothing more than generalized public information to support their claim that HSBC had actual knowledge of specific Events of Default in the at-issue trusts, the claim should be dismissed.

### C.   Plaintiffs' Breach of Contract Claim Is Barred by "No-Action" Clauses.

Each of the Agreements contains a "No-Action" or "Limitation of Suits" Clause that prohibits Holders from pursuing any action unless (1) the Holder has first provided notice of default to the Trustee and (2) some percentage (often 25%) of Holders make written request on HSBC to file suit against a third party (such as a Servicer or Originator) and offer HSBC reasonable indemnity for its costs in pursuing the suit.[35]  No-Action Clauses serve the important function of preventing expenditures of trust funds to pursue "unworthy or unpopular actions." *RBC Capital Mkts., LLC v. Educ. Loan Trust IV*, 2011 WL 6152282, at *2 (Del. Ch. Dec. 6, 2011) (applying New York law); *see also Friedman v. Chesapeake & Ohio Ry.*, 261 F. Supp. 728, 731 n.7 (S.D.N.Y. 1966) ("If in a mortgage securing thousands of bonds every holder of a bond or bonds were free to sue at will for himself and for others similarly situated, the resulting harassment and litigation would be not only burdensome but intolerable." (quotations and citations omitted)), *aff'd*, 395 F.2d 663 (2d. Cir. 1968); American Bar Foundation, *Commentaries on Model Debenture Indenture Provisions* 232 (1971) ("The major purpose of [the No-Action Clause] is to deter individual debentureholders from bringing independent law suits for unworthy or unjustifiable reasons, causing expense to the [trust] and diminishing its assets.  The theory is that if the suit is worthwhile, 25% of the debentureholders would be willing to join in sponsoring it.  The 25% figure is standard.  An additional purpose is the expression of the principle of law that would otherwise be implied that all rights and remedies of the indenture are for the equal and ratable benefit of all the holders.").

---

[35] Substantively similar provisions are found in all thirty-nine trusts.  *See* Ex. 8 at Chart 5.

Plaintiffs' claims are based on HSBC's alleged failure to take action against Servicers, Originators, and other third parties who allegedly breached their obligations.  *See, e.g.,* BR Compl. ¶¶ 6-14; RP Compl. ¶¶ 104-105, 133, 149-154, 184-190; PL Compl. ¶¶ 49, 64**.**  But Plaintiffs cannot maintain such claims when they have not alleged satisfaction of the conditions precedent of the No-Action Clauses, namely, a notice of default, demand, and offer of indemnity.

It is of no moment that the Plaintiffs style their Complaints as against the trustee rather than against third parties.  If Plaintiffs' suit were allowed, it would effectively nullify the No-Action Clauses by providing a Holder with an end-run around the requirement that it must first petition HSBC before seeking relief for the conduct of other parties.  There is no excuse for Plaintiffs' failure to utilize the demand and indemnification provisions of the No-Action Clauses, particularly since they allege that the "defaults" underlying their claims were widely suspected and reported as early as 2007 and 2008.[36]  Indeed, BlackRock admits that Holders in some trusts (not at issue here) properly followed the procedures in the No-Action Clauses and that HSBC took appropriate action.  BR Compl. ¶ 7.  Had these sophisticated investors, who are themselves fiduciaries to their own investors, actually believed that public information about news reports and government investigations constituted Events of Default, they should have provided notice, direction, and indemnity to the indenture trustee to begin an investigation or institute a proceeding.  Plaintiffs do not allege satisfaction of such conditions precedent as to the trusts at issue here; thus, Plaintiffs' breach of contract claims are barred.

---

[36] For example, Royal Park alleges that "numerous news stories . . . private and governmental lawsuits . . . and abundant Congressional testimony" during the period from 2007 to 2008 "revealed that many of the Warrantors of the Covered Trusts routinely engaged in lending practices that would have likely rendered their [representations and warranties in the PSAs] false,"  RP Compl. ¶ 67, and that "as early as March 2008, news reports surfaced concerning SPS, a Servicer for the DBALT 2006-AR5 . . . . reveal[ing] that SPS had engaged in predatory loan servicing practices, charging improper fees to borrowers, and making servicing advances that improperly diverted money from RMBS investors to SPS," *id.* ¶ 108.

**D.    Plaintiffs Lack Standing To Enforce Any Obligations Set Forth in the Contracts Containing Negating Clauses.**

Agreements governing twenty-five of the trusts at issue[37] contain a "Negating Clause" that expressly limits the parties who may enforce their terms to the specific parties to the Agreements and named third-party beneficiaries, including defined "Certificateholders" and "Noteholders."[38]  Plaintiffs are not parties to the Agreements, and they do not allege that they are "Certificateholders" or "Noteholders" as those terms are defined.  The PSAs define a "Certificateholder" as "[t]he Person in whose name a Certificate is registered in the Certificate Register," WFHET 2006-2 PSA § 1.01, and the Indentures or SSAs similarly define "Noteholder" in relevant part as the "Person in whose name a Note is registered on the Note Register," FMIC 2004-3 Indenture § 1.01(a).[39]  Plaintiffs allege only that they "acquired" or "hold[]" certificates and notes in the relevant trusts.[40]  These allegations are consistent only with the separately-defined statuses of "Certificate Owner," *i.e.*, "any beneficial owner" of trust certificates, WFHET 2006-2 PSA § 1.01, or "Note Owner," *i.e.*, "the Person that is the beneficial owner" of a note, FMIC 2004-3 Indenture § 1.01(a).[41]  Certificate *Owners* and Note *Owners* do not have standing under the Agreements to sue.

New York courts recognize that "it is well settled that a beneficial holder of a note lacks standing to sue . . . where . . . the indenture reserves the right to sue to the registered holder of the note." *Cortlandt St. Recovery Corp. v. Hellas Telecomms., S.a.r.l.*, 996 N.Y.S.2d 476, 489 (N.Y.

---

[37] These trusts and their Negating Clauses are listed in Exhibit 10 Chart 13 ("Negating Clauses").

[38] The Negating Clauses in indenture trusts refer to Noteholders, while those in PSAs refer to Certificateholders.  *See* Ex. 10 Chart 14 ("Certificateholder/Noteholder vs. Certificate Owner/Note Owner Definitions").

[39] *Id.*

[40] *See, e.g.*, RP Compl. ¶ 31; PL Compl. ¶¶ 15-23.  The BlackRock Plaintiffs allege that they are Certificateholders, BR Compl. ¶ 15, but not Noteholders of the indenture trusts, nor do they allege the factual basis for that assertion.

[41] *See* Ex. 10 Chart 14.

Sup. Ct. 2014); *see also Springwell Navigation Corp. v. Sanluis Corporacion, S.A.*, 849

N.Y.S.2d 34, 34 (1st Dep't 2007) (affirming trial court's holding that the plaintiff "had no right

to sue upon an indenture agreement for interest payments . . . since that document specifically

reserved that right to the registered holder of the Note"); *Edward B. Fitzpatrick, Jr. Constr.*

*Corp. v. Cnty. of Suffolk*, 525 N.Y.S.2d 863, 866 (2d Dep't 1988) (where "a provision in the

contract expressly negates enforcement by third-parties, that provision is controlling").

Accordingly, Plaintiffs' breach of contract claims must be dismissed as to the twenty-five trusts

that include a Negating Clause.

      **E.**    **BlackRock Fails To Allege Specific Contract Provisions upon Which Its**
             **Breach of Contract Claim Is Based.**

      To state a claim for breach of contract, "[t]he claimant must allege the specific provisions

of the contract upon which the breach of contract claim is based." *Schupak Grp., Inc. v.*

*Travelers Cas. & Sur. Co.*, 716 F. Supp. 2d 262, 267 (S.D.N.Y. 2010). Despite filing a 569-

paragraph Complaint, BlackRock fails to identify with any specificity a single contract provision

that HSBC allegedly breached. Accordingly, BlackRock's claim should be dismissed. *See, e.g.*,

*Valentini v. Citigroup, Inc.*, 837 F. Supp. 2d 304, 327 (S.D.N.Y. 2011) (dismissing breach of

contract claim for failure to identify what specific provision of the contract was breached,

including "where th[e] contractual provision can be found").

      BlackRock's inability to identify specific provisions is particularly suspect because of the

sheer number of breach of contract actions BlackRock seeks to amalgamate into a single

Complaint. BlackRock uses only general language and a few footnote references in which some

(though, notably, not all) of the duties they allege were breached are "typically expressed" or

"generally found." *See* BR Compl. ¶¶ 239-284. These conclusory references are woefully

inadequate. For one thing, the section numbers cited are not found in the twenty-seven indenture

trusts at issue here.  But more importantly, as the above arguments show, *see supra* sections

I.A.1; I.B.3 & I.B.4, BlackRock's attempts to have the Court adopt a one-size-fits-all approach to

the hundreds of breach of contract actions that it seeks to aggregate is simply inconsistent with

the underlying contracts.  The Court should not allow BlackRock to circumvent basic pleading

requirements, and thus should dismiss its breach of contract claim.

### F.   Phoenix Light Seeks To Impose Additional Duties on HSBC that Are Contrary To the Terms of the Agreements.

The Phoenix Light Complaint alleges HSBC breached various contractual and regulatory

obligations the Agreements assign to other parties, not HSBC.  In any event, these claims are

time barred.

Regulation AB Reports.  Phoenix Light alleges that HSBC failed to make the accurate

certifications purportedly required of it in accordance with governing SEC regulations and the

governing transaction documents.  PL Compl. ¶¶ 55-58, 422-425.  However, the regulation

Phoenix Light cites governs only public deals issued after December 31, 2005.  17 C.F.R.

§ 229.1100 *et seq.*; 70 Fed. Reg. 1506-01 (applying to "any registered offering of asset-backed

securities commencing . . . after December 31, 2005").  As a result, it applies to only four of the

eleven trusts in the Phoenix Light Complaint.[42]  Even as to those trusts, however, the

Agreements obligated the Servicers, Master Servicers, and/or Custodians, not HSBC, to supply

Regulation AB Item 1122 Reports, as those parties were directly involved in the servicing of the

mortgage loans.  Ex. 11 Chart 15 ("Regulation AB Obligations").  Similarly, the Agreements

obligated the Securities Administrator, who prepared the monthly remittance reports, to deliver

the relevant certification to the Depositor, and to provide copies of those reports to the SEC.  *Id.*

---

[42] DMSI 2006-PR1 is a private trust, and six trusts closed prior to 2006 (FBR 2005-2, FBR 2005-4, NAA 2005-AR6, OWNIT 2005-2, OWNIT 2005-3, OWNIT 2005-4).

Taking Physical Possession of Mortgage Loan Files.  Phoenix Light's allegation that HSBC breached its obligation to take physical possession of complete mortgage files, PL Compl. ¶¶ 38, 68-69, 484, is expressly contradicted by the plain language of the Agreements.[43]  The Agreements generally assign the job of holding and reviewing loan files to other parties, like the Custodian, and not to HSBC.[44]  *See, e.g.*, DBALT 2006-AB4 § 2.01 ("Notwithstanding anything to the contrary contained herein, the parties hereto acknowledge that the functions of the Trustee with respect to the custody, acceptance, inspection and release of the Mortgage Files . . . shall be performed by the related Custodian . . . .").

Preparing and Delivering Certification and Exception Reports.  Phoenix Light alleges HSBC breached its obligation to review the mortgage loan files and to prepare and deliver certification and exception reports following that review.  PL Compl. ¶ 484.  However, the Agreements specifically assign to the Custodian or to the Trust Administrator those obligations. *See* Ex. 11 Chart 16.  For instance, § 2.01 of the DBALT 2006-AB4 PSA states that "the parties hereto acknowledge that the functions of the Trustee with respect to the custody, acceptance, inspection and release of the Mortgage Files . . . and  preparation and delivery of the certifications shall be performed by the related Custodian . . . ."  *See* Ex. 11 Chart 16.  In fact, the "Form of Trustee Certification" attached as Exhibit D to the OWNIT 2005-2 PSA cited by Phoenix Light expressly provides that it is prepared by the Custodian.  PL Compl. ¶ 44.  As Phoenix Light concedes, the remainder of the covered trusts have substantially similar final certification forms.  *Id.*

---

[43] To the extent that BlackRock makes similar allegations, HSBC's arguments herein apply with equal force to those allegations.  *See* BR Compl. ¶¶ 231, 251, 253-55.
[44] *See* Ex. 11 Chart 16 ("Other Party Document Receipt and Review Obligations").

In any event, even if HSBC did have these obligations (it did not), these claims are time barred by the applicable statute of limitations for contract actions, which is at most six years (and possibly as short as three years). *See Ely-Cruikshank Co. v. Bank of Montreal*, 599 N.Y.S.2d 501, 502-03 (N.Y. 1993); N.Y. CPLR § 202. Any reporting obligation under Regulation AB would have terminated in the fiscal year following the closing of the trust, when HSBC filed the relevant suspension notice pursuant to 17 C.F.R. § 249.323. Thus, this obligation ended in 2007 (the relevant trusts closed in 2006), more than six years before Phoenix Light filed this suit. Similarly, HSBC's alleged breaches relating to receiving mortgage loan files and creating certification and exception reports would have all occurred at or near the time the trusts closed, which was more than six years before Phoenix Light filed suit. To the extent these duties are also pled as breaches of fiduciary duties or tort claims, they are also time barred. N.Y. CPLR § 213.

## II.    Plaintiffs' Tort and Breach of Trust/Fiduciary Duty Claims Should Be Dismissed.

Plaintiffs assert claims for (1) breach of trust/fiduciary duty (all plaintiffs), (2) negligence (BlackRock and Phoenix Light), (3) negligent misrepresentation (Phoenix Light), and (4) failing to avoid conflicts of interest (Royal Park and BlackRock).[45] The first three claims are duplicative of Plaintiffs' contract claims. The negligent misrepresentation and negligence claims are also barred by the economic loss rule. Finally, the fiduciary duty, conflict of interest, and negligent misrepresentation counts also fail to state a claim.

### A.    Indenture Trustees Do Not Owe Fiduciary Duties To Holders.

Plaintiffs' fiduciary duty/breach of trust claims fail, because prior to an Event of Default indenture trustees are not in a fiduciary relationship with Holders. *See AG Capital Funding*

---

[45] Phoenix Light makes reference to HSBC's duty of "undivided loyalty," but pleads no facts supporting a claim for breach of this alleged duty. PL Compl. ¶ 496. Accordingly, it has alleged no conflict of interest claim. *Ashcroft v. Iqbal*, 556 U.S. 662, 681 (2009).

*Partners*, 866 N.Y.S.2d at 583-84; *Ellington*, 837 F. Supp. 2d at 192.  Even after an Event of Default, the indenture trustee's duties are not those of a general fiduciary, but are limited to "the exercise of those rights and powers granted in the indenture."  *Beck v. Mfrs. Hanover Trust Co.*, 632 N.Y.S.2d 520, 528 (1st Dep't 1995).

> **B.**   **Plaintiffs' Tort and Breach of Trust/Fiduciary Duty Claims Are Duplicative of Their Contract Claims.**

"It is a well-established principle that a simple breach of contract is not to be considered a tort unless a legal duty independent of the contract itself has been violated."  *Clark-Fitzpatrick, Inc. v. Long Island R.R.*, 521 N.Y.S.2d 653, 656 (N.Y. 1987).  The common law imposes no pre-Event of Default extra-contractual duties on indenture trustees besides certain ministerial duties and the duty to avoid conflicts of interest.  Any other obligations are imposed solely by contract, and claims for breach alleged extra-contractual obligations should be dismissed as duplicative of Plaintiffs' contract claims.  *AG Capital Funding Partners*, 866 N.Y.S.2d at 584; *Ellington*, 837 F. Supp. 2d at 192-93 (dismissing breach of fiduciary duty claim as duplicative); *id.* at 200-01 (dismissing negligent misrepresentation claim as duplicative).

Here, Plaintiffs' non-contract claims also fail because they simply restate Plaintiffs' contract claims.  *Clark-Fitzpatrick, Inc.*, 521 N.Y.S.2d at 657.  The contract claims are virtually mirror images of Plaintiffs' other claims.

**Royal Park:**

Royal Park's breach of trust claim that HSBC failed to act prudently in the face of Events of Default restates its contract claim:

> Royal Park Contract Claim: "[P]laintiff . . . did not receive the benefit of [its] bargain, to wit, that HSBC would act as a prudent person . . . when HSBC knew of Events of Default." RP Compl. ¶ 187.

> Royal Park Breach of Trust Claim: "HSBC breached its duty of trust owed to plaintiff . . . by failing . . . to act prudently, as was required when it became aware of uncured Events of Defaults . . . ." *Id.* ¶ 193.

The same is true of Royal Park's breach of trust claim that HSBC failed to enforce Depositors'

warranty obligations:

> Royal Park Contract Claim: HSBC failed in its "duty to enforce the Warrantors' breaches of their R&Ws upon discovery, by seeking the cure, substitution or repurchase of any and all defective Mortgage Loans . . . ." *Id.* ¶ 184(a).

> Royal Park Breach of Trust Claim: "HSBC breached its duty of trust owed to plaintiff . . . by . . . failing to demand that the Warrantors cure, substitute, or repurchase Mortgage Loans that breached their R&Ws . . . ." *Id.* ¶ 193.

**BlackRock:**

BlackRock's fiduciary duty and negligence claims regarding the Sellers' representations

and warranties restate its contract claim:

> BlackRock Contract Claim: "HSBC . . . (i) fail[ed] to provide prompt written notice . . . of breaches of the sellers' mortgage loan representations and warranties . . . ; and (ii) fail[ed] to enforce the sellers' obligation to repurchase, substitute, or cure the defective mortgage loans." BR Compl. ¶ 514.

> BlackRock Fiduciary Duty Claim: "HSBC . . . failed to promptly enforce the sellers' obligation to cure, repurchase, or substitute mortgage loans . . . affected by breaches of the sponsors' and originators' representations and warranties . . . . Moreover, HSBC failed to provide notice to the Certificateholders of the breaches . . . ." *Id.* ¶ 543.

> BlackRock Negligence Claim: "HSBC . . . negligently failed to promptly enforce the sellers' obligation to cure, repurchase, or substitute mortgage loans . . . affected by breaches of the sponsors' and originators' representations and warranties . . . . Moreover, HSBC negligently failed to provide notice to the Certificateholders of the breaches . . . ." *Id.* ¶ 550.

Likewise, BlackRock's fiduciary duty and negligence claims regarding Servicer misconduct

restate its contract claim:

> BlackRock Breach of Contract Claim: "HSBC failed to deliver written notices to the servicers of the defaults or terminate the servicers.  Similarly, HSBC failed to provide Certificateholders with notice of these Events of Default." *Id.* ¶ 519. HSBC also failed to "enforce[] the servicers' prudent-servicing obligations." *Id.* ¶ 521.

> BlackRock Breach of Fiduciary Duty Claim: HSBC "has refused . . . to enforce the servicers' obligations . . . set forth in the PSAs . . . . Moreover, HSBC failed to provide notice to the Certificateholders of the servicing violations . . . ." *Id.* ¶ 545.

> BlackRock Negligence Claim: "HSBC's failure to enforce the servicers' obligations . . . set forth in the PSAs, as well as its failure to provide notice to the Certificateholders of the servicing violations . . . constituted breaches of its duty [of care]." *Id.* ¶ 552.

**Phoenix Light:**

Phoenix Light's breach of fiduciary duty claim attempts to recast a contract claim as a tort.  It alleges that HSBC owed it a fiduciary duty "when performing the obligations set forth in the PSAs," PL Compl. ¶ 496, and copies its laundry list of alleged HSBC failures verbatim from the breach of contract claim, *compare id.* ¶ 490, *with id.* ¶ 496.

Likewise Phoenix Light's negligence claim merely asserts that HSBC performed its "contractual obligations" in an "inadequate and negligent manner."  *Id.* ¶ 500.

Finally, Phoenix Light's negligent misrepresentation claim is duplicative of its contract claim, because each alleged "misrepresentation" is merely a re-characterization of an alleged contractual breach:

> Phoenix Light Misrepresentation Claim 1: HSBC failed to state "(i) whether . . . Servicers had failed to perform their duties under the PSA." *Id.* ¶ 503.
> Phoenix Light Contract Claim: HSBC failed to "remedy . . . Servicers' failure to adhere to prudent servicing standards." *Id.* ¶ 490.

> Phoenix Light Misrepresentation Claim 2: HSBC failed to state "(ii) whether the operative documents for the mortgage loans had been transferred to the Trustee." *Id.* ¶ 503.
> Phoenix Light Contract Claim: HSBC failed to "take physical possession of the operative documents for the mortgage loans in the Covered Trusts." *Id.* ¶ 490.

> Phoenix Light Misrepresentation Claim 3: HSBC failed to state "(iii) whether the mortgage files contained missing, defective, or incomplete information." *Id.* ¶ 503.
> Phoenix Light Contract Claim: HSBC failed to "identify all mortgage loans for which there was missing, defective or incomplete documentation." *Id.* ¶ 490.

<u>Phoenix Light Misrepresentation Claim 4</u>: HSBC failed to state "(iv) whether the improperly documented loans were identified on the final exception report, and whether the irregularities remained uncorrected." *Id.* ¶ 503.

<u>Phoenix Light Contract Claim</u>: HSBC failed to "identify all mortgage loans for which there was missing, defective or incomplete documentation on the final exception reports." *Id.* ¶ 490.

<u>Phoenix Light Misrepresentation Claim 5</u>: HSBC failed to state "(v) whether the statements in the various certifications provided by HSBC and described herein were accurate." *Id.* ¶ 503.

<u>Phoenix Light Contract Claim</u>: HSBC failed to "make accurate representations in the final certifications." *Id.* ¶ 490.

### C.  The Economic Loss Doctrine Bars Plaintiffs' Claims.

Plaintiffs' tort claims also fail because Plaintiffs plead only economic loss.  Under New York's economic loss rule, where there is no "personal injury or property damage" and the plaintiff is "essentially seeking enforcement of the bargain, the action should proceed under a contract theory."  *Sommer v. Fed. Signal Corp.*, 583 N.Y.S.2d 957, 961 (N.Y. 1992).  Plaintiffs' alleged injuries are monetary losses, not property damage or physical injury.  Thus, Plaintiffs' claims lie in contract, not tort.  *King Cnty., Wash. v. IKB Deutsche Industriebank AG*, 863 F. Supp. 2d 288, 302 (S.D.N.Y. 2012), *modified on other grounds by* 2012 WL 11896326 (S.D.N.Y. Sept. 28, 2012) ("[T]he presence of a contract . . . can be a strong indicator that a plaintiff was not owed a legal duty separate and apart from obligations bargained for and subsumed within the transaction.")

### D.  Phoenix Light's Negligent Misrepresentation Claim Fails.

Phoenix Light asserts a negligent misrepresentation claim based on HSBC's alleged "special knowledge" regarding these transactions.  PL Compl. ¶¶ 502–508.  This claim fails for multiple additional reasons.

First, negligent misrepresentation claims must be alleged with particularity.  Fed. R. Civ. P. 9(b); *Ellington*, 837 F. Supp. 2d at 200.  "Accordingly, the Complaint must '(1) detail the statements (or omissions) that the plaintiff contends are fraudulent, (2) identify the speaker, (3)

state where and when the statements (or omissions) were made, and (4) explain why the statements (or omissions) are fraudulent.'" *Ellington*, 837 F. Supp. 2d at 197 (quoting *Harsco Corp. v. Segui*, 91 F.3d 337, 347 (2d Cir. 1996)).  The Complaint meets none of these requirements.  For example, it asserts that HSBC had knowledge of whether "the various certifications provided by HSBC" were accurate, but fails to identify any allegedly fraudulent statement made by HSBC or explain why the statement was false.  PL Compl. ¶ 503.  Consequently, the claim must be dismissed.

Furthermore, there is no justified reliance on a statement when sophisticated plaintiffs had ready access to the underlying facts.  *See Allen v. Westpoint-Pepperell, Inc.*, 11 F. Supp. 2d 277, 287 (S.D.N.Y. 1997); *Abrahami v. UPC Constr. Co.*, 638 N.Y.S.2d 11, 14 (1st Dep't 1996).  Here, Phoenix Light had access to all the facts.  The Agreements generally provide that upon request, "[t]he Trustee, the Custodians and the Securities Administrator . . . shall provide [Certificateholders] access to the records and documentation in [their] possession."  DBALT 2006-AB4 § 3.01.  HSBC is also required to "provide equipment" for Certificateholders to photocopy any records they desire.  *Id.*[46]  Plaintiffs cannot now claim to have not had access to information and therefore to have been misled.

Moreover, a negligent misrepresentation claim requires a "special . . . relationship imposing a duty on the defendant to impart correct information to the plaintiff."  *Landesbank Baden-Württemberg v. RBS Holdings USA Inc.*, 14 F. Supp. 3d 488, 513 (S.D.N.Y. 2014).  Courts have rejected claims that a special relationship exists where all parties are "highly sophisticated players in the mortgage-backed securities market."  *BNP Paribas*, 949 F. Supp. 2d

---

[46] Most of the other trusts have similar provisions for Holder access to information, either from HSBC or other parties.  *See* Ex. 12 Chart 17 ("Certificateholders' Rights to Documents and Information").

at 511.  Here, Phoenix Light pleads no facts suggesting that HSBC had such a relationship, and the Agreements affirmatively demonstrate that it did not.  *See BNP Paribas Mortg. Corp. v. Bank of Am., N.A.*, 949 F. Supp. 2d 486, 510 (S.D.N.Y. 2013) ("Plaintiffs' grounds to establish a 'special relationship' independent of the contracts are barred by the [contracts].").  Under the Agreements, HSBC has no special access to information.  It is the Servicers, not HSBC, that have the day-to-day dealings with the mortgagors, and the Custodians or Trust Administrators, not HSBC, that are responsible for holding loan documents and verifying their contents.[47] Moreover, HSBC "may conclusively rely" upon the statements provided by other parties,[48] and the Agreements provide that HSBC need not independently investigate facts without direction from Holders.[49]  Because HSBC had no special access to information, it could not have had a special duty to impart information, and this claim fails.

**E.     Plaintiffs' Conflict of Interest Allegations Are Insufficient As a Matter of Law.**

**1.     Fee Structure Conflict of Interest**

Royal Park asserts that HSBC was conflicted because it was paid pursuant to a "letter agreement" between HSBC and the Master Servicer, or in the case of WHFET 2006-2, between HSBC and the Securities Administrator.  RP Compl. ¶ 144.  Likewise, BlackRock asserts that HSBC was conflicted because the Agreements provided that HSBC would be paid a flat fee regardless of how much work it did for the trusts.  BR Compl. ¶¶ 503-504.  These allegations fail because, as the Complaints admit, these fee arrangements are specifically disclosed and provided for in the Agreements.  *See* BR Compl. ¶ 504; RP Compl. ¶ 144.  A trustee's compensation that

---

[47] *See, e.g.*, DBALT 2006-AB4 § 2.01 ("[T]he parties hereto acknowledge that the functions of the Trustee with respect to the custody, acceptance, inspection and release of the Mortgage Files . . . shall be performed by the related Custodian"); Ex. 11 Chart 16.
[48] *See* Ex. 8 Chart 4.
[49] *See* Ex. 10 Chart 11.

is expressly authorized by the governing Agreements cannot create a conflict of interest. Restatement (Third) of Trusts § 78 cmt. c(4) (2007); *see also id.* § 78 cmt. c(2); *id.* § 38 cmt. e. Likewise, since the fee structures were disclosed in the Agreements, Plaintiffs consented to them and are estopped from arguing that they create a conflict.  *See In re Accounts of Separate Trusts*, 916 N.Y.S.2d 77, 78 (1st Dep't 2011); *Zinn v. Salomon, Smith Barney, Inc.*, 787 N.Y.S.2d 309, 311 (1st Dep't 2005).

### 2.      Servicer Fee Conflict of Interest

BlackRock asserts that HSBC was conflicted because, if the Master Servicer defaulted, HSBC may have been required to assume the Master Servicer's duties, but without additional compensation.  BR Compl. ¶ 505.  But the SSAs provide that in the event the indenture trustee, or anyone else, takes over for the Master Servicer, the new Master Servicer is "entitled to [the same] compensation which the Master Servicer would have been entitled" had it not been replaced.  *See, e.g.*, MLCC 2005-2 SSA § 6.02(a).[50]  Also, as discussed above, Plaintiffs consented to this structure, *Accounts of Separate Trusts*, 916 N.Y.S.2d at 78, and the indenture trustee's fee provided in the Agreements cannot create a conflict of interest, Restatement (Third) of Trusts §§ 78 cmt. c(2), 78 cmt. c(4), 38 cmt. e (2007).

### 3.      Repeat Business Conflict of Interest

BlackRock and Royal Park allege that HSBC was dependent on the Master Servicers because it received repeat business from them.  BR Compl. ¶ 490; RP Compl. ¶¶ 142-143.  But the mere fact that an indenture trustee does repeat business with an entity does not create a conflict of interest.[51]

---

[50] Ex. 12 Chart 18 ("Replacement Master Servicer Compensation").

[51] *Knights of Columbus v. Bank of N.Y. Mellon*, 2013 WL 1822565, at *7 (N.Y. Sup. Ct. Apr. 26, 2013) (defendant did not breach its duty of loyalty when it received the "lion's share" of its trustee business from large banks); *Sterling Fed. Bank, F.S.B. v. DLJ Mortg. Capital, Inc.*, 2010

### 4.    Unrelated Misconduct Conflict of Interest

Royal Park alleges that HSBC was conflicted because it was "involved in and participated in [the Master Servicers'] misconduct."  RP Compl. ¶ 145.  However, nothing in the Complaint describes *how* HSBC was "involved" in the Master Servicers' misconduct.  The Complaint simply asserts that HSBC *was* involved.  *Id.*  This is the kind of conclusory pleading courts should reject.  *Iqbal*, 556 U.S. at 681.

Royal Park also alleges that HSBC and other banks served both as indenture trustees on some RMBS transactions and Sellers or Servicers on others.  RP Compl. ¶ 146.  As discussed above, however, no conflict arises from the mere fact that banks do business together.[52]  Recognizing this deficiency in its Complaint, Royal Park asks the Court to infer that HSBC, as indenture trustee, would overlook Seller or Servicer misconduct in the hopes of receiving the same favorable treatment from other banks on unrelated deals in which HSBC played the role of Seller or Servicer.  *Id.* ¶ 146.  The Complaint, however, does not set forth *any* facts supporting this speculation.  Plaintiffs' failure to plead "specific acts of self-dealing" dooms their claim.  *Ellington*, 837 F. Supp. 2d at 193; *see E.F. Hutton*, 953 F.2d at 972 (holding that "mere hypothetical possibility" of a conflict does not suffice to state a claim); *Elliott Assocs.*, 838 F.2d at 70 (rejecting a fiduciary duty claim based on "bald assertions of conflict[s] of interest").

---

WL 3324705, at *5 (N.D. Ill. Aug. 20, 2010) (applying New York law and finding no conflict arising from the fact that the defendant "regularly acts and is appointed as a trustee" by the trust's depositor (internal quotation marks omitted)); *CFIP Master Fund, Ltd. v. Citibank, N.A.*, 738 F. Supp. 2d 450, 475 (S.D.N.Y. 2010) ($185,000 annually in repeat business does not create conflict of interest); *Page Mill Asset Mgmt. v. Credit Suisse First Bos. Corp.*, 2000 WL 877004, at *2 (S.D.N.Y. June 30, 2000) ("[T]he existence of a conflict of interest can not [sic] be inferred solely from a relationship between an issuer and an indenture trustee that is mutually beneficial and increasingly lucrative."); *see also E.F. Hutton Sw. Props. II, Ltd. v. Union Planters Nat'l Bank,*, 953 F.2d 963, 972 (5th Cir. 1992) (rejecting a claim based on "hypothetical" conflicts of interest).

[52] *Supra* note 51.

BlackRock similarly asserts that HSBC was engaged in misconduct as a Servicer and Seller in other unrelated transactions.  BR Compl. ¶¶ 491-502.  BlackRock, however, does not explain the relevance of HSBC's actions in unrelated transactions or otherwise allege "specific acts of self-dealing."  *Ellington*, 837 F. Supp. 2d at 193.

### 5.    Ministerial Duties Conflict of Interest

BlackRock additionally asserts that HSBC was conflicted because it failed to perform ministerial duties with respect to the handling of mortgage files.  BR Compl. ¶ 506.  But the Agreements provide for the Custodian to handle the loan files, not HSBC.  *See, e.g.*, RAMC 2006-4 Indenture § 2.03(b) ("[T]he parties hereto acknowledge that the functions of the Indenture Trustee with respect to the custody, acceptance, inspection and release of the Mortgage Files . . . shall be performed by the Custodian . . . .").[53]

Moreover, even if HSBC had failed to perform some ministerial act, BlackRock's claim would be for that failure, not an act of "self-dealing" implicating the duty of loyalty.  *See AG Capital Funding Partners*, 866 N.Y.S. at 584; *Ellington*, 837 F. Supp. 2d at 193.  Since BlackRock has not asserted how it was injured by any omission of a ministerial duty, this claim fails.

### III.   The Court Should Strike Plaintiffs' Demand for Consequential Damages As To Agreements Under Which Such Damages Are Unavailable.

The Court should strike the Complaints' demand for damages to the extent that they seek to recover consequential damages—namely, investment losses—in the sixteen trusts with provisions specifically precluding recovery of such damages.  *See* Fed. R. Civ. P. 12(f); *Russell Publ'g Grp., Ltd. v. Brown Printing Co.*, 2014 WL 6790762, at *7-8 (S.D.N.Y. Dec. 2, 2014) (striking demand for consequential damages precluded by limiting clause in contract).

---

[53] Ex. 13 Chart 19 ("Custodian Document Obligations").

For example, section 9.2(xi) of the DBALT 2006-AR5 PSA expressly provides that:

> In no event shall the Trustee be liable, directly or indirectly, for any special, indirect or consequential damages, even if the Trustee has been advised of the possibility of such damages . . . .[54]

Contract provisions limiting the type or extent of damages available are enforceable, *see, e.g.*, *Metro. Life Ins. Co. v. Noble Lowndes Int'l, Inc.*, 618 N.Y.S.2d 882, 885 (N.Y. 1994), particularly in commercial contracts between sophisticated parties, *Russell*, 2014 WL 6790762, at *7. The no-consequential-damages provisions are clearly reasonable allocations of risk. HSBC was paid only $3,500 to $4,000 per year, and no party would agree to the indenture trustee role if it risked consequential damages that are potentially *tens or hundreds of thousands times* larger than the fees received. *See Metro. Life Ins. Co.*, 618 N.Y.S.2d at 885-86.

Plaintiffs seek damages for Holders' alleged investment losses. BR Compl. ¶ 509; RP Compl. ¶ 157; PL Compl. ¶ 465. These damages are consequential because they go beyond the "value of the very performance promised." *Schonfeld v. Hilliard*, 218 F.3d 164, 175 (2d Cir. 2000) (citation and quotation marks omitted). Investment loss and lost profits are commonly considered consequential damages in breach of contract cases. *See, e.g.*, *Russell*, 2014 WL 6790762, at *7 (loss of profits constitutes consequential damages).

The Court should strike Plaintiffs' damages demand for investment losses in trusts with consequential damages prohibitions.

## IV. The Plaintiffs' TIA Claims Should Be Dismissed.

### A. The TIA Does Not Apply To Trusts Governed by PSAs.

At the January 6, 2015 hearing, BlackRock conceded that the TIA does not apply to trusts governed by PSAs in light of the Second Circuit's recent decision in *Policemen's Annuity*, 2014

---

[54] Fifteen other Agreements contain similar provisions precluding consequential damages. Ex. 13 Chart 20 ("Consequential Damages Limitations").

WL 7272269, at *13-14.[55]  The Court likewise should dismiss the TIA claims in the Royal Park

and Phoenix Light Complaints to the extent they relate to PSA trusts.

### B. Plaintiffs Fail To State a Claim Under the TIA for the Indenture Trusts.

Plaintiffs also fail to state a claim under the TIA as to the indenture trusts.  First,

§ 315(a), 15 U.S.C. § 77ooo(a), does not create any independent actionable rights pre-Event of

Default.  Second, although §§ 315(b)-(c), 15 U.S.C. §§ 77ooo(b)-(c), impose obligations on the

indenture trustee upon a default, Plaintiffs have failed adequately to allege the occurrence of

such a triggering event.  Finally, Plaintiffs fail to allege damages under the TIA.

### 1. Section 315(a) of the TIA Does Not Impose Extra-Contractual Obligations on the Trustee.

BlackRock and Royal Park allege that HSBC violated § 315(a) of the TIA by "failing to

perform duties specifically set out in the indenture."  BR Compl. ¶ 526; RP Compl. ¶ 179.  But

§ 315(a) does not impose additional obligations on the trustee; it merely requires the indenture to

contain language limiting the trustee's duties to those in the indenture.  *Policemen's/BNY*, 914 F.

Supp. 2d at 429, *abrogated on other grounds by Policemen's Annuity*, 2014 WL 7272269; 15

U.S.C. § 77ooo(a)(1).  Thus, § 315(a) does not provide a legal basis for relief.

### 2. Plaintiffs Fail to Allege a Default That Would Trigger Trustee Obligations Under Sections 315(b) and (c) of the TIA.

Sections 315(b) and (c) impose obligations upon the trustee in the event of a default.[56]

The TIA looks to the indenture language itself to define default.  15 U.S.C. § 77ooo(c) (limiting

default to how "such term is defined in such indenture"); *see also* American Bar Foundation,

---

[55] The Second Circuit held that PSA certificates are exempt under § 304(a)(2) of the TIA.  *Id*.

[56] Section 315(b) requires the indenture trustee to "give to the indenture security holders . . . notice of all defaults known to the trustee, within ninety days after the occurrence thereof."  15 U.S.C. § 77ooo(b).  Section 315(c) requires the indenture trustee to "exercise in case of default (as such term is defined in such indenture) such of the rights and powers vested in it by such indenture, and to use the same degree of care and skill in their exercise, as a prudent man would exercise."  15 U.S.C. § 77ooo(c).

*Commentaries on Model Debenture Indenture Provisions* 249 (1971) ("[T]he TIA leaves the

definition of 'default' to the discretion of the draftsman.  Most lawyers define 'default' as 'Event

of Default' and the Securities and Exchange Commission has qualified all indentures containing

this definition of 'default.'"); *Dresner Co. Profit Sharing Plan v. First Fid. Bank, N.A.*, 1996 WL

694345, at *4 (S.D.N.Y. Dec. 4, 1996) ("before an event of default, the prudent person standard

does not apply").  As explained above, Plaintiffs fail to allege the occurrence of an Indenture

Event of Default that would trigger any obligations in §§ 315(b) and (c), and so these claims

should be dismissed.[57]

### 3.      Plaintiffs Fail To Allege Damages Under the TIA.

To state a claim under the TIA, a plaintiff must allege injury from the trustee's conduct

while the plaintiff owned the indenture notes.  *Bluebird Partners, L.P. v. First Fid. Bank*, 896 F.

Supp. 152, 157 (S.D.N.Y. 1995).  Here, Plaintiffs do not allege that they have failed to receive

any specific payment of interest or principal under the indenture notes and, unlike in

*Policemen's/BNY*, where plaintiffs had purchased and subsequently sold their notes and then

alleged a drop in value, Plaintiffs here do not allege that they sold their notes and suffered a loss.

914 F. Supp. 2d at 427.  Because Plaintiffs fail to allege an injury they suffered from HSBC's

conduct while they owned the indenture notes, the TIA claim should be dismissed.

## V.      Phoenix Light's Streit Act Claim Should Be Dismissed.

Phoenix Light asserts claims against HSBC under § 124 and § 126(1) of the Streit Act,

N.Y. Real Property Law §§ 124, *et seq*.  PL Compl. ¶¶ 509–517.  The Streit Act, however, "does

not apply to collateral trusts," like the trusts at issue here, whose assets happen to include

---

[57] Although courts have held other plaintiffs alleged the occurrence of an Event of Default for the purposes of stating a claim under the TIA, *see, e.g.*, *Okla. Police Pension & Ret. Sys. v. U.S. Bank Nat'l Ass'n*, 291 F.R.D. 47, 66 (S.D.N.Y. 2013), those decisions are limited to the specific allegations in those complaints.

mortgages; rather, it applies only to "direct[]" investments in real estate mortgages.  *See*

*Prudence Realization Corp. v. Atwell*, 35 N.Y.S.2d 1001, 1005 (1st Dep't 1942), *aff'd*, 290 N.Y.

597 (1943) (per curiam).  Phoenix Light's claims also fail because § 124 does not impose any

duties; it is merely a preamble describing the purposes of the act.  N.Y. Real Prop. Law § 124

("It is the purpose of the legislature, in enacting this article, to . . . ."); *Thompson v. Wallin*, 301

N.Y. 476, 493 (1950) ("[A] preamble enacts nothing, contains no directives and . . . is not made

a part of the . . . [l]aw.").  Further, Phoenix Light's claims under § 126(1) fail because § 126(1) is

triggered only by "an event of default (*as such term is defined in such instrument*)."  *See* N.Y.

Real Prop. Law § 126(1) (emphasis added).  As discussed above, Phoenix Light has not pled the

occurrence of an Event of Default.  Consequently, its § 126(1) claim fails.  Finally, any trust

which is qualified with the SEC and to which the TIA applies are exempt from the Streit Act.

*See* N.Y. Real Prop. Law § 130-k.  This includes FBR 2005-2 and FBR 2005-4.

## VI.    The Court Should Dismiss All Derivative Claims.

The BlackRock Plaintiffs purport to bring their claims "derivatively in the right of the

Trustee and on behalf of the Trusts."  BR Compl. ¶ 222.  Royal Park asserts "alternatively" to its

class-action claims that it may maintain the same claims "derivatively in the right of and for the

benefit of the Covered Trusts against Defendant HSBC."  RP Compl. ¶ 3; *see also id.* at ¶¶ 172-

76.  These derivative claims fail for multiple, independent reasons.

### A.    These Claims Are Direct, Not Derivative.

Courts have treated cases brought against indenture trustees, such as HSBC in the Royal

Park PSA trusts,[58] as direct actions for as long as these trusts have existed.[59]  Similarly, since the

---

[58] The trusts governed by PSAs have no enforcement rights, nor could they.  As a matter of law, New York common-law trusts must sue or be sued in the name of the indenture trustee, as they are not juridical entities.  *See* Uniform Statutory Trust Entity Act, Prefatory Note; *see also*

advent of the private right of action under the TIA, claims against trustees under that statute have always been brought directly, not derivatively.[60]  Indeed, in *Caplin v. Marine Midland Grace Trust Co.*, 406 U.S. 416 (1972), the Supreme Court held that a TIA claim must be brought as a direct action by bondholders.  *Id.* at 428-34.

Royal Park's and BlackRock's claims are direct, not derivative, under *Tooley v. Donaldson, Lufkin, & Jenrette, Inc.*, 845 A.2d 1031, 1039 (Del. 2004), which New York courts have also adopted.  *See, e.g.*, *Yudell v. Gilbert*, 949 N.Y.S.2d 380, 384 (1st Dep't 2012).  The *Tooley* test instructs that "a court should look to [1] the nature of the wrong and [2] to whom the relief should go" to determine whether a claim is direct or derivative.  *See Tooley*, 845 A.2d at 1039.  The first prong of this test addresses whether "the duty breached was owed to" the plaintiff directly.  *Id.*  Under that prong, the BlackRock Plaintiffs' claims are direct because they are based on allegations that HSBC breached duties running to the holders of the notes, including HSBC's purported duty to "give prompt written notice to all Noteholders of Servicer Event of Defaults."  BR Compl. ¶ 284.  Royal Park's claims are likewise direct because they are based on allegations that HSBC breached duties running to the holders of the certificates, including HSBC's purported "duty to notify plaintiff and the class of Events of Default and the

---

Bogart, et al., *The Law of Trusts and Trustees* §§ 1, 594, 712, 869.  Accordingly, no cause of action under the PSAs is legally vested in the trusts as such.

[59] *See, e.g.*, *Meckel v. Cont'l Res. Co.*, 758 F.2d 811 (2d Cir. 1985); *BNP Paribas Mortg. Corp. v. Bank of Am., N.A.*, 949 F. Supp. 2d 486 (S.D.N.Y. 2013); *Ellington Credit Fund, Ltd. v. Select Portfolio Servicing, Inc.*, 837 F. Supp. 2d 162 (S.D.N.Y. 2011); *Racepoint Partners, LLC v. JP Morgan Chase Bank, N.A.*, 902 N.Y.S.2d 14 (N.Y. 2010); *Magten Asset Mgmt. Corp. v. Bank of N.Y.*, 841 N.Y.S.2d 219 (N.Y. Sup. Ct. 2007); *Ray v. Marine Midland Grace Trust Co.*, 359 N.Y.S.2d 28 (N.Y. 1974); *Hazzard v. Chase Nat'l Bank*, 287 N.Y.S. 541 (N.Y. Sup. Ct. 1936), *aff'd*, 282 N.Y. 652 (N.Y. 1940); *Fleisher v. Farmers' Loan & Trust Co.*, 69 N.Y.S. 437 (1st Dep't 1901).

[60] *See, e.g.*, *Zeffiro v. First Pa. Banking & Trust Co.*, 623 F.2d 290, 298 (3d Cir. 1980) ("the bondholders may bring a suit for breach of the indenture provisions"); *LNV Invs., Inc. v. First Fid. Bank*, 935 F. Supp. 1333, 1339 (S.D.N.Y. 1996) ("Congress intended to permit debenture holders to sue"); *Morris v. Cantor*, 390 F. Supp. 817 (S.D.N.Y. 1975).

Warrantors' breaches/defaults."  RP Compl. ¶ 184(c).  Similarly, as shown by the many cases cited above, the alleged duties arising under the common law and the TIA have always been seen as running to trust beneficiaries and, therefore, are enforceable in direct suits.[61]

Even if the injuries alleged by BlackRock and Royal Park apply to all Holders equally (which they do not because of varying payment priorities), that would not be dispositive of the direct/derivative distinction.  *Tooley* clarified the law in this respect.  *See Tooley*, 845 A.2d at 1037 (holding that "a direct, individual claim of stockholders that does not depend on harm to the corporation can also fall on all stockholders equally, *without the claim thereby becoming a derivative claim*") (emphasis added); *see also AHW Inv. P'ship v. Citigroup, Inc.*, 980 F. Supp. 2d 510, 516-18 (S.D.N.Y. 2013) (same).[62]

 These claims are also direct under the second prong of the *Tooley* test, which addresses "to whom the relief should go."  *Tooley*, 845 A.2d at 1039.  Because the BlackRock Plaintiffs and Royal Park plainly seek recovery for themselves and not for the trusts, their claims cannot be derivative.  *See id*.  The Royal Park trusts, for example, are Real Estate Mortgage Investment Conduit (REMIC) pass-through vehicles.  "[I]ncome received by the [Trusts] . . . is passed through to the various [Certificateholders], without being subject to federal income tax."  *LaSalle Bank Nat'l Ass'n v. Nomura Asset Capital Corp.*, 180 F. Supp. 2d 465, 467 n.1 (S.D.N.Y. 2001).  Accordingly any recovery would pass directly to holders of certificates, and the proposition that Royal Park seeks recovery "in the right of and for the benefit of the Covered Trusts" is a fiction.  RP Compl. ¶ 172.

---

[61] *See supra* notes 59, 60.

[62] In *Dallas Cowboys Football Club, Ltd. v. Nat'l Football League Trust*, 1996 WL 601705, (S.D.N.Y. Oct. 18, 1996), this Court held a claim against a trustee to be derivative based on the then-governing standard, which turned on whether the alleged injury was "equally applicable" to all beneficiaries of the trust.  *Id*. at *2.  This is not the case here where payment priority rights vary among the Holders.  In any event, the standard changed under *Tooley*.

**B.    The BlackRock Plaintiffs' Derivative Claims Fail Under the Delaware Statutory Trust Act.**

All of the trusts at issue in this Motion, on behalf of which the BlackRock Plaintiffs purport to sue, *see* BR Compl. Ex. 1, are Delaware statutory trusts.  Statutory trusts are a relatively recent development; the Delaware Statutory Trust Act ("DSTA") was enacted in 1988.  Unlike PSA trusts and traditional indenture trusts, Delaware statutory trusts are juridical entities that could give rise to derivative litigation, as recognized by the DSTA.  The BlackRock Plaintiffs, however, are not proper derivative plaintiffs as to these statutory trusts because they do not qualify as "beneficial owners" under the DSTA.  *See* 12 Del. C. § 3816(b) ("In a derivative action, the plaintiff must be a beneficial owner at the time of bringing the action.").  The DSTA defines "[b]eneficial owner" as "any owner of a beneficial interest in a statutory trust, the fact of ownership to be determined and evidenced . . . in conformity to the applicable provisions of the governing instrument of the statutory trust."  *Id.* § 3801(a).  The BlackRock Plaintiffs do not own a beneficial interest in the Delaware statutory trusts here.  The governing agreements specifically distinguish between the notes that the BlackRock Plaintiffs hold and Certificates.  Only the latter constitute "equity certificate[s]" qualifying as "beneficial interest[s]" under 12 Del. C. § 3801(a).  *See, e.g.*, Ex. 3 (FBR 2005-2 Amended and Restated Owner Trust Agreement) § 1.1 (defining the term "Certificate" as "an equity certificate representing a beneficial interest in the Trust").  By contrast, BlackRock holds notes that "qualify as indebtedness of the Issuer secured by the Trust Fund." *See, e.g.,* FBR 2005-2 Indenture § 2.12.  Accordingly, the BlackRock Plaintiffs lack derivative standing.  *See CML V, LLC v. Bax*, 28 A.3d 1037, 1041 (Del. 2011).

C.     **BlackRock and Royal Park Cannot Satisfy the Contemporaneous Ownership Requirement.**

Even assuming that BlackRock and Royal Park could properly assert derivative claims on behalf of the trusts, their derivative claims nevertheless fail because they cannot satisfy the contemporaneous ownership requirement.  BlackRock does not satisfy the DSTA requirement that a derivative plaintiff establish that it was a "beneficial owner . . . [a]t the time of the transaction of which the plaintiff complains."  12 Del C. § 3816(b)(1).  Similarly, Royal Park cannot satisfy the requirement under New York law that it held its interest "at the time of the transaction of which [it] complains."  N.Y. BCL § 626(b).

BlackRock and Royal Park concede that they did not own their certificates during the entirety of the alleged wrongdoing.  *See* BR Compl. ¶ 225 ("Plaintiffs are Certificateholders and have been beneficial owners of RMBS in each of the Trusts during all *or a large portion of* HSBC's wrongful course of conduct alleged herein." (emphasis added)); RP Compl. ¶ 173 ("Plaintiff is the owner of RMBS in each of the Covered Trusts during all *or a large portion of* HSBC's wrongful course of conduct alleged [in Plaintiff's Complaint]." (emphasis added)).  Indeed, the Complaints allege much conduct that predated Plaintiffs' acquisition of certificates and notes.  For example, Royal Park alleges that revelations in 2007 and 2008 "revealed that many of the Warrantors of the Covered Trusts routinely engaged in lending practices that would have likely rendered their [representations and warranties] false."  RP Compl. ¶ 67.  The contemporaneous ownership requirement is not satisfied where, as here, "the crux of the Complaint objects to conduct that occurred well before [Plaintiff] purchased [its certificates]."  *In re Bank of New York Derivative Litig.*, 320 F.3d 291, 299 (2d Cir. 2003).

BlackRock and Royal Park also seek to invoke the exception from the contemporaneous-ownership requirement for persons who acquired their interests by operation of law.  *See* 12 Del.

C. § 3816(b)(2) (BlackRock trusts); N.Y. BCL § 626(b) (Royal Park trusts).  The BlackRock

Plaintiffs plead that "interests [in the trusts] devolved upon [them] by operation of law in

accordance with New York General Obligations Law § 13-107."  BR Compl. ¶ 15.  Royal Park

pleads the same.  *See* RP Compl. ¶ 173.  These arguments are fatally flawed because § 13-107

deals with the assignment of claims, not the acquisition of shares.  Neither the BlackRock

Plaintiffs' notes nor Royal Park's certificates devolved upon them by operation of law pursuant

to § 13-107, which is an exception to the general rule that assignment of claims must be express

under New York law.  *See Consol. Edison, Inc. v. Ne. Utils.*, 318 F. Supp. 2d 181, 186

(S.D.N.Y.), *rev'd on other grounds*, 426 F.3d 524 (2d. Cir. 2005).  An interest devolves by

operation of law "only if it occurs automatically by application of some legal mandate or

doctrine, not by the voluntary actions of private parties," including "by gift or contract."  *Pessin*

*v. Chris-Craft Indus., Inc.*, 586 N.Y.S.2d 585, 587 (1st Dep't 1992).

Furthermore, it would completely undermine the purpose of the contemporaneous

ownership requirement to apply § 13-107 to permit the BlackRock Plaintiffs and Royal Park to

purchase derivative suits.  *See Roy v. Vayntrub*, 841 N.Y.S.2d 221 (N.Y. Sup. Ct. 2007)

("Because the contemporaneous ownership rule fosters the public policy of inhibiting

speculation in litigation, it must, as a general matter, be rigorously enforced." (quotations and

citations omitted)).  Accordingly, the BlackRock Plaintiffs and Royal Park cannot invoke § 13-

107 to satisfy the contemporaneous ownership requirement.[63]

---

[63] Even if § 13-107 applies in the derivative context (which it does not), the BlackRock Plaintiffs
and Royal Park have failed to plead facts adequate to establish that § 13-107 actually governed
their acquisitions.  *See Racepoint Partners LLC v. JPMorgan Chase Bank*, 2006 WL 3044416, at
*3-5 (S.D.N.Y. Oct. 26, 2006); *see also Semi-Tech Litig., LLC v. Bankers Trust Co.*, 272 F.
Supp. 2d 319, 330 (S.D.N.Y. 2003).  Furthermore, § 13-107 applies only to bonds, not to
certificates like those Royal Park holds, which are more akin to equity.  In addition, federal law,
and not § 13-107, governs the assignment of TIA claims, which remain with the injured party

49

### D.       BlackRock Fails to Plead Demand Futility As To the Owner Trustee.

Even if the BlackRock Plaintiffs could sue on behalf of the Delaware statutory trusts (which they cannot, *see* section VI.B above), they have failed to plead demand futility as to those trusts.  The Owner Trustee (which is not HSBC) is the proper demand party for the BlackRock Delaware trusts.  The BlackRock Plaintiffs have failed to assert demand futility as to the Owner Trustee.  Accordingly, their derivative claims should be dismissed.

Under the DSTA, beneficial owners (which BlackRock is not) may bring derivative actions only "if persons with authority to do so have refused to bring the action or if an effort to cause those persons to bring the action is not likely to succeed."  12 Del. C. § 3816(a); *see also id.* § 3816(c) ("In a derivative action, the complaint shall set forth with particularity the effort, if any, of the plaintiff to secure initiation of the action by the persons with authority to do so, or the reasons for not making the effort.").  The governing documents for the BlackRock Delaware trusts make clear that the only entity with authority to sue on behalf of the trust is the Owner Trustee, which is not HSBC.  *See, e.g.*, Ex. 3 § 5.6(a) (authorizing the Owner Trustee to "initiat[e] . . . any claim or lawsuit by the Trust . . . and the compromise of any action, claim or lawsuit brought by or against the Trust").

While the BlackRock Plaintiffs allege demand futility as to HSBC, *see* BR Compl. ¶ 174, they fail to allege demand futility as to the Owner Trustee, which is the proper demand party under the DSTA.  Therefore, their derivative claims should be dismissed.

### <u>CONCLUSION</u>

For the foregoing reasons, the Court should dismiss the Complaints.

---

rather than traveling to subsequent purchasers of the debt security.  *See Excelsior Fund, Inc. v. JP Morgan Chase Bank, N.A.*, 2007 WL 950134, at *4 (S.D.N.Y. Mar. 28, 2007).

Dated:  January 23, 2015             Respectfully submitted,

By:    /s/  George A. Borden
          George A. Borden
          Kevin M. Hodges (*pro hac vice*)[64]
          Andrew W. Rudge  (*pro hac vice*)[65]
          Edward C. Reddington (*pro hac vice*)[66]
          Vidya Atre Mirmira (*pro hac vice*)[67]
          WILLIAMS & CONNOLLY LLP
          725 Twelfth Street, N.W.
          Washington, DC 20005
          Telephone: (202) 434-5000
          Facsimile: (202) 434-5029
          gborden@wc.com
          khodges@wc.com
          arudge@wc.com
          ereddington@wc.com
          vmirmira@wc.com

          Michael O. Ware
          Jennifer M. Rosa[68]
          MAYER BROWN LLP
          1675 Broadway
          New York, N.Y. 10019
          (212) 506-2500
          mware@mayerbrown.com
          jrosa@mayerbrown.com

          *Counsel for HSBC Bank USA, N.A.*

---

[64] Mr. Hodges has been admitted *pro hac vice* in the BlackRock and Royal Park cases.
[65] Mr. Rudge has been admitted *pro hac vice* in the BlackRock case.
[66] Mr. Reddington's application for admission *pro hac vice* is pending in the BlackRock case.
[67] Ms. Mirmira has been admitted *pro hac vice* in the Royal Park case.
[68] Ms. Rosa has appeared in the BlackRock and Phoenix Light cases.

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on January 23, 2015, I electronically filed the foregoing document

with the Clerk of the Court using the CM/ECF system which will send notification of such filing

to all counsel of record in this matter who are on the CM/ECF system.


/s/  George A. Borden
George A. Borden