USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 6/1/15

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------------------X

ROYAL PARK INVESTMENTS SA/NV,
individually and on behalf of all others similarly
situated,

            Plaintiffs,

        - against -

HSBC BANK USA, NATIONAL ASSOCIATION,
as Trustee,

            Defendant.

--------------------------------------------------------------X

BLACKROCK BALANCED CAPITAL
PORTFOLIO (FI), et al.,

            Plaintiffs,

        -against-

HSBC BANK USA, NATIONAL ASSOCIATION,

            Defendant.

--------------------------------------------------------------X

PHOENIX LIGHT SF LIMITED, et al.,

            Plaintiffs,

        -against-

HSBC BANK USA, NATIONAL ASSOCIATION,

            Defendant.

--------------------------------------------------------------X

OPINION AND
ORDER

14-cv-8175 (SAS)

14-cv-9366 (SAS)

14-cv-10101 (SAS)

1

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

## I.    INTRODUCTION

Plaintiffs in three related cases[1] allege the failure of HSBC Bank USA, National Association ("HSBC") to discharge its duties as a trustee for residential mortgage backed securities ("RMBS") trusts, including trusts that issue certificates and are governed by pooling and servicing agreements ("PSA Trusts") and Delaware statutory trusts that issue notes pursuant to Indentures ("Indenture Trusts").  This Court previously determined that it has supplemental jurisdiction over the *BlackRock* plaintiffs' state law claims arising out of the PSA Trusts.[2]  HSBC now moves to dismiss all claims, and moves to strike plaintiffs' demand for consequential damages.[3]  For the following reasons, HSBC's motion to dismiss is

---

[1]    Though the motion to dismiss addresses three Complaints, the same arguments are also addressed to the Complaint in the *National Credit Union Adminsistration Board et al. v. HSBC Bank USA, N.A.*, No. 15 Civ. 2144 ("*NCUA*") action.  *See* 4/27/15 Letter from George A. Borden, Counsel to HSBC, to the Court.  HSBC has separately moved to dismiss the *NCUA* Complaint, addressing only issues unique to that Complaint.  That motion is not yet fully submitted and is not addressed in this Opinion and Order.

[2]    *See BlackRock Balanced Capital Portfolio v. HSBC Bank USA, Nat'l Ass'n*, No. 14 Civ. 9366, 2015 WL 1501283 (S.D.N.Y. Mar. 31, 2015).

[3]    *See* Memorandum in Support of HSBC Bank USA, N.A.'s Motion to Dismiss Pursuant to Federal Rule of Civil Procedure 12(b)(6) and Motion to Strike Pursuant to Federal Rule of Civil Procedure 12(f) ("Def. Mem."); 4/15/15 Letter from Borden to the Court; 4/27/15 Letter from Borden to the Court.

granted in part and denied in part, and its motion to strike is denied.

## II.   BACKGROUND[4]

Plaintiffs assert claims arising from HSBC's role as trustee for two hundred eighty-three trusts:  two hundred seventy-one in *BlackRock*, three in *Royal Park*, and eleven in *Phoenix Light*.[5]  Twenty-eight of the trusts are Indenture Trusts that issued debt obligations, or notes.  Indenture Trusts involve three agreements: a trust agreement creating the Delaware statutory trust that issues the notes, an indenture containing the terms of the notes (the "Indenture"); and a sales and servicing agreement setting forth the servicing obligations as to the underlying mortgage loans (the "SSA").  The remaining trusts (including all three trusts in the *Royal Park* action) are PSA trusts that issued certificates, representing ownership interests.   The PSA Trusts are governed by the PSA itself, which governs the terms of the certificates and the servicing of the loans.[6]  Both the PSAs and the

---

[4]     The facts below are taken from the Royal Park Investments SA/NV Class Action Complaint and Alternative Verified Derivative Action ("RP Compl."), the BlackRock Balanced Capital Portfolio (FI) Verified Derivative Complaint and Alternative Class Action ("BR Compl."); and the Phoenix Light SF Limited Complaint ("PL Compl.").

[5]     Several of the trusts are at issue in multiple Complaints.

[6]     *See* Plaintiffs' Joint Memorandum of Law in Opposition to Defendant's Motions to Dismiss Pursuant to Rule 12(b)(6) ("Opp. Mem.") at 6.

Indentures provide that they are construed in accordance with New York law.[7]

Both the PSA Trusts and Indenture Trusts are species of RMBS trusts.[8]  Investment bank entities called "Sponsors" and "Depositors" acquired the loans generated by originators and pooled and conveyed them into the Trusts (collectively, "Sellers").[9]  The Master Servicers and their subservicers (collectively, "Servicers") service and administer the loans.[10]  The principal and interest payments are passed through to plaintiffs and other beneficial certificateholders and noteholders ("Holders").[11]

The Sellers provide contractual representations and warranties to the Trusts attesting to the completeness of the mortgage loan files and the credit quality and characteristics of the loans and borrowers.[12]  The Sellers agree to cure,

---

[7]     *See* BR Compl. ¶ 212, PL Compl. ¶ 27.

[8]     *See* RP Compl. ¶ 37; BR Compl. ¶ 2; PL Compl. ¶¶ 4, 28.

[9]     *See* RP Compl. ¶ 38; BR Compl. ¶ 2; PL Compl. ¶¶ 29–30.

[10]    *See* RP Compl. ¶ 43; BR Compl. ¶ 2; PL Compl. ¶ 31.

[11]    *See* RP Compl. ¶ 43; BR Compl. ¶ 2; PL Compl. ¶¶ 33–34.  The RMBS are registered in "street name" to Cede & Co., as nominee for the Depository Trust Company, a central securities depositary and clearing agency. Cede & Co. has no beneficial interest in the RMBS or Trusts.  *See* Opp. Mem. at 5 n.3.

[12]    *See* RP Compl. ¶¶ 48–51; BR Compl. ¶¶ 241–247; PL Compl. ¶¶ 35, 41, 45.

substitute, or repurchase mortgages that materially breach these representations and warranties.[13]  Similarly, the Servicers agree to service the loans in accordance with customary and usual standards.[14]

The Agreements impose limited, contractual duties on HSBC as trustee.  Except for an implied duty to avoid clear conflicts and perform its ministerial duties with due care, the trustee's obligations are strictly defined by the terms of the Agreements.[15]  Upon the occurrence of a contractually defined Event of Default, HSBC must exercise its rights and powers under the Agreements using the same degree of care and skill as a prudent person would exercise under the circumstances in the conduct of his or her own affairs.[16]

## III.   STANDARD OF REVIEW

### A.   Motion to Dismiss Under Rule 12(b)(6)

In deciding a motion to dismiss pursuant to Rule 12(b)(6), the court must "accept[] all factual allegations in the complaint as true and draw[] all reasonable inferences in the plaintiff's favor."[17]  The court evaluates the

---

[13]   *See id.*

[14]   *See* RP Compl. ¶¶ 53–54; BR Compl. ¶¶ 266–268; PL Compl. ¶ 13.

[15]   *See* RP Compl. ¶ 6; BR Compl. ¶ 213; PL Compl. ¶ 35.

[16]   *See* RP Compl. ¶ 57; BR Compl. ¶ 260; PL Compl. ¶ 49.

[17]   *Grant v. County of Erie*, 542 Fed. App'x 21, 23 (2d Cir. 2013).

sufficiency of the complaint under the "two-pronged approach" set forth by the Supreme Court in *Ashcroft v. Iqbal*.[18]  Under the first prong, a court may "begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth."[19]  For example, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."[20]  Under the second prong of *Iqbal*, "[w]hen there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief."[21]  A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[22]  "The plausibility standard is not akin to a probability requirement" because it requires "more than a sheer possibility that a defendant has acted unlawfully."[23]

　　　　When deciding a motion to dismiss, "a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and

---

[18]　　*See* 556 U.S. 662, 678–79 (2009).

[19]　　*Id.* at 679.

[20]　　*Id.* at 678.

[21]　　*Id.* at 679.

[22]　　*Id.* at 678.

[23]　　*Id.* (quotation marks omitted).

documents incorporated by reference in the complaint."[24]   A court may also

consider a document that is not incorporated by reference "where the complaint

'relies heavily upon its terms and effect,' thereby rendering the document 'integral'

to the complaint."[25]   In an action under the Trust Indenture Act ("TIA"), a court

may refer to the Indenture and its exhibits.[26]

### B.    Leave to Amend

Federal Rule of Civil Procedure 15(a)(2) provides that, other than

amendments as a matter of course, "a party may amend [its pleading] only by leave

of court or by written consent of the adverse party."[27]   Although "[t]he Court

should freely give leave when justice so requires,"[28] it is "within the sound

discretion of the district court to grant or deny leave to amend."[29]   When a motion

---

[24]     *DiFolco v. MSNBC Cable LLC*, 622 F.3d 104, 111 (2d Cir. 2010) (citing *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002)).

[25]     *Id*. (quoting *Mangiafico v. Blumenthal*, 471 F.3d 391, 398 (2d Cir. 2006)).

[26]     *See Field v. Trump*, 850 F.2d 938, 949 (2d Cir. 1988).

[27]     *Slayton v. American Express Co.*, 460 F.3d 215, 226 n.10 (2d Cir. 2006) (citation and quotation marks omitted).

[28]     Fed. R. Civ. P. 15(a)(2).

[29]     *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007) (citation omitted).

to dismiss is granted, "'[i]t is the usual practice . . . to allow leave to replead.'"[30]

Where a plaintiff inadequately pleads a claim and cannot offer additional

substantive information to cure the deficient pleading, granting leave to replead is

futile.[31]

## IV.   APPLICABLE LAW

### A.   Breach of Contract

"Under New York law, the elements of a cause of action for breach of

contract are (1) the existence of a contract, (2) performance of the contract by one

party, (3) breach by the other party, and (4) damages suffered as a result of the

breach."[32]   A plaintiff "is required only to provide defendants with a 'short, plain

notice' of the claims against them pursuant to Rule 8."[33]   Nevertheless, the

complaint must provide "specific allegations" as to the contract's parties, terms,

and breached provisions.[34]

---

[30]     *Schindler v. French*, 232 Fed. App'x 17, 19 (2d Cir. 2007) (quoting *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991)).

[31]     *See Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000).

[32]     *Beautiful Jewellers Private Ltd. v. Tiffany & Co.*, 438 Fed. App'x 20, 21–22 (2d Cir. 2011).

[33]     *Diesel Props S.r.l. v. Greystone Bus. Credit II LLC*, 631 F.3d 42, 52 (2d Cir. 2011) (citations omitted).

[34]     *Abu Dhabi Commercial Bank v. Morgan Stanley & Co.*, 651 F. Supp. 2d 155, 173 (S.D.N.Y. 2009) (citations omitted).

**B.** **Tort Claims**

**1.** **Fiduciary Duty of an Indenture Trustee**

"'[U]nlike the ordinary trustee, who has historic common-law duties imposed beyond those in the trust agreement, an indenture trustee is more like a stakeholder whose duties and obligations are exclusively defined by the terms of the indenture agreement.'"[35]  This is true regardless of whether the trust is an indenture trust or a PSA.[36]  Prior to an Event of Default, an indenture trustee's duty is governed solely by the terms of the indenture, with two exceptions: a trustee must still "(1) avoid conflicts of interest, and (2) perform all basic, non-discretionary, ministerial tasks with due care."[37]  "These two pre-default obligations are not construed as '*fiduciary* duties,' but as obligations whose breach

---

[35]  *Bank of N.Y. v. Tyco Int'l Grp., S.A.*, 545 F. Supp. 2d 312, 324 n.79 (S.D.N.Y. 2008) (quoting *Meckel v. Continental Res. Co.*, 758 F.2d 811, 816 (2d Cir. 1985)).  *Accord AG Capital Funding Partners, L.P. v. State Street Bank & Trust Co.*, 11 N.Y.3d 146, 157 (2008).

[36]  *See Greenwich Fin. Servs. Distressed Mortg. Fund 3 LLC v. Countrywide Fin. Corp.*, 603 F.3d 23, 29 (2d Cir. 2010).  *See also Bank of N.Y. Mellon v. Walnut Place LLC*, 819 F. Supp. 2d 354, 364–65 & n.6 (S.D.N.Y. 2011).

[37]  *Ellington Credit Fund, Ltd. v. Select Portfolio Servicing Inc.*, 837 F. Supp. 2d 162, 191 (S.D.N.Y. 2011).  *Accord LNC Invs., Inc. v. First Fidelity Bank, Nat'l Ass'n,* 935 F. Supp. 1333, 1347 (S.D.N.Y. 1996).

may subject the trustee to '*tort* liability.'"[38]

Following a contractually defined "Event of Default," the indenture trustee's obligations "'come more closely to resemble those of an ordinary fiduciary, regardless of any limitations or exculpatory provisions contained in the indenture.'"[39]  Even after the Event of Default, "[t]he scope of the trustee's obligation . . . is still circumscribed by the indenture. . . .  The trustee is not required to act beyond his contractually conferred rights and powers."[40]  However, though the trustee's obligations remain limited by the scope of the indenture, it now "'must, as prudence dictates, exercise those singularly conferred prerogatives in order to secure the basic purpose of any trust indenture, the repayment of the underlying obligation.'"[41]

"'[T]he existence of a conflict of interest can not be inferred solely from a relationship between an issuer and an indenture trustee that is mutually

---

[38]   *Ellington Credit Fund,* Ltd., 837 F. Supp. 2d at 192 (quoting *AG Capital Funding Partners, L.P.*, 11 N.Y.3d at 157) (emphasis in original).

[39]   *BNP Paribas Mortg. Corp. v. Bank of America, N.A.*, 778 F. Supp. 2d 375, 401 (S.D.N.Y. 2011) (quoting *Beck v. Manufacturers Hanover Trust Co.*, 632 N.Y.S. 2d 520, 527–28 (1st Dep't 1995)).

[40]   *Beck*, 632 N.Y.S. 2d at 528.

[41]   *Phillip v. Rothschild*, No. 90 Civ. 0708, 2000 WL 1263554, at *5 (S.D.N.Y. Sept. 5, 2000) (quoting *Beck*, 632 N.Y.S.2d at 528).

beneficial and increasingly lucrative.'"[42]   In considering conflict of interest claims, the Second Circuit has disregarded "bald assertions of conflict," and has instead required a showing that the trustee "personally benefitted" from the disputed action.[43]   A trustee must have "'an interest [in the entities in question] of such a substantial nature that there would be a temptation to consider its own advantage in making the sale and not to consider solely the advantage to the beneficiaries of the trust.'"[44]   A fee arrangement expressly authorized by the trust's governing agreements generally cannot create a conflict of interest.[45]

## 2.   Duplicative Contract Claims

"It is well settled that 'a simple breach of contract is not to be considered a tort unless a legal duty independent of the contract itself has been violated.'"[46]   However, "under New York law, parallel fraud and contract claims

---

[42]   *CFIP Master Fund, Ltd. v. Citibank, N.A.*, 738 F. Supp. 2d 450, 475 (S.D.N.Y. 2010) (quoting *Page Mill Asset Mgmt. v. Credit Suisse First Boston Corp.*, No. 98 Civ. 6907, 2000 WL 877004, at *2 (S.D.N.Y. June 30, 2000)).

[43]   *Elliott Assocs. v. J. Henry Schroder Bank & Trust Co.*, 838 F.2d 66, 70 (2d Cir. 1988).

[44]   *In re Accounts of Separate Trusts*, 81 A.D.3d 456 (1st Dep't 2011) (alterations in original)  (quoting Restatement (Third) of Trusts § 170, cmt. (1)(i)).

[45]   *See* Restatement (Third) of Trusts § 78 cmt. c(2), c(4).  *See also id.* § 38 cmt. e.

[46]   *OP Solutions, Inc. v. Crowell & Moring*, 900 N.Y.S.2d 48, 49 (1st Dep't 2010) (quoting *Clark-Fitzpatrick, Inc. v. Long Island R.R.*, 521 N.Y.S.2d

may be brought if the plaintiff (1) demonstrates a legal duty separate from the duty to perform under the contract; (2) points to a fraudulent misrepresentation that is collateral or extraneous to the contract; or (3) seeks special damages that are unrecoverable as contract damages."[47]

### 3.    Economic Loss Doctrine

"Plaintiffs who enter into transactions that are of a contractual nature — even if no contract exists — are limited to 'the benefits of their bargains' unless they can show 'a legal duty separate and apart from obligations bargained for and subsumed within the transaction.'"[48]  This doctrine "serves two purposes: (1) it protect[s] defendants from disproportionate, and potentially limitless, liability; and (2) it disentangles contract and tort law by restricting plaintiffs who suffer economic losses to the benefits of their bargains."[49]  Therefore, deciding whether

---

653, 656 (1987)).

[47]    *Merrill Lynch & Co. v. Allegheny Energy, Inc.*, 500 F.3d 171, 183 (2d Cir. 2007) (citing *Bridgestone/Firestone Inc. v. Recovery Credit Servs.*, 98 F.3d 13, 20 (2d Cir. 1996)).  *Accord Clark-Fitzpatrick, Inc.*, 521 N.Y.S.2d at 656.

[48]    *In re MF Global Holdings Ltd. Inv. Litig.*, 998 F. Supp. 2d 157, 185 (S.D.N.Y. 2014) (quoting *King Cnty., Wash. v. IKB Deutsche Industriebank AG*, 863 F. Supp. 2d 288, 304–05 (S.D.N.Y. 2012), *amended in part*, 2012 WL 11896326 (S.D.N.Y. Sept. 28, 2012).  *Accord Hydro Investors, Inc. v. Trafalgar Power Inc.*, 227 F.3d 8, 18 (2d Cir. 2000).

[49]    *King Cnty., Wash.*, 863 F. Supp. 2d at 302.

the doctrine applies encompasses a "focused duty analysis" that is a "policy-driven

scrutiny of whether a defendant had a duty to protect a plaintiff against purely

economic losses."[50]  "The fact that the duty breached [] is independent of any

contract . . . does not allow evasion of the economic loss rule, which presents a

second, distinct barrier."[51]  However, "in claims against professionals, '[a] legal

duty independent of contractual obligations may be imposed by law as an incident

to the parties' relationship.  Professionals . . . may be subject to tort liability for

failure to exercise reasonable care, irrespective of their contractual duties,'" and

irrespective of the economic loss doctrine.[52]

### C.    Streit Act

Article 4A of the New York Real Property Law, or the "Streit Act"

was enacted to regulate "all mortgage investments" where: (i) all or part of the

underlying properties are located in the state, (ii) the trustee transacts business with

respect to the investments in New York, or (iii) the trustee is authorized to do

---

[50]      *Id.*

[51]      *Manhattan Motorcars, Inc. v. Automobili Lamborghini, S.p.A.*, 244
F.R.D. 204, 220 (S.D.N.Y. 2007).

[52]      *Hydro Investors, Inc.*, 227 F.3d at 18 (quoting *17 Vista Fee Assocs. v.
Teachers Ins. and Annuity Ass'n of America*, 693 N.Y.S.2d 554, 560 (1st Dep't
1999)).

business in the state.[53]  It dictates that "in the case of an event of default (as such term is defined in such instrument)," the indenture trustee is obligated to "exercise such of the rights and powers vested in the trustee by such instrument, and to use the same degree of care and skill in their exercise as a prudent man would exercise or use under the circumstances in the conduct of his own affairs."[54]  The Streit Act "does not apply to collateral trusts."[55]  Rather, it applies only to direct investments in real estate mortgages.[56]  Furthermore, any trust that is qualified with the Securities and Exchange Commission ("SEC") and to which the TIA applies is exempt from the Streit Act.[57]

## D.   The Trust Indenture Act

The TIA provides that instruments to which it applies must be issued under an indenture that has been qualified by the SEC.[58]  The requirements of such

---

[53]   *See* N.Y. Real Prop. Law § 124.

[54]   *Id.* § 126(1).

[55]   *Prudence Realization Corp. v. Atwell*, 35 N.Y.S.2d 1001, 1005 (1st Dep't 1942), *aff'd*, 290 N.Y. 597 (1943).

[56]   *See id.*

[57]   *See* N.Y. Real Prop. Law § 130-k.

[58]   *See generally* 15 U.S.C. §§ 77eee-77ggg.  "A 'trust indenture' is a contract entered into between a corporation issuing bonds or debentures and a trustee for the holders of the bonds or debentures, which, in general, delineates the rights of the holders and the issuer."  *Upic & Co. v. Kinder-Care Learning Ctrs.,*

14

indentures are "designed to vindicate a federal policy of protecting investors."[59] Because the interests of a PSA Trust are "'certificate[s] of interest or participation in two or more securities having substantially different rights and privileges,' namely, the numerous mortgage loans held by each trust," PSA Trusts are exempted from the TIA and are instead governed by New York State law.[60]

Section 315 of the TIA sets out the duties and responsibilities of the indenture trustee.[61] Section 315(a) states the indenture trustee "shall not be liable except for the performance of such duties as are specifically set out in such indenture" and, with some exceptions, may accept as true the statements given to it in certificates conforming with the Indenture.[62] However, it also states a trustee "shall examine the evidence furnished to it . . . to determine whether or not such

---

*Inc.*, 793 F. Supp. 448, 450 (S.D.N.Y. 1992).

[59]   *Bluebird Partners, L.P. v. First Fid. Bank, N.A. New Jersey*, 85 F.3d 970, 974 (2d Cir. 1996) (explaining that the law was "enacted because previous abuses by indenture trustees had adversely affected 'the national public interest and the interest of investors in notes, bonds[, and] debentures . . . .'") (quoting 15 U.S.C. § 77bbb(a)).

[60]   *Retirement Bd. of the Policemen's Annuity and Benefit Fund of the City of Chicago v. Bank of New York Mellon*, 775 F.3d 154, 166–70 (2d Cir. 2014) (quoting 15 U.S.C. § 77ddd(a)(2)).

[61]   *See* 15 U.S.C. § 77ooo.

[62]   *Id.* § 77ooo(a).

evidence conforms to the requirements of the indenture."[63]

Section 315(b) states that the "trustee shall give to the indenture security holders . . . notice of all defaults known to the trustee, within ninety days after the occurrence thereof."[64]  However, "except in the case of default in the payment of the principal of or interest on any indenture security" the trustee is protected in withholding that information if the indenture trustee believes withholding such notice is in the best interests of the Noteholders.[65]

Section 315(c) states that an indenture trustee is to "exercise in case of default (as such term is defined in such indenture)" all of the powers available to it under the indenture agreement, using "the same degree of care and skill in their exercise, as a prudent man would exercise" in conducting his own affairs.[66]

Section 323(b) limits a plaintiff's recovery to actual damages.[67]  In

---

[63]    *Id.  Accord Semi-Tech Litig., LLC v. Bankers Trust Co.*, 353 F. Supp. 2d 460, 474 (S.D.N.Y. 2005) (plain language of statute and legislative history imply this is a separate duty).

[64]    15 U.S.C. § 77ooo(b).

[65]    *Id.*

[66]    *Id.* § 77ooo(c).

[67]    *See id.* § 77www(b) ("[N]o person permitted to maintain a suit for damages under the provisions of this subchapter shall recover, through satisfaction of judgment in one or more actions, a total amount in excess of his actual damages on account of the act complained of.").

general, courts have held this language to mean victorious plaintiffs would be entitled "to recover only their out-of-pocket losses, or the difference between what they paid for the certificates and what they received for them."[68]

## V.   DISCUSSION

### A.   Sufficiency of Allegations (Contract Claims)

HSBC asserts that plaintiffs' contract claims fail for numerous reasons.  With regard to plaintiffs' claims relating to the Sellers' breaches of representations and warranties, HSBC argues that plaintiffs (1) fail to allege specific breaches of representations and warranties; (2) fail to allege that HSBC had actual knowledge of such breaches; and (3) fail to allege that HSBC had enforcement obligations for all trusts.  With regard to plaintiffs' claims relating to HSBC's post-Event of Default duties, HSBC contends that plaintiffs (1) fail to allege the occurrence of Events of Default, as defined in the various Agreements; and (2) fail to allege HSBC's responsible officers' knowledge of such Events of Default.

### 1.   Claims Relating to Sellers' Breaches of Representations and Warranties

#### a.   Allegations of Breaches of Representations and

---

[68]      *LNC Investments, Inc. v. First Fidelity Bank*, No. 92 Civ. 7584, 1997 WL 528283, at *34 (S.D.N.Y. Aug. 27, 1997) (citing *Barr v. McGraw-Hill, Inc.*, 710 F. Supp. 95, 98 (S.D.N.Y. 1989)).

**Warranties**

HSBC argues that the plaintiffs have failed to allege any "breaches of specific representations and warranties made in connection with specific loans in specific trusts."[69]  The Second Circuit has required plaintiffs to prove their claim "loan-by-loan and trust-by-trust."[70]  Thus, according to HSBC, plaintiffs' claims fail because instead of alleging specific representations and warranties in connection with specific loans that were breached, plaintiffs instead "detail . . . systemic and widespread breaches."[71]

In *Retirement Board of the Policemen's Annuity and Benefit Fund of the City of Chicago v. Bank of New York Mellon*, the Second Circuit held that named plaintiffs in a putative class action did not have standing to assert claims on behalf of absent class members relating to trusts in which the named plaintiff had not invested.  The test for class standing includes asking whether the trustee's conduct "'implicate[d] the same set of concerns' as [the trustee's] alleged failure to

---

[69]     Def. Mem. at 14.

[70]     *Retirement Bd. of the Policemen's Annuity and Benefit Fund of the City of Chicago*, 775 F.3d at 162.

[71]     Opp. Mem. at 12.  However, *Royal Park* plaintiffs have alleged specific examples of loans within the trusts with breaches of representations and warranties and provided specific representations and warranties that were breached.  *See* RP Compl. ¶¶ 95–104.

18

take action with respect to defaults in other trusts in which Plaintiffs did not invest."[72]  The court noted that the trustee's alleged misconduct would need to be proved "loan-by-loan and trust-by-trust," which would require "examining its conduct with respect to each trust."[73]  Thus, "even proof that [the trustee] *always* failed to act when it was required to do so would not prove [plaintiffs'] case, because they would still have to show which trusts actually had deficiencies that required [the trustee] to act in the first place."[74]  Because of the "significant differences in the proof that will be offered for each trust," the court held that plaintiffs did not have the "necessary stake in litigating" claims related to trusts in which they did not invest.[75]  The court therefore concluded that the plaintiffs' claims did not implicate the "same set of concerns" as those of absent class members, and affirmed the district court's dismissal of those claims for lack of standing.[76]

HSBC attempts to use this decision to import a heightened pleading

---

[72]   *Retirement Bd. of the Policemen's Annuity and Benefit Fund of the City of Chicago*, 775 F.3d at 161 (quoting *NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*, 693 F.3d 145, 162 (2d Cir. 2012)).

[73]   *Id.* at 162.

[74]   *Id.*

[75]   *Id.* at 163.

[76]   *Id.*

requirement into the RMBS context, but nothing in this decision implicates plaintiffs' burden *at the pleading stage*.  Plaintiffs' claims are contract and tort claims governed by Rule 8, as interpreted by *Twombly* and *Iqbal*.  Thus, the applicable standard is whether plaintiffs have pleaded "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[77]  Certainly, at trial or summary judgment, plaintiffs must prove their claims "loan-by-loan and trust-by-trust."[78]  But at the pleading stage, plausibility will suffice.

Plaintiffs' complaints are replete with allegations of pervasive breaches of representations and warranties by the Sellers.[79]  Each complaint details the "routine abandonment of their underwriting guidelines; the routine fabrication of borrower and loan information; massive breaches of their [representations and warranties]; and the engagement in predatory and abusive lending."[80]  These factual allegations raise a plausible inference that there were in fact breaches of the

---

[77]     *Iqbal*, 556 U.S. at 678 (quotation marks omitted).

[78]     *Retirement Bd. of the Policemen's Annuity and Benefit Fund of the City of Chicago*, 775 F.3d at 162.

[79]     *See* RP Compl. ¶¶ 67–94; BR Compl. ¶¶ 285–380, 421–461; PL Compl. ¶¶ 168, 178–399.

[80]     RP Compl. ¶ 70.

Sellers' representations and warranties with respect to the loans included in the

trusts at issue in each of these cases.  As Judge Katherine Forrest concluded,

> Indeed, based on the allegations of the [Complaint], it would be
> implausible to assume that somehow all of the mortgage loans
> underlying the MBS miraculously avoided being originated with
> practices generally utilized [by the seller] and its contracted
> affiliates at that time.

> At the pleading stage, plaintiffs cannot be required to identify
> breaches of representations and warranties with respect to the
> individual loans in the specific trusts—such information is, at this
> stage, [] uniquely in the possession of defendants.  Rather,
> plaintiffs satisfy their burden where their allegations "raise a
> reasonable expectation that discovery will reveal evidence proving
> their claim."[81]

Therefore, plaintiffs have sufficiently alleged breaches of representations and

warranties with respect to the loans in the trusts in each case.

### b. Allegations of Actual Knowledge of Breaches of Representations and Warranties

HSBC argues that all of plaintiffs' allegations amount only to

constructive knowledge of breaches, and not actual knowledge, as required by the

Agreements.  Plaintiffs, again, contend that HSBC confuses the standard of proof

with the plausibility requirement at the pleading stage.  Plaintiffs in all actions have

---

[81]     *Policemen's Annuity and Benefit Fund of the City of Chicago v. Bank of America, NA* ("*Policemen's/BofA II*"), 943 F. Supp. 2d 428, 442 (S.D.N.Y. 2013) (quoting *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511 (2002)), *abrogated on other grounds sub nom. by Retirement Bd. of the Policemen's Annuity and Benefit Fund of the City of Chicago*, 775 F.3d 154.

pleaded HSBC's actual knowledge of the Sellers' breaches of representations and

warranties by alleging

> (1) the high number of borrower defaults; (2) the enormous losses
> to the Trusts; (3) the collapse of the certificates' and notes' credit
> ratings; (4) reports and litigation concerning common originators'
> systemic abandonment of underwriting standards, as well as
> common Sponsors' pervasive disregard of prudent securitization
> standards; (5) litigation contending the specific loans in some of
> the specific Trusts had been misrepresented; and (6) HSBC's
> involvement in putback efforts involving the same Sellers.[82]

"[T]he question is not whether *in fact* the Trustee[] had [actual

knowledge] — that is a factual determination left for trial.  Instead, the question . .

. is whether plaintiffs have pled plausible facts supporting allegations" of actual

knowledge.[83]  Based on plaintiffs' detailed allegations, it is indeed plausible to

infer that HSBC had actual knowledge of breaches in representations and

warranties in the specific loans at issue.  *How* HSBC gained this actual knowledge,

or whether in fact it had actual knowledge, may be determined through discovery.

If, after discovery, plaintiffs cannot prove that HSBC had actual knowledge

regarding the loans at issue here, HSBC may move for summary judgment.  But at

---

[82]     Opp. Mem. at 14.  *See also* RP Compl. ¶¶ 67–104; BR Compl. ¶¶
381–420, 462–472; PL Compl. ¶¶ 155–175.

[83]     *Policemen's/BofA II*, 943 F. Supp. 2d at 442–43.

this time, plaintiffs' allegations will suffice.[84]

### c. Allegations of Enforcement Obligations Relating to Breaches of Representations and Warranties

HSBC argues that for thirteen trusts, it had no enforcement

obligations with respect to Sellers' breaches of representations and warranties.[85]

Plaintiffs point to language in two of those trusts suggesting that HSBC did have

such an obligation.[86]  For the remaining eleven, plaintiffs acknowledge that another

party had the *initial* enforcement obligation, but argue that after an Event of

Default, HSBC's "prudent person" obligations were triggered.  HSBC responds

that even if the "prudent person" standard was triggered, that standard does not

create new contractual duties, but only describes the standard of care with which it

must perform already existing contractual duties.

---

[84]    HSBC's argument that it had no obligation to undertake an investigation to discover if there were loan-level, trust-specific breaches is beside the point.  Even assuming *arguendo* that it had no duty to investigate, it is plausible to infer that HSBC in some way gained actual knowledge of breaches based on plaintiffs' allegations.

[85]    *See* Def. Mem. at 13 & nn.16–17.

[86]    Plaintiffs are correct only with respect to one trust, FHLT 2006-C. With respect to WFHET 2006-2, however, plaintiffs misread the contractual language.  Though the first sentence sets out HSBC's duty to "enforc[e] the Depositor's obligations," the following sentences describe the manner of this enforcement — after receiving written notice from the Custodian or the Securities Administrator.  Plaintiffs do not allege that HSBC received such notice.

For example, in one of the Indentures, section 5.03(c) states that once an Event of Default has occurred, HSBC "may . . . proceed to protect and enforce its rights and the rights of the Noteholders, by such appropriate Proceedings as the Indenture Trustee shall deem most effective to protect and enforce any such rights . . . ."[87] Section 6.01(a) of the same Indenture then states that "[i]f an Event of Default has occurred and is continuing, the Indenture Trustee shall exercise the rights and powers vested in it by this Indenture and use the same degree of care and skill in its exercise as a prudent person would exercise or use under the circumstances in the conduct of such person's own affairs."[88] The first section gives HSBC the right to enforce the Noteholders' rights using appropriate proceedings, and the second section obligates HSBC to exercise its rights as a prudent person would. It is certainly plausible, as plaintiffs allege, that a prudent person would have taken actions to enforce the Sellers' repurchase obligations. HSBC had the right to do so, under section 5.03(c), but failed to "exercise the . . . power[] vested in it by [the] Indenture" as a prudent person would have done in the

---

[87] Indenture Prudent Person Clauses, FMIC 2004-3 Indenture, Ex. 9, Chart 9 to Declaration of George A. Borden in Support of Defendant HSBC Bank USA, N.A.'s Motion to Dismiss and Motion to Strike ("Borden Decl.") at 1.

[88] *Id.*

conduct of that person's own affairs.[89]   Thus, plaintiffs have sufficiently alleged

that, by failing to enforce these repurchase obligations, HSBC failed to act as a

prudent person and breached the contract.

### 2.   Claims Relating to HSBC's Post-Event of Default Obligations

Plaintiffs allege that after a contractually defined Event of Default, the

Agreements require HSBC to (1) notify Holders of its occurrence and (2) act as a

prudent person in the exercise of its rights and powers under the Agreements.

HSBC contends that plaintiffs have failed to allege Indenture Events of Default,

SSA Services Events of Default, or PSA Events of Default.   HSBC further argues

that plaintiffs have failed to allege HSBC's actual knowledge of such Events of

Default.

### a.   Allegations of Events of Default

HSBC first argues that plaintiffs have failed to allege an Indenture

Event of Default.   The Indentures define an Event of Default to implicate only the

conduct of the Issuer (*i.e.*, the Trust itself).   Because the *BlackRock* plaintiffs do

not allege any duties that the Issuer breached, and the *Phoenix Light* plaintiffs

assert only "a single conclusory allegation of an alleged Issuer breach," HSBC

contends that neither Complaint adequately pleads an Indenture Event of Default.

---

[89]     *Id.*

In response, plaintiffs highlight language in the Indenture obligating the Issuer to "enforce any rights to the mortgage loans" and "preserve or defend title to the Trust Estate and the rights of the Indenture Trustee and the Noteholders in such Trust Estate against the claims of all persons and parties."[90]  As such, "known and unremedied Seller and Servicer defaults constitute . . . a violation of the issuer's duties under the Indenture."[91]

The Indentures define an "Indenture Event of Default" to occur upon, among other events, a default in the performance of the Issuer or any representation or warranty of the Issuer proving to be materially incorrect.[92] The Indentures also require the Issuer to "enforce any rights with respect to the Trust Fund" and "preserve and defend title to the Trust Fund and the rights of the Indenture Trustee, the Noteholders and the Note Insurer in such Trust Fund against the claims of all persons and parties."[93]

---

[90]     BR Compl. ¶ 278.  *See also* PL Compl. ¶ 418.

[91]     Opp. Mem. at 20.

[92]     *See, e.g.*, Indenture Event of Default Definitions, MLCC 2005-2 Indenture, Ex. 8 Chart 6 to Borden Decl., at 2

[93]     Issuer Protection of Trust Fund Provisions, FBRSI 2005-1 Indenture, Ex. E Chart 22 to Declaration of Andrew W. Rudge in Support of Defendant HSBC Bank USA, N.A.'s Motion to Dismiss and Motion to Strike ("Rudge Decl."), at 2.

Each Indenture Trust also entered into an SSA with, among others, the

Sellers and Servicers of the Trust.  The SSA required the Seller and Servicer to

make certain representations and warranties, and to cure or repurchase defective

loans.  As discussed previously, plaintiffs have sufficiently alleged breaches in

representations and warranties and the Sellers' and Servicers' failure to cure these

breaches.  "While these alleged failures constitute[] direct breaches of the SSA,

they also violate[] the issuer's duties under the Indenture.  After all, if [Sellers]

failed to cure or repurchase defective mortgages, the issuer similarly failed to

'enforce any rights with respect to [the Trust Fund],' as the Indenture required it to

do."[94]  Thus, plaintiffs have adequately alleged an Indenture Event of Default.

The PSAs and SSAs define an Event of Default to occur after the

Servicer (1) materially breaches its contractual obligations, (2) is notified in

writing of its breach by specified parties, including HSBC, and (3) does not cure

---

[94]    *Retirement Bd. of the Policemen's Annuity and Benefit Fund of the
City of Chicago v. Bank of New York Mellon* ("*Policemen's/BNYM*"), 914 F. Supp.
2d 422, 432 (S.D.N.Y. 2012), *abrogated on other grounds by* 775 F.3d 154 (2d
Cir. 2014).  HSBC's argument that the Issuer's obligation to "enforce any rights"
was limited to ownership interests fails.  Nothing in the language of that clause
limits this obligation to ownership interests — in fact, the language is sweepingly
broad and by its plain terms encompasses *any* rights with respect to the Trust Fund.
Moreover, the clause is included in a section entitled "Protection of Trust Fund,"
which is similarly not limited to protection of ownership rights.

the breach within a specified time.[95]  HSBC argues that because plaintiffs have not

alleged the second element, written notice to the Servicer, they have failed to allege

an Event of Default under the PSAs and SSAs.  Plaintiffs respond that, as one of

the parties who was required to give this notice to the Servicer, HSBC cannot rely

on its own failure to give notice to escape liability.

While it is unclear whether HSBC had a *duty* to give notice, the

Agreements specifically designate HSBC as one of the parties who could give the

required notice to trigger an Event of Default.  As such, HSBC is insisting on the

performance of a condition that HSBC itself had the power to satisfy.  "'[I]t has

been established for over a century that a party may not insist upon performance of

a condition precedent when its non-performance has been caused by the party

itself.'"[96]  Under New York law "[t]he implied covenant of good faith and fair

dealing requires a promisor to reasonably facilitate occurrence of a condition

precedent by either refraining from conduct which would prevent or hinder the

---

[95]     *See* SSA Servicer Event of Default Definitions, Ex. 8 Chart 7 to
Borden Decl.; PSA Event of Default Definitions, Ex. 9 Chart 8 to Borden Decl.

[96]     *Bank of New York*, 545 F. Supp. 2d at 324 n.81 (quoting *Lomaglio
Assocs. v. LBK Marketing Corp.*, 892 F. Supp. 89, 93 (S.D.N.Y. 1995)).  *Accord
Oklahoma Police Pension and Ret. Sys. v. U.S. Bank Nat'l Ass'n*, 291 F.R.D. 47,
70 (S.D.N.Y. 2013) ("[T]he trustee cannot rely on its own failure to give notice to
escape its own liability."), *abrogated on other grounds sub nom. by Retirement Bd.
of the Policemen's Annuity and Benefit Fund of the City of Chicago*, 775 F.3d 154.

occurrence of the condition, or by taking positive action to cause its occurrence."[97]

HSBC took no steps to fulfill the condition, though it had the power and (plaintiffs

allege) the knowledge to do so.  As HSBC failed to act in good faith to facilitate

the occurrence of a condition precedent — the requirement of written notice — the

condition is excused.[98]  Therefore, plaintiffs have sufficiently alleged an Event of

Default under the PSAs and SSAs.[99]

### b.    Allegations of Actual Knowledge of Events of Default

HSBC also contends that plaintiffs have failed to allege HSBC's

responsible officers' actual knowledge of Events of Default, as required by the

Agreements.  For the reasons discussed above regarding HSBC's actual knowledge

of breaches of representations and warranties, this argument fails.  Plaintiffs have

alleged HSBC's responsible officers' receipt of written notice of Seller breaches

---

[97]    *Cauff, Lippman & Co. v. Apogee Fin. Grp., Inc.*, 807 F. Supp. 1007, 1022 (S.D.N.Y. 1992).

[98]    *See id.*

[99]    HSBC also argues that for twenty-seven trusts, SSA Servicer Events of Default do not trigger prudent person obligations, but, as to those trusts, prudent person obligations attach upon an Issuer Event of Default.  As discussed above, plaintiffs have sufficiently alleged Issuer Events of Default.  HSBC also argues that for twelve trusts, SSA Servicer Events of Default do not trigger notice requirements.  Though HSBC has listed the trusts in a footnote, it has not provided the Court with a reference to the actual language of the trusts.  Therefore I cannot address this argument at this time.

from monoline insurers[100] and Holders.[101]  Plaintiffs have alleged HSBC was the

target of government investigations, prosecutions, and settlements with many of

the Servicers to the Trusts for the same alleged improper servicing practices.[102]

Plaintiffs also allege HSBC's responsible officers' receipt of written notice from

Holders to other RMBS trusts regarding the same servicing violations by the same

servicers to the Trusts here.[103]  Again, at trial or summary judgment, plaintiffs must

produce proof of actual knowledge with regard to these trusts on the part of

HSBC's responsible officers.  At the pleading stage, however, plaintiffs have met

their burden.

### B.    Matters of Law (Contract Claims)

#### 1.    No-Action Clauses

Each Agreement at issue includes a No-Action Clause.  This clause

prohibits Holders from pursuing any action unless (1) the Holder has provided

---

[100]    "Monoline insurance is a form of credit enhancement that involves purchasing insurance to cover losses from any defaults. . . . [M]onoline insurers must provide notice of a breach of representation and warranty to the responsible loan sponsor and parties to the agreement, including the trustee."  PL Compl. ¶ 171.

[101]    *See* BR Compl. ¶¶ 398–403, 411–413; PL Compl. ¶¶ 170–175.

[102]    *See* RP Compl. ¶¶ 115, 188; BR Compl. ¶¶ 463–467; PL Compl. ¶¶ 160, 429.

[103]    *See* BR Compl. ¶¶ 468–471.

notice of default to the Trustee and (2) some percentage, usually twenty-five percent, of Holders make a written request on HSBC to file suit against a third party and offer HSBC reasonable indemnity for its costs in pursuing the suit. Plaintiffs do not allege that they met these conditions.  Rather, plaintiffs point to authority that holds that the pre-suit requirements of a No-Action Clause may not be construed to bar a Holder's claims against an indenture trustee, because it would be "absurd to require the debenture holders to ask the trustee to sue itself."[104]

Though HSBC argues that *Cruden v. Bank of New York* is distinguishable on its facts, the Second Circuit's holding is clear:  a No-Action Clause does not apply to debenture holder suits against the indenture trustee, as it would make little sense to ask the trustee to sue itself.  The same logic holds true in these cases.  HSBC appears to be making a policy argument that excusing compliance with the No-Action Clause provides an end-run around the requirement and effectively nullifies the clause.  But HSBC has not provided *any* authority that would permit the Court to ignore *Cruden*. Therefore, plaintiffs' noncompliance with the No-Actions Clauses is excused.

### 2.    Standing

---

[104]     *Cruden v. Bank of New York*, 957 F.2d 961, 968 (2d Cir. 1992). *Accord Ellington Credit Fund, Ltd.*, 837 F. Supp. 2d at 186 (excusing noncompliance with no action clause in a suit against trustee of mortgage-backed securities trusts).

Twenty-five Agreements contain Negating Clauses that limit the parties who may enforce the Agreement.  Only the parties to the Agreement and named third-party beneficiaries, including "Certificateholders" and "Noteholders" are entitled to rights under the Agreements.[105]  A Certificateholder or Noteholder is defined as the person in whose name a Certificate or Note is registered.[106]  By contrast, a Certificate or Note *Owner* is defined as the beneficial owner of a certificate or note.[107]  Here, plaintiffs are the certificate and note owners, while Cede & Co., the nominee of The Depository Trust Company ("DTC") is the holder of record.

Plaintiffs contend that "'Holder' was intended to include the beneficial Holders of RMBS (*i.e.*, 'Owners'),"[108] but the plain terms of the Agreements belie this claim.  "[U]nder New York law, the effectiveness of a negating clause to preclude third-party beneficiary status is well-established . . . ."[109]  Plaintiffs further argue that they have standing as Cede & Co.'s principals, or

---

[105]    *See* Negating Clauses, Ex. 10 Chart 13 to Borden Decl.

[106]    *See* Certificateholder/Noteholder vs. Certificate Owner/Note Owner Definitions, Ex. 10 Chart 14 to Borden Decl.

[107]    *See id.*

[108]    Pl. Opp. at 34.

[109]    *India.Com, Inc. v. Dalal*, 412 F.3d 315, 321 (2d Cir. 2005).

as third-party beneficiaries of last resort.  However, plaintiffs have cited no

authority in which a court allowed these arguments to overcome a clear negating

clause barring enforcement by unnamed third-party beneficiaries.

Nevertheless, plaintiffs' lack of standing can be cured.  A beneficial

owner who lacks standing may receive authorization to sue from the registered

Holder, and that authorization may be granted subsequent to the filing of the

lawsuit.[110]  Indeed, *Royal Park* plaintiffs have already begun this process.[111]  In

order to cure plaintiffs' lack of standing for the twenty-five Agreements at issue,

plaintiffs must obtain authorizations to sue from the registered Holder, at plaintiffs'

expense.

### 3.    Claims Relating to HSBC's Breach of Document Delivery and Servicing Related Certifications (*Phoenix Light*)

*Phoenix Light* plaintiffs plead additional breaches relating to HSBC's

---

[110]    *See Applestein v. Province of Buenos Aires*, 415 F.3d 242 (2d Cir. 2005).

[111]    *See* The Bank of New York Mellon's Letter to The DTC, Ex. 6 to Declaration of Timothy A. Delange in Support of Plaintiffs' Joint Memorandum of Law in Opposition to Defendant's Motions to Dismiss Pursuant to Rule 12(b)(6). HSBC responds that the Agreements do not allow the registered Holders to authorize other parties to sue, but has not cited any clause of the Agreement to support this contention.  Therefore this argument fails, as contract rights are freely assignable unless there is a specific clause prohibiting assignment.  *See, e.g.*, *Corbett v. Firstline Sec., Inc.*, 687 F. Supp. 2d 124, 129 (E.D.N.Y. 2009).

alleged duties to make certifications pursuant to Regulation AB,[112] taking physical possession of mortgage loan files, and preparing and delivering certification and exception reports.  HSBC argues that these claims must be dismissed.  *First*, HSBC contends that the obligations to take physical possession of complete mortgage files and the obligations to prepare and deliver certification and exception reports are contractually assigned to the Custodian, and not HSBC.[113]  *Second*, HSBC argues that even if it had these obligations, the claims are time barred by the statute of limitations, which is at most six years.[114]

According to HSBC, all of these obligations ended in 2006 or 2007.  The reporting obligation under Regulation AB terminated in the fiscal year after the trust closed in 2006, when HSBC filed the relevant suspension notice.[115]  Similarly, all alleged breaches relating to receiving mortgage loan files and creating certification and exception reports occurred at or near the time the trusts

---

[112]    *See* 17 C.F.R. § 229.1100 *et seq.*  HSBC argues, and plaintiffs do not contest, that this regulation applies only to four of the eleven trusts in the *Phoenix Light* Complaint.  *See* 70 Fed. Reg. 1506-01 (applying regulation only to public deals issued after December 31, 2005).

[113]    *See* Other Party Document Receipt and Review Obligations (*Phoenix Light*), Ex. 11 Chart 16 to Borden Decl.

[114]    *See* N.Y. CPLR § 213.

[115]    *See* 17 C.F.R. § 249.323 (notice of suspension of duty to file reports).

closed.  Plaintiffs respond that the statute of limitations is not a bar because "where a contract provides for continuing performance over a period of time, each breach may begin the running of the statute anew such that accrual occurs continuously and plaintiffs may assert claims for damages occurring up to six years prior to filing of the suit."[116]  *Phoenix Light* plaintiffs argue that the Complaint adequately alleges continuing duties relating to document delivery and servicing certifications.

The claims relating to Regulation AB are time-barred.  This Regulation creates an obligation that terminated in 2007.  Thus, the cause of action accrued no later than 2007, and the six-year statute of limitations bars any action based on the breach of this regulation.  With respect to document obligations, most (but not all) of the claims fail because the relevant contractual language states that these obligations belong to the Custodian, and not HSBC.[117]  Only five trusts assign these duties to HSBC.[118]  Nevertheless, the clauses in these trusts relating to initial document obligations set a time period during which HSBC must undertake

---

[116]     *Airco Alloys Div. v. Niagara Mohawk Power Corp.*, 430 N.Y.S.2d 179, 186 (4th Dep't 1980).

[117]     *See* Document Obligations (All Trusts), Ex. I Chart 21 to Rudge Decl.

[118]     *See id.* at 7–10 (FHLT 2006-C PSA § 2.03(c); OWNIT 2005-4 PSA §§ 2.02, 2.03; OWNIT 2005-2 PSA §§ 2.02, 2.03; OWNIT 2005-3 PSA §§ 2.02, 2.03; STALT 2006-1F PSA § 2.02(a)).

these duties — within 60 to 90 days after the closing date of the trusts.[119]  Only

three trusts contain language that plausibly gives rise to a continuing obligation

with respect to document obligations.[120]  Thus, plaintiffs' document delivery and

certification claims are dismissed with the exception of claims relating to the three

trusts listed above.[121]

### C.    Tort Claims (Matters of Law)

Plaintiffs assert claims for (1) breach of trust/fiduciary duty (all

plaintiffs), (2) negligence (*BlackRock* and *Phoenix Light*), (3) negligent

misrepresentation (*Phoenix Light*), and (4) failing to avoid conflicts of interest (all

plaintiffs).  HSBC argues that these causes of action fail as a matter of law.  For the

reasons below, HSBC's motion to dismiss is granted as to claims (2) and (3), and

denied as to claims (1) and (4).

#### 1.    Fiduciary Duty Claims

HSBC argues that it was not in a fiduciary relationship with the

---

[119]    *See id.*

[120]    *See id.* at 8 (OWNIT 2005-4 PSA § 2.03; OWNIT 2005-2 PSA § 2.03; OWNIT 2005-3 PSA § 2.03).

[121]    Plaintiffs make broad arguments regarding their allegations of HSBC's breach of fiduciary duties.  Because these arguments are not related to the specific allegations of HSBC's document delivery and certification obligations, they are addressed elsewhere in this Opinion.

plaintiffs. This is correct before an Event of Default, as HSBC's duty to avoid conflicts of interests and duty to perform its functions with due care are not considered fiduciary duties under New York law.[122]  However, after an Event of Default, an indenture trustee takes on a special fiduciary duty to exercise its powers in order to secure the trust.[123]  Thus, insofar as plaintiffs allege a post-Event of Default breach of fiduciary duty, they properly state a claim, in that "fidelity to the terms of an indenture does not immunize an indenture trustee against claims that the trustee has acted in a manner inconsistent with his or her fiduciary duty of undivided loyalty to trust beneficiaries."[124]  To the extent that plaintiffs plead a post-Event of Default breach of HSBC's duty of loyalty, HSBC's motion to dismiss these claims is denied.

### 2.    Negligence Claims

HSBC argues that each of plaintiffs' tort claims fail because they are duplicative of the plaintiffs' contract claims. HSBC is correct only with regard to plaintiffs' negligence claims. *BlackRock* plaintiffs claim that HSBC "negligently failed to promptly enforce the sellers' obligations," which is effectively a claim

---

[122]    *See AG Capital Funding Partners, L.P.,* 11 N.Y.3d at 157.

[123]    *See Beck*, 632 N.Y.S.2d at 528.

[124]    *BNP Paribas Mortg. Corp.*, 778 F. Supp. 2d at 401.

that HSBC violated its contractual obligation to force others to cure.[125]  Similarly, *Phoenix Light* plaintiffs allege that "HSBC owed . . . Plaintiffs[] duties under the PSA . . . [and] HSBC performed or failed to perform its responsibilities in a grossly inadequate and negligent manner."[126]  These are again better defined as claims that HSBC was negligent in performing its duties under the contracts.  Therefore, both claims are dismissed.[127]

### 3.   Negligent Misrepresentation Claim

Because plaintiffs allege only monetary losses, without  property damage or physical injury, the negligent misrepresentation claim is barred by New York's economic loss doctrine.  There is no special duty for HSBC to refrain from negligently making misrepresentations to Certificateholders.  Plaintiffs are sophisticated commercial parties who can bargain over what information HSBC

---

[125]   BR Compl. ¶ 550.  *See also id.* ¶ 545.

[126]   PL Compl. ¶ 500.

[127]   Plaintiffs' remaining tort claims are not duplicative as they arise out of a separate, extra-contractual duty.  *See Sommer v. Federal Signal Corp.*, 583 N.Y.S.2d 550, 551 (3d Dep't 1992).  HSBC had an independent duty to perform its nondiscretionary ministerial duties with due care and to avoid conflicts of interest. *See Ellington Credit Fund, Ltd.* 837 F. Supp. 2d at 191.  It also had a post-Event of Default fiduciary duty.  *See id.*  It is irrelevant that plaintiffs claim that while violating these duties, HSBC was *also* breaching the contracts.  The fiduciary duties were independently created by New York courts for fear that "broad exculpatory provisions" would excuse indenture trustees from operating in the best interest of the certificateholders.  *Beck*, 632 N.Y.S.2d at 527.

must reveal and may then sue for breach of contract if such information is not provided.[128]  This is especially true in the indenture trust context, where the trustees' duties are circumscribed by contract, with a few narrow exceptions. Therefore, *Phoenix Light*'s negligent misrepresentation claim is dismissed.

### 4.    Conflict of Interest Claims

HSBC argues that plaintiffs fail to properly allege a conflict of interest between HSBC and the Sellers of the Trusts.  Plaintiffs first claim that (1) the Agreements provided HSBC would be paid a flat fee regardless of how much work it did for the trusts and (2) the Agreements provided that if the Master Servicer defaulted HSBC may have been required to assume the Master Servicer's duties without additional compensation.  Plaintiffs' second contention is incorrect as a factual matter, as HSBC would have been allowed to take the Master Servicer's fees as payment for additional work.[129]  Regardless, the fee arrangements were expressly disclosed to plaintiffs,[130] and therefore cannot sustain a conflict of

---

[128]     *Manhattan Motorcars, Inc.*, 244 F.R.D. at 220.

[129]     *See* Replacement Master Servicer Compensation, Ex. 12 Chart 18 to Borden Decl.

[130]     *See* BR Compl. ¶ 504; RP Compl. ¶ 144.

interest claim.[131]  Plaintiffs may argue that these fee arrangements *induced* HSBC to commit a breach of contract or a tort, but they may not argue that the fee arrangements *alone* constitute a conflict of interest.

Plaintiffs also allege that HSBC was conflicted because it had repeated business with the Master Servicers and therefore was beholden to them.[132] The mere fact that an indenture trustee does repeat business with an entity does not create a conflict of interest.[133]  However, plaintiffs' allegations go further.  They plead that HSBC was involved with the Master Servicers' misconduct, helped facilitate it, or looked the other way in these cases so that the Master Servicers would return the favor when the roles were reversed.[134]  Viewing the allegations of the Complaints as a whole,[135] plaintiffs have raised the plausible inference that HSBC was beholden to the Master Servicers and therefore conflicted, and it would be premature to dismiss these claims at this stage.  Therefore, HSBC's motion with respect to these claims is denied.

---

[131]     *See* Restatement (Third) of Trusts § 78 cmt. c(2), c(4). *See also id.* § 38 cmt. e.

[132]     *See* BR Compl. ¶ 490; RP Compl. ¶¶ 142–143.

[133]     *See CFIP Master Fund, Ltd.* 738 F. Supp. 2d at 475.

[134]     *See* RP Compl. ¶¶ 145–146; BR Compl. ¶¶ 491–502.

[135]     *See National Credit Union Admin. Bd. v. Wachovia Capital Mkts.*, No. 13 Civ. 6719, 2014 WL 1795294, at *2 (S.D.N.Y. May 6, 2014).

**D.     Streit Act Claims (*Phoenix Light*)**

*Phoenix Light* plaintiffs bring a claim under the Streit Act, arguing

that HSBC failed to uphold its statutorily defined duty to act as a prudent person

upon the occurrence of an Event of Default.[136]  As a preliminary matter, HSBC

argues that *Phoenix Light*'s claims arising from section 124 of the Streit Act fail,

because that is a preliminary section that does not create any duties.[137]  This is

correct, and any claims arising from that section of the Streit Act are dismissed.

HSBC also argues that the Streit Act does not apply to any of the

trusts because they are collateral trusts.[138]  The Streit Act defines "mortgage

investments" to include "bonds, notes, or other evidence of indebtedness . . .

secured by a mortgage or mortgages on real property . . . ."[139]  A PSA Trust is

formed when mortgage loans are pooled into a trust and shares representing

certificates of participation in the underlying mortgage loans are issued to

investors.[140]  *Prudence Realization Corp.* has no bearing on the question, because

---

[136]     *See* PL Compl. ¶ 515.

[137]     *See* New York Real Prop. Law § 124.

[138]     *See* Def. Mem. at 44 (citing *Prudence Realization Corp. v. Atwell*, 35
N.Y.S.2d 1001, 1005 (1st Dep't 1942)).

[139]     New York Real Prop. Law § 125(1).

[140]     *See Retirement Bd. of the Policemen's Annuity & Benefit Fund of the
City of Chicago*, 775 F.3d at 165.

the trust there held shares in *another entity*, which in turn held property, including mortgages.  Because of the degree of separation, the court held that the trust was a collateral trust that did not "deal[] directly with real estate," and therefore the Streit Act did not apply.[141]  By contrast, the trusts here directly hold mortgages on real property, and therefore the Streit Act applies.

HSBC also argues that the Streit Act exempts any trust indenture that is qualified upon filing a registration statement with the SEC under the TIA.[142] Despite plaintiffs' complaints that this issue should not be adjudicated on a motion to dismiss, determining which trusts fall under the TIA is a matter of law that can be decided as a preliminary matter.  Trusts FBR 2005-2 and FBR 2005-4 are therefore exempt from the Streit Act for this reason and *Phoenix Light*'s claims under the Act are dismissed as to these Trusts.[143]  However, HSBC has not pointed to any other *Phoenix Light* trust that falls under this exception, and therefore HSBC's motion to dismiss *Phoenix Light*'s Streit Act claim is denied with respect to the remaining Trusts.

### E.    TIA Claims

---

[141]    *Prudence Realization Corp.*, 35 N.Y.S.2d at 1005.

[142]    Def. Mem. at 44.  *See also* New York Real Prop. Law § 130-k; 15 U.S.C. § 77iii(a).

[143]    *See* SEC filings, Exs. K and L to Rudge Decl.

Plaintiffs allege violations stemming from Sections 315(a), 315(b) and 315(c) of the TIA.[144]  As a preliminary matter, the Second Circuit has held that the TIA does not apply to PSA Trusts.[145]  Therefore, all claims arising under the TIA with regard to those Trusts are dismissed.

### 1.    Section 315(a)

Plaintiffs argue that because the TIA requires the indenture trustee to abide by the terms of the Indenture, HSBC violated the TIA every time it failed to uphold its duties under the contract.[146]  As HSBC argues, this contention misreads the TIA.  Section 315(a)(1) does not impose any additional duties upon the trustee; it merely requires the indenture to contain language limiting the trustee's duties to those in the indenture.[147]  Because plaintiffs have no right of action under this section based solely on HSBC's violation of the Indenture, the section 315(a) claims are dismissed.

### 2.    Sections 315(b) and (c)

---

[144]    *See* RP Compl. ¶ 179; BR Compl. ¶ 526.

[145]    *See Retirement Bd. of the Policemen's Annuity and Benefit Fund of the City of Chicago*, 775 F.3d at 166–70.

[146]    *See* RP Compl. ¶ 179; BR Compl. ¶ 526; PL Compl. ¶ 179.

[147]    *See Policemen's/BNYM*, 914 F. Supp. 2d at 429.  *See also* 15 U.S.C. § 77ooo(a).

43

HSBC first argues that these claims should be dismissed because plaintiffs have not properly alleged a default under the TIA. Section 315(b) requires the indenture trustee to give "notice of all defaults known to the trustee."[148] No further description of "default" is provided in that section. By contrast, section 315(c) states that "[t]he indenture trustee shall exercise in case of default (as such term is defined in such indenture) such of the rights and powers vested in it by such indenture, and to use the same degree of care and skill in their exercise, as a prudent [person] would exercise or use under the circumstances in the conduct of [her] own affairs."[149] By its plain terms, and unlike section 315(c), section 315(b) does not limit defaults to those Events of Default defined in the Indenture.[150] Thus, the notice provision of section 315(b) is triggered by any default, meaning any "omission or failure of a legal or contractual duty."[151] As detailed above, plaintiffs have adequately alleged such defaults. Section 315(c)'s prudent person obligations are triggered upon defaults as defined by the Indentures. As discussed above, plaintiffs have adequately alleged an Indenture

---

[148]    15 U.S.C. § 77ooo(b).

[149]    *Id.* § 77ooo(c).

[150]    *See Policemen's/BofA II*, 943 F. Supp. 2d at 441.

[151]    *Id.* (citing Black's L. Dict., 9th Ed. (2009)).

Event of Default, and therefore the prudent person obligations of section 315(c) apply.

HSBC next argues that plaintiffs have not properly alleged damages under the Act. HSBC contends that the TIA requires plaintiffs to allege "actual damages," meaning out-of-pocket losses, and plaintiffs allege only diminution in the value of notes they still own.[152] Though the TIA does indeed limit plaintiffs' eventual recovery to their actual damages, nothing in this section bears on the type of damages that must be alleged in the Complaint. The method for measuring recoverable damages will be determined at a later date, as is customary in securities actions.[153] The parties have not cited any case that delineates the pleading requirements for damages under the TIA, but in securities actions alleging a violation of Section 10(b) of the Securities and Exchange Act of 1934, "'decades of precedent' . . . [hold] that plaintiffs holding shares at the time of suit 'have not been precluded from maintaining securities fraud actions.'"[154] Similarly, plaintiffs

---

[152]    *See* BR ¶¶ 509, 530–531; PL Compl. ¶¶ 465–470, 485; RP Compl. ¶¶ 157, 182.

[153]    *See LNC Invs. Inc.*, 1997 WL 528283, at *34 (discussing the TIA in relation to the "broad federal securities scheme" of which the TIA is a part).

[154]    *Varghese v. China Shenghuo Pharm. Holdings, Inc.*, 672 F. Supp. 2d 596, 611 (S.D.N.Y. 2009) (quoting *In re Royal Dutch/Shell Transport Sec. Litig.*, 404 F. Supp. 2d 605, 611 (D.N.J. 2005)).

should not be precluded from maintaining an action under the TIA, though they have failed to allege selling the notes at a loss.  If plaintiffs ultimately prevail, any recovery will certainly be limited to the actual damages plaintiffs suffered.

In sum, with regard to the Indenture Trusts, plaintiffs have adequately alleged violations of the TIA under sections 315(b) and 315(c).

### F.    Derivative Claims

HSBC argues that the *Royal Park* and *BlackRock* plaintiffs' claims should be dismissed because they are pleaded as derivative claims, instead of as direct claims.  HSBC contends that under the test articulated in *Tooley v. Donaldson, Lufkin & Jenrette, Inc.*,[155] the claims can only be brought as direct claims.  Plaintiffs respond that under *Dallas Cowboys Football Club, Ltd. v. National Football League Trust*,[156] the claims are properly brought derivatively, and the *Tooley* test does not change that result.

In *Dallas Cowboys*, I held that the claims brought by trust beneficiaries must be brought as derivative actions.  I reviewed New York law and determined that an action "must be asserted derivatively if the injury was suffered by the corporation and thus by stockholders only through dimunition in the value

---

[155]    845 A.2d 1031 (Del. 2004).

[156]    No. 95 Civ. 9426, 1996 WL 601705 (S.D.N.Y. Oct. 18, 1996).

of their shares, and directly if the injury was suffered in some fashion separately and distinctly from injury to the corporation."[157]  I also concluded that "an alleged injury that is 'equally applicable' to all shareholders gives rise to a derivative, not a direct, action."[158]

In *Tooley*, the Delaware Supreme Court clarified the test to distinguish between direct and derivative actions.  "The analysis must be based solely on the following questions: Who suffered the alleged harm — the corporation or the suing stockholder individually — and who would receive the benefit of the recovery or other remedy?"[159]  The court expressly disapproved of previous cases using the concept of "special injury" to distinguish between the two types of actions, stating that the concept was confusing and inaccurate "because a direct, individual claim of stockholders that does not depend on harm to the corporation can also fall on all stockholders equally, without the claim thereby becoming a derivative claim."[160] Instead, for a direct claim, "the court should look to the nature of the wrong and to whom the relief should go."[161]

---

[157]   *Id.* at *2.

[158]   *Id.*

[159]   *Tooley*, 845 A.2d at 1035.

[160]   *Id.* at 1037.

[161]   *Id.* at 1039.

The *Tooley* test was subsequently adopted by a New York intermediate appellate court, which found it "consistent with New York law."[162]   A federal court will follow an intermediate appellate court decision unless it "find[s] persuasive evidence that the New York Court of Appeals, which has not ruled on this issue, would reach a different conclusion."[163]  Because the *Tooley* test is consistent with New York law, it is likely that the New York Court of Appeals would follow this test.

Under both prongs of *Tooley*, plaintiffs' claims are direct, not derivative.  The first prong asks who suffered the injury.  Plaintiffs allege that HSBC breached duties running to the holders of the notes and certificates.  For example, the breaches relating to failure to give notice are duties owed to Noteholders and Certificateholders.[164]  The Agreements likewise recognize that, during an Event of Default, HSBC may "proceed to protect and enforce its rights and the rights of the Noteholders."[165]  HSBC's alleged breach of this duty,

---

[162]     *Yudell v. Gilbert*, 949 N.Y.S.2d 380, 381 (1st Dep't 2012).

[163]     *10 Ellicott Square Corp. v. Mountain Valley Indem. Co.*, 634 F.3d 112, 120 (2d Cir. 2011).

[164]     *See* BR Compl. ¶ 284 ("HSBC must also give prompt written notice to all Noteholders of Servicer Event of Defaults."); RP Compl. ¶ 184(c).

[165]     FMIC2004-3 Indenture, §§ 5.03(c), Indenture Prudent Person Clauses, Ex. 9 Chart 9 to Borden Decl.

therefore, injured the plaintiffs directly.  The second prong asks who would receive the benefit of the recovery.  Plainly, the plaintiffs themselves stand to receive the benefit.  Though any recovery would initially go to the trusts, it would simply pass through the trusts and be distributed to the Noteholders and Certificateholders — the trusts themselves would not retain any payments.

Plaintiffs principally argue, relying on *Dallas Cowboys*, that they do not assert unique injuries and that all Noteholders and Certificateholders have been equally injured.  In light of *Tooley*, this contention fails.  The court expressly rejected the "special injury" test and stated that "a direct, individual claim of stockholders that does not depend on harm to the corporation can also fall on all stockholders equally, without the claim thereby becoming a derivative claim."[166] Because plaintiffs directly suffered the injury, and because plaintiffs would receive the benefit of any recovery, the claims are direct, and plaintiffs' derivative claims are dismissed.

### G.   Consequential Damages

HSBC moves to strike the Complaints' demand for damages to the extent that they seek to recover consequential damages in the sixteen trusts with provisions specifically precluding recovery of such damages.  HSBC contends that

---

[166]    *Tooley*, 845 A.2d at 1037.

the plaintiffs seek investment losses that qualify as consequential damages because they go beyond the value of the performance promised.  However, HSBC has not cited any cases that characterize investment losses as consequential damages, and relies instead on cases that conclude that lost business profits are consequential damages that may be struck where the contract includes a limitation on such damages.  Here, HSBC's role was to protect the Trusts' assets.  The extent of what HSBC was required to do to protect those assets raises issues of fact.  As such, as this stage in the litigation, I cannot conclude as a matter of law that losses sustained by the trust assets qualify as consequential damages.  Therefore HSBC's motion to strike is denied.

### H.    Leave to Amend

Though plaintiffs have not requested it, leave to amend should be freely given "when justice so requires."[167]  Therefore, I grant plaintiffs leave to amend if they can correct the deficiencies noted in this Opinion in compliance with their obligations under Rule 11.  Any repleading must be made within thirty days of the date of this Order.

## VI.   CONCLUSION

For the foregoing reasons, HSBC's motion to strike is DENIED.

---

[167]    Fed. R. Civ. P. 15(a)(2).

50

HSBC's motion to dismiss is GRANTED in part and DENIED in part.

Specifically, HSBC's motion to dismiss is GRANTED as to: (1) *Phoenix Light*'s

claims relating to Regulation AB; (2) *Phoenix Light*'s claims relating to document

obligations with the exception of the three trusts identified in footnote 120; (3)

negligence claims; (4) negligent misrepresentation claims; (5) claims under section

315(a) of the TIA; and (6) all derivative claims.  Further, plaintiffs must take steps

to cure their lack of standing for the trusts containing Negating Clauses and

provide a status update to the Court within thirty days of the date of this Order.

The Clerk of the Court is directed to close this motion (Docket No. 26 in 14 Civ.

8175, Docket No. 42 in 14 Civ. 9366, Docket No. 15 in 14 Civ. 10101).  A

conference is scheduled for June 24, 2015 at 4:30 p.m.


                                        SO ORDERED:


                                        Shira A. Scheindlin
                                        U.S.D.J.


Dated:       June __, 2015
             New York, New York


51

**- Appearances -**

**For *BlackRock* Plaintiffs:**

Blair A. Nicholas, Esq.
Benjamin Galdston, Esq.
David R. Kaplan, Esq.
Lucas E. Gilmore, Esq.
Timothy A. Delange, Esq.
Bernstein Litowitz Berger & Grossmann LLP
12481 High Bluff Drive, Suite 300
San Diego, CA 92130
(858) 793-0070

Jeroen Van Kwawegen, Esq.
Hannah E. Ross, Esq.
Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas, 38th Fl.
New York, NY 10019
(212) 554-1400

**For *Royal Park* Plaintiffs:**

Arthur C. Leahy, Esq.
Ashley M. Robinson, Esq.
Jennifer Nunez Caringal, Esq.
Steven W. Pepich, Esq.
Robbins Geller Rudman & Dowd LLP
655 West Broadway, Suite 1900
San Diego, CA 92101
(619) 231-1058

Samuel H. Rudman, Esq.
Robbins Geller Rudman & Dowd LLP
58 South Service Road, Suite 200
Melville, NY 11747
(631) 367-7100

Christopher M. Wood, Esq.
Robbins Geller Rudman & Dowd LLP
One Montgomery Street, Suite 1800
San Francisco, CA 94104
(415) 288-4545

**For *Phoenix Light* Plaintiffs:**

David H. Wollmuth, Esq.
Melissa A. Finkelstein, Esq.
Randall R. Rainer, Esq.
Steven S. Fitzgerald, Esq.
Danielle A. D'Aquila, Esq.
William A. Maher, Esq.
Wollmuth Maher & Deutsch LLP
500 Fifth Ave., Suite 1200
New York, NY 10110
(212) 382-3300

George A. Zelcs, Esq.
Matthew Davies, Esq.
Maximilian C. Gibbons, Esq.
Korein Tillery, LLC
205 North Michigan Ave., Suite 1950
Chicago, IL 60601
(312) 641-9750

John A. Libra, Esq.
Korein Tillery, LLC
505 North 7th Street, Suite 3600
St. Louis, MO 63101
(314) 241-4844

**For Defendant:**

Andrew W. Rudge, Esq.

George A. Borden, Esq.
Kevin M. Hodges, Esq.
Vidya Atre Mirmira, Esq.
Williams & Connolly LLP
725 Twelfth Street, N.W.
Washington, DC 20005
(202) 434-5000

Michael Orth Ware, Esq.
Mayer Brown LLP
1675 Broadway
New York, NY 10019
(212) 506-2500

Jennifer M. Rosa, Esq.
Mayer Brown LLP
1999 K Street, N.W.
Washington, DC 20006
(202) 506-2500