**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ROYAL PARK INVESTMENTS SA/NV,<br><br>                          Plaintiff,<br>      v.<br><br>HSBC BANK USA, NATIONAL<br>ASSOCIATION,<br><br>                          Defendant. | **Case No. 14-CV-8175-LGS-SN** |
| BLACKROCK BALANCED CAPITAL<br>PORTFOLIO (FI), *et al.*,<br><br>                         Plaintiffs,<br>      v.<br><br>HSBC BANK USA, NATIONAL<br>ASSOCIATION,<br><br>                         Defendant. | **Case No. 14-CV-9366-LGS-SN** |

**HSBC BANK USA, N.A.'S OPPOSITION
TO PLAINTIFFS' AMENDED MOTIONS FOR CLASS CERTIFICATION**

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................1

BACKGROUND .................................................................................................................3

ARGUMENT ....................................................................................................................10

I.     Plaintiffs Fail To Meet Rule 23's Requirements of Commonality and Predominance ..........................................................................................................10

       A.     Plaintiffs' Claims Require Loan-by-Loan and Trust-by-Trust Proof ...................12

              1.     Material Breach or Event of Default ........................................................12

              2.     Actual Knowledge ....................................................................................15

              3.     Materially Different Provisions in the Agreements ...................................16

              4.     Causation and Damages ...........................................................................17

       B.     Claims Relating to Individual Investors Require Different Proof .......................17

              1.     Standing to Sue for Losses Incurred by Prior Owners..............................18

              2.     Conflicts Among Differently-Situated Investors ......................................21

              3.     Individualized Affirmative Defenses ........................................................23

II.    The Proposed Classes Are Not Ascertainable ...............................................................28

III.   Plaintiffs' Damages Models Do Not Satisfy *Comcast Corp. v. Behrend* and are Contrary to Law ................................................................................................................29

       A.     Plaintiffs' Damages Models Include a Sampling Methodology Which Courts Have Rejected ...........................................................................................30

       B.     Hartzmark's Model Is Based on Derivative Claims that the Court Dismissed and Are Inconsistent with the Remaining Liability Theories .............31

       C.     Plaintiffs' Damages Models Are Contrary to Their Theories of Causation and the Law of Proximate Cause ........................................................................33

IV.    Class Action Treatment Is Not a Superior Method of Adjudicating This Case................35

V.     Plaintiffs Cannot Adequately Represent the Proposed Classes .........................................40

       A.     Irreconcilable Intra-Class Conflicts Preclude Plaintiffs from Adequately Representing the Proposed Classes...........................................................................40

       B.     PIMCO Is Not an Adequate Representative Because It Is a Vulture Investor that Has Profited from Its RMBS Investments ......................................40

       C.     Royal Park Is Subject to Unique Defenses that Render It Unfit To Adequately Represent Its Proposed Class..................................................................43

VI.    Plaintiffs Do Not Have Standing To Represent Major Portions of the Putative Class....................................................................................................................................46

i

A.      The *BlackRock* Plaintiffs Have No Standing To Represent Investors in
        Trusts in Which They Did Not Suffer Any Loss ...................................................47

B.      Plaintiffs Have No Standing To Represent Purchasers in Other Tranches
        Backed by Different Loans ...................................................................................48

CONCLUSION ......................................................................................................................49

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Air et Chaleur, S.A. v. Janeway*, 757 F.2d 489 (2d Cir. 1985) .....................................25

*Amchem Prods., Inc. v. Windsor*, 521 U.S. 591 (1997) ..........................................36, 40

*Bd. of Trs. of S. Cal. IBEW-NECA Defined Contribution Plan v. Bank of N.Y. Mellon Corp.*, 287 F.R.D. 216 (S.D.N.Y. 2012) ........................................................36, 37

*Blackrock Allocation Target Shares: Series S Portfolio v. U.S. Bank N.A.*, 2015 WL 2359319 (S.D.N.Y. May 18, 2015) ..........................................................13

*Bluebird Partners, L.P. v. First Fid. Bank*, 896 F. Supp. 152 (S.D.N.Y. 1995), *aff'd*, 85 F.3d 970 (2d Cir. 1996) ......................................................................43

*Brecher v. Republic of Argentina*, 806 F.3d 22 (2d Cir. 2015) ..............................20, 28

*Cafferty v. Scotti Bros. Records, Inc.*, 969 F. Supp. 193 (S.D.N.Y. 1997) ...................25

*Comcast Corp. v. Behrend*, 133 S. Ct. 1426 (2013) ...........................................2, 29, 30, 32

*Dunnigan v. Metro. Life Ins.*, 214 F.R.D. 125 (S.D.N.Y. 2003) ...................................12

*Eisen v. Carlisle & Jacquelin*, 391 F.2d 555 (2d Cir. 1968), *vacated on other grounds*, 417 U.S. 156 (1974) ..................................................................................35

*Engel v. Scully & Scully, Inc.*, 279 F.R.D. 117 (S.D.N.Y. 2011) ................................36

*FHFA v. HSBC N.A. Holdings Inc.*, 33 F. Supp. 3d 455, 480 (S.D.N.Y. 2014) ...........16

*Fogarazzo v. Lehman Bros.*, 263 F.R.D. 90 (S.D.N.Y. 2009) ......................................37

*Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 903 F.2d 176 (2d Cir. 1990) .....................................................................................43

*Hunter v. Am. Gen. Life & Acc. Ins.*, 2004 WL 5231631 (D.S.C. Dec. 2, 2004) .........39

*In re Chevron U.S.A., Inc.*, 109 F.3d 1016 (5th Cir. 1997) ..........................................38

*In re Enron Corp. Sec. Litig.*, 206 F.R.D. 427 (S.D. Tex. 2002) ..................................18

*In re Literary Works in Elec. Databases Copyright Litig.*, 654 F.3d 242 (2d Cir. 2011) .........................................................................................................................40

*In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.*, 2007 WL 1791258 (S.D.N.Y. June 15, 2007) .............................................................................38

*In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.*, 209 F.R.D. 323 (S.D.N.Y. 2002) ................................................................................................36

*In re Petrobras Sec. Litig.*, 152 F. Supp. 3d 186, 193 (S.D.N.Y. 2016)........................20

*In re Sumitomo Copper Litig.*, 182 F.R.D. 85 (S.D.N.Y. 1998)....................................27

*In re U.S. Foodservice Inc. Pricing Litig.*, 729 F.3d 108 (2d Cir. 2013).....................36

*Johnson v. Nextel Commc'ns, Inc.*, 780 F.3d 128 (2d Cir. 2015) ...........................10, 39

*JPMorgan Chase Bank v. Winnick*, 228 F.R.D. 505 (S.D.N.Y. 2005) ...........................46

*Koss v. Wackenhut Corp.*, 2009 WL 928087 (S.D.N.Y. Mar. 30, 2009)........................45

*Lazard Freres & Co. v. Protective Life Ins.*, 108 F.3d 1531 (2d Cir. 1997) .................19

*Lewis v. Rosenfeld*, 138 F. Supp. 2d 466 (S.D.N.Y. 2001). ...............................24, 25

*MacNamara v. City of New York*, 275 F.R.D. 125 (S.D.N.Y. 2011)..............................18

*McDaniel v. County of Schenectady*, 2005 WL 1745566 (N.D.N.Y. July 21, 2005)...................45

*McLaughlin v. Am. Tobacco Co.*, 522 F.3d 215 (2d Cir. 2008), *abrogated on other grounds by Bridge v. Phx. Bond & Indem. Co.,* 553 U.S. 639 (2008)....................35

*Me. State Ret. Sys. v. Countrywide Fin. Corp.*, 2011 WL 4389689 (C.D. Cal. May 5, 2011) ...........................................................................................49

*Meckel v. Cont'l Res. Co.*, 758 F.2d 811 (2d Cir. 1985)...........................................5

*Mohsen v. Morgan Stanley & Co.*, 2014 WL 4593919 (S.D.N.Y. Sept. 15, 2014).....................25

*Moskowitz v. La Suisse, Societe D'Assurances sur la Vie*, 282 F.R.D. 54 (S.D.N.Y. 2012) ...........................................................................12, 23, 24

*Peak Partners, LP v. Republic Bank*, 191 F. App'x 118 (3d Cir. 2006) .........................5

*Phx. Light SF Ltd. v. U.S. Bank Nat. Ass'n*, 2015 WL 2359358 (S.D.N.Y. May 18, 2015) ...........................................................................................18, 19

*Policemen's Annuity & Benefit Fund of Chi. v. Bank of Am., N.A.*, 907 F. Supp. 2d 536 (S.D.N.Y. 2012) ...................................................................................49

*Racepoint Partners, LLC v. JPMorgan Chase Bank*, 2006 WL 3044416 (S.D.N.Y. Oct. 26, 2006) ...........................................................................................19

*Randleman v. Fid. Nat'l Title Ins.*, 646 F.3d 347 (6th Cir. 2011) .................................28

*Ret. Bd. of Policemen's Annuity & Benefit Fund of Chicago v. Bank of N.Y. Mellon*, 775 F.3d 154 (2d. Cir. 2014), *cert. denied*, 136 S. Ct. 796 (2016).................... passim

*Robinson v. Gillespie*, 219 F.R.D. 179, 185 (D. Kan. 2003) ........................................18

*Rosen v. Chrysler Corp.*, 2000 WL 34609135 (E.D. Mich. July 18, 2000) .................24

*Royal Park Invs. SA/NV v. Deutsche Bank Nat'l Trust Co.*, 2017 WL 1331288 (S.D.N.Y. Apr. 4, 2017)........................................................................................ passim

*Royal Park Invs. SA/NV v. HSBC Bank USA, N.A.*, 109 F. Supp. 3d 587, 606 (S.D.N.Y. 2015) ..............................................................................6, 12, 15, 31

*Sacred Heart Health Sys., Inc. v. Humana Military Healthcare Servs., Inc.*, 601 F.3d 1159 (11th Cir. 2010) .........................................................12, 16, 18, 23

*Semi-Tech Litig. LLC v. Bankers Tr. Co.*, 272 F. Supp. 2d 319 (S.D.N.Y. 2003), *aff'd*, 450 F.3d 121 (2d Cir. 2006) .............................................................19

*Semi-Tech Litig., LLC v. Bankers Tr. Co.*, 353 F. Supp. 2d 460 (S.D.N.Y. 2005), *aff'd per curiam*, 450 F.3d 121 (2d Cir. 2006) .........................................33, 34

*Sykes v. Mel S. Harris & Assocs. LLC*, 780 F.3d 70 (2d Cir. 2015)..............................37

*Thorn v. Jefferson-Pilot Life Ins. Co.*, 2004 WL 5745993 (D.S.C. Dec. 2, 2004), *aff'd*, 445 F.3d 311 (4th Cir. 2016).............................................................39

*U.S. Bank v. UBS Real Estate Securities Inc.*, 2016 WL 4690410 (S.D.N.Y. Sept. 6, 2016) ...............................................................................................1, 15, 30

*Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011) ..............................10, 11, 12, 35

*Warth v. Seldin*, 422 U.S. 490 (1975) ..........................................................................47

*Weiss v. La Suisse, Societe D'Assurances sur La Vie*, 226 F.R.D. 446 (S.D.N.Y. 2005) ......................................................................................................... passim

*Woori Bank v. Merrill Lynch*, 923 F. Supp. 2d 491 (S.D.N.Y. 2013), *aff'd*, 452 F. App'x 81 (2d Cir. 2013).....................................................................................24

*Wu v. Pearson Educ. Inc.*, 2012 WL 6681701 (S.D.N.Y. Dec. 21, 2012)....................17

## STATE CASES

*Bluebird Partners, L.P. v. First Fid. Bank, N.A.*, 11 A.D.3d 232 (1st Dep't 2004) ...............33, 34

*Commerce Bank v. Bank of N.Y. Mellon*, 35 N.Y.S.3d 63 (1st Dep't 2016) ...........................5, 48

*Fundamental Portfolio Advisors, Inc. v. Tocqueville Asset Mgmt., L.P.*, 7 N.Y.3d 96 (2006) ...................................................................................................25

*Glob. Fin. Corp. v. Triarc Corp.*, 93 N.Y.2d 525 (1999) ............................................24

*IKB Int'l, S.A. v. HSBC Bank USA, N.A.*, No. 654440/2015 (N.Y. Sup. Ct., N.Y. Cty.) ...................................................................................................................7

*Portfolio Recovery Assocs., LLC v. King*, 14 N.Y.3d 410 (2010) ........................24, 25

*Western & Southern Life Ins. v. HSBC Bank USA, N.A.*, No. A1501580 (Ohio Ct. Com. Pl.) ...........................................................................................................7

*White v. Farrell*, 20 N.Y.3d 487 (2013) ....................................................................32

## STATUTES

N.Y. C.P.L.R. § 202 .....................................................................................................24

New York General Obligations Law § 13-107 .................................................. passim

## OTHER AUTHORITIES

28 N.Y. Prac., *Contract Law* .....................................................................................33

Joseph A. Grundfest, Morrison, *The Restricted Scope of Securities Act Section 11 Liability, and Prospects for Regulatory Reform*, 41 J. Corp. L. 1 (2015) .............20

Manual for Complex Litigation (4th ed. 2004) ..........................................................18

Michael Lewis, *The Big Short* (2010) ....................................................................5, 26

Staff of the Senate Report, Permanent Subcommittee on Investigations, 112th Cong., *Wall Street and the Financial Crisis: Anatomy of a Financial Collapse* (2011). ...........................................................................................................26

## INTRODUCTION

These cases cannot satisfy the stringent requirements for class certification under Rule 23 for many reasons.  Under Second Circuit precedent, as recently reiterated by this Court, Plaintiffs' claims must be proved trust-by-trust and loan-by-loan.  *Ret. Bd. of Policemen's Annuity & Benefit Fund of Chicago v. Bank of N.Y. Mellon*, 775 F.3d 154, 162 (2d. Cir. 2014) ("*Retirement Board*"), *cert. denied*, 136 S. Ct. 796 (2016).  As a result, there are literally no common issues of any significance that span all 24 bellwether trusts.  And even if there were some common questions, a long list of individual issues would predominate over them.  Although these are indisputably complex cases, class action treatment is not the answer to their challenges.  The class action mechanism would only exacerbate the complexities, without offering any countervailing benefits.  This Court already has in place the best method to manage this litigation going forward: the bellwether process instituted by Judge Scheindlin, under which the parties have proceeded on a subset of 24 trusts.

The reasoning of recent decisions concerning the use of statistical sampling in residential mortgage-backed securities ("RMBS") cases shows why Plaintiffs' multi-trust classes cannot be certified.  There is now a growing consensus that sampling and extrapolation cannot establish breaches across all the loans in a single trust.  Judge Castel reached that conclusion in *U.S. Bank v. UBS Real Estate Securities Inc.*, 2016 WL 4690410, at *75 (S.D.N.Y. Sept. 6, 2016), and Magistrate Judge Netburn followed suit in denying Plaintiffs' request to employ a sample-and-extrapolate approach here, Op. & Order (Mar. 10, 2017) (Netburn, Mag. J.), *BlackRock* Doc. No. 320 ("Sampling Op.").   If the law does not permit Plaintiffs to extrapolate from a sample of loans in a trust to other loans in the same trust (and it does not), then it necessarily follows that

Plaintiffs also cannot establish HSBC's liability on a class-wide basis across 3 trusts, much less 24 (or 267) trusts.[1]

Even within each trust, individual issues predominate.  Notably, because most of the named Plaintiffs actually have profited on their investments, they claim losses incurred by *prior* owners.  The only way to establish standing to sue for such losses, however, is by proving an express assignment or by establishing the application of New York law under a fact-specific choice-of-law analysis.  This individualized determination would overwhelm any purported common issues and make it impossible even to ascertain the members of the purported classes. Judge Nathan recently denied class certification in a case against another trustee on this ground. *See Royal Park Invs. SA/NV v. Deutsche Bank Nat'l Trust Co.*, 2017 WL 1331288, *4-9 (S.D.N.Y. Apr. 4, 2017).

Another fatal flaw is that Plaintiffs' proposed models for determining class-wide damages are inconsistent with any potentially viable liability theory and thus fail under *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1433 (2013).  Both models include the sampling methodology that courts have rejected.  Another fundamental problem with these models is that they would impose damages without requiring evidence of HSBC's actual knowledge of breaches.   The *BlackRock* Plaintiffs' model also is designed for a derivative suit theory that this Court dismissed, and would ignore critical requirements of the "but-for" world and thereby produce damages without any showing of causation.

---

[1] Magistrate Judge Netburn's Sampling Opinion was not a ruling on the merits of any liability issue and does not have law-of-the-case effect.  However, the Sampling Opinion is thorough, well-reasoned, and persuasive on issues relevant to class certification, and it is consistent with the rulings of other courts on merits issues.

In addition, because of the varying positions and interests of the investors in the trusts, no named Plaintiff could adequately represent these classes.  Moreover, the dominant named Plaintiff in the *BlackRock* case, PIMCO, is an inadequate class representative because it is a vulture investor that purchased the great majority of its securities long after the financial crisis and has made a substantial profit on its investments, which it considered to be "lottery tickets" for a possible "windfall."  This atypical circumstance will render PIMCO subject to unique defenses that may not apply to other investors and disqualifies it from representing the class.  Royal Park, too, is subject to unique defenses, because it has failed to meet its discovery obligations and other responsibilities of class representation.

There are many additional reasons these cases cannot be certified as class actions, discussed more fully below.  Early in the case, Judge Scheindlin implemented a different case-management tool—a bellwether process.  Under her direction, the parties chose 24 trusts on which to proceed.  To be sure, these cases remain large even absent class treatment.  But the bellwether process, as applied to the individual claims of the named Plaintiffs, provides a manageable means to resolve these cases and is far superior to class action treatment.

## BACKGROUND

Historical Context

In the wake of the financial crisis, investors in RMBS litigated claims against many parties that originated mortgage loans or packaged and sold RMBS.  These claims included allegations that these parties breached representations and warranties ("R&Ws") concerning the loans backing the securities.  The agreements governing these securities generally provide that in case of a breach, holders of the securities may direct the trustee to "put back" the defective loan, i.e., demand that the warrantor repurchase it from the trust.  Many investors—including many of the named Plaintiffs in these actions—banded together to negotiate settlements on putback

claims.  In 2013, however, the New York Court of Appeals ruled that putback claims that had not

yet been asserted were time-barred.  Not long after, holders of RMBS began bringing suits like

these two—seeking to hold the indenture trustees liable for the losses allegedly caused by the

third parties who actually packaged the securities and made R&Ws.  In short, Plaintiffs seek to

hold trustees like HSBC liable for the very claims that Plaintiffs took no action to address and

allowed to expire.

Mortgage-Backed Securities

Securitization is a process by which financial assets (here, mortgage loans) are bundled;

interests in the resulting revenue streams are then sold to investors.  A securitization generally is

organized by a financial institution, called the "sponsor."  Each securitization trust usually

contains thousands of individual loans, typically originated by many different loan originators.

Most trusts issue multiple classes of securities—known as "tranches"—which carry

different rights.  The trust documents' definition of the priority of payments among holders is

referred to as the "waterfall."  Typically, senior tranches are first to receive any cash flow from

the underlying mortgages, and more junior tranches receive amounts that flow down the

waterfall after the senior tranches are satisfied.  Losses move in the opposite direction; they

affect junior tranches first, then impair senior tranches only if the lower tranches are

extinguished.  The 24 bellwether trusts issued hundreds of separate tranches of securities.

Mortgage-backed securities typically are marketed to large institutions or other very

sophisticated investors.  The holders in the bellwether trusts number only in the hundreds, not the

many thousands as is typical in a securities class action.  Hartzmark Rep. ¶¶ 19-24; Dalrymple

Rep. ¶¶ 19, 45-47.  Of the 274 holders identified by one of Plaintiffs' experts, Dalrymple Rep.

¶ 46, fewer than 20 appear to be individuals, and even those are hardly moms and pops—they

include ████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████ and several assorted billionaires.  Declaration

of George A. Borden ("Borden Dec.") ¶ 2.

<u>The Role of the Indenture Trustee</u>

HSBC is the indenture trustee for the trusts at issue.  An indenture trustee—a creature of

contract—is a "different legal animal" than an ordinary trustee.  *Peak Partners, LP v. Republic

Bank*, 191 F. App'x 118, 122 (3d Cir. 2006).  "Unlike the ordinary trustee, who has historic

common-law duties imposed beyond those in the trust agreement, an indenture trustee is more

like a stakeholder whose duties and obligations are exclusively defined by the terms of the

indenture agreement."  *Meckel v. Cont'l Res. Co.*, 758 F.2d 811, 816 (2d Cir. 1985).  The

indenture trustee's duties are ministerial and its compensation is correspondingly *de minimis*—in

the case of HSBC, typically $3,500 to $4,500 per year per trust.  As the Investment Committee

of one Plaintiff exemplified, investors understood that "[t]he trustee is not paid enough to stick

its neck out."  Borden Dec. Ex. 2 at 9.

While other parties to securitizations make R&Ws concerning the loans, the trustee does

not.  Nor does the trustee interact with mortgage borrowers or service the underlying loans.

Additionally, as a New York appellate court recently held, "the trustee of an RMBS . . . trust

does not have a duty to 'nose to the source'" to discover breaches by other parties.  *Commerce

Bank v. Bank of N.Y. Mellon*, 35 N.Y.S.3d 63, 65 (1st Dep't 2016) (citation omitted).  As the

contracts here reflect, RMBS trusts commonly contain provisions that, among other limitations

on the trustee's duties, (1) disclaim any duty of the trustee to investigate potential breaches;

(2) authorize the trustee to presume compliance absent actual knowledge; and (3) insulate the

trustee from expending any money (e.g., in enforcement) without assurances of indemnity from the holders of the securities.  Borden Dec. Ex. 3 (DBALT 2006-AR5 PSA § 9.2(v), (i), and (ix)) & Ex. 4 (WFMBS 2006-19 PSA §§ 7.03, 8.01-03).

The Claims

Plaintiffs claim that HSBC breached the governing agreements by failing to take action to remedy alleged breaches by other parties, principally breaches of R&Ws by various sponsors and Events of Default triggered by alleged failings by servicers.  These claims entail individual allegations of potentially thousands of unique breaches in some portion of the approximately one million individual mortgage loans backing Plaintiffs' securities.

The agreements, however, require action on HSBC's part only if it obtains actual knowledge of a breach.  *Royal Park Invs. SA/NV v. HSBC Bank USA, N.A.*, 109 F. Supp. 3d 587, 606 (S.D.N.Y. 2015); Sampling Op. at 13-16.  Some agreements do not impose any enforcement obligation on HSBC.  Even when the agreements do so, any obligation to enforce a breach is conditioned on HSBC's receipt of authorization from a specified percentage of holders (which varies by trust) and indemnification.  Moreover, any such enforcement is limited to the sole remedy available under the agreements, which is a repurchase of the specific defective loan by the warranting party.  In addition, HSBC's post-Event-of-Default standard of care is triggered only when a Responsible Officer working in HSBC's trust department has actual knowledge or written notice of an actual Event of Default.  Sampling Op. at 18.

Other Litigation by Putative Class Members

Other investors in the same securities have brought individual suits making similar allegations.  Four of these other cases are coordinated before this Court.  Two others are pending

in other courts.[2]  Even though the plaintiffs in these cases invested in many fewer trusts than are at issue here, they were nonetheless sufficiently motivated to bring individual claims.

<u>The Trusts at Issue and the Bellwether Process</u>

To address the complexity of these cases, early on Judge Scheindlin directed the parties to consider a bellwether process in which proceedings would go forward with respect to a manageable subset of the trusts at issue.  The parties jointly chose 24 trusts.  Discovery is nearing completion as to these trusts, which issued approximately 400 separate securities, and are backed by approximately 65,000 individual mortgage loans.  Many third parties were involved in the securitizations, including at least 24 individual originators and 23 separate servicers.

<u>The Named Plaintiffs</u>

The named Plaintiffs in the *BlackRock* action are 175 investment funds run by some of the largest and most sophisticated institutional investors in the world.[3]  The named Plaintiff in *Royal Park* is a type of special-purpose vehicle known colloquially as a "bad bank."  It was established in Belgium for the specific purpose of taking impaired assets off the books of a Belgian institution, Fortis Bank.  Royal Park holds securities issued by three trusts, which overlap completely with the trusts at issue in *BlackRock*.  *Compare Royal Park* Compl. ¶ 2 *with BlackRock* Am. Compl. Ex. 1.

The dominant named Plaintiff in the *BlackRock* action is PIMCO.  The PIMCO funds hold securities in 20 of the 24 bellwether trusts and are the sole Plaintiff for 11 of the 24.  In

---

[2] *IKB Int'l, S.A. v. HSBC Bank USA, N.A.*, No. 654440/2015 (N.Y. Sup. Ct., N.Y. Cty.); *Western & Southern Life Ins. v. HSBC Bank USA, N.A.*, No. A1501580 (Ohio Ct. Com. Pl.).

[3] One Plaintiff, Kore, recently dropped its claims entirely.

contrast, no other named Plaintiff in that case holds securities in more than five bellwether trusts. Virtually all of PIMCO's purchases of bellwether securities came after the financial crisis at below-par prices—indeed, PIMCO is even suing on securities it acquired after filing this suit—and they have produced $49 million in profit.  Borden Dec. Ex. 1 ("Torous Rep.") ¶ 99 & Ex. 7. PIMCO's own internal documents reveal that it believed its approach set it apart from other investors, and that it viewed its purchases of the securities as "lottery tickets" for a potential "windfall."  Borden Dec. Ex. 5 at 328:15-23; 362:9-364:4.

Other named Plaintiffs in the *BlackRock* action illustrate the variety of individual circumstances presented by putative class members.  Sealink, for example, is a "bad bank" similar to Royal Park, which exists only on paper to hold toxic assets once owned by a failed German bank (Sachsen LB).  Sealink acquired these securities knowing they had suffered "massive underlying losses," but it nonetheless paid par value for them so that it would take the loss instead of Sachsen, whose wind-down Sealink was facilitating.  Borden Dec. Ex. 6 ¶ 39.  In contrast, named Plaintiffs Aegon (a multinational insurance company headquartered in the Netherlands) and DZ Bank (the third largest bank in Germany) collectively hold only three bellwether securities, which they purchased at par in the original offerings in 2004 and 2005 and have held since then.  Torous Rep. Ex. 7.

Plaintiffs' Motions

The *BlackRock* Plaintiffs originally defined their putative class to include all current holders in the 24 bellwether trusts.  *BlackRock* Mot. at 1.  In their "renewed" motion, which they filed after Judge Nathan denied certification in *Royal Park Inv. SA/NV v. Deutsche Bank Nat'l Trust Co.*, they propose a class that would include "all individuals who purchased or otherwise acquired a beneficial interest in a security issued from the Bellwether Trusts between the date of

offering and 60 days from the final order certifying the class and who hold that beneficial interest in the security through the date of final judgment in the District Court, and who were damaged as a result of [HSBC's] alleged breaches of contract and violations of the Trust Indenture Act of 1939." *BlackRock* Renewed Mot. at 1. Royal Park defines its class to include both current and former holders of securities issued by its three trusts, all of which are among the 24 bellwether trusts. Like the *BlackRock* Plaintiffs, it, too, has revised its class definition in response to Judge Nathan's recent decision. Royal Park's new definition includes "[a]ll persons and entities who held Certificates in the Covered Trusts at any time between the date of issuance to no later than 60 days after notice of class certification and opportunity to opt-out is issued and were damaged as a result of HSBC Bank USA, N.A.'s conduct alleged in the Complaint." *Royal Park* Am. Mot. at 1.

In support of their motions, the *BlackRock* Plaintiffs have submitted an expert report by Michael Hartzmark, Ph.D., and Royal Park has submitted a report by W. Scott Dalrymple. Both assert that damages in the respective cases can be determined on a class-wide basis. Hartzmark Rep. ¶¶ 16, 71-73; Dalrymple Rep. ¶¶ 4, 49-58. Both experts, however, formed their opinions prior to this Court's Sampling Opinion. Contrary to that decision, both experts propose that other experts will choose a sample of loans from each trust and then yet other experts will "re-underwrite" the sampled loans to determine whether they were originated in breach of R&Ws or were not properly serviced. Hartzmark Rep. ¶¶ 48-50; Dalrymple Rep. ¶ 53.[4] Notwithstanding the loan-by-loan nature of the claims, the damages experts would use these results "to estimate the portion of losses attributable to uncured R&W breaches or servicing failures," Dalrymple

---

[4] In his revised expert report, Hartzmark now states alternatively that he would determine damages based on the reunderwriting of individual loans if Plaintiffs' sampling approach "were to be rejected by the Court and upheld on appeal." Hartzmark Rep. ¶¶ 51, 55, 79.

Rep. ¶ 53; *see also* Hartzmark Rep. ¶¶ 48, 78, and then extrapolate those estimates to the balance of loans in each trust.

Whether or not they use sampling, both experts assume that HSBC could have brought about repurchase of 100% of these defective loans or successfully remedied the alleged servicing failures, and could have done so with no off-setting costs (such as litigation expenses).  Torous Rep. ¶¶ 39, 43-53, 83 & Ex. 2.

Hartzmark would then model the result of pouring the amounts he attributes to past and future projected losses—without regard to whether HSBC could have recovered those amounts—over each trust's waterfall today and distribute the proceeds to current holders— irrespective of whether they held the securities at the time of the alleged breach.  Torous Rep. ¶¶ 8, 41, 60-66.  Hartzmark declines to address "but-for scenarios" of "what would have happened (and when)" if HSBC had acted as Plaintiffs assert because it would be "speculative." Hartzmark Rep. ¶ 74; Torous Rep. ¶ 43.  Dalrymple's report is too vague to qualify as a damages model, Torous Rep. ¶ 78, but he acknowledges that any such model must include a "but for" world, Dalrymple Rep. ¶ 54.

## ARGUMENT

## I.     Plaintiffs Fail To Meet Rule 23's Requirements of Commonality and Predominance

Plaintiffs bear the burden of proving that their claims meet the commonality and predominance requirements of Rules 23(a)(2) and 23(b)(3).  *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 349-50 (2011).  To establish commonality, Plaintiffs must identify issues "whose resolution will affect all or a significant number of the putative class members."  *Johnson v. Nextel Commc'ns, Inc.*, 780 F.3d 128, 137 (2d Cir. 2015).  It is not sufficient, however, for a party simply to raise common questions.  *Id.* at 138 (noting that "any competently crafted class complaint literally raises common questions" (quoting *Wal-Mart Stores*, 564 U.S. at 349)).

"What matters to class certification . . . is not the raising of common 'questions'—even in droves—but, rather the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation." *Wal-Mart Stores*, 564 U.S. at 350 (ellipsis in original).

The predominance requirement under Rule 23(b)(3) is "more stringent and far more demanding" than the commonality requirement under Rule 23(a). *Weiss v. La Suisse, Societe D'Assurances sur La Vie*, 226 F.R.D. 446, 451 (S.D.N.Y. 2005); *Johnson*, 780 F.3d at 138. "Like the commonality inquiry, a court examining predominance must assess (1) the elements of the claims and defenses to be litigated; and (2) whether generalized evidence could be offered to prove those elements on a class-wide basis or whether individualized proof will be needed to establish each class member's entitlement to relief." *Johnson*, 780 F.3d at 138 (internal quotation marks omitted). "Predominance requires a further inquiry, however, into whether the common issues can profitably be tried on a classwide basis, or whether they will be overwhelmed by individual issues." *Id.*

Plaintiffs' arguments supporting commonality and predominance are perfunctory and fail to meet their burden. According to Plaintiffs, commonality and predominance are premised on the supposition that HSBC had identical contractual obligations across the trusts and followed a common course of conduct with respect to the investors. *BlackRock* Renewed Mot. at 8-12; *Royal Park* Am. Mot. at 8-9. Plaintiffs further assert that common questions, such as whether HSBC had actual knowledge of breaches or acted prudently in response, can be answered with common proof. *BlackRock* Renewed Mot. at 19-21; *Royal Park* Am. Mot. at 14-19.

In fact, there is no common proof for Plaintiffs' claims. Proof of these claims will require evidence that is unique to each loan in each of the trusts, and dispositive issues will require different proof for individual investors within each trust. The lack of common answers to

11

any dispositive issue in this case means that Plaintiffs are unable to "affirmatively demonstrate [their] compliance" with the requirements of Rule 23.  *Wal-Mart Stores*, 564 U.S. at 350.

### A.     Plaintiffs' Claims Require Loan-by-Loan and Trust-by-Trust Proof

When individualized inquiries are necessary to resolve breach of contract claims, courts routinely hold that those claims fail to meet the requirements of commonality and predominance. *See Sacred Heart Health Sys., Inc. v. Humana Military Healthcare Servs., Inc.*, 601 F.3d 1159, 1170 (11th Cir. 2010); *Moskowitz v. La Suisse, Societe D'Assurances sur la Vie*, 282 F.R.D. 54, 74 (S.D.N.Y. 2012); *Dunnigan v. Metro. Life Ins.*, 214 F.R.D. 125, 138 (S.D.N.Y. 2003).  Here, Plaintiffs must prove each element of their claims with evidence pertaining to the specific factual circumstances of each loan and each trust, as required by Second Circuit law and recently confirmed by this Court.  *See Royal Park*, 109 F. Supp. 3d at 601 ("Certainly, at trial or summary judgment, plaintiffs must prove their claims 'loan-by-loan and trust-by-trust.'" (quoting *Retirement Board*, 775 F.3d at 162)); Sampling Op. at 8.  In particular, whether HSBC "breached its obligations under the governing agreements (thus triggering [its] duty to act) requires examining its conduct with respect to each trust.  Whether it was obligated to repurchase a given loan requires examining which loans, in which trusts, were in breach of the [R&Ws].  And whether a loan's documentation was deficient requires looking at individual loans and documents."  *Retirement Board*, 775 F.3d at 162; *see also* Sampling Op. at 9.  Importantly, HSBC may be liable for failure to act only if it had actual knowledge of the specific alleged breach.  Sampling Op. at 13-16.  Each of these elements of liability require an inquiry into specific facts relating to each individual breach.

### 1.     Material Breach or Event of Default

The existence of a breach or Event of Default is not susceptible to class-wide proof. "The repurchase remedy contemplated in [the agreements] rests on the ability of an RMBS

trustee to undertake defined, concrete measures (*i.e.*, enforce the originator's or the seller's repurchase obligation) with respect to a *specific defect*, in a *specific loan*, in a *specific trust*." Sampling Op. at 13 (emphases added); *Blackrock Allocation Target Shares: Series S Portfolio v. U.S. Bank N.A.*, 2015 WL 2359319, at *4 (S.D.N.Y. May 18, 2015) ("[T]he misconduct alleged in the Complaint must be established 'loan-by-loan and trust-by-trust'—by reference to the documents underlying each trust and loan."). Whether or not a breach occurs in one loan underlying one trust has no bearing on whether a breach has occurred in a different loan in a different trust. Consequently, the existence of breaches is not a common issue.

*Retirement Board* is dispositive of Plaintiffs' arguments. That case, like this one, included allegations of breaches of representations that the mortgage loans were underwritten consistent with the originator's underwriting guidelines. The Second Circuit explained that "the question of whether one originator . . . followed the underwriting guidelines . . . might well have had nothing to do with whether another originator . . . followed the guidelines that the defendants represented that *it* had followed." 775 F.3d at 162. Thus, "plaintiffs must establish the relevant underwriting guidelines and show that the loan breached a specific R&W." Sampling Op. at 10.

For the same reasons that sampling cannot establish breaches in unsampled loans, breaches cannot be established by class-wide proof covering 24 separate trusts. As the Second Circuit explained, "the nature of the claims in this case unavoidably generates significant differences in the proof that will be offered for each trust. Given these differences, Plaintiffs' quest to show [the indenture trustee]'s wrongdoing with respect to their own certificates does not encompass proving claims related to certificates from other trusts." *Retirement Board*, 775 F.3d at 163.

Plaintiffs rely heavily on an alleged "common course of conduct" by HSBC with respect to all trusts. *BlackRock* Renewed Mot. at 8-12; *Royal Park* Am. Mot. at 6. But even if HSBC followed the same course of action invariably, or did absolutely nothing, Plaintiffs would still have to prove whether that action or inaction was a breach of duty under the unique circumstances of each trust and loan. In *Retirement Board*, the Second Circuit adopted exactly this view:

> Whether it was obligated to repurchase a given loan requires examining which loans, in which trusts, were in breach of the representations and warranties. And whether a loan's documentation was deficient requires looking at individual loans and documents. We see no way in which answering these questions for the trusts in which Plaintiffs invested will answer the same questions for the numerous trusts in which they did not invest.
>
> We are not persuaded by Plaintiffs' arguments to the contrary. Plaintiffs claim that evidence of [the indenture trustee]'s policy of "inaction" in the face of widespread defaults will be applicable to all of the trusts at issue. But as Plaintiffs recognize, even proof that [the indenture trustee] *always* failed to act when it was required to do so would not prove their case, because they would still have to show which trusts actually had deficiencies that required [the indenture trustee] to act in the first place.

775 F.3d at 162.

The materiality of any purported R&W breach also is a loan-specific inquiry. Sampling Op. at 10. Only breaches that are material as to a specific loan trigger the repurchase obligation under the agreements. *Id.* And just as "sampling cannot reliably prove which loan defects had a material and adverse effect on the value of a particular loan," *id.*, class-wide proof cannot establish materiality within a specific trust or across 24 separate trusts.

For these reasons, there is no possible common proof that will show material breaches on a class-wide basis. Plaintiffs will have to prove each alleged material breach trust-by-trust and loan-by-loan, precluding class certification. *See Weiss*, 226 F.R.D. at 453 (concluding that the "various types of breach peculiar to [] some class members, the requirement of individualized proof on the different types of breaches, their corresponding individualized defenses, and the

14

significance of those uncommon questions, are not predominated by the fact that all plaintiff[s] have a common overarching complaint").

### 2.    Actual Knowledge

As this Court and other courts have held, it is not sufficient for Plaintiffs to prove the occurrence of breaches or Events of Default; they must also prove that a Responsible Officer working in the relevant corporate trust department of HSBC had actual knowledge of those occurrences.  *Royal Park*, 109 F. Supp. 3d at 606 ("[A]t trial or summary judgment, plaintiffs must produce proof of actual knowledge with regard to these trusts on the part of HSBC's responsible officers."); Sampling Op. at 13-16.  Just as breaches must be shown trust-by-trust and loan-by-loan, HSBC's actual knowledge of those breaches must be proved as to each specific breach.

The Sampling Opinion thoroughly explained the reasons for this conclusion.  Permitting Plaintiffs to proceed based on anything less than actual knowledge of specific breaches would be "inconsistent with the bargained-for terms of the PSAs, which limit HSBC's pre-EOD duties as trustee to the four corners of the governing agreements."  Sampling Op. at 14.  In *U.S. Bank v. UBS Real Estate Securities Inc.*, Judge Castel reached the same conclusion following a bench trial on breach of contract claims against an RMBS sponsor.  2016 WL 4690410, at *27-28 (S.D.N.Y. Sept. 6, 2016).  The court required plaintiffs to prove knowledge on "an individualized loan-by-loan basis," concluding that the "parties could have, but did not, bargain for additional remedies or a notice provision that did not turn on loan-specific knowledge."  *Id.*

And just as "[s]ampling cannot establish that HSBC had actual knowledge of specific breaches on the requisite loan-by-loan basis," Sampling Op. at 16, there is no class-wide proof that could establish HSBC's actual knowledge on such a basis.  HSBC's alleged knowledge of a specific breach in a particular loan in a particular trust, or of general problems in the industry or

15

with certain originators, does not equate to knowledge of any other specific breaches in any other

loan, whether in that same trust or in any other trust.  *See FHFA v. HSBC N.A. Holdings Inc.*, 33

F. Supp. 3d 455, 480 (S.D.N.Y. 2014) ("[K]nowledge about a general population—here, the set

of all loans generated by a particular Originator—cannot be conflated with knowledge

concerning a specific subset of that population.").  The necessity of proving knowledge as to

each breach prevents Plaintiffs from meeting the commonality and predominance requirements.

### 3.      Materially Different Provisions in the Agreements

Determining whether "HSBC failed to act with respect to the loan-specific remedies

available for a particular defect," Sampling Op. at 9, requires knowing what the contract in

question requires.  "[C]laims for breach of contract are peculiarly driven by the terms of the

parties' agreement, and common questions rarely will predominate if the relevant terms vary in

substance among the contracts." *Sacred Heart*, 601 F.3d at 1171.  Here, there are materially

different provisions in individual contracts.

To begin with, the R&Ws made by other parties were not uniform.  For example, some

PSAs include "no fraud" representations, while in other trusts "no representation or warranties

are made by the Depositor with respect to the absence or effect of fraud in the origination of any

Mortgage Loan."  Borden Dec. Ex. 7 (FHLT 2006-C PSA § 2.03(a) & Schedule IV.I.k) & Ex. 8

(WFHET 2006-2 PSA § 2.04).   And while HSBC's duties remain ministerial across the trusts,

some trusts include provisions that others do not.  For example, some trusts include an express

enforcement obligation, while other trusts do not include any language requiring the trustee to

enforce the warranting party's obligation to cure or repurchase. *See* Borden Dec. ¶ 3 & Ex. 3

(DBALT 2006-AR5 PSA § 2.3(a) (including an express enforcement provision)).  In another

permutation, the PSAs governing the WFMBS trusts require the trustee to enforce repurchase

obligations only if it receives written notice from the Master Servicer or Custodian that a

16

particular breach has not been cured.  Borden Dec. Ex. 4 (WFMBS 2006-19 PSA § 2.03).

Additionally, some PSAs define the price at which a warrantor must repurchase a defective loan

as zero for any already liquidated loan, which would preclude Plaintiffs from recovering putback

damages as to those loans.  Five of the bellwether trusts fall into this category.  Borden Dec.

Ex. 9.

These variations preclude class certification.  Not only must Plaintiffs establish facts

specific to each individual loan to show elements such as breach and knowledge, but the

significance of those facts under particular contractual provisions will depend on contractual

terms that vary.  Courts facing a "multiplicity of contracts" in putative class actions have held

"that there is no way to answer th[e] question [of defendant's liability] on a class-wide basis" and

denied certification.  *Wu v. Pearson Educ. Inc.*, 2012 WL 6681701, at \*7-8 (S.D.N.Y. Dec. 21,

2012).  That result is mandated here.

### 4.    Causation and Damages

Plaintiffs also must adduce loan-specific proof that any breaches by HSBC caused harm.

Sampling Op. at 9.  Damages, too, must be determined loan-by-loan, because the sole remedy

available under the contracts was for the warrantors to repurchase defective loans, and "all the

components of the '[Re]Purchase Price' are specific to a particular loan."  Sampling Op. at 11.

These elements of Plaintiffs' claims also are not susceptible of class-wide proof.

### B.    Claims Relating to Individual Investors Require Different Proof

The issues described above prevent the certification of any class, let alone a class that

includes multiple trusts.  Moreover, there is no basis to take the extraordinary step of certifying

24 different subclasses (based on the bellwether trusts), nor the 267 subclasses that ultimately

would be necessary if the *BlackRock* plaintiffs were permitted to proceed with a class action

across all trusts in that case.[5]  The many issues that will affect individual investors within each

trust differently will overwhelm any efficiencies that might be gained from resolving issues on a

trust-by-trust basis.

### 1.     Standing to Sue for Losses Incurred by Prior Owners

Some members of the proposed class may be proceeding as original holders of their

certificates, but others, including many named Plaintiffs (e.g., PIMCO and BlackRock), are

seeking losses incurred by prior holders of their securities.  Investors claiming losses incurred by

earlier owners must show they have the right to do so.  The fact that Plaintiffs are currently

holders is not sufficient to "establish standing as to all claims, past and present."  *Phx. Light SF*

*Ltd. v. U.S. Bank Nat. Ass'n*, 2015 WL 2359358, at *2 (S.D.N.Y. May 18, 2015).   Plaintiffs

could try to prove an express assignment of claims from a prior owner, but that would entail an

individualized inquiry in every case, which would make class certification impossible.

Plaintiffs instead pin their hopes on Section 13-107 of the New York General Obligations

Law.  That section provides that "[u]nless expressly reserved in writing, a transfer of any bond

shall vest in the transferee all claims or demands of the transferrer."  But § 13-107 cannot

---

[5] "Common sense tells us that 'the necessity of a large number of subclasses may indicate that common questions do not predominate.'"  *Sacred Heart*, 601 F.3d at 1176 (quoting Manual for Complex Litigation § 21.23 (4th ed. 2004)).  While some courts have certified up to eight subclasses, *see, e.g.*, *MacNamara v. City of New York*, 275 F.R.D. 125, 138 (S.D.N.Y. 2011), others have held that "the fact that seven subclasses are proposed tends to indicate a lack of commonality in the class as a whole."  *Robinson v. Gillespie*, 219 F.R.D. 179, 185 (D. Kan. 2003).  When courts have considered the possibility of hundreds of subclasses, they have rejected it as unmanageable.  *See, e.g.*, *In re Enron Corp. Sec. Litig.*, 206 F.R.D. 427, 451 (S.D. Tex. 2002) ("The argument that each group of notes issued pursuant to a different Registration Statement and Prospectus requires a different class or subclass and separate Lead Plaintiff would fracture this litigation into hundreds of classes or subclasses and obstruct any efficient and controlled progress.").  Subclasses also may not meet Rule 23's numerosity requirement.  Torous Rep. ¶¶ 75-76 & Ex. 4.

salvage Plaintiffs' classes, as this statute's potential application raises multiple individualized

issues that will overwhelm any common questions, even among investors in the same trust.

Every investor invoking § 13-107 must prove that the statute applies to their purchase of

the security in question.  *See Phx. Light SF Ltd. v. U.S. Bank N.A.*,  2015 WL 2359358, at *2 n.3

(S.D.N.Y. May 18, 2015) ("[P]laintiffs provide no explanation as to why this New York statute

applies to a transfer of certificates and/or claims from a German company in Germany to Irish

and Cayman companies in Ireland and the Cayman Islands.").  That issue is governed by New

York's "center of gravity" test, which considers a "spectrum of significant contacts," including

the place of contracting, place of negotiation and performance, location of the subject matter, and

the contracting parties' domicile, as to *each* transfer.  *Lazard Freres & Co. v. Protective Life

Ins.*, 108 F.3d 1531, 1539 (2d Cir. 1997).  And Plaintiffs cannot simply rely on New York law as

the law governing the PSAs themselves; they would have to show it also applies to the transfer

of rights.  *See Semi-Tech Litig. LLC v. Bankers Tr. Co.*, 272 F. Supp. 2d 319, 330 (S.D.N.Y.

2003) (holding that the law governing the indenture had "no relevance to the question whether

the contracts of sale [of notes] . . . operated to assign certain rights of action"), *aff'd*, 450 F.3d

121 (2d Cir. 2006).  The need for individualized mini-trials makes class treatment impossible.[6]

Plaintiffs admit that class members "are from all over the country . . . as well as from

outside the United States, including Europe and Asia."  Dalrymple Rep. ¶ 48.  And all these

---

[6] If there were intervening transfers of ownership between the plaintiff and whichever prior owner originally held the claim, then the Plaintiff also must show that New York law governed all of the intervening transactions.  *Racepoint Partners, LLC v. JPMorgan Chase Bank*, 2006 WL 3044416, at *5 (S.D.N.Y. Oct. 26, 2006).

holders executed trades through brokers that were potentially located in yet other jurisdictions.[7]
These permutations add up to insurmountable problems for the proposed classes.

Judge Nathan recently denied class certification in another trustee case for precisely these
reasons. *See Royal Park Inv. SA/NV v. Deutsche Bank Nat'l Trust Co.*, 2017 WL 1331288, *4-9
(S.D.N.Y. Apr. 4, 2017). She concluded that in addition to lacking any temporal limitation as
required by Second Circuit law, the proposed class faced "inherent obstacles" because of the
"'[d]ifficulty [in] establishing a particular interest's provenance.'" *Id.* at *6 (quoting *Brecher v.
Republic of Argentina*, 806 F.3d 22, 25 (2d Cir. 2015)). These obstacles include that the
securities are traded over the counter, not on any exchange; the certificates "lack unique
identifiers corresponding to individual investors' ownership interests"; and "ownership interests
likely at times [were] sold off in pieces to multiples investors and individual purchase orders
likely at times [were] filled by holdings previously acquired from multiple different sources."
2017 WL 1331288, at *6.

These problems are "especially problematic" in an RMBS trustee case, *id.* at *6, because,
unlike in a typical securities fraud case where purchasers have standing to sue whether or not
they still hold the securities, the right to sue on RMBS certificates may (or may not) transfer
when the certificates are sold or otherwise change hands, *id.* at *6-7. The court would be

---

[7] That some trades may have been reflected in book entries at the Depository Trust Company
("DTC") is irrelevant. "[The] flow of undifferentiated interests in larger fungible pools of
undifferentiated securities interests [at DTC] is different from the transfer of title associated with
a specific transaction that represents a purchase or sale of a security entitlement." Joseph A.
Grundfest, Morrison, *The Restricted Scope of Securities Act Section 11 Liability, and Prospects
for Regulatory Reform*, 41 J. Corp. L. 1, 37-38 (2015). Merely because a securities transaction is
reflected in DTC's system does not mean the law of New York applies to that transaction. *Cf. In
re Petrobras Sec. Litig.*, 152 F. Supp. 3d 186, 193 (S.D.N.Y. 2016) ("[T]he mechanics of DTC
settlement involve neither the substantive indicia of a contractual commitment necessary to
satisfy *Absolute Activist's* first prong nor the formal weight of a transfer of title necessary for its
second.").

required to conduct a two-part "individualized inquiry" as to each "relevant assignment (or assignments, if the ownership chain includes multiple links)":  First, it must apply "New York's fact-intensive 'grouping of contacts' choice-of-law framework" to determine the governing law for each assignment, and then it "would have to apply that law to determine whether claims were assigned along with the Certificates or retained by the seller." *Id*. at *7.   Because of these problems, the court ruled that Royal Park had not met its burden to show that class claims could be adjudicated "in an administratively feasible manner that does not require[] individualized hearings." *Id*. at *8.   That same conclusion applies to both cases here, since the same "inherent obstacles" apply equally to both proposed classes and the same type of "individualized inquiries" would be required in both cases.[8]

The *Royal Park* class further complicates matters, because it is defined to include former holders, leading to inevitable conflicts.  Former holders would argue that § 13-107 does not apply, and current holders would take the opposite position.  The amount of time and effort the Court would have to expend resolving these issues would far outweigh any possible efficiencies gained by class treatment.

## 2.   Conflicts Among Differently-Situated Investors

Even aside from § 13-107, the proposed classes are riddled with unresolvable intra-class conflicts.  Different investors in *Royal Park*'s putative class have different incentives to argue that HSBC breached its duties at different times in different ways.  The *BlackRock* Plaintiffs attempt to avoid these timing problems by ignoring the past (which itself is improper, *see*

---

[8] Although Judge Nathan based her decision on the threshold issue of lack of ascertainability of class membership, and therefore did not reach the issues of commonality and predominance, the logic of her ruling also shows that Plaintiffs cannot satisfy these additional requirements.

Sections III.B and III.C *infra*), but still would face conflicts between junior and senior noteholders with respect to administering any recovery in the present.

The issue of timing is especially relevant under *Royal Park*'s damages theory as described by Dalrymple. When estimating the amounts that could have been realized "but for" HSBC's alleged failures, one first needs to determine when HSBC should have taken the corrective actions. Different investors will have different preferences on that timing. *See* Torous Rep. ¶¶ 89-92 & Exs. 5-6. Because losses typically are allocated to junior noteholders first, and recoveries are generally allocated according to principal balance, junior noteholders have an incentive to argue that HSBC should have accomplished repurchase before their securities' principal balances were completely written down. Senior noteholders would benefit from proving that any breaches occurred later, after junior noteholders were wiped out and ineligible to receive any portion of the recovery. *Id*. ¶ 94. Timing of the damages allocation also would give rise to differences in future cash flows to junior and senior holders. *Id*. ¶ 93 & Ex. 6.

A similar conflict arises based on the timing of an investor's purchase. *Id*. ¶ 95. A repurchase action that occurred in 2010, for example, would only benefit noteholders who held at that time. Noteholders who held claims later would have no incentive to prove that HSBC had a duty to act at that time; they will want to prove that HSBC's obligation arose later. Conversely, noteholders who sold their claims prior to an alleged breach by HSBC have no incentive to prove claims that will not benefit them.[9]

The *BlackRock* Plaintiffs' expert purports to avoid these problems by modeling the result of pouring the amounts of losses he attributes to defective loans over the trust's waterfall today.

---

[9] The statute of limitations, discussed below, creates another intra-class conflict, as investors subject to varying limitations periods will have different incentives with regard to when they claim a particular breach occurred.

This approach is improper for the reasons discussed in Sections III.B and III.C *infra*. But in any event, Hartzmark's model would create other intraclass conflicts. Such payments could be treated as principal repayments for current certificate holders, resulting in a paydown of outstanding principal at par. Torous Rep. ¶ 60. But if the value of the holder's security is greater than the par amount, that holder would prefer not to receive such a principal repayment because that investor would lose the certificate value in excess of par—putting it at odds with other holders of different (lower value) tranches in the same trusts. *Id*. In addition, under Hartzmark's approach, junior and senior holders would have different positions with respect to whether receipt of any recovery would affect the trust's internal accounting or not. Because allocating damages without regard to those internal accounting rules could lead to windfall gains for senior certificates, this would be yet another source of potential conflict. *Id*. ¶¶ 62-65.

There is no basis for certifying a class that contains so many distinct and sometimes opposing interests. Any course of action the named Plaintiffs pursue in this litigation will inevitably benefit some members at the expense of others.

### 3.    Individualized Affirmative Defenses

When the defendant has "non-frivolous defenses to liability that are unique to individual class members, any common questions may well be submerged by individual ones." *Sacred Heart*, 601 F.3d at 1170; *see also Moskowitz*, 282 F.R.D. at 62. Courts have held that "the existence of a meritorious defense does not necessarily defeat certification," but "affirmative defenses may be considered as a factor in the class certification calculus." *Weiss*, 226 F.R.D. at 454. Here, HSBC has multiple defenses affecting both liability and damages with respect to individual investors within each trust that weigh against commonality and predominance.

23

a.     **Statute of Limitations**

Courts have denied certification when individualized inquiries are necessary to determine which limitations period applies to each class member's claim. *See Moskowitz*, 282 F.R.D. at 74; *Rosen v. Chrysler Corp.*, 2000 WL 34609135, at *12 (E.D. Mich. July 18, 2000) ("[The] statute of limitations defense here not only involves individual fact questions, but the application of varying and conflicting state limitations periods.").

In this case, to determine the applicable statute of limitations, the Court will be required to apply New York's borrowing statute, C.P.L.R. § 202. *Woori Bank v. Merrill Lynch*, 923 F. Supp. 2d 491, 495 (S.D.N.Y. 2013), *aff'd*, 452 F. App'x 81 (2d Cir. 2013); *Lewis v. Rosenfeld*, 138 F. Supp. 2d 466, 473 (S.D.N.Y. 2001). C.P.L.R. § 202 requires "courts to 'borrow' the Statute of Limitations of a foreign jurisdiction where a nonresident's cause of action accrued, if that limitations period is shorter than New York's." *Glob. Fin. Corp. v. Triarc Corp.*, 93 N.Y.2d 525, 526 (1999). For the purposes of § 202, "a cause of action accrues at the time and in the place of the injury." *Id.* at 485. "When an alleged injury is purely economic, the place of injury usually is where the plaintiff resides and sustains the economic impact of the loss." *Id.*

Here, the borrowing statute will require the Court to determine the residency of every class member, the limitations period applicable in that jurisdiction, and whether that investor's claim is time-barred. Given the geographic dispersal of potential class members, the Court would need to apply multiple states' (and countries') varying limitations periods. When the application of a statute-of-limitations defense depends on such individualized inquiries, courts have found that these issues predominate over common questions. *See Weiss*, 226 F.R.D. at 454.

Moreover, these individual inquiries will be substantially more complex for the investors proceeding on claims purportedly assigned under § 13-107. For assigned claims, the cause of action accrues where the *assignor's* claim accrued. *Portfolio Recovery Assocs., LLC v. King*, 14

24

N.Y.3d 410, 416 (2010).  So prior to conducting the necessary analysis under the borrowing statute, the Court would be required to determine when the assigned claim accrued and who held the security at that time.  This information is difficult to obtain; the *BlackRock* Plaintiffs were required to issue subpoenas to obtain just a partial list of prior holders.  *BlackRock* Doc. No. 170.

Choice-of-law provisions in the agreements will not affect the application of the borrowing statute.  *See Mohsen v. Morgan Stanley & Co.*, 2014 WL 4593919, at *5 (S.D.N.Y. Sept. 15, 2014).  The agreement at issue in *Mohsen* provided that "its enforcement will be governed by the law of the State of New York without regard to conflict of law provisions."  *Id.* The court explained, however, that under New York law, "a choice of law clause is construed as choosing only the applicable substantive law, not the applicable limitation period," which is considered procedural.  *Id.* (quoting *Cafferty v. Scotti Bros. Records, Inc.,* 969 F. Supp. 193, 203 (S.D.N.Y. 1997); citing *Portfolio Recovery Assocs.,* 14 N.Y.3d at 416).  Accordingly, the court concluded that the plaintiffs' claims would be subject to the California statute of limitations under the New York borrowing statute.  *Mohsen*, 2014 WL 4593919, at *5; *see also Lewis*, 138 F. Supp. 2d at 476 n.16 (New York substantive law applied but "for purposes of the borrowing statute, the claims accrued in Texas.").  The same analysis would apply here.

### b.    Mitigation and Waiver

Courts applying New York law "adhere to the universally accepted principle that a harmed plaintiff must mitigate damages."  *Air et Chaleur, S.A. v. Janeway*, 757 F.2d 489, 494 (2d Cir. 1985).  Plaintiffs are "obligated to take whatever reasonable actions they could to minimize their damages."  *Id.*  In addition, "[c]ontractual rights may be waived if they are knowingly, voluntarily and intentionally abandoned."  *Fundamental Portfolio Advisors, Inc. v. Tocqueville Asset Mgmt., L.P.*, 7 N.Y.3d 96, 104 (2006).

In this case, Plaintiffs allege that HSBC had knowledge of breaches and Events of Default no later than 2011 based on publically-available information.  Taking those allegations at face value, Plaintiffs had access to the same public information and were thus aware no later than HSBC of the same problems with their own investments.  In reality, the sophisticated investors who sue here had access to models and other expertise that far exceeded that available to an indenture trustee.  The PSAs granted certificateholders the right to direct the trustee to take action under specified circumstances.   If a certificateholder failed to take reasonable steps to direct HSBC to act in order to mitigate any damages arising out of an Event of Default or breach, or waived its right to do so, HSBC will have a meritorious defense as to that individual investor. This issue will have to be proven investor-by-investor.

The inclusion of ███████████ as a class member illustrates the impossibility of class certification here. ██████████████████████████████████████████████████
███████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████
██████████████████████████████████████████████████
████████████████████████████████████████████
██████████████████████████████████████████████████████
███████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████ Like many other purported class members, he would be subject to individual defenses.

Discovery also has revealed that many sophisticated investors—such as Plaintiffs here—were fully aware of the difficulties of pursuing repurchases and made conscious decisions not to do so.  For example, internal Aegon documents show that by 2011 "investment personnel deci[ded] to not pursue legal claims against banks and underwriters in bad RMBS deals." Borden Dec. Ex. 10.  Another investor who failed to mitigate damages and waived their claims is the National Credit Union Administration ("NCUA") (a plaintiff in a coordinated case but otherwise a member of both putative classes).  NCUA inherited RMBS when it liquidated five credit unions that had purchased them.  Many consultants sought to help it "mitigate losses" by assisting in making repurchase demands.  Borden Dec. Ex. 11.  NCUA was even on notice that time was "running out" on repurchase requests, and that if it did not "throw [its] hat in the ring" it would be "out of luck."  Borden Dec. Ex. 12.  But NCUA made a conscious decision not to pursue repurchases, and instead sued the sellers of the securities for fraud and the managers of the largest credit union for gross negligence for buying the securities in the first place.  Not only did NCUA choose not to pursue repurchase claims, but when it settled with one of the sellers, it promised not to pursue such claims, or even to vote in favor of any other holder's proposal to initiate a putback, for 15 trusts, including four of the bellwether trusts. Borden Dec. Ex. 13. Some other class members likely will be subject to similar defenses, but others may not be.

Although courts have held that individualized mitigation defenses, standing alone, are not sufficient to defeat the predominance requirement, *In re Sumitomo Copper Litig.*, 182 F.R.D. 85, 95 (S.D.N.Y. 1998), they are "a factor in the class certification calculus," *Weiss*, 226 F.R.D. at 454.  Here, HSBC's defenses of mitigation and waiver contribute to the multiple ways in which individualized issues predominate over common questions.

## II.      The Proposed Classes Are Not Ascertainable

Plaintiffs also cannot show that their proposed classes are sufficiently ascertainable to warrant class certification.  "A class is ascertainable when defined by objective criteria that are administratively feasible and when identifying its members would not require a mini-hearing on the merits of each case."  *Brecher v. Republic of Argentina*, 806 F.3d 22, 24-25 (2d Cir. 2015). As discussed in Section I.B.1 *supra*, the proposed class definitions fail this test because determining which holders have litigation rights will require individualized inquiries into the circumstances of each holder's transactions, including whether § 13-107 applies.  This was the basis of Judge Nathan's recent decision denying certification in *Royal Park Inv. SA/NV v. Deutsche Bank Nat'l Trust Co.*[10]

Plaintiffs have revised their proposed class definitions to address Judge Nathan's ruling, but the revisions do not solve the problems.  The *BlackRock* Plaintiffs now include an endpoint for their class of "60 days from the final order certifying the class," which Plaintiffs contend overcomes the lack of temporal limitation noted by Judge Nathan.  But whether that is true or not, the new definition does nothing to address the more significant "inherent obstacles" to ascertainability identified by Judge Nathan—in particular, the need for "individualized inquiries" to determine who holds litigation rights and thus has standing to be a member of the class.  And although Judge Nathan's decision addressed Royal Park's proposed class, which included former holders, she made clear that the same "inherent" problems "present[] hurdles even to identifying

---

[10] Both class definitions are also impermissible fail-safe classes; each expressly defines the class as only those holders "damaged as a result" of HSBC's alleged breaches.  *Randleman v. Fid. Nat'l Title Ins.*, 646 F.3d 347, 352 (6th Cir. 2011).

*current* Certificate holders."  2017 WL 1331288, at *6.  For these reasons, both motions should be denied for failure to satisfy the ascertainability requirement.[11]

### III.    Plaintiffs' Damages Models Do Not Satisfy *Comcast Corp. v. Behrend* and are Contrary to Law

In *Comcast Corp. v. Behrend*, 133 S. Ct. 1426 (2013), the Supreme Court held that in a class action, "any model supporting a plaintiff's damages case must be consistent with its liability case," and therefore "must measure only those damages attributable to that [liability] theory."  *Id.* at 1433 (internal quotation marks omitted).  Plaintiffs' damages models fail under *Comcast* because they depart from Plaintiffs' liability theories, as well as the law governing those theories, in several key respects.

Both models include a sampling methodology that courts have rejected.  Notably, although Plaintiffs' claims require proof that HSBC had actual knowledge of breaches, neither Hartzmark nor Dalrymple incorporate HSBC's knowledge into their analysis.  Indeed, both models expressly base damages on the mere presence of "defect[s]" in the underlying loans—in essence, they presume breach by HSBC flows automatically from breach by the warrantor or servicer, contrary to both the contractual language, this Court's orders, and other case law. Another fatal flaw in Hartzmark's approach, in particular, is that it is based on a derivative claim that the Court dismissed, rather than on the direct claim Plaintiffs are pressing.  Also, Hartzmark's remarkable assertion that "but-for scenarios" of "what would have happened (and when)" are not relevant, Hartzmark Rep. ¶ 74, flies in the face of the settled law governing this case and thus from any proper liability theory posited by Plaintiffs.

---

[11] Although Royal Park also has revised its class definition to include a temporal component, it does not even bother to argue that this change is sufficient to avoid the result in *Royal Park Inv. SA/NV v. Deutsche Bank Nat'l Trust Co*., which it does not even mention.

A.     **Plaintiffs' Damages Models Include a Sampling Methodology Which Courts Have Rejected**

As the Court explained in *Comcast*, "[t]he first step in a damages study is the translation of the *legal theory of the harmful event* into an analysis of the economic impact *of that event*." *Id.* at 1435 (internal quotation omitted).  Any theory of class-wide damages that "identifies damages that are not the result of the wrong" cannot be sustained.  *Id.* at 1434.  In *Comcast*, the Court reversed certification of the class because the plaintiffs' damages model included damages based on four separate theories of liability, three of which had been rejected by the district court. *Id.* at 1434.  Plaintiffs' damages models here fail for precisely the same reason—they include a sampling-and-statistical-extrapolation method which courts have rejected because it is inconsistent with the law governing Plaintiffs' claims.

Although there are differences in their approaches, Hartzmark and Dalrymple both propose models that would extrapolate from the results of re-underwriting performed by other experts on a sample of loans selected by a statistics expert.  Hartzmark Rep. ¶¶ 48-50, 75-76; Dalrymple Rep. ¶ 53.  But as Judge Castel concluded in *U.S. Bank v. UBS Real Estate Securities Inc.*, 2016 WL 4690410, at *75, sampling cannot capture the loan-by-loan nature of Plaintiffs' claims.  In the Sampling Opinion, Magistrate Judge Netburn agreed.  Plaintiffs' plan for "replacing loan-specific proof with extrapolated pool- or trust-wide breach rates ignores the Court of Appeals' requirement that breaches be proven on a loan-by-loan basis."  Sampling Op. at 9.  Additionally, sampling cannot prove whether HSBC had actual knowledge of specific breaches.  *U.S. Bank*, 2016 WL 469410, at *75.  *See also* Sampling Op. at 16 ("Sampling cannot

establish that HSBC had actual knowledge of specific breaches on the requisite loan-by-loan basis.").[12]

### B.   Hartzmark's Model Is Based on Derivative Claims that the Court Dismissed and Are Inconsistent with the Remaining Liability Theories

Plaintiffs originally attempted to plead both direct claims on behalf of investors and derivative claims on behalf of the trusts that issued the securities.  Judge Scheindlin, however, granted HSBC's motion to dismiss all derivative claims.  The Court ruled that because Plaintiffs allege that HSBC failed to perform duties owed directly to certificateholders, the claims are direct, not derivative.  *Royal Park*, 109 F. Supp. 3d at 612-13.  Yet Hartzmark's model is inconsistent with Plaintiffs' remaining direct-liability theory and instead is based on the derivative theory the Court has rejected.

The key point is that although the theory of Plaintiffs' direct claims is that HSBC gained actual knowledge of breaches "beginning in 2009 and by 2011," *BlackRock* Compl. ¶ 369; *see also Royal Park* Compl. ¶ 71, and should have acted at those times to enforce warrantors' repurchase obligations, Hartzmark has made clear that he does not propose to determine what any investor would have received had HSBC performed its allegedly required duties at the points in time when such claims arose.  Torous Rep. ¶¶ 16, 43-53.  Rather, he proposes to determine what holders would receive if the total amount he attributes to defective loans—as of now and projected into the future—were to be poured over the trusts' waterfalls *now*.  *Id.* ¶ 41.  And Hartzmark would make no effort to determine who held the securities when recoveries could

---

[12] Although Hartzmark now also suggests an alternative approach that would not employ sampling, Hartzmark Rep. ¶¶ 51, 55, 79, he apparently does not intend to resort to that approach unless the Court of Appeals rules out sampling.

have been obtained but would instead simply distribute the postulated recoveries to current holders. *Id.* ¶ 43. This approach is inappropriate for the direct claims Plaintiffs are pressing.

To illustrate the distinction, consider the difference between a class action raising a direct claim under Rule 10b-5 and a derivative suit that arises from the same underlying events. In a direct class action, based on investors' purchases in reliance on false information, the recovery must go to the investors who purchased at inflated prices in the past—even if they are no longer shareholders. Such a direct claim requires identifying the affected purchasers and determining their damages based on the amount of inflation at the time of their purchase. On the other hand, in a derivative suit, the recovery would go to the corporation itself—for the ultimate benefit of the current shareholders, whether or not they were shareholders at the time the claim arose. Shareholders who held at the time of the harm to the corporation but who no longer own their shares go uncompensated under this approach.

Hartzmark's approach here is akin to the derivative model. It does not identify the persons who owned the certificates at the time of HSBC's alleged failures. Torous Rep. ¶ 43. It does not attempt to ascertain the damages to each such investor at the time the claim arose, *id.*, even though New York law requires damages for breach of contract to be determined as of the time of breach. *White v. Farrell*, 20 N.Y.3d 487, 499 (2013). Rather, it simply takes the entire amount Hartzmark attributes to losses on defective loans and pours it over the trust's waterfall now, with the proceeds flowing exclusively to current holders—whether or not they held at the time of the allegedly wrongful conduct. Torous Rep. ¶¶ 16, 41-43. And just as in the corporate derivative model, those past holders who no longer own their certificates would be out of luck.

These facts put this case on all fours with *Comcast*. Here, Hartzmark's model is based on Plaintiffs' dismissed derivative theory rather than their direct claim, just as in *Comcast* the

plaintiffs' model included damages arising from the three liability theories the district court had rejected as well as the one it had approved.

Of course, a damages approach that would be consistent with a direct claim demonstrates the impossibility of certifying a class here.  Determining when in the past a claim arose (i.e., when HSBC learned of each specific breach and failed to act); who held the securities at the relevant time; and exactly how much the holder would have received if HSBC had acted as Plaintiffs suggest are all fact-specific determinations that cannot be made on a class-wide basis. It is much more convenient for Hartzmark to assert that the past is "not relevant."  Hartzmark Rep.  ¶ 74.  The law, however, says otherwise.[13]

### C.    Plaintiffs' Damages Models Are Contrary to Their Theories of Causation and the Law of Proximate Cause

A required element of Plaintiffs' claims for breach of contract is proximate causation of the alleged damages.  *See* 28 N.Y. Prac., *Contract Law* § 22.5.  Because the sole remedy in the event of a breach of R&Ws is the repurchase of the specific breaching loan, to prove causation Plaintiffs must show that these repurchase efforts would have succeeded, either through the warrantor's agreement to repurchase the loan or by litigation.  *See, e.g.*, *Bluebird Partners, L.P. v. First Fid. Bank, N.A.*, 11 A.D.3d 232, 234 (1st Dep't 2004) (claim against an indenture trustee is akin to a legal malpractice claim in which plaintiff must prove trustee "would have prevailed in the underlying action").  Moreover, even if litigation to enforce breaches would have been meritorious, Plaintiffs must prove that any judgment in such a case would have been collected. *See, e.g.*, *Semi-Tech Litig., LLC v. Bankers Tr. Co.*, 353 F. Supp. 2d 460, 482-87 (S.D.N.Y.

---

[13]  Royal Park's damages model falls far short of describing an acceptable class-wide damages model.  Torous Rep. ¶¶ 80-87.

2005) (but-for cause requires that "the complained-of loss would not have occurred had the defendant not committed the relevant breach"), *aff'd per curiam*, 450 F.3d 121 (2d Cir. 2006).

In recognition of these principles, the *BlackRock* Plaintiffs stated in their interrogatory responses that they intend to "eliminate[e] [from their damages] realized losses . . . that could not have been avoided by HSBC's failure to act." Borden Dec. Ex. 14 at 6. That, however, is not what Hartzmark's model does. Hartzmark proposes to ignore all of these causation requirements based on his the-past-is-irrelevant dictum. He declines to "speculate" about "what would have happened (and when)" if HSBC had acted as Plaintiffs allege it should have. Hartzmark Rep. ¶ 74.

But the law requires Plaintiffs to prove causation, and the Court cannot determine if Plaintiffs are entitled to damages without knowing "what would have happened" had HSBC acted differently. That is the definition of "but for" cause. *See Semi-Tech*, 353 F. Supp. 2d at 483-84 & n.110. For example, under a straightforward application of but-for causation, HSBC cannot be held liable for failing to recover if the breaching warrantor was bankrupt and incapable of repurchasing any defective loans. Yet Hartzmark fails to take account of such facts.

Nor does playing the "speculative" card help Hartzmark. New York courts have made clear that the required causation inquiry in a trustee case is "no more speculative than in a legal malpractice trial, where the proponent must show that the client would have prevailed in the underlying action." *Bluebird Partners*, 11 A.D.3d at 234.

It is not surprising that Plaintiffs' experts would attempt to gloss over the actual elements of Plaintiffs' claims. Determining whether any particular failing on HSBC's part caused any particular loss would be impossible on a class-wide basis. That inquiry would require weighing, among other possible factors, whether HSBC discovered the specific breach; whether the

34

warrantor would have accepted a repurchase demand; if not, whether the requisite number of holders would have authorized further action and the expense it would entail; whether that action would have succeeded; and whether the specific warranting party would have been able to satisfy a judgment. Plaintiffs' attempt to avoid these required elements in order to advance their attempt to certify a class cannot withstand the "rigorous scrutiny" this Court must give the motion. *McLaughlin v. Am. Tobacco Co.*, 522 F.3d 215, 222-27 (2d Cir. 2008) (reversing certification where, *inter alia*, causation could not be established by class-wide proof), *abrogated on other grounds by Bridge v. Phx. Bond & Indem. Co.,* 553 U.S. 639 (2008).[14]

## IV. Class Action Treatment Is Not a Superior Method of Adjudicating This Case

"Rule 23(b)(3) requires that a class action be superior to other available methods for the fair and efficient adjudication of the controversy . . . ." *Eisen v. Carlisle & Jacquelin*, 391 F.2d 555, 571-72 (2d Cir. 1968), *vacated on other grounds*, 417 U.S. 156 (1974). Here, at Judge Scheindlin's direction, the parties have established a bellwether process that provides a superior alternative to class certification. By following the bellwether process, the Court will be able to fairly and efficiently manage these cases while avoiding the problems with proceeding as a class.

Rule 23 identifies four "matters pertinent" to the issue of superiority: (1) "the class members' interests in individually controlling the prosecution or defense of separate actions"; (2) "the extent and nature of any litigation concerning the controversy already begun by or against class members"; (3) "the desirability or undesirability of concentrating the litigation of

---

[14] In addition to all the reasons discussed above that Plaintiffs' damages methodologies are fatally flawed, these models also do not account for opt-outs, in violation of Rules 23(b)(3) and 23(c)(2)(B)(v). *See Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 363 (2011) ("In the context of a class action predominantly for money damages . . . absence of notice and opt-out violates due process."). Plaintiffs' experts propose to distribute any damages award using the trusts' waterfall structure. Dalrymple Rep. ¶¶ 55, 58; Hartzmark Rep. ¶¶ 71-73. Hartzmark does not adequately address how his methodology could provide for opt-outs. Torous Rep. ¶ 67.

the claims in the particular forum"; and (4) "the likely difficulties in managing a class action." Fed. R. Civ. P. 23(b)(3)(A)-(D); *Bd. of Trs. of S. Cal. IBEW-NECA Defined Contribution Plan v. Bank of N.Y. Mellon Corp.*, 287 F.R.D. 216, 229-30 (S.D.N.Y. 2012) ("*IBEW*").

Underlying the relevant factors enumerated in the rule are two fundamental concerns that often lead courts to decide that a class action is a superior process—but neither of which applies in this case. The first is that individual claims are too small to justify proceeding on a case-by-case basis. "The policy at the very core of the class action mechanism is to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights." *Engel v. Scully & Scully, Inc.*, 279 F.R.D. 117, 130 (S.D.N.Y. 2011) (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 617 (1997)); *see also In re U.S. Foodservice Inc. Pricing Litig.*, 729 F.3d 108, 130 (2d Cir. 2013) ("[C]lass actions can be superior precisely because they facilitate the redress of claims where the costs of bringing individual actions outweigh the expected recovery."); *In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.*, 209 F.R.D. 323, 350 (S.D.N.Y. 2002) ("The most compelling rationale for finding superiority in a class action [is] the existence of a negative value suit." (internal quotation marks omitted)). In this case, however, the named Plaintiffs are claiming hundreds of millions of dollars in damages, and absent class members are likely to have claims similar in scope and likely already have decided whether or not to pursue claims.

In an analogous case involving ERISA claims against pension plan managers, the court in *IBEW* denied class certification because "the proposed class members would have a strong interest in individually controlling the prosecution of their own actions because they are sophisticated institutional investors with large claims in the millions of dollars," and "several plans have already commenced their own lawsuits against Defendants." 287 F.R.D. at 229-30.

The same is true in this case.  RMBS were not available to ordinary individual investors; the purchasers of these certificates were typically large, highly sophisticated institutions or wealthy private investors.  If these parties believed they had claims against HSBC, they would have asserted them already—as some have.  The Court need look no further than the cases deemed related to this matter:  the plaintiffs in *NCUA*, *Phoenix Light*, *Commerzbank*, and *Triaxx* all are actively pursuing claims in this Court, while others are doing so in several state courts.  None of the sophisticated investors that purchased RMBS needs these named Plaintiffs to protect their interests.

The second concern underlying the Rule 23 factors is that adjudication of individual claims might entail "a significant waste of judicial resources."  *Fogarazzo v. Lehman Bros.*, 263 F.R.D. 90, 110 (S.D.N.Y. 2009); *see also Sykes v. Mel S. Harris & Assocs. LLC*, 780 F.3d 70, 93 (2d Cir. 2015) ("[A] class action is . . . more efficient than requiring thousands of debtors to sue individually.").  Here, for all the reasons discussed in Section I *supra*, the presence of myriad individual issues means that class treatment would be no less wasteful of the Court's resources than individual suits.  *See IBEW*, 287 F.R.D. at 230 (finding class treatment not superior where "a class action could become unmanageable because of the . . . need for 'mini-trials' to resolve individual issues").  And because RMBS investors typically are large and sophisticated and have already made their litigation decisions, there is no reason to believe that denial of certification here would lead to a flood of additional individual suits.

These cases are undeniably complex.  But the complexity is not of the sort that can be remedied by class action treatment.  The loan-by-loan nature of Plaintiffs' claims cannot be papered over with a class certification order.  Whether or not a class is certified, the Court cannot avoid inquiring into each specific alleged breach; whether and when HSBC gained actual

knowledge of it; and to what extent HSBC could have recovered in enforcing the breach. Adding many other investors as class members would multiply these inevitable complexities without offering any countervailing efficiencies.

In any event, manageability is precisely the reason the Court has adopted the bellwether process here. Courts have long recognized the value of bellwether trials to resolve complex aggregate litigation that is not amenable to class treatment. As the Fifth Circuit explained in *In re Chevron U.S.A., Inc.*:

> The notion that the trial of some members of a large group of claimants may provide a basis for enhancing prospects of settlement or for resolving common issues or claims is a sound one that has achieved general acceptance by both bench and bar. . . . The reasons for acceptance by bench and bar are apparent. If a representative group of claimants are tried to verdict, the results of such trials can be beneficial for litigants who desire to settle such claims by providing information on the value of the cases as reflected by the jury verdicts. Common issues or even general liability may also be resolved in a bellwether context in appropriate cases.

109 F.3d 1016, 1019 (5th Cir. 1997); *see also In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.*, 2007 WL 1791258, at *1 (S.D.N.Y. June 15, 2007) (following *Chevron*).

The court in *MTBE* observed that "bellwether trials [are] becom[ing] more common in large actions" because they are an efficient means of proceeding when a complex case "has the potential of overwhelming the resources of a particular court." 2007 WL 1791258, at *1-2. The court in that case correctly recognized that "a defendant is not liable merely because it has been sued by a large group of plaintiffs." *Id.* at *2. Proceeding with a bellwether trial allows a court to "give the major arguments of both parties due consideration without facing the daunting prospect of resolving every issue in every action." *Id.* "A bellwether trial allows each party to present its best arguments" on the "crucial issues on which the litigation primarily turns." *Id.* Often, the resolution of these issues "facilitates settlement of the remaining claims." *Id.*

Given these advantages, courts in numerous substantive contexts have suggested bellwether trials as a superior alternative to problematic class actions.  *See Johnson v. Nextel Commc'ns Inc.*, 780 F.3d 128, 147 (2d Cir. 2015) ("[T]here is no great advantage in trying the common issues in this case as a class action.  A single bellwether trial that establishes [the defendant's] role through special interrogatories would have the same consequence as trying common issues on a class-wide basis . . . ."), *aff'd per curiam*, 205 F. App'x 177 (4th Cir. 2006); *Hunter v. Am. Gen. Life & Acc. Ins.*, 2004 WL 5231631, at *14 (D.S.C. Dec. 2, 2004) (denying class certification in part on superiority grounds and suggesting that members of the proposed class "may be able to advance a single bellwether case in which many of the issues critical to all [class-wide] claims could be resolved . . . ."); *Thorn v. Jefferson-Pilot Life Ins. Co.*, 2004 WL 5745993, at *16 (D.S.C. Dec. 2, 2004) ("Various mechanisms such as bellwether trials and the use of collateral estoppel might then serve the interests of judicial economy.  While these options would not resolve all claims in a single action, they do afford some efficiencies of scale for Plaintiffs while preserving Defendant's significant rights" to present individualize defenses.), *aff'd*, 445 F.3d 311 (4th Cir. 2016).

The Court should reach the same conclusion here.  For the reasons discussed, a class action is not a superior method of adjudication in this case.[15]

---

[15] In the unlikely event that the Court finds that common questions predominate in both these cases (which it should not, for all the reasons stated above), HSBC respectfully suggests that the two cases be consolidated for all further purposes.

## V.   Plaintiffs Cannot Adequately Represent the Proposed Classes

### A.   Irreconcilable Intra-Class Conflicts Preclude Plaintiffs from Adequately Representing the Proposed Classes

The myriad conflicts of interest between investors in these trusts discussed in Section

I.B.2 *supra* also make Plaintiffs inadequate to represent absent class members.  Indeed, the wide

range of competing incentives among putative class members makes *any* single investor

inadequate to represent the class as a whole under Rule 23(a)(4).  "[A] class representative must

be part of the class and possess the *same* interest and suffer the *same* injury as the class

members."  *Amchem*, 521 U.S. at 625-26 (emphases added).  Plaintiffs cannot adequately

represent the proposed classes if their proposed theory of liability and damages methodology do

not maximize recovery for other investors.  *Cf. In re Literary Works in Elec. Databases

Copyright Litig.*, 654 F.3d 242, 254 (2d Cir. 2011) ("Although all class members share an

interest in maximizing the collective recovery, their interests diverge as to the distribution of that

recovery because each category of claim is of different strength and therefore commands a

different settlement value.").  As explained in the Torous Report, putative class members in these

cases do not share an interest in proving the same theory of liability because a recovery for one

would come at the expense of another.  Torous Rep. ¶¶ 54-65, 86-93.  Thus, the proposed classes

are not "sufficiently cohesive to warrant adjudication by representation."  *Amchem*, 521 U.S. at

623.

### B.   PIMCO Is Not an Adequate Representative Because It Is a Vulture Investor that Has Profited from Its RMBS Investments

PIMCO is by far the dominant named Plaintiff in the *BlackRock* case; it invested in 20 of

the 24 bellwether trusts.  Torous Rep. Ex. 7.  In 11 of those trusts, it is the only named Plaintiff

investor and thus the only basis for class standing as to those trusts.  *Id.*  But PIMCO is no

standard-bearer for investors who might have actually suffered losses.  To the contrary, PIMCO

was an opportunistic vulture investor which purchased the lion's share of its securities long after

the financial crisis, at bargain prices, and has profited handsomely.  PIMCO has suffered no out-

of-pocket loss and will be subject to unique defenses.  *Id.* ¶ 99 & Ex. 7.  As a result, even if other

named Plaintiffs in the *BlackRock* action are permitted to proceed (and they should not be, for

the reasons discussed above), PIMCO must be disqualified from serving as a representative

plaintiff.  The inevitable consequence is that the trusts for which PIMCO is the only named

Plaintiff should no longer be part of the case.

PIMCO's investments in the 20 bellwether trusts comprised 25 separate securities

purchased in 44 separate transactions.  Torous Rep. ¶ 199.  The great majority of these purchases

took place after the financial crisis; only one purchase took place prior to 2008, and 37 of the 44

were in 2010 or later.  *Id.* ¶ 99 & Ex. 7.  In one instance, PIMCO is suing on a security it

purchased in March 2015, months after it brought this suit.  *Id.* Ex. 7.

In the aggregate, PIMCO's 44 purchases of bellwether securities have resulted in an out-

of-pocket gain of over $48 million.  *Id.* ¶ 99 & Ex. 7.  In only one of its 44 transactions has

PIMCO suffered (minor) out-of-pocket losses, totaling less than $80,000.  *Id.*  In that instance, its

loss was outweighed by its gain on other tranches of the same trust (SEMT 2005-2).  *Id.*

Indeed, PIMCO touted its performance as establishing key distinctions between it and

other investors.  For example, PIMCO fund manager Joshua Anderson said in an internal memo

in 2013:

> [T]he PIMCO structured credit group surpassed our peers and positioned ourselves
> to take the offensive during the crisis and ensuing years.  Our clear outperformance
> of nearly all of our peers, aggressive asset gathering, and other accomplishments
> illustrates this well.

Borden Dec. Ex. 15.  PIMCO has made clear that its strategy in investing in distressed RMBS

included its view that such securities were "mispriced" and were likely to revert to their true

value.  Borden Dec. Ex. 16 at 2.  It therefore "[r]e-entered Non-agency RMBS in 2009 when risk compensation was high."  Borden Dec. Ex. 17 at 10.  PIMCO knew full well that some of these RMBS would suffer losses and not return full principal, but invested nonetheless because PIMCO believed they were still profitable investments.  As one PIMCO analyst stated, "we're able to add significant value by looking at these underlying loans, finding the best of these mortgage-backed securities to invest in [and] buy[ing] these bonds at a substantial discount from par, around seventy-five cents on the dollar, and this enables us to get a very attractive return even if we don't get par back on these bonds."  Borden Dec. Ex. 18 at 3.

For example, consider the example of PIMCO's purchase of CUSIP 81744FAZ0, a tranche of SEMT 2004-3, in October 2011.  Torous Rep. Ex. 7.  PIMCO purchased that security at a price of 70—in other words, at a 30 percent discount from par value.  *Id.*  Since that time, PIMCO has been receiving principal and interest payments, and the price of the security has risen to 95.52.  PIMCO has profited by $300,000 on a $650,000 investment.  *Id.*

This strategy was so successful that it won the managers of PIMCO Income Fund—the specific fund that invested in multiple trusts in this case—Morningstar's award as Fixed Income Fund Manager of the year for 2013.  Borden Dec. Ex. 18 at 1.  In fact, for one bellwether security in this case (STALT 2006-1F, tranche 3A), PIMCO has earned an annual return of 17.3 percent since purchasing it in 2012.  Torous Rep. Ex. 7.

PIMCO's analysis also indicated that market prices of RMBS securities were not properly reflecting the potential benefits of putbacks against warrantors.  In 2010, a PIMCO analyst recommended buying RMBS in which PIMCO could "obtain potential windfall profits from a massive number of DQ loans which are repurchased."  Borden Dec. Ex. 5 at 328:15-23.  Indeed, in 2013, the same analyst noted that "[r]ecently there have been several instances where

42

individual non-agency MBS trusts have filed lawsuits against mortgage *originators* with the goal of compelling the *originators* to repurchase defective loans" and stated "[o]ur general view is that these lawsuits should essentially be viewed as positive net present value lottery tickets."   *Id.* at 362:9-364:4 (emphasis added).

These facts demonstrate that PIMCO is a "treasure hunter[]" that invested at discounted prices after "[m]arket forces assured that the price [] paid for certificates . . . reflected [any] diminished value," *Bluebird Partners, L.P. v. First Fid. Bank*, 896 F. Supp. 152, 157 (S.D.N.Y. 1995), *aff'd*, 85 F.3d 970 (2d Cir. 1996), and, with respect to the vast majority of the bellwether trusts, after the putback claims accrued ("by 2011," *BlackRock* Am. Compl. ¶ 369).   PIMCO is thus subject to unique defenses that render it inadequate to represent other putative class members.   *See Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 903 F.2d 176, 180 (2d Cir. 1990).   For instance, because PIMCO itself suffered little or no loss with respect to the bellwether trusts, it necessarily will attempt to rely on § 13-107 to assert the claims of prior holders who did suffer such losses.   But PIMCO is located in California and made its RMBS purchases in that state, not New York; it has no basis to assert that § 13-107 will apply to its trades.   As discussed above, determining whether § 13-107 applies is an individualized, transaction-specific inquiry that will overwhelm any common issues.   For all these reasons, PIMCO should be disqualified from serving as a class representative.

### C.   Royal Park Is Subject to Unique Defenses that Render It Unfit To Adequately Represent Its Proposed Class

Royal Park also is particularly unfit to adequately represent the class it proposes.   It is susceptible to unique defenses that arise because of the atypical circumstances of its creation and because of its adverse relationship with BNP Paribas, which is both the successor to Royal Park's assignors and a member of Royal Park's board of directors.

43

In 2008, Fortis Bank collapsed.  Borden Dec. Ex. 19 ¶¶ 46-50.  In the course of a drawn-out attempt to salvage what remained of the bank, the Belgian government brokered the sale of parts of Fortis to BNP Paribas.  *Id.*  BNP would only agree to the purchase, however, on the condition that the parties to the sale create Royal Park as a "bad bank" to take a portfolio of toxic assets off the books of Fortis.  *Id.* ¶ 52.  BNP itself selected which securities would be transferred, and it became a part-owner and Director of Royal Park.  *Id.*

Royal Park acquired the three securities at issue in this case when the portfolio was transferred from Fortis in 2009.  *Royal Park* Compl. ¶ 33.  Royal Park acquired DBALT 2006-AR5 directly from Fortis.  *Id.*  It also acquired a controlling stake in two CDO entities, Clifton and Pacific Pinnacle, which were managed by Fortis Securities.  *Id.*; Borden Dec. Ex. 20 at 405:10-19.  Clifton owned FHLT 2006-C and Pacific Pinnacle owned WFHET 2006-2.  Borden Dec. Ex. 21 at 5.  In 2010, Royal Park exercised it power as controlling noteholder to order those CDO entities to liquidate, and it acquired direct ownership of FHLT 2006-C and WFHET 2006-2 in the liquidation process.  *Royal Park* Compl. ¶ 33.

Royal Park, by its own admission, made no effort at the time of these events to collect documents from Fortis relevant to these securities, despite the fact that it now argues (for obvious reasons) that all parties involved intended to assign litigation rights at that time.  Borden Dec. Ex. 20 at 43:11-44:8, 327:8-23, 331:3-14.  Instead, it made only a very limited collection of documents necessary for the future management of the assets.  *Id.*  Crucially, it collected documents only from Fortis in Brussels, not from Fortis Securities.  *Id.* at 325:10-16; 328:22-329:2.  As a result, Royal Park cannot make an adequate production of documents in this case for two of the three trusts at issue.  Royal Park itself recognized this as a serious problem prior to filing this lawsuit.  Borden Dec. Ex. 22 at 4. ("[I]t is almost 100% certain that Fortis Bank will

be subpoenaed by the US court, later in the process, to deliver, not only the RPI requested information and documentation, but all emails and reports made by each individual, existing or former employees, directly or indirectly linked to the Fortis Bank NY operations.").

When Royal Park initiated litigation related to its RMBS portfolio, it knew that the documents it collected were insufficient, so it began requesting additional documents from BNP. Borden Dec. Ex. 20 at 332:2-333:4; Ex. 23 at 3.  BNP provided some documents but refused to provide others.  Borden Dec. Ex. 20 at 334:15-336:1.  That was not the only point of dispute, however.  BNP also claimed that it had the right to directly collect proceeds from class action settlements related to RMBS in Royal Park's portfolio.  Borden Dec. Ex. 24 at 2.  In other words, BNP did *not* take the position that it had transferred all litigation rights to Royal Park.

Ultimately, Royal Park sued BNP in Belgium on November 20, 2012.  Borden Dec. Ex. 25.  The end result was a settlement agreement that provided Royal Park with a limited set of documents in exchange for releasing BNP from any further obligation.  Borden Dec. Ex. 26. Thus, prior to filing this lawsuit in 2014, Royal Park knew that it had signed away its right to obtain any further documents from BNP.  Nevertheless, it moved forward with this litigation, knowing that it could not meet its discovery obligations and that its failure to produce all relevant documents may deny defendants access to materials important to their defense.

These issues raise numerous problems with Royal Park's representation of the proposed class.  "Courts have . . . found class representatives inadequate when they have exhibited a disregard or inability to comply with discovery requests."  *Koss v. Wackenhut Corp.*, 2009 WL 928087, at *7 (S.D.N.Y. Mar. 30, 2009); *see also McDaniel v. County of Schenectady*, 2005 WL 1745566, at *3 (N.D.N.Y. July 21, 2005) (holding that failure to meet discovery obligations "strongly intimates that the class representation is inadequate").  Royal Park fails on this count.

45

When a plaintiff is suing on assigned claims, as Royal Park is here, it has an affirmative obligation to collect all relevant documents from its assignors. *JPMorgan Chase Bank v. Winnick*, 228 F.R.D. 505, 507 (S.D.N.Y. 2005). Yet Royal Park deliberately took steps that prevented it from meeting that obligation—first, it failed to collect all relevant documents when it had the opportunity in 2009, and then it signed away its rights to collect documents from BNP after the 2012 settlement. Royal Park thus put itself in a position where it has directly defied discovery orders from this Court for over a year.[16]

Moreover, Royal Park was not forthcoming either with HSBC or the Court. It never disclosed the highly relevant facts about the Belgian litigation settlement or its repeated statements to BNP that these documents would be relevant to this litigation. Instead, it took the untenable position that *Winnick* did not apply and that BNP's documents are not relevant. HSBC only learned about the Belgian litigation because it came to light in a motion for sanctions against Royal Park in another case. Royal Park's conduct demonstrates that it falls far short of its obligations to conduct discovery in a manner befitting a class representative.

## VI. Plaintiffs Do Not Have Standing To Represent Major Portions of the Putative Class

Even if the Court certifies a class (and it should not for all the reasons discussed above), the law of standing requires that the class be substantially narrowed. The *BlackRock* Plaintiffs lack standing to assert claims in eleven trusts as to which they have suffered no losses. Also,

---

[16] Under *Winnick*, this Court ordered Royal Park in December 2015 to produce documents from BNP. *Royal Park* Doc. No. 89. More than fifteen months later, at the end of fact discovery and after HSBC has deposed Royal Park's key witnesses, Royal Park made a limited production of documents that was entirely inadequate to cure their former non-compliance with the order, because the production was the result of wholly inadequate search terms. HSBC raised the issue before Judge Netburn, who confirmed the inadequacy of the search terms and ordered Royal Park to produce additional documents. Borden Dec. Ex. 27 at 35:10-36:12. As of this filing, Royal Park has not represented to HSBC whether it will comply with Judge Netburn's Order.

both the *BlackRock* Plaintiffs and Royal Park lack standing to assert claims on behalf of absent

class members who invested in securities of the same trust that are backed by different loans.

> A.    The *BlackRock* Plaintiffs Have No Standing To Represent Investors in Trusts
>        in Which They Did Not Suffer Any Loss

Under Second Circuit law, a plaintiff has class standing only when its own actual injury

"implicates the same set of concerns as the conduct alleged to have caused injury to other

members of the putative class by the same defendants." *Retirement Board*, 775 F.3d at 161

(internal quotation marks omitted).  In the specific context of RMBS litigation against a trustee,

the Second Circuit has ruled that investors in one trust do not share the "same set of concerns" as

investors in other trusts and therefore have no class standing to represent them.  *Id.* at 162-63.

The court reasoned that because a trustee's alleged failures "must be proved loan-by-loan and

trust-by-trust," a plaintiff who purchased in one trust does not have a sufficiently "concrete

stake" in proving the claims of purchasers in other trusts to be granted standing to represent those

other purchasers.  *Id.*  Because the type of claims asserted here trust-by-trust and loan-by-loan

proof, the named Plaintiffs' standing to address losses suffered on certificates they purchased

"does not encompass proving claims related to certificates from other trusts."  *Id.*

The upshot of *Retirement Board* is that even if a class could be certified here (and it

cannot be, for the reasons noted above), any class would have to be limited to trusts in which a

named Plaintiff suffered a loss.  If no named Plaintiff has suffered a loss—an "actual injury"—

on its investment in a trust, no Plaintiff has standing to represent others who might have suffered

losses on investments in that trust.  *See, e.g.*, *Warth v. Seldin*, 422 U.S. 490, 498-99 (1975).

Although at least one named *BlackRock* Plaintiff invested in each of the 24 bellwether

trusts, the securities owned by the named *BlackRock* Plaintiffs in 11 of those trusts have not

incurred any realized principal loss nor are projected to incur any future loss.  Torous Rep. ¶ 100

47

& Ex. 8.  In short, no past or current holder of these securities has lost (or is expected to lose) a

penny of principal.  *Id.*  As a result, these trusts cannot be included as part of a certified class.

### B. Plaintiffs Have No Standing To Represent Purchasers in Other Tranches Backed by Different Loans

Each investor purchased a specific "tranche" of securities backed by a specific group of

loans.  Under the reasoning of *Retirement Board* (which was decided at the motion to dismiss

stage, not the class certification stage), a Plaintiff may not represent a class consisting of

purchasers of other tranches not backed by the same loans as Plaintiffs' tranche.  Twelve of the

24 bellwether trusts include tranches that are backed by different loans from those backing the

tranches in which Plaintiffs purchased.  Therefore, Plaintiffs could not represent purchasers in

those other tranches that are backed by different loans.

In *Retirement Board*, the Second Circuit held that purchasers of securities issued by one

trust have no class standing to represent purchasers in another trust because of the "loan-by-loan

and trust-by-trust" nature of the claims.  775 F.3d at 162.  The Second Circuit's reasoning easily

extends to the issue here—the standing of purchasers of one tranche within a trust to represent

purchasers of other tranches backed by other loans.  The key point is the "loan-by-loan" nature

of Plaintiffs' claims.  HSBC's alleged failures were at the loan-by-loan level—alleged failures to

obtain repurchase of specific loans that violated R&Ws, or to take some other (undefined) action

with respect to the servicing of specific loans.[17]  Proving a breach of HSBC's duties as to a loan

backing one tranche "unavoidably generates significant differences in the proof," *Retirement*

*Board*, 775 F.3d at 163, from proving a breach as to another loan backing another tranche.

---

[17] Of course, the trusts' governing agreements do not charge HSBC with the duty to oversee
servicers.  *See Commerce Bank*, 35 N.Y.S.3d at 65 (indenture trustees do not have duty "to
monitor other parties").

Therefore, just as a purchaser of one trust lacks a "concrete stake" in proving breaches in another trust, so does a purchaser of one tranche backed by one group of loans lack a concrete stake in proving breaches in other tranches of the same trust backed by other loans.

As Judge Forrest held in another putative class action against an RMBS trustee, when investments "are backed by different loans," allegations against the trustee with respect to those investments raise "'concerns' [that] would be varied—not the 'same,'" as required by Second Circuit case law. *Policemen's Annuity & Benefit Fund of Chi. v. Bank of Am., N.A.*, 907 F. Supp. 2d 536, 547-50 (S.D.N.Y. 2012) (concluding that any "diminution in value of loans in Loan Groups 1 or 2 could only (potentially) affect the value of tranches tied to one of those two loan groups"). Likewise here, the unavoidable conclusion is that a purchaser in one tranche lacks standing to represent purchasers in other tranches not backed by the same loans.

With respect to the *BlackRock* Plaintiffs, these limitations apply to 12 of the bellwether trusts. Torous Rep. ¶¶ 69-72 & Ex. 3.[18] As for Royal Park, these limitations apply to one of the three trusts on which it sues. *See id.* ¶¶ 95-97.

## CONCLUSION

For the reasons stated above, Plaintiffs' motions for class certification should be denied.

---

[18] Plaintiffs may respond that they have class standing to represent (1) investors in the same tranches in which Plaintiffs invested; *and* (2) investors in tranches that are cross-collateralized with Plaintiffs' tranches. However, the fact that certain trusts' contractual provisions provide for the possibility of cross-collateralization (i.e., under limited specified circumstances, the proceeds of loans in one loan group may be used to satisfy obligations to investors in tranches backed by other loan groups) is insufficient to confer class standing on Plaintiffs for investors in cross-collateralized tranches because Plaintiffs have offered no evidence that any cross-collateralization occurred. *See Me. State Ret. Sys. v. Countrywide Fin. Corp.*, 2011 WL 4389689, at *7 (C.D. Cal. May 5, 2011) (holding that the plaintiffs lacked class standing to represent investors in cross-collateralized tranches because such cross-collateralization "would never be triggered if the loans underlying their own tranche paid out sufficiently" and thus "[i]t is . . . speculative to conclude that any injury to one tranche will necessarily result in injury to a different tranche").

Dated: May 19, 2017                    By:    /s/ *George A. Borden*

George A. Borden
Kevin M. Hodges (*pro hac vice*)
Andrew W. Rudge  (*pro hac vice*)
Edward C. Reddington (*pro hac vice*)
Vidya Atre Mirmira (*pro hac vice*)
Eric C. Wiener (*pro hac vice*)
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, DC 20005
Telephone: (202) 434-5000
Facsimile: (202) 434-5029
gborden@wc.com
khodges@wc.com
arudge@wc.com
ereddington@wc.com
vmirmira@wc.com
ewiener@wc.com

*Counsel for HSBC Bank USA, N.A.*